ENRON CORP., *et al.*
Debtors-in-Possession,
By Special Litigation Counsel,
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366
H. Lee Godfrey (*Pro Hac Vice* Pending)
Kenneth S. Marks (KSM-7050)
Mary Kathryn Sammons (*Pro Hac Vice* Pending)
Eric J. Mayer (EJM-1744)

TOGUT, SEGAL & SEGAL LLP,
Bankruptcy Co-Counsel to
ENRON CORP., *et al.*,
Debtors-in-Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)
Richard K. Milin (RM-7755)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                :

| | |
|---|---|
| **In re** : | **Chapter 11** |
| : | **Case No. 01-16034 (AJG)** |
| **ENRON CORP., *et al.*,** : | |
| : | **Jointly administered** |
| **Debtors.** : | |
| : | |

———————————————————— x
                                :

| | |
|---|---|
| **ENRON CORP. and ENRON NORTH** : | |
| **AMERICA CORP.,** : | |
| : | |
| **Plaintiffs,** : | |
| : | **Adversary Proceeding** |
| **v.** : | **No. 03 - _____ (AJG)** |
| : | |
| **CITIGROUP INC.; CITIBANK, N.A.;** : | |
| **CITIGROUP GLOBAL MARKETS, INC.** : | |
| **(formerly Salomon Smith Barney, Inc.);** : | |
| **CITICORP NORTH AMERICA, INC.;** : | |
| **CITICORP VENDOR FINANCE, INC.;** : | |

**DELTA ENERGY CORPORATION;** :
**SALOMON BROTHERS HOLDING** :
**COMPANY, INC.;CXC INCORPORATED;** :
**J.P. MORGAN CHASE & CO.;** :
**JP MORGAN CHASE BANK (formerly** :
**Chase Manhattan Bank);MAHONIA** :
**LIMITED; MAHONIA NATURAL GAS** :
**LIMITED; STONEVILLE AEGEAN** :
**LIMITED; JP MORGAN SECURITIES INC.;** :
**CANADIAN IMPERIAL BANK OF** :
**COMMERCE; CIBC WORLD MARKETS** :
**CORP. (formerly known as CIBC Corp.);** :
**CIBC CAPITAL CORPORATION;** :
**CIBC WORLD MARKETS plc; CIBC** :
**CAPITAL PARTNERS; CIBC, INC.;** :
**BARCLAYS BANK PLC; COLONNADE** :
**LIMITED; BARCLAYS PLC;** :
**BARCLAYS CAPITAL, INC.;** :
**MERRILL LYNCH & CO., INC.;** :
**MERRILL LYNCH, PIERCE, FENNER &** :
**SMITH INC.; MERRILL LYNCH CAPITAL** :
**SERVICES, INC. MERRILL LYNCH** :
**JAPAN SECURITIES CO. LTD.;** :
**DEUTSCHE BANK AG; DEUTSCHE BANK** :
**TRUST COMPANY AMERICAS;** :
**DEUTSCHE BANK SECURITIES INC.;** :
**DEUTSCHE BANK LUXEMBOURG, S.A.;** :
**DEUTSCHE BANK TRUST COMPANY** :
**DELAWARE; DEUTSCHE BANK TRUST** :
**CORP. (formerly known as Bankers Trust** :
**New York Corp.); DEUTSCHE TRUSTEE** :
**COMPANY LTD.; BANKERS TRUST** :
**INTERNATIONAL PLC; YOSEMITE** :
**SECURITIES TRUST I; SUNDANCE** :
**INDUSTRIAL PARTNERS L.P.; CAYMUS** :
**TRUST; PONDEROSA ASSETS, L.P.;** :
**SUNDANCE ASSETS, L.P.; RAWHIDE** :
**INVESTORS L.L.C; BESSON TRUST; and** :
**JGB TRUST,** :
 :
 **Defendants.** :
_____x

# DEBTORS' COMPLAINT FOR THE AVOIDANCE AND
# RETURN OF PREFERENTIAL PAYMENTS AND FRAUDULENT TRANSFERS,
# EQUITABLE SUBORDINATION, AND DAMAGES, TOGETHER WITH
# OBJECTIONS AND COUNTERCLAIMS TO CREDITOR DEFENDANTS' CLAIMS

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        (1)    Enron Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        (2)    Enron North America Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The Bank Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (1)    The Citigroup Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (2)    The JP Morgan Chase Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        (3)    The CIBC Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        (4)    The Barclays Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        (5)    The Merrill Lynch Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        (6)    The BT/Deutsche Bank Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        (7)    The Bank Defendants' Proofs of Claim . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    Additional Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    Enron Insiders And The Bank Defendants Together Contributed To
        Enron's Collapse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.    The Insiders Were Enron Officers With Power and Authority,
            Motivated by Greed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            a.    Fastow, Causey, McMahon, and Glisan caused Enron
                to enter into the improper SPE transactions, and
                ensured they were also improperly reported. . . . . . . . . . . . . . . 18

            b.    Causey and Maxey caused Enron to enter into improper
                tax transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

c.     Fastow and Kopper orchestrated (and profited from) the scheme through SPEs they managed . . . . . . . . . . . . . . . . . . . 20

d.     The Insiders benefitted from their improper conduct . . . . . . . . 20

e.     The Insiders are being held accountable . . . . . . . . . . . . . . . . . . 21

2.     The Bank Defendants Were Essential To The Scheme and Were Also Motivated By Greed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.     How The Scheme Worked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.     Enron embraced mark to market accounting and trading. . . . . . 23

b.     Enron's credit rating became vitally important. . . . . . . . . . . . . . 25

c.     The Insiders knew how the rating agencies determined Enron's credit rating. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

d.     The Insiders engaged in a scheme that used SPEs improperly to prop up Enron's credit rating. . . . . . . . . . . . . . . . 29

(1)     The Insiders applied accounting techniques improperly to four types of transactions. . . . . . . . . . . . . . . . . . . . . . . 31

(2)     The Enron prepay transactions were loans improperly disguised as commodity trades. . . . . . . . . . . 33

(3)     The Insiders used FAS 140 transactions improperly to hide and move debt off Enron's balance sheet and to increase cash flow. . . . . . . 39

(4)     The Insiders used minority interest transactions improperly to hide debt. . . . . . . . . . . . . . . . . . . . . . . . . . 43

(5)     The Insiders used tax transactions improperly to generate paper income. . . . . . . . . . . . . . . . . . . . . . . . 45

e.     The scheme gave Insiders and the Bank Defendants time and opportunity to profit at Enron's expense . . . . . . . . . . . . . . . 47

(1)     In late 1997, Fastow and Kopper formed Chewco . . . . . . 48

(2)     In 1999, Fastow and Kopper Expanded Their Scheme by Creating the LJM Partnerships . . . . . . . . . . . 49

        (3)     In 1999, The Bank Defendants Facilitated
Fastow and Kopper By Becoming LJM2
Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   f.    Enron's outside directors were unaware of the scheme. . . . . . . 54

4.   The Bank Defendants Knowingly Participated In Manipulating And
Misstating Enron's Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . 56

   a.    Citigroup knowingly assisted the Insiders
in misstating Enron's financial condition. . . . . . . . . . . . . . . . . . . 56

        (1)     Citigroup's relationship with Enron . . . . . . . . . . . . . . . . 60

        (2)     The Citigroup prepays . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        (3)     The Minority Interest transactions . . . . . . . . . . . . . . . . . 72

              (i)     Nighthawk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

              (ii)    Nahanni . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

        (4)     The Forest Products transactions . . . . . . . . . . . . . . . . . . 77

        (5)     Citigroup offloaded its Enron exposure. . . . . . . . . . . . . . 83

        (6)     Citigroup revised its structured finance policies. . . . . . . . 84

   b.    Chase knowingly assisted the Insiders
in misstating Enron's financial condition. . . . . . . . . . . . . . . . . . . 86

        (1)     Chase's relationship with Enron . . . . . . . . . . . . . . . . . . 88

        (2)     the Chase prepay transactions . . . . . . . . . . . . . . . . . . . . 89

              (i)     Payments or transfers during the
ninety-day period prior to bankruptcy . . . . . . . . 98

        (3)     FAS 140 transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

              (i)     Hawaii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

              (ii)    Fishtail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

   c.    Barclays knowingly assisted the Insiders in
misstating Enron's financial condition. . . . . . . . . . . . . . . . . . . . 103

(1)     Barclay's relationship with Enron . . . . . . . . . . . . . . . . . 104

(2)     J.T. Holdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

(3)     Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

(4)     $SO_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

       (a)     The September transaction . . . . . . . . . . . . . . 109

       (b)     The October transaction . . . . . . . . . . . . . . . . 112

       (c)     Economic Reality and Allocation of Risk
in the $SO_2$ Transaction . . . . . . . . . . . . . . . . . . . 114

(5)     Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

(6)     Prepays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

d     BT/Deutsche Bank knowingly assisted the Insiders
in misstating Enron's financial condition. . . . . . . . . . . . . . . . 117

(1)     BT/Deutsche Bank's  relationship with Enron . . . . . . . 118

(2)     The tax transactions . . . . . . . . . . . . . . . . . . . . . . . . . . 119

       (a)     Steele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

       (b)     Cochise . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

       (c)     Teresa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

       (d)     Tomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

       (e)     Renegade and Valhalla . . . . . . . . . . . . . . . . . . 126

(3)     BT/Deutsche Bank attempts to reduce its
Enron exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

e.     CIBC knowingly assisted the Insiders in
misstating Enron's financial condition. . . . . . . . . . . . . . . . . . 128

(1)     CIBC's relationship with Enron . . . . . . . . . . . . . . . . . . 129

(2)     FAS 140 transactions . . . . . . . . . . . . . . . . . . . . . . . . . 130

       (a)     The 1998 FAS 140 transactions . . . . . . . . . . . 131

(b)    The 1999 FAS 140 transactions . . . . . . . . . . . . 132

(c)    The 2000 FAS 140 transactions . . . . . . . . . . . . 133

f.    Merrill Lynch knowingly assisted the Insiders
in misstating Enron's financial condition. . . . . . . . . . . . . . . . 134

(1)    Merrill Lynch's relationship with Enron . . . . . . . . . . 139

(2)    Nigerian Barge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

(3)    1999 electricity trade . . . . . . . . . . . . . . . . . . . . . . . . 143

(4)    LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

5.    The Bank Defendants' Participation in the Insiders' Scheme Caused
Substantial Loss to Enron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

V.    CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

A.    COUNTS 1-5 (Against Citigroup Defendants) . . . . . . . . . . . . . . . . . . . . . . . 148

COUNT 1 (Avoidance of Preferential Transfers Related to the
Citi Preferential Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

COUNT 2 (Avoidance of Fraudulent Transfers Related to the
Citi 548 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

COUNT 3 (Avoidance of Fraudulent Transfers Related to the
Citi 544 Transfers Under Section 544 of the Bankruptcy Code
and Applicable State Fraudulent Conveyance or Fraudulent
Transfer Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

COUNT 4 (Recovery of Avoided Transfers Related to the
Citi Preferential Transfers, the Citi 548 Transfers, and
the Citi 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

COUNT 5 (Disallowance of Claims Under Section 502(d) of
the Bankruptcy Code; Against Citigroup, Citibank, SSB, Delta,
Yosemite I Trust, Sundance Industrial, Salomon Holding,
Ponderosa, Sundance, Rawhide, CXC, and Caymus Trust) . . . . . . . . . . . . . 154

B.    COUNTS 6-19 (Against JP Morgan Chase Defendants) . . . . . . . . . . . . . . . . . 155

COUNT 6 (Avoidance of Preferential Transfers Related to the
Mahonia Commodity Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

COUNT 7 (Avoidance of Fraudulent Transfers Related to
the Mahonia Commodity Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

COUNT 8 (Avoidance of Fraudulent Transfers Related to
the Mahonia Commodity Transfers Under Section 544 of
the Bankruptcy Code and Applicable State Fraudulent Conveyance
or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

COUNT 9 (Avoidance of Preferential Transfers Related to
Chase Principal and Interest Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

COUNT 10 (Avoidance of Fraudulent Transfers Related to
the Chase Principal and Interest Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . 162

COUNT 11 (Avoidance of Fraudulent Transfers Related to
the Chase Principal and Interest Transfers Under Section 544
of the Bankruptcy Code and Applicable State Fraudulent
Conveyance or Fraudulent Transfer Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

COUNT 12 (Avoidance of Preferential Transfers Related to the
Purported Margin Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

COUNT 13 (Avoidance of Fraudulent Transfers Related to the
Purported Margin Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

COUNT 14 (Avoidance of Fraudulent Transfers Related to the
Purported Margin Transfers Under Section 544 of the Bankruptcy
Code and Applicable State Fraudulent Conveyance or Fraudulent
Transfer Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

COUNT 15 (Avoidance of Preferential Transfers Related to the
Chase Preferential Fee Transfer) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

COUNT 16 (Avoidance of Fraudulent Transfers Related to the
Chase Structuring Fee Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

COUNT 17 (Avoidance of Fraudulent Transfers Related to the
Chase 544 Transfers Under Section 544 of the Bankruptcy Code
and Applicable State Fraudulent Conveyance or Fraudulent
Transfer Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

COUNT 18 (Recovery of Avoided Transfers Related to the
Mahonia Commodity Transfers, the Chase Principal and Interest
Transfers, the Purported Margin Transfers, the Chase Preferential
Fee Transfer, the Chase Structuring Fee Transfers, and the Chase
544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

COUNT 19 (Disallowance of Claim Under Bankruptcy Code
Section 502(d); Against JP Morgan Chase, Mahonia, and
Stoneville Aegean) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

C.     COUNTS 20-24 (Against CIBC Defendants) . . . . . . . . . . . . . . . . . . . . . . . . 175

COUNT 20 (Avoidance of Preferential Transfers Related to
CIBC Hawaii Preferential Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

COUNT 21 (Avoidance of Fraudulent Transfers Related to the
CIBC 548 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

COUNT 22 (Avoidance of Fraudulent Transfers Related to the
CIBC Transfers Under Section 544 of the Bankruptcy Code and
Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) . . . . . . 178

COUNT 23 (Recovery of Avoided Transfers Related to the CIBC
Hawaii Preferential Transfers, the CIBC 548 Transfers, and the
CIBC 544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

COUNT 24 (Disallowance of Claim Under Bankruptcy Code
Section 502(d); Against CIBC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

D.     COUNTS 25-38 (Against Barclays Defendants) . . . . . . . . . . . . . . . . . . . . . . . 181

COUNT 25 (Avoidance of Preferential Transfers Related to the
Barclays Preferential Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

COUNT 26 (Avoidance of Fraudulent Transfers Related to
Barclays 548 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

COUNT 27 (Avoidance of Fraudulent Transfers Related to the
Barclays 548 Transfers Under Section 544 of the Bankruptcy Code
and Applicable State Fraudulent Conveyance or Fraudulent Transfer
Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

COUNT 28 (Recovery of Avoided Transfers Related to the Barclays
Preferential Transfers, the Barclays 548 Transfers, and the Barclays
544 Transfers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

COUNT 29 (Turnover of Property of the Estate) . . . . . . . . . . . . . . . . . . . . . . 187

COUNT 30 (Violation of Automatic Stay) . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

COUNT 31 (Invalid and Avoidable Non-Mutual Setoffs) . . . . . . . . . . . . . . . 189

COUNT 32 (Recovery of Invalid and Avoidable Non-Mutual Setoffs for the Benefit of the Estates) ................................. 189

COUNT 33 (Avoidable Setoffs Resulting in Improvement in Position) ...................................................... 190

COUNT 34 (Recovery of Avoidable Setoffs Resulting in Improvement in Position for the Benefit of the Estates) .................. 190

COUNT 35 (Avoidance of Unauthorized Postpetition Transfers) ........... 191

COUNT 36 (Recovery of Avoided Unauthorized Postpetition Transfers) ......................................................... 191

COUNT 37 (Avoidance of Unperfected Security Interest in Certain Emission Credits) ..................................................... 192

COUNT 38 (Disallowance of Claim Under Section 502(d) of the Bankruptcy Code; Against Barclays and Besson Trust) .................. 192

E.  COUNTS 39-45 (Against BT/Deutsche Bank Defendants) ................ 193

COUNT 39 (Avoidance of Valhalla Setoff as a Postpetition Transaction) ................................................... 193

COUNT 40 (Recovery of Avoided Postpetition Transaction) .............. 197

COUNT 41 (Avoidance of Preferential Transfers Related to the BT/Deutsche Bank Preferential Transfers) ........................... 197

COUNT 42 (Avoidance of Fraudulent Transfers Related to the BT/Deutsche Bank Fraudulent Transfers) ............................. 198

COUNT 43 (Avoidance of Fraudulent Transfers Related to the BT/Deutsche Bank 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law) ...................................................... 200

COUNT 44 (Recovery of Avoided Transfers Related to the BT/Deutsche Bank Preferential Transfers, the BT/Deutsche Bank Fraudulent Transfers, and the BT/Deutsche Bank 544 Transfers) ........... 201

COUNT 45 (Disallowance of Claim Under Section 502(d) of the Bankruptcy Code; Against Bankers Trust and Deutsche Bank) ........... 202

F.  COUNTS 46-50 (Against Multiple Defendant Group) ................... 202

COUNT 46 (Avoidance of Intentional Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code; Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

COUNT 47 (Avoidance of Intentional Fraudulent Transfers and Conveyances Under Section 544 of the Bankruptcy Code and Applicable State Law; Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . 204

COUNT 48 (Recovery of Avoided Intentional Fraudulent Transfers and Conveyances Under Section 550 of the Bankruptcy Code; Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

COUNT 49 (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code; Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . 205

COUNT 50 (Equitable Subordination Under Sections 510(c)(1) and 105(a) of the Bankruptcy Code; Against Defendants and Affiliates Submitting Proofs of Claim) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

COUNT 51, Aiding and Abetting Breach of Fiduciary Duty (Enron Against all Bank Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

COUNT 52, Aiding and Abetting Fraud (Enron Against all Bank Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

  Roosevelt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

  Truman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

  Jethro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

  Yosemite I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

  Nixon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

  Yosemite II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

  Yosemite III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

  Yosemite IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

  June 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

  Nighthawk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

  Nahanni . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Bacchus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Sundance Industrial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Chase VI Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

Chase VII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

Chase VIII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Chase IX Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

Chase X Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Chase XI Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Chase XII Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Fishtail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

Prepaid Oil Swap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

JT Holdings Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

SO$_2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

Steele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Cochise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Teresa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

Tomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Renegade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Valhalla . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Riverside III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

Riverside IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

Pilgrim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

Riverside V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Leftover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

Nimitz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

Ghost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Alchemy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Specter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Hawaii . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

Nigerian Barge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

1999 Electricity Trades . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Citigroup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

JP Morgan Chase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

Barclays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

BT/Deutsche Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

CIBC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

Merrill Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

COUNT 53, Unlawful Civil Conspiracy (Enron Against All Bank
Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

**DEBTORS' COMPLAINT FOR THE AVOIDANCE AND
RETURN OF PREFERENTIAL PAYMENTS AND FRAUDULENT TRANSFERS,
EQUITABLE SUBORDINATION, AND DAMAGES, TOGETHER WITH
OBJECTIONS AND COUNTERCLAIMS TO CREDITOR DEFENDANTS' CLAIMS**

Enron Corp. and Enron North America Corp., as debtors and debtors in possession, allege

for their Complaint as follows:

## I.
## NATURE OF THIS ACTION

1.        Debtors Enron Corp. ("Enron") and Enron North America Corp. ("ENA") bring this

adversary proceeding against the banks and investment banks that bear substantial responsibility for

the stunning downfall of what was once the seventh largest corporation in the United States.  These

banks and investment banks (together with their subsidiaries and affiliates, the "**Bank Defendants**")

participated with a small group of senior officers and managers of Enron (the "**Insiders**") in a multi-

year scheme to manipulate and misstate Enron's financial condition.  The central purposes of this

scheme were to mask a growing disparity between the company's reported revenues, which were

increasingly based upon mark-to-market accounting valuations, and its "real" earnings from

operations and to conceal the mountain of debt required to keep the company's varied and often

unsuccessful business ventures afloat.  For the Insiders, the ultimate purpose of the scheme was to

provide them with opportunities to obtain profits from self-dealing transactions with Enron – profits

that were shared with many of the Bank Defendants.

2.        The Bank Defendants principally assisted the scheme by designing, implementing,

and often financing structured finance transactions with Enron, *knowing* that the Insiders were

improperly recording the financial effects of these transactions.  For example, many of the Bank

Defendants made loans to Enron but deliberately disguised these loans as prepay commodity

contracts. These phony "prepay" transactions routinely closed at the end of a fiscal quarter and were

arranged in amounts specifically chosen to inflate Enron's operating cash flow to levels necessary

to maintain Enron's credit ratings. The billions of dollars received by Enron from the "prepay" transactions were wrongly recorded as cash flow from Enron's business operations, giving the false appearance that Enron's businesses were healthy and disguising the mismatch between its reported income and the cash generated by ongoing operations. Both the Bank Defendants and the Insiders knew that the "prepay" transactions were loans and should have been recorded by Enron as cash from financing activities – not from business operations. In addition, Enron's obligation to repay the amounts loaned in the "prepay" deals was debt, but the Bank Defendants knew the Insiders were manipulating Enron's balance sheet by recording them as price risk management liabilities.

3.      Another example is the numerous transactions involving the purported sale of Enron assets to special purpose entities ("SPEs") in which the Bank Defendants appeared to make the "at risk" equity investment required by accounting rules. In many cases, however, the Insiders gave the Bank Defendants secret assurances that their equity investment would be repaid. Often, since the Bank Defendants viewed these transactions as loans and not as true equity investments, *they* insisted upon promises of repayment as a condition of the deal. Knowing that such assurances invalidated the intended accounting for these transactions, these oral promises were concealed from others at Enron and its accountants, and the Insiders improperly treated the proceeds received in these transactions as operating cash flow – not financing activities – and often recorded bogus gains on sales of the assets. The cumulative effect on Enron's financial statements of the Bank Defendants' knowing participation in the scheme is staggering: Between 1997 and 2001, the Bank Defendants' structured finance transactions with Enron enabled the Insiders to wrongfully record more than $9 billion as operating cash flow and more than $1 billion as income and to improperly understate Enron's debt by more than $11 billion.

4.      Many of the Bank Defendants also aided the scheme by becoming investors in private partnerships formed by the Insiders for the purpose of profiting from transactions with Enron. The

most notorious of these partnerships, LJM, was named for former Chief Financial Officer Andrew Fastow's wife and children. Some of the Bank Defendants were attracted to these partnerships by the promise of extraordinary returns on their investment; others were induced by Fastow's threat that their participation was the key to a continuing flow of business from his employer, Enron. All knew that by investing in these partnerships, whose only business would be with Enron, that they were assisting Enron's CFO and other Insiders in profiting at Enron's expense. Importantly, the longer the Insiders and the Bank Defendants were able to maintain the appearance of Enron's success through structured finance transactions, the more opportunities the Insiders and their private partnerships would have to extract ill-gotten gains from Enron.

5.     For the Bank Defendants, the scheme offered the irresistible temptation of enormous fees and other revenues from equity and debt underwritings, traditional financings, and other unusually lucrative transactions with Enron, such as the phony "prepays" and the SPEs. For some of the Bank Defendants, the sheer frequency of Enron deals – an average of one per month for over four years – was sufficient reward for the risk that the scheme might unravel. For other Bank Defendants, the unmistakable threat by the Insiders that any lender who refused a transaction would be denied future Enron business did the trick. The Bank Defendants were hugely rewarded for their involvement. Between 1997 and Enron's demise in 2001, they collected over $500,000,000 in revenue from Enron deals. In addition, those who invested in the private partnerships with the Insiders received lucrative returns.

6.     For the Insiders, the scheme provided unparalleled financial and professional rewards. They received generous compensation packages and bonuses based upon the company's financial performance fueled by the scheme. They exercised stock options and reaped millions of dollars in gains from Enron's stock prices inflated by the scheme. And some of them made millions of dollars in profits from their ownership in the private partnerships that did business with Enron.

Former CFO Fastow and his family members made $60,000,000 from slight investments in these partnerships. Former Enron Treasurer Ben Glisan made $1,000,000 in a few months from an investment of only $6,000. Former senior manager Michael Kopper took home almost $30,000,000. Some of the Insiders such as Kopper and Glisan kept their participation in these partnerships secret from Enron. Fastow, whose participation was known, deceived Enron by promising that both the transactions between the partnerships and Enron and his compensation would be carefully reviewed by others, including at least one Insider, to determine their fairness. Those promises were never kept.

7.     The effect of the Insiders' and the Bank Defendants' scheme on Enron was devastating. While the company's financial statements were manipulated to appear robust, in truth many of Enron's operations were struggling. Buoyed by artificially strong credit ratings and flourishing stock prices, and willingly assisted by the Bank Defendants, the company incurred billions and billions of dollars of debt which its business operations were not able to repay. As a result, in a few years Enron deteriorated from a healthy energy company to a deeply insolvent trading company. Its bankruptcy followed quickly from the first disclosures of the scheme. By that time, with the scheme fully unraveled, Enron was insolvent by tens of billions of dollars.

8.     By this Complaint, Enron and ENA bring several types of claims against the Bank Defendants (and in certain counts against all Defendants). First, under section 550 of title 11 of the United States Code ("the Bankruptcy Code"), Enron and ENA seek to recover from the Bank Defendants payments made by Plaintiff in connection with the structured finance transactions as preferential transfers under section 547(b), improper postpetition payments under section 549 of the Bankruptcy Code, and/or as fraudulent transfers under sections 544 and 548 of the Bankruptcy Code and applicable state law. These payments total in excess of $3 billion. These claims for relief are set forth in Counts 1 through 49 of this Complaint. Second, based upon these preferences and/or

fraudulent transfers, Enron and ENA seek to disallow the Bank Defendants' claims filed against the Plaintiff's estates, pursuant to section 502(d) of the Bankruptcy Code. These claims are contained in Counts 5, 19, 24, 38, 45, and 49 of this Complaint. Third, in Count 50 of this Complaint, Enron and ENA seek to equitably subordinate the Bank Defendants' claims against the Plaintiff's estates under sections 510 and 105 of the Bankruptcy Code. Fourth, Enron seeks to recover the enormous damages it suffered as a result of the Bank Defendants' knowing participation in the scheme with the Insiders to manipulate and misstate Enron's financial condition. Claims against the Bank Defendants for aiding and abetting the Insiders' breaches of fiduciary duties to Enron are brought in Count 51, for aiding and abetting the Insiders' fraud in Count 52, and for civil conspiracy in Count 53. As to those Bank Defendants who have filed claims or on whose behalf claims have been filed against Enron and/or ENA, this adversary proceeding is brought as a counterclaim to those claims.

## II.
## THE PARTIES

### A. The Plaintiffs

#### (1) Enron Corp.

9. Plaintiff Enron Corp. ("Enron") is an Oregon corporation with its principal place of business in Houston, Texas. Enron is a debtor and debtor in possession in this bankruptcy case. Enron today is neither represented by, nor representative of, the group of corrupt officers who contributed to the company's financial collapse. The wrongdoers have been driven from Enron. They have been replaced by outside, independent management from Stephen Forbes Cooper, LLC (headed by restructuring specialist Stephen Cooper), whose retention was approved by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). By Order dated April 4, 2002, the Bankruptcy Court authorized and approved the employment of Stephen

Cooper as acting CEO and Chief Restructuring Officer of Enron effective January 28, 2002. The Bankruptcy Court also authorized the retention of a certain number of Stephen Forbes Cooper, LLC individuals to act as new officers of Enron. Cooper and the new officers were given full authority to manage and operate Enron's business.

10.     Further, the wrongdoing of former Enron officers and managers, as well as that of the Bank Defendants in this case, has been investigated by an independent examiner appointed by the Bankruptcy Court. By Order dated April 8, 2002, the Bankruptcy Court directed the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner for Enron (the "Enron Examiner"). That Order gave the Enron Examiner broad authority to investigate and report on transactions at Enron involving special purpose entities. On May 22, 2002, the U.S. Trustee appointed Neal Batson as the Enron Examiner. Since his appointment, the Enron Examiner has reviewed over four million pages of documents, has taken sworn testimony from over 100 witnesses, and has issued three extensive reports on SPE transactions at Enron. The Enron Examiner's third report was devoted to examining the role of the Bank Defendants in causing Enron's collapse.

### (2)     Enron North America Corp.

11.     Plaintiff Enron North America Corp. ("ENA") is a Delaware corporation with its principal place of business in Houston, Texas. ENA is a debtor and debtor in possession in this bankruptcy case. ENA today is under the management of Stephen Forbes Cooper, LLC.

12.     The wrongdoing of certain financial institutions is being investigated by an independent examiner appointed by the Bankruptcy Court ("the ENA Examiner"). The Bankruptcy Court appointed the ENA Examiner, Harrison J. Goldin, to investigate institutions for which the Enron Examiner was conflicted. As a result, the ENA Examiner is reviewing the activities of Bank

of America, Royal Bank of Canada and UBS Warburg AG, and their respective subsidiaries and/or affiliates. The ENA Examiner is expected to report on one or more of these institutions shortly.

13.     Enron and ENA are referred to collectively herein as Plaintiff.

**B.     The Bank Defendants**

**(1)     The Citigroup Defendants**

14.     Defendant Citigroup Inc. is a Delaware corporation with its principal place of business at 399 Park Ave., New York, New York 10043. Citigroup Inc. is a registered bank holding company. Citigroup Inc. owns and/or controls each of the following entities.

15.     Defendant Citibank, N.A. ("Citibank") is a nationally chartered bank and is Citigroup Inc.'s principal bank subsidiary with its principal place of business at 399 Park Avenue, New York, New York 10043.

16.     Defendant Citigroup Global Markets, Inc. (formerly Salomon Smith Barney, Inc.) ("SSB") is a New York corporation with its principal place of business at 388 Greenwich Street, New York, New York 10013. It is a Citigroup Inc. subsidiary.

17.     Defendant Citicorp North America, Inc. ("Citicorp N.A.") is an indirect subsidiary of Citigroup Inc. It is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528.

18.     Defendant Citicorp Vendor Finance, Inc. ("Citicorp VF") is a Delaware corporation with its principal place of business at One International Blvd., Mahwah, New Jersey 07430. It is a Citigroup Inc. subsidiary.

19.     Defendant Delta Energy Corporation ("Delta") is a Cayman Islands limited liability company. Delta is an SPE created solely for the purpose of serving as the conduit party in Citigroup prepay transactions.

20.     Defendant Salomon Brothers Holding Company, Inc. ("Salomon Holding") is a Delaware corporation and, upon information and belief, is a wholly-owned subsidiary of Citibank. Its principal place of business is at 388 Greenwich Street, New York, New York 10013.

21.     Defendant CXC Incorporated ("CXC") is a Delaware corporation which, upon information and belief, is a wholly-owned subsidiary of Citibank and maintains its principal place of business at 399 Park Avenue, New York, New York.

22.     Each of Citigroup Inc., Citibank, Citicorp N.A., Citicorp VF, SSB, Delta, Salomon Holdings and CXC acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein and are collectively referred to in this Complaint as "Citigroup."

### (2)     The JP Morgan Chase Defendants

23.     Defendants J.P. Morgan Chase & Co. and its wholly-owned subsidiary, JP Morgan Chase Bank (formerly Chase Manhattan Bank) (together, "JPMC"), are banking corporations organized and existing under the laws of Delaware and New York, respectively, each having its headquarters at 270 Park Avenue, 35th Floor, New York, New York 10017. JPMC includes the successor to The Chase Manhattan Bank, as a result of the merger between J.P. Morgan & Co., Inc. with and into The Chase Manhattan Corporation on December 31, 2000. JPMC owns and/or controls each of the following entities.

24.     Defendant Mahonia Limited is a Jersey, Channel Islands SPE established by JP Morgan Chase for the purpose of serving as the conduit party in Chase prepay transactions.

25.     Defendant Mahonia Natural Gas Limited is a Jersey, Channel Islands SPE established at the request of JP Morgan Chase and is a subsidiary of Mahonia Limited.

26.     Defendant Stoneville Aegean Limited is a Jersey, Channel Islands SPE established at the request of JP Morgan Chase.

27.     Defendant JP Morgan Securities Inc. is a Delaware corporation with its principal place of business at 270 Park Avenue, 35th Floor, New York 10017.  It is a subsidiary of JP Morgan Chase.

28.     Each of JPMC,  Mahonia Ltd., Mahonia Natural Gas Ltd., Stoneville Aegean Ltd. and JP Morgan Securities Inc. acted as the control person, successor, agent, co-conspirator, and or co-venture partner of the others as to the matters discussed herein and are collectively referred to in this Complaint as "Chase" or "JP Morgan Chase."

### (3)     The CIBC Defendants

29.     Canadian Imperial Bank of Commerce is a Canadian chartered bank with its principal place of business at Commerce Court, Toronto, Ontario, Canada M5L 1A2.  Canadian Imperial Bank of Commerce owns and/or controls each of the following entities.

30.     CIBC World Markets Corp. (formerly known as CIBC Corp.) is a Delaware corporation with its principal place of business at 425 Lexington Avenue, New York, New York 10017.  CIBC World Markets Corp. is an indirect subsidiary of Canadian Imperial Bank of Commerce.

31.     CIBC Capital Corporation is a Delaware corporation with its principal place of business at 425 Lexington Ave., New York, New York 10017.  CIBC Capital Corporation is a subsidiary of Canadian Imperial Bank of Commerce.

32.     CIBC World Markets plc is a company authorized to do business in the United Kingdom with its office address at Cotton Centre, Cotton Lane, SE1 2QL, London, England.  CIBC World Markets plc is a wholly-owned subsidiary of Canadian Imperial Bank of Commerce.

33.     Defendant CIBC Capital Partners has its principal place of business at BCE Place, 161 Bay Street, Box 500, Toronto, Ontario M5J 2S8.  It is a subsidiary of CIBC World Markets Corp.

34.    CIBC, Inc. is a Delaware corporation with its principal place of business at 425 Lexington Avenue, New York, New York 10017. CIBC, Inc. is an indirect subsidiary of Canadian Imperial Bank of Commerce.

35.    Each of Canadian Imperial Bank of Commerce, CIBC World Markets Corp., CIBC Capital Corp., CIBC World Markets plc, CIBC Capital Partners, and CIBC Inc. acted as the control person, successor, agent, co-conspirator, and/or co-venture partner of the others as to the matters discussed herein, and are collectively referred to in this Complaint as "CIBC."

**(4)    The Barclays Defendants**

36.    Defendant Barclays PLC is incorporated under the laws of England and has its principal place of business at 54 Lombard Street, London, England EC3P 3AH. Barclays PLC owns and/or controls each of the following entities.

37.    Defendant Barclays Bank PLC is a public limited company registered under the laws of England and Wales. Barclays Bank PLC maintains its principal place of business at 54 Lombard St., London, England, EC3P 3AH, United Kingdom.

38.    Defendant Colonnade Limited ("Colonnade") is a limited company registered in Guernsey. Its registered offices are located at 7 New Street, St. Peter Port, Guernsey, Channel Islands.

39.    Defendant Barclays Capital, Inc. is a Connecticut corporation with its principal place of business at 200 Park Avenue, New York, New York 10166. It is an indirect subsidiary of Barclays PLC.

40.    Each of Barclays PLC, Barclays Bank PLC, Colonnade Limited, Barclays PLC and Barclays Capital, Inc. acted as the control person, successor, agent, co-conspirator, or/or co-venture partner of the others as to the matters discussed herein, and are collectively referred to in this Complaint as "Barclays."

**(5)**     **The Merrill Lynch Defendants**

41.     Defendant Merrill Lynch & Co., Inc. is a Delaware corporation with its principal place of business at 2 Broadway, New York, New York 10080. Merrill Lynch & Co., Inc. is a holding company that owns and/or controls each of the following entities.

42.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation with its principal place of business at 4 World Financial Center, 250 Vesey Street, New York, New York 10281 and is a wholly-owned subsidiary of Merrill Lynch & Co., Inc.

43.     Defendant Merrill Lynch Capital Services, Inc. is a Delaware corporation with its principal place of business at 250 Vesey Street, New York, New York 10281. It is a subsidiary of Merrill Lynch & Co., Inc.

44.     Defendant Merrill Lynch Japan Securities Co., Ltd. is a Japanese corporation with its principal place of business at OTE Center Bldg., Chiyoda-Ku, Tokyo, TK4, 100-8180, Japan. It is a subsidiary of Merrill Lynch International Inc., which is a subsidiary of Merrill Lynch & Co., Inc.

45.     Each of Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Capital Services, Inc. and Merrill Lynch Japan Securities Co., Ltd. acted as the control person, successor, agent, co-conspirator, or/or co-venture partner of the others as to the matters discussed herein, and are collectively referred to in this Complaint as "Merrill Lynch."

**(6)**     **The BT/Deutsche Bank Defendants**

46.     Defendant Deutsche Bank AG is a stock corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business in Frankfurt, Germany. Deutsche Bank AG does business throughout the world, including in the United States where its principal place of business is 31 West 52nd Street, New York, New York 10019. Plaintiff is informed and believes, and on that basis alleges, that Deutsche Bank, New York and Deutsche

London are not separate entities, but, rather, branches of Deutsche Bank AG. Deutsche Bank AG owns and/or controls each of the following entities.

47.     Upon information and belief, on or about June 4, 1999, Deutsche Bank AG merged with Bankers Trust Corporation, which owns 100% of the common stock of Bankers Trust Company, a corporation organized and existing under the laws of New York. Upon information and belief, Bankers Trust Company changed its name to Deutsche Bank Trust Company Americas in or about August 2002.

48.     Defendant Deutsche Bank Trust Company Americas is a New York corporation with its principal place of business at 16 Wall Street, New York, New York. Upon information and belief, it is an indirect subsidiary of Deutsche Bank AG.

49.     Defendant Deutsche Bank Securities Inc. is a Delaware corporation with registered agent at CT Corporation System, 111 Eighth Avenue, New York, New York 10011. DB Alex. Brown LLC merged with Deutsche Bank Securities, Inc. in April of 2001, and Deutsche Bank Securities, Inc. is the surviving corporation.

50.     Defendant Deutsche Bank Luxembourg S.A. is a stock corporation organized and existing under the laws of the Grand Duchy of Luxembourg, with a registered seat and its principal place of business in Luxembourg. Deutsche Bank Luxembourg S.A. does business throughout the world, including in the United States. Upon information and belief, Deutsche Bank Luxembourg S.A. is a wholly-owned subsidiary of Deutsche Bank AG.

51.     Defendant Deutsche Bank Trust Company Delaware is a banking corporation organized and existing under the laws of Delaware, with its principal place of business in Wilmington, Delaware. Upon information and belief, Deutsche Bank Trust Company Delaware is a wholly-owned subsidiary of Deutsche Bank AG.

52.     Defendant Deutsche Bank Trust Corporation (f/k/a Bankers Trust New York Corp.) is a banking corporation organized and existing under the laws of New York, with its principal place of business at 31 West 52nd Street, New York, New York 10019. Upon information and belief, Deutsche Bank Trust Corporation is a wholly-owned subsidiary of Deutsche Bank AG.

53.     Upon information and belief, Deutsche Trustee Company Ltd. is a business entity organized and existing under the laws of England, with its principal place of business in London, England. Upon further information and belief, Deutsche Trustee Company Ltd. is a wholly-owned subsidiary of Deutsche Bank AG.

54.     Defendant Bankers Trust International PLC is a public limited company organized and existing under the laws of England, with its principal place of business in London, England. Upon information and belief, Bankers Trust International PLC is a wholly-owned subsidiary of Deutsche Bank AG.

55.     Each of Deutsche Bank AG, Deutsche Bank Trust Company Americas, Deutsche Bank Securities, Inc., Deutsche Bank Luxembourg S.A., Deutsche Bank Trust Company Delaware, Deutsche Bank Trust Corporation, Deutsche Trustee Company, Ltd., and Bankers Trust International PLC acted as the control person, successor, agent, co-conspirator, or/or co-venture partner of the others as to the matters discussed herein, and are collectively referred to in this Complaint as "BT/Deutsche Bank."

**(7)     The Bank Defendants' Proofs of Claim**

56.     Each of the Bank Defendants – Citigroup, JP Morgan Chase, CIBC, Barclays, Merrill Lynch, and BT/Deutsche Bank – has filed one or more proofs of claim on behalf of themselves and/or against the bankruptcy estates of Enron, ENA and/or their affiliated debtor entities in the Chapter 11 cases being jointly administered in this Court under consolidated case number 01-16034 (collectively, "the Debtors").

## C.    **Additional Defendants**

57.    Defendant Yosemite Securities Trust I ("Yosemite I Trust") is a Delaware business trust, which maintains its registered office at CT Corp. System, 111 Eighth Avenue, New York, New York 10011.

58.    Defendant Sundance Industrial Partners L.P. ("Sundance Industrial") is a Delaware limited partnership, which maintains its registered office at National Registered Agents Inc., 9 East Loockerman Street, Suite 1B, Dover, Delaware 19901.  Under Bankruptcy Code § 101(2)(B), Sundance Industrial is an "affiliate" of Enron and ENA.  As such, it is an "insider" of Enron and ENA under Bankruptcy Code § 101(31)(E).

59.    Defendant Caymus Trust is a Delaware business trust, which maintains its registered office at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

60.    Defendant Ponderosa Assets, L.P. is a limited partnership organized under the laws of the State of Delaware, which maintains its registered office at National Registered Agents Inc., 9 East Loockerman Street, Suite 1B, Dover, Delaware 19901 ("Ponderosa").  Under Bankruptcy Code § 101(2)(B), Ponderosa is an "affiliate" of Enron and ENA.  As such, it is an "insider" of Enron and ENA under Bankruptcy Code § 101(31)(E).

61.    Defendant Sundance Assets, L.P. is a limited partnership organized under the laws of the State of Delaware, which maintains its registered address at National Registered Agents Inc., 9 East Loockerman Street, Suite 1B, Dover, Delaware 19901 ("Sundance").  Under Bankruptcy Code § 101(2)(B), Sundance is an "affiliate" of ENA.  As such, it is an "insider" of ENA under Bankruptcy Code § 101(31)(E).

62.    Defendant Rawhide Investors L.L.C. is a limited liability company organized under the laws of the State of Delaware, which maintains its registered office at The Corporation Trust

Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 ("Rawhide").

63.     Defendant Besson Trust is a business trust formed under the laws of the State of Delaware ("Besson Trust").  Its registered office is at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890. Wilmington Trust Company is the trustee of Besson Trust.

64.     Defendant JGB Trust is a business trust formed under the laws of the State of Delaware ("JGB Trust").  Its registered office is at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890.

## III.
## JURISDICTION AND VENUE

65.     On December 2, 2001 ("the Petition Date"), Enron and ENA filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  Enron and ENA continue to be authorized to operate their respective businesses and to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

66.     The Court has jurisdiction of this Adversary Proceeding pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1334(b) and 1334(e).  The claims alleged herein are core proceedings under 28 U.S.C. §§ 157(b)(2)(B), (C), (E), (F), (H), (K), and (O).  Resolution of the claims alleged herein will critically affect the Debtors' reorganization, the value of the Debtors' estates, and any distribution to the Debtors' creditors.  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the United States District Court for the Southern District of New York's reference of proceedings to the Bankruptcy Court, this Court may exercise subject matter jurisdiction in this case.

67.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and

certain of the defendants may be found in this District, and pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under title 11 or arising in or related to a case under title 11.

68.     This Adversary Proceeding is brought in accordance with Federal Rules of Bankruptcy Procedure 7001, *et seq.*, and seeks relief under sections 105(a), 362, 502(d), 510(c)(1), 542, 544, 547(b), 548, 549, 550, and 553 of the Bankruptcy Code.

69.     The dates on which Enron and ENA each filed for protection under the Bankruptcy Code are collectively referred to herein as "the Petition Date."

### IV.
### FACTUAL ALLEGATIONS

**A.     Enron Insiders And The Bank Defendants Together Contributed To Enron's Collapse**.

70.     During the year-plus that the Enron Examiner has been investigating Enron's SPEs, he has gathered and reviewed over 4.3 million pages of documents from Citigroup, JP Morgan Chase, CIBC, Barclays, Merrill Lynch and BT/Deutsche Bank.   As part of his investigation, the Enron Examiner has taken over 130 oral sworn statements, including more than 80 statements of the Bank Defendants' employees.   He has issued three reports which, combined, total 3,318 pages of text, including 27 appendices that are themselves expanded discussions of topics covered in the body of the reports.     In these reports and their appendices, the Enron Examiner dissects "substantially all of Enron's material SPE transactions identified to date."   Exam. II at 3.[1]   He explains precisely how SPEs were improperly used at Enron in conjunction with specific accounting techniques "to impact dramatically its financial statements" in violation of Generally Accepted Accounting Principles ("GAAP").   Exam. III at 2.   He identifies a number of Enron's senior officers

---

[1] The Enron Examiner's three reports are cited as Exam. I, Exam. II, or Exam. III.   If the cite is to the report as opposed to its appendices, the volume is followed by a page number.   An example is "Exam. II at 6."   If the cite is to one of the appendices, the volume is followed by the appendix name, which is followed by a page number.   An example is "Exam. II, App. B at 3."

responsible for manipulating Enron's financial statements, discusses specific claims Enron has against those officers, discusses the role the Bank Defendants played in that manipulation, and discusses specific claims Enron has against the Bank Defendants for their wrongdoing.

71.     It is not surprising that the Enron Examiner spent over 3,300 pages of text to explain the fraud that caused Enron to collapse into bankruptcy. The scope and complexity of the transactions in which certain Enron officers entangled Enron, with the help of the Bank Defendants, during the late 1990s and early 2000s is breathtaking.

72.     Basically, Enron was bled to death during the late 1990s and early 2000s by a relative few, key Insiders. From at least 1997, the Insiders engaged in a sophisticated – and startlingly effective – fraud using SPEs that ultimately destroyed Enron. Based on his review of "substantially all" of Enron's material SPE transactions, the Enron Examiner concluded in his second report that:

> through pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance. This financial engineering in many cases violated GAAP and applicable disclosure laws, and resulted in financial statements that did not fairly present Enron's financial condition, results of operations or cash flows.

Exam. II at 15.

**1.      The Insiders Were Enron Officers With Power and Authority, Motivated by Greed**

73.     The Insiders were at least six Enron officers (although it is likely there were others): Andrew S. Fastow, Ben F. Glisan, Jr., Jeffrey McMahon, Michael Kopper, Richard A. Causey, and R. Davis Maxey. The Insiders held positions of authority and substantial responsibility at Enron – positions they abused by improperly using SPEs, manipulating Enron's financial statements, and profiting from that manipulation at Enron's expense.

> **a.** **Fastow, Causey, McMahon, and Glisan caused Enron to enter into the improper SPE transactions, and ensured they were also improperly reported.**

74.     Fastow led the six Insiders.  From January 1997 to March 1998, Fastow was Senior Vice President of Finance and a Managing Director of Enron.  During that time, Fastow engaged in and encouraged the structured financing deals that eventually felled Enron.  In March 1998, he was elevated to Chief Financial Officer.  As CFO, Fastow's direct reports included the Treasury and the Special Projects Groups.  Fastow was fired for cause in October 2001.

75.     McMahon was also intimately involved with Enron's finances from at least 1997 through May 2000.  Throughout 1997 and early 1998, McMahon served as Chief Financial Officer of Enron Europe.  In July 1998, he became Senior Vice President of Finance and Treasurer of Enron Corp. – a position that reported directly to Fastow.  He remained Treasurer until mid-2000.  When Fastow was fired in late 2001 and Enron began to unravel, McMahon was first named CFO and then President and COO.  He resigned all positions effective June 1, 2002.

76.     Glisan held various positions at Enron from 1997 until May 2000.  Among other things, he was an accountant for Enron and an officer of two Enron subsidiaries – Enron Capital Corp. and Enron Energy Services Capital Corp.  In May 2000, Glisan replaced McMahon as Treasurer of Enron, and began reporting directly to Fastow.  Glisan was Treasurer until November 2001, when he was fired upon the company's discovery that he profited from secret transactions with Enron.

77.     Causey was Executive Vice President and Enron's Chief Accounting Officer from 1996 until Enron's collapse.  Enron's Corporate Accounting & Financial Reporting Group reported directly to him.  He was also a member of Enron's Management Committee.  Before he joined Enron, Causey was a senior manager at Arthur Anderson & Co., where he had primary responsibility for the Enron engagement.  Causey was fired on February 14, 2002.

78.     By March 2000, Fastow, Glisan, and Causey (as ex officio member) also comprised the Office of the Chair of Enron Global Finance. Enron Global Finance was charged with the treasury and capital raising functions, and had its own set of accountants.

79.     As a result of their positions, Fastow, Causey, Glisan and McMahon were able to control the SPE transactions in which Enron engaged, the manner in which Enron reported those transactions, and the flow of information to rating agencies, including Moody's Investor's Service, Inc. ("Moody's) and Standard & Poor's Credit Information Services ("S&P")

80.     Causey and Fastow oversaw and implemented the financial and accounting operations at Enron. Causey and R. Davis Maxey were responsible for the tax transactions. Glisan and McMahon were responsible for the SPE transactions, and both reported to Fastow. Together Fastow, Glisan, and McMahon determined which transactions to begin and which to complete. They determined what structures to form and which lenders to use. In cooperation with the Bank Defendants, they also determined the terms and conditions of the transactions themselves.

81.     Together, Fastow, Causey, Glisan and McMahon were the architects of Enron's disclosure policy, and were responsible for how Enron's financial statements disclosed the SPE transactions. Their strategy – refined and implemented over a period of years – was one of opaqueness, not transparency.

82.     Fastow, Glisan and McMahon also were responsible for communicating with the rating agencies. They knew that from at least 1997 on the rating agencies believed Enron's operations and prospects were robust, and they knew the rating agencies formed those beliefs as a result of the distorted and inaccurate financial results the Insiders had Enron report. John Diaz, a Managing Director at Moody's, testified before Congress that Fastow, Glisan, and McMahon did not deal truthfully with Moody's.

**b.    Causey and Maxey caused Enron to enter into improper tax transactions.**

83.    The Tax Group reported to Causey, Enron's CAO.  Maxey headed the Structured Transactions Group within the Tax Group.  Like Causey, Maxey is a certified public accountant. From at least 1997 through bankruptcy, Maxey was also a licensed attorney.  Maxey was fired on January 11, 2002, after he refused his superior's request to detail, in writing, all tax transactions that implicated Enron's assets.  Immediately before he was fired, Maxey is alleged to have shredded documents from his office.

84.    Causey was responsible for determining which tax transactions to begin and which to complete.  Maxey worked closely with BT/Deutsche Bank in designing, structuring and/or implementing the tax transactions, which Causey then approved.

**c.    Fastow and Kopper orchestrated (and profited from) the scheme through SPEs they managed.**

85.    Between 1994 and July 2001, Kopper held various executive positions at Enron, including head of Special Projects.  For most of that time, Kopper reported directly to Fastow. Between January 2000 and July 2001, Kopper was also a managing director of LJM2 Capital Management.  In July 2001, Kopper resigned to run LJM2 Co-Investments LP, an affiliate of entities that Kopper purchased from Fastow for approximately $16.5 million.

**d.    The Insiders benefitted from their improper conduct.**

86.    Manipulating Enron's financial statements brought the Insiders huge personal gains, both in employee benefits (salary, bonus, stock options, etc.), and from improper transactions with Enron in which they or their family members received personal benefits at Enron's expense.  For example:

•    Between October 1998 and November 2001, Fastow sold Enron stock for $33.675 million.  This included sales in each of the years 1998, 1999, and 2000.  In addition to his salary, Fastow RECEIVED $3 million in bonuses

from 1997 through 2000. He also received at least $60.6 million from related party transactions, bringing his total take during the period of fraud to nearly $100 million.

- Between October 1998 and November 2001, Causey sold Enron stock for $13.386 million. This included sales in each of the years 1998, 1999, and 2000. In addition to his salary, Causey RECEIVED another $1.5 million in bonuses from 1997 through 2000, bringing his total take nearly $15 million.

- At the end of 1999, McMahon sold Enron stock for $2.739 million. In addition to his salary, McMahon received another $3.3 million in bonuses from 1997 through 2000, bringing his total take to over $6 million.

- For the five years 1997 through 2001, Maxey received bonuses totaling $1.7 million in addition to his regular salary. Interestingly, Maxey's bonus for 1996 (before many of the tax structures discussed in this complaint) was just $15,6667. For 2000, Maxey also received $625,000 of restricted Enron stock. For that year, Maxey's compensation exceeded that of his superior, Robert Hermann. Caused approved Maxey's compensation.

- For the year 2001 alone, Glisan received compensation in the form of salary, bonuses and stock worth a total of $2.05 million. He also made $1 million in a matter of months on an investment of $6,000.

- From 1997 through bankruptcy, Kopper (and his friend, Dodson) received approximately $30 million solely from Kopper's participation in three "independant" investment vehicles that engaged in related party transactions: $12.7 million in distributions and $1.6 million in management fees from transactions with Chewco, at least $7.3 million in distributions and $178,000 in management fees from LJM1, and at least $7.2 million in management fees from LJM2 during a short tenure as *de facto* general partner of LJM2.

**e.    The Insiders are being held accountable.**

87.    Two of the six Insiders – Fastow and Glisan – were indicted as a result of Enron's collapse. Fastow was indicted on seventy-eight counts of money laundering, fraud, and conspiracy. He invoked the Fifth Amendment when he appeared before Congress, and his criminal trial is scheduled for April 2004.

88.    Glisan was indicted on 24 counts of money laundering, wire fraud, and conspiracy. On September 10, 2003, he pled guilty to one count of conspiracy to commit wire and securities fraud. Pursuant to a plea agreement, Glisan forfeited $938,000 in profit from an illegal transaction

involving one of Enron's off-balance sheet partnerships. He was sentenced to five years in prison, the maximum term for the charge to which he pled, and began serving his sentence immediately. As part of his plea agreement, Glisan admitted: "Beginning in the spring of 2000, I and others at Enron engaged in a conspiracy to manipulate artificially Enron's financial statements." Glisan 9/10/03 Statement, Ex. 1 to Plea Agreement.

89.     Neither Causey, McMahon, nor Maxey has yet been indicted, although the criminal investigations into Enron's destruction are ongoing. Causey invoked his Fifth Amendment right against self-incrimination when called to testify before Congress, and refused to give testimony to the Enron Examiner. For their part, McMahon and Maxey both asserted their Fifth Amendment right in order to avoid being deposed by the Enron Examiner. Maxey's alleged document shredding has also been investigated by the FBI.

90.     The United States Attorney filed felony charges against the last Insider – Kopper – in the form of a criminal information. On August 21, 2002, Kopper pled guilty to conspiracy to commit wire fraud and money laundering, and agreed to forfeit $4 million in criminal proceeds. Under the terms of his plea agreement, Kopper must cooperate fully with the government. On that same date, Kopper also settled an action brought against him by the SEC. The terms of settlement required Kopper to disgorge an additional $8 million (beyond the $4 million he forfeited in the criminal case). Kopper is now permanently barred from acting as an officer or director of public companies.

## 2.     The Bank Defendants Were Essential To The Scheme and Were Also Motivated By Greed

91.     The Enron Examiner concluded that the Insiders did not – and could not have – consummated the SPE transactions that brought down Enron on their own. The Bank Defendants joined them in the fraud. In written testimony to Congress, the Chief Investigator for

the Permanent Subcommittee on Investigations voiced the same conclusion: "The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities." Testimony of Robert Roach before Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate, 127th Cong. (2d Sess.) ("the PSI Hearings), July 23, 2002 at 1 [hereinafter "Roach PSI Report"]. Like the Insiders, the Bank Defendants were motivated by greed.

92.     In exchange for substantially aiding the Insiders, the Bank Defendants earned huge fees. Just between 1998 and 2001, Citigroup received $99.05 million, JP Morgan Chase received $96 million, Merrill Lynch received $35.94 million, BT/Deutsche Bank received $38 million, Barclays received $27.28 million, and CIBC received $24.16 million. The Bank Defendants also received premium interest rates on their investments: For example, in the Nigerian Barge deal, Merrill Lynch was promised and received a guaranteed 22.14% return on an investment of $7 million for approximately 6 months. In addition, the Bank Defendants and many of their executives received lucrative returns on investments made in partnerships formed by the Insiders to improperly transact business with Enron.

### 3.     How The Scheme Worked

#### a.     Enron embraced mark to market accounting and trading.

93.     The Insiders' financial manipulation worked because of the transformation that occurred within Enron and the energy industry at the close of the last century. Until the mid-1990s, Enron was a relatively traditional energy company with a concentration in natural gas pipelines. In the mid- to late-1990s, however, Enron's management, including the Insiders, transformed Enron into a company that depended less on pipelines and transportation and more on energy trading and

investing in new technologies and businesses. In many ways, an accounting concept fueled this change: mark to market accounting ("MTM accounting").

94.     Before MTM accounting, energy companies (including Enron) carried their assets at historical value. Under MTM accounting, assets are carried at fair value. Importantly, under MTM accounting, a change in value of an asset from quarter-to-quarter is recorded as a gain or loss on the income statement.

95.     Enron began using MTM accounting in 1992 for its gas trading business. Enron received the SEC's approval to do so after representing that Enron's gas business (i) was separately operated from Enron's other business, (ii) consisted of contracts and financial instruments, and (iii) was analogous to a securities trading operation. Over the next few years, as Enron grew its commodity trading operations, it extended MTM accounting to those areas as well: electric power, pulp and paper, and coal. In 1996, Enron extended MTM accounting to JEDI, an off-the-books investment partnership, by analogizing JEDI's activities to that of an investment company. In 1997, Enron extended the investment company analogy (and MTM accounting) to its merchant banking business. In 1998, the Financial Accounting Standards Board promulgated EITF 98-10, which for the first time required energy trading contracts to be marked to market. Finally, in 1999-2000 Enron extended the use of MTM accounting to nonenergy commodities.

96.     There was nothing inherently wrong with Enron's use of MTM accounting. As the Enron Examiner noted, "Setting aside valuation abuses, the problem was not that Enron used MTM accounting, but rather that Enron resorted to financial engineering to address the effects of MTM accounting." Exam. II at 24 n.63. In fact, MTM accounting was a potent generator of earnings, earnings Enron could recognize on its financial statements long before the activities it was valuing actually generated cash. MTM accounting was such a successful earnings generator that by

December 31, 2000, $22.8 billion – or 35% – of Enron's total balance sheet assets were accounted for using MTM accounting.

### b. Enron's credit rating became vitally important.

97.     Enron's use of MTM accounting grew as Enron discovered new ways to realize its benefits.  Over time, Enron made huge investments in new technologies, as well as in businesses potentially capable of using those technologies.  Not surprisingly, by mid-1999, Enron as an entity had grown into a "voracious consumer of cash" – cash it did not have.  As an analyst at JP Morgan explained at that time:

> Unlike the typical domestic electric utility, ENE is not a cash flow story.  It has not invested in infrastructure during the past 100 years in order to rest on its depreciation laurels.  It is investing vigorously in its future.  As such, operating cash flow is eaten up by the need for working capital and capital expenditures.  Beyond that, ENE's equity investments need to be funded via bank debt, debt and equity capital markets, and asset divestitures.

JP Morgan Securities, Inc. Company Report on Enron Corp., July 9, 1999 at 7 (JP Morgan Securities) (quoted in Exam. II at 17 n.47).

98.     Enron's need for cash made Enron's credit rating critically important.  As explained in Enron's 1999 Annual Report:  "Enron's continued investment grade status is critical to the success of its wholesale business as well as its ability to maintain adequate liquidity."  Enron's growing emphasis on trading also implicated Enron's credit rating.  Absent a favorable rating, Enron could not trade with others in the commodities markets except by posting collateral.  Without substantial cash, posting collateral was a significant problem.  As the Enron Examiner found, Enron Wholesale Services – the division of Enron that created trading markets in gas, oil, electricity and other energy products – was by far the most significant of Enron's business segments.

> Thus, the continued success of Enron's entire business was dependent upon the continued success of its Wholesale Services business segment, which in turn was dependent upon Enron's credit ratings for its senior unsecured long-term debt.

Exam. II at 18-19.

99.     One other reason why Enron's credit rating was vital:  A key component of Enron's credit rating was the amount of its debt.  Because of that, the Insiders used financing structures to obtain cash that could be accounted for on Enron's financial statements as something other than debt or, in some cases, not at all.  Ironically, some of those structures themselves had the effect of increasing the importance of Enron's credit ratings because they included defaults or trigger events directly or indirectly based on Enron's credit rating.  Three examples:

100.    The Marlin share trust structure raised more than $1 billion in December 1998.  The structure included a trigger, and a trigger event occurred if Enron's credit rating on its senior debt fell below a certain point at the same time that Enron's stock price fell below a certain point for a certain number of days.  Once a trigger event occurred, other provisions went into play, the culmination of which was that Enron could be required to make a deficiency payment to noteholders of $915 million.

101.    Enron's other large share trust, the Osprey (or Whitewing) structure, involved a similar arrangement.  Through an initial financing in September 1999 and subsequent rounds in July and October 2000, Enron raised more than $2.6 billion.  In connection with that structure, a decline in credit rating coupled with a fall in Enron's stock price could, under certain other circumstances, require Enron to pay $2.4 billion to noteholders.

102.    Finally, in the Rawhide minority interest structure – which raised $750 million in December 1998 – a downgrade event was defined as a specified drop in the rating of Enron's long-term, unsecured debt.  Under the transaction documents, that downgrade would put other provisions into play which, at their end, required Enron to repay certain loans.  This was significant since at the date of bankruptcy, the loan amount was still approximately $691 million.

103.    Thus, in just three structures, a drop in Enron's credit rating could have required Enron to make payments of more than $4 billion dollars – again, money Enron did not have.  And these are not the only structures in which credit rating triggers created adverse consequences for Enron.  The transaction documents for other structures included triggers that caused defaults, increased margins, increased interest rates, eliminated the ability to invest in Enron notes, and increased pricing for the financing – to the tune of $3 billion: Triple Lutz ($114 million), Valhalla ($50 million), Nahanni ($15 million), SE Acquisition (up to $120 million), Margaux ($125 million), Mahonia ($650 million), Aircraft Financing ($468 million), Monte ($350 million), Brazos VPP ($170 million), Enron Building North Synthetic Lease ($284 million), Tammy ($500 million), Choctaw ($500 million), and JT Holdings ($74 million).

> **c.    The Insiders knew how the rating agencies determined Enron's credit rating.**

104.    The soundness of Enron's credit rating depended on the soundness of certain financial ratios.  Five were key:  (i) funds flow interest coverage, (ii) pre-tax interest coverage, (iii) funds flow from operations to total obligations, (iv) total obligations to total obligations plus shareholders' equity and certain other items, and (v) debt to total capital.  Between them, these five ratios shared six components:

- **Funds flow from operation**, defined as **net cash provided by operating activities** (from the cash flow statement) less cash provided from decreases in working capital (or plus cash used for increases in working capital).

- **Balance sheet debt**, defined as short-term and long-term **debt appearing on the face of the balance sheet**.

- Total obligations, defined as **balance sheet debt, plus guarantees of debt of third parties** and guarantees of lease residual values, **plus any excess of price risk management liabilities over price risk management assets**. Guaranteed debt was reduced by the value Enron attributed to the assets supporting the underlying debt.  **Debt of unconsolidated equity affiliates was not included because (unless guaranteed) it was nonrecourse to Enron**.

- **Shareholders equity** and certain other items, defined as shareholders' equity, plus "mezzanine" items, minority interests and company-obligated preferred securities of subsidiaries.

- Adjusted earnings for credit analysis, defined as IBIT, less gain on sale of nonmerchant assets and the excess of earnings from equity method investees over distributions from those investees, plus impairment losses.

- **Interest expense**, defined as interest incurred, less interest capitalized, plus estimated lease interest expense.

Enron 2000 Annual Report, "Financial Review – Selected Financial and Credit Information (Unaudited)" at 52 (emphasis added).

105.    Understanding the effect these components had on Enron's credit ratios gave the Insiders the power to manage the ratios by managing Enron's financial statements.  Simply stated, and measured by their impact on Enron's credit ratios, the Insiders recognized that:

- raising money by increasing debt (and interest) which shows up on Enron's balance sheet was bad,

- raising money by issuing stock and increasing shareholders' equity was bad, and

- raising money by guaranteeing others' obligations was bad.

106.    Moreover, the Insiders learned early that the rating agencies viewed MTM accounting itself as having a possible negative effect on Enron's credit ratios.  The fact that MTM accounting allowed Enron to recognize earnings before an activity generated cash created a "quality of earnings" problem.  As JP Morgan explained in 1999,

> [ENA] has significant flexibility in structuring contracts and hence booking earnings. It is primarily a financial business and hence uses "mark to market" accounting.  As such, contracts can be structured to recognize the economic value of projects long before they are operational and cash is coming in the door. . . .  This has two effects: front-end-loaded earnings that bias the denominator in the P/E ratio and a timing disconnect between projects' cash and earnings effects.

JP Morgan Securities at 4 (quoted at Exam. II at 26).

107.     The Insiders also learned quickly that the rating agencies measured the earnings

problem as the gap between net income and funds flow *from operations*.  That is because funds flow

from operations represents high quality earnings that will likely recur and can be counted on to

service debt and provide cash for operations in the future.  A gap between book net income and

funds flow from operations makes the quality of net income suspect and puts into doubt whether

funds will be available, as needed, to run the business.  For example, if cash needed for day-to-day

operations is entirely raised through financing (as opposed to operations), the business is likely in

trouble.  On the other hand, a small gap between net income and funds flow from operations likely

means the business is healthy – at least it does if the size of the gap has not been fraudulently

engineered.

108.     The Insiders, however, realized that by "managing" the gap between net income and

funds flow from operations, they could hide the extent of any earnings problem MTM accounting

created.  For the Insiders, managing the gap came to mean characterizing cash Enron received in

transactions involving SPE structures as cash flowing from operating activities instead of from

financing activities.  Of course, knowing how a financial statement can be manipulated is not the

same thing as manipulating it.  For help – and for financing – the Insiders turned to the Bank

Defendants.

> **d.     The Insiders engaged in a scheme that used SPEs improperly to prop up
> Enron's credit rating.**

109.     Enron is *not* complaining simply that the Insiders and the Bank Defendants managed

Enron's business with SPE structures.  Just as there is nothing inherently wrong with MTM

accounting, there is nothing inherently improper about using structured finance and SPEs to achieve

and report legitimate business results.  As the Chief Credit Officer of the Corporate Finance Group

of Moody's testified during the PSI Hearings, "It should be stressed that structured financing is a

common risk management tool available globally to corporations, financial institutions, and state and local governments. It is a recognized method, for example, of enhancing liquidity and of transferring credit risk when appropriately implemented." Testimony of Pamela M. Stumpp, the PSI Hearings, July 23, 2002 at 28 [hereinafter "Stumpp Testimony"].

110. However, in the case of Enron, the Insiders and the Bank Defendants used structured finance to report results Enron never achieved. Again, as Moody's testified at the PSI Hearings: "The problem was that the actual Enron risk was different from that portrayed by Enron's incomplete and misleading financial disclosures." *Id.* at 31. Obviously, reporting results that were never achieved is improper, especially because the whole point of reporting the incorrect results is to fool rating agencies and others – including Enron's creditors and its own Board of Directors – into believing that Enron was living up to its credit rating.

111. Companies registered with the Securities and Exchange Commission are required to file their financial statements in conformance with GAAP. If a structure is used, the financial impact of that structure must – at a bare minimum – be captured in the company's financial statements in accordance with the requirements of GAAP. In addition to technical compliance with GAAP's specific rules, the accounting must also satisfy the principles of "fairly presents." That is, even if a structure is reported in a manner that complies with individual, technical rules of GAAP, the reporting still violates GAAP if the resulting financial statements do not "fairly present in all material respects" the financial position, results of operations, and cash flows of the company.

112. The Insiders saw to it the SPE transactions were recorded and reported in a manner that violated GAAP. In each instance, the transaction was reported inconsistent with a key part of the structures by which the transaction was accomplished. Some (but not necessarily all) of these specific failings are identified in the discussion of the types of structures the Insiders used, which follows. Equally important, however, the manner in which the transactions were reported did not

fairly present in all material respects Enron's financial position, results of operations, and cash flows for the periods reported. In part, as the Enron Examiner explained, that is because many of the SPE transactions were designed to be reported in a manner inconsistent with the economic substance of the underlying transaction:

> [I]t is doubtful that a company's financial position can be "fairly presented" . . . if, through pervasive use of structured finance and aggressive accounting practices, a public company has so engineered its reported financial position and results of operation that its financial statements bear little resemblance to the economic substance of its actual financial condition or performance.

Exam. II at 56. That is exactly what the Insiders – with necessary help from the Bank Defendants – did.

### (1) The Insiders applied accounting techniques improperly to four types of transactions.

113. The Insiders repeatedly and improperly used accounting techniques, each dependent on the use of SPEs, to prop up Enron's important credit ratios. They applied these techniques to four different transaction structures: (i) prepay transactions, (ii) FAS 140 transactions, (iii) minority interest transactions, and (iv) tax transactions. The basics of these structures are discussed below.

114. Self-interested partnerships – like LJM1 and LJM2 – were also used in the process. Basically, the Insiders used these partnerships to temporarily "warehouse" Enron's underperforming assets – that is, the Insiders ostensibly sold underperforming assets to the self-interested partnerships (counter-intuitively, often at *higher* values than appeared on Enron's financial statements). The "sale" justified moving the assets off Enron's balance sheet. Moving the assets off balance sheet meant that Enron's financial statements never showed the decrease in value the asset had suffered (as MTM accounting would have required, had they been kept on the balance sheet), or the debt associated with the asset. It also left Enron's credit ratios undisturbed. The history of one asset illustrates the process.

115.    In January 1998, Enron acquired an interest in Catalytica, a developer of technology to reduce or eliminate emissions produced by natural gas turbines.   Enron's interest was subsequently hedged through Raptor – an SPE. It was "warehoused" between December 18, 1998 and December 3, 2000 in Rawhide, and then warehoused again between December 3, 2000 and March 12, 2001 with an affiliate of LJM2.  Enron Insiders controlled Raptor and LJM2, which was an investor in Rawhide. Several months before the asset was sold to the LJM2 affiliate, an Enron employee wrote:

> Some straight talk on valuation:
>
> Catalytica: Our initial investment was $30 million.  By early 2000 this had been writtenup [sic] to 47 million (the value BR – before raptor) based on a wing and a prayer.  Subsequently we were requested to come up with the highest possible value for the raptor arrangement. *This value is not the value at which a willing buyer and seller would transact an exchange.*  We conjured up a model which used every assumption provided by the company at face value with no risk adjustment.  These assumptions were "aggressive" to say the least; they constituted the basis for IB hype for the then contemplated IPO.  We could mathematically get to the $116.1 million raptor value, which translates to a $600-$700 million enterprise value.  The IPO was pulled and the company strategy changed to spin-off, i.e. no IB hype, roadshow, romance etc.  The technology has not been commercially  tested.  . . .

E-mail from Richard Lydecker, Enron, to Jeff Donahue, Enron, Sept. 15, 2000 at 1 (emphasis added).

116.    For some Insiders, the ultimate purpose of these partnerships was improper.  They were vehicles for siphoning money from Enron.  Not just those Insiders profited, however.  Bank Defendants did too.  The Insiders permitted and/or encouraged the Bank Defendants to invest in the partnerships and reap significant returns on their investments as reward for facilitating "problematic" SPE transactions and remaining quiet about the impropriety of Enron's financial reporting.

(2)     **The Enron prepay transactions were loans improperly disguised as commodity trades.**

117.    From 1992 through 2001, Enron engaged in structured transactions called "prepay transactions" ("the Enron prepay transactions").  Ostensibly, the Enron prepay transactions were commodity trades – that is, trades in which Enron agreed to deliver a specific amount of a commodity (such as gas or oil) in the future, usually over the course of several years, in exchange for a single, up-front payment (the purchase price) from the purchaser.

118.    Enron did not invent the concept of prepay transactions.  As the Securities and Exchange Commission recently explained in a complaint filed against JP Morgan Chase, in a typical prepay transaction there are two parties and

> the seller bets that the market price of the subject commodity would be lower at the time of delivery than at the time the contract is made.  The purchaser bets the opposite way: that the market price of the commodity at the time of delivery will exceed the price it paid at the time of contracting.  In a typical prepay transaction, therefore, each side assumes commodity price risk.

*SEC v. J.P. Morgan Chase & Co.*, Complaint at ¶ 12 (S.D. Tex. 2003) [hereinafter "SEC Chase Complaint].  But, beginning in at least 1997, the Enron prepay transactions failed to qualify as typical prepay transactions, because each side did not assume commodity price risk.  More specifically, when the relevant trades involved in a typical Enron prepay are pieced together, it is clear that *neither* party assumed commodity price risk.  In fact, the commodity price was irrelevant to the transaction.

119.    As the SEC explained (in the context of JP Morgan Chase), the Enron prepay transactions:

> employed a structure that passed the counter-party commodity price risk back to Enron, thus eliminating all commodity risk from the transaction.  As in typical prepays, Enron received cash up front.  In contrast to typical prepays, however, with all elements of the structure taken together, if all parties performed as expected, Enron's future obligations were distilled to repayment of that cash with negotiated interest.  The interest amount was set at the time of the contract and was independent

of any changes in the price of the underlying commodity. This was accomplished through a series of simultaneous trades whereby Enron passed the counter-party commodity price risk to a Chase-sponsored special purpose vehicle, which passed the risk to Chase, which, in turn, passed the risk back to Enron.

*Id.* ¶ 13.

120. The "trick" to the Enron prepay transactions was a circle of three. That is, each prepay transaction involved three essential parties: an Enron affiliate, a financial institution, and a conduit entity (usually controlled by the financial institution), each of which, at the end of the transaction, owed obligations to the other. Although their details differed, from 1997 forward, the Enron prepay transactions always included three steps that viewed together, eliminated commodity price risk for all three parties while producing reams of paper giving the appearance of commodity trades. As the Enron Examiner explained, "Thus, in substance, the prepayments to Enron simply created Enron debt." Exam. II at 64. And the Enron prepay transactions were actually loans.

121. The Insiders understood and intended that the three steps be viewed together, and that they effectively eliminate commodity risk. In June 2000, a recently completed $650 million prepay transaction with Chase was commemorated with a tombstone that included a triangle, to represent the three parties to the transaction. It also included, in quotation marks, the slogan: "Let the circle be unbroken."

122. Earlier this year, the District Attorney of New York County completed an 18-month investigation into Enron's prepay transactions with JP Morgan Chase and Citigroup. In a July 28, 2003 letter to Alan Greenspan, Chairman of the Board of Governors of the Federal Reserve System, and others, the District Attorney explained the nature of its investigation:

In the course of our investigation, which began shortly after Enron filed its bankruptcy petition, we have interviewed hundreds of witnesses from throughout the country and abroad and analyzed more than one million documents. In addition, testimony was taken from 46 witnesses and more than 2,700 exhibits were introduced before a New York Grand Jury, which sat for six months.

R. Morgenthau letter to The Honorable Alan Greenspan, July 28, 2003 [hereinafter "Morgenthau Letter"] at 2.

123.    Based on this extensive, independent investigation, District Attorney Morgenthau reached the same conclusion as the Enron Examiner:

> Prepaid commodities transactions, which involve the present sale of a commodity in exchange for future delivery, are routine and serve legitimate economic ends in commodities trading.  As our investigation disclosed, however, the prepaids Chase and Citibank engaged in with Enron were never designed to constitute trading in the commodities markets.  Despite the banks' efforts to make these transactions look like commodities trades, they were trades on paper only.  In substance, they were loans.

*Id.*

124.    The Insiders used the prepay device because accounting rules for commodity trades are different than accounting rules for debt.  Prepay transactions were simply a means of obtaining significant amounts of cash pursuant to a structure that allowed Enron to report favorable financial statement results.  Had the financial institutions simply loaned Enron money, the Insiders would have been required to record the loan amount on Enron's balance sheet as debt.  Instead, by falsely classifying the repayment obligation as generated by a commodity sales contract, the Insiders reported the repayment obligation as price risk management liabilities.  The difference in treatment was important because balance sheet debt is a component of several of the key financial ratios the rating agencies continuously monitored.

125.    The difference in accounting treatment also was important to Enron's cash flow statements.  Had the cash flow to Enron been properly recognized as loan proceeds, those funds would have been recorded as cash flow from financing activity.  Instead, by misclassifying the funds flow as part of a commodity contract, the Insiders ensured that the funds were reported as cash flow from operating activities.  Again, cash categorized as funds flow from operations helped the Insiders

"manage" the "quality of earnings" problem that the rating agencies perceived could arise from the use of MTM accounting.

126.    Accounting for the Enron prepay transactions as if they were commodities contracts rather than debt violated GAAP – among other provisions, FAS 95 and Emerging Issues Task Force Abstract 98-15 ("EITF 98-15"), titled "Structured Notes Acquired for a Specified Investment Strategy."

127.    Every independent entity to investigate the Enron prepays agrees that they violated GAAP.  The Senate Permanent Committee on Investigations also investigated and reported on Enron's prepay transactions.   At the conclusion of the investigation, the Committee's Chief Investigator, Robert Roach, characterized the prepays as a "sham" and described succinctly the GAAP rules for prepays and how the Enron prepays deviated from those rules:

> In order for [prepay] transactions like the ones used by Enron and the banks to be legitimately booked as a trading liability and not debt, four elements had to be present: One, the three parties had to be independent; two, the trades among the three parties could not be linked; three, the trades had to contain price risk; and, four, there had to be a legitimate business reason for the trades.
>
> The Enron type prepays we examined failed on all accounts:  Two of the three parties in the Enron trades were related – the banks and their offshore special purpose entities which the banks established and controlled; the trades among the parties were linked – contracts associated with the trades were designed so that a default in one trade affected the other trades; there was no price risk – except for fees and interest payments, the final impact of the trades was a wash; neither the banks nor the banks' special purpose entities had a legitimate business reason for purchasing the commodities used in the trades.

Testimony of Robert Roach, The PSI Hearings [hereinafter "Roach Testimony"], July 23, 2002 at 15-16.

128.    Both the Enron Examiner and the District Attorney for New York County reached the same conclusion, as a result of their respective investigations.  The Enron Examiner concluded:

> Pursuant to an application of existing GAAP, the commercially interdependent steps in the transactions should have been viewed together, and Enron should have

recorded the proceeds of these borrowings as cash flow from financing activities and its repayment obligations as debt. As a result of its accounting for the Prepay Transactions, Enron materially (i) understated its debt, (ii) overstated its cash flow from operating activities and (iii) overstated it price risk management liability.

Exam. II at 66. In the New York District Attorney's words, "Structuring these transactions as commodities trades . . . enabled Enron unfairly to account for the funds it received as cash flow from operations, rather than as the proceeds of bank or credit financing." Morgenthau Letter at 2.

129. The violations were particularly egregious because – as the Bank Defendants knew – the Insiders used the prepay transactions as a tool to satisfy the rating agencies' expectations. The tool was effective because the ratings agencies understood neither the nature of the prepays nor the fact that they violated GAAP. On July 23, 2002, Ronald Barone, the Managing Director of Standard & Poors' Utilities, Energy & Project Finance Group testified at the PSI Hearings. With respect to the Enron prepays, he stated:

> It now appears . . . [that] Enron may have incurred approximately $4 billion in debt-like obligations structured as prepaid forward transactions and swap transactions. . . . While Enron did not provide specific details about these particular transactions, the generalized information it did provide, which underpinned our analysis, led us to conclude that the funds from these transactions were more akin to operational cash flow than new debt-like obligations.

> Despite our repeated requests for complete, timely and reliable information, Enron did not disclose any information revealing a link between the prepaid forward transactions and the swap transactions. . . . While our knowledge about the full nature of these transactions and/or any links between them is still limited, any lack of disclosure by Enron of their material aspects would have been yet another flagrant violation of Enron's duty and responsibility to provide Standard & Poor's with complete, timely and reliable information.

Testimony of Ronald Barone, the PSI Hearings [hereinafter "Barone Testimony"], July 23, 2002 at 32. Pamela Stumpp, likewise testified on behalf of Moody's, albeit more bluntly: "Moody's did not have any knowledge, prior to Enron's bankruptcy, of the existence of Enron's prepaid forward and related swap transactions." Stumpp Testimony at 29. When Senator Lieberman asked why Moody's did not detect the transactions, Ms. Stump stated: "[C]andidly, these transactions were

disguised loans, and it was very difficult, and it would be very difficult from a simple examination of a company's financial statements to detect them. . . . [I]n this case it was a clear effort at hiding what was really debt from ourselves as well as other investors." *Id.* at 43.

130.     Enron obtained more than $8 billion in financing from just Citigroup and Chase over the six years before bankruptcy. Other financial institutions – including Barclays – also participated in prepays.

131.     Enron prepay transactions were also Enron's single largest source of cash during the four years before bankruptcy. Typically, the prepay transactions closed at the end of a financial quarter, and had a striking impact on Enron's financial statements. For example, in 2000, Enron's total operating cash flows were $4.779 billion, of which prepay transactions generated $1.527 billion (or 32%). In 1999, Enron total operating cash flows were $1.228 billion, of which prepay transactions supplied $1.231 billion gross.

132.     Had the Enron prepays been reported as debt, Enron's debt to total capital ratio would have been dramatically different in 1999 and 2000. In 1999, treating the Enron prepay amounts as debt would have increased Enron's debt by 31% and changed Enron's debt to capital ratio from 38.5% to 45%. In 2000, treating the Enron prepay amounts as debt would have increased Enron's debt by 39% and changed Enron's debt to capital ratio from 40.9% to 49.1%. As the Enron Examiner concluded, "Reduced operating cash flow and increased debt levels in these amounts would almost certainly have resulted in credit ratings lower than those enjoyed by Enron at the applicable times." Exam. II at 61.

133.     In their testimony to Congress, representatives from Moody's and S&P's agreed. Ms. Stumpp from Moody's testified,

> Based on our limited knowledge, these transactions appear to have been a form of financing. If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The

disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating.

Of course, knowing all that we do know today about the true nature of Enron's corporate enterprise, ***it is clear that Enron had not been an investment grade company for several years***. The compounded impact of these [prepay] transactions alone on Enron's financial framework may have resulted in the lower rating and perhaps an earlier downgrade to below investment grade status.

Stumpp Testimony at 30 (emphasis added). Mr. Barone from S&P's explained: "In hindsight, and without full information, it is difficult to assess the effect full disclosure about these transactions would have had on our ratings analysis; but the sheer volume of the transactions suggests that it would likely have been significant." Barone Testimony at 33.

> **(3)   The Insiders used FAS 140 transactions improperly to hide and move debt off Enron's balance sheet and to increase cash flow**.

134.    The Insiders found other ways to raise financing without reporting debt. In general, Enron could generate cash immediately from an asset by monetizing the asset through a structured finance transaction involving an SPE. By 1998, the Insiders were raising money by monetizing Enron's assets through "FAS 140 transactions." FAS 140 is a financial accounting standard that governs the securitization of financial assets.[2] As such, it defines the accounting by which transfers of financial assets (and their liabilities) to SPEs are recorded. By 1998, the Insiders had become vitally interested in structuring FAS 140 transactions because FAS 140 allowed asset transfers to be accounted for as sales. The beauty of accounting for a transfer as a sale was that the sale removed the asset (and its corresponding liabilities) from Enron's balance sheet and allowed Enron to recognize gain and operating cash flow from the transfer.

---

[2] FAS 140 replaced FAS 125 effective April 1, 2001. Some of Enron's transactions were governed by FAS 125 and some by FAS 140. All Enron's FAS 125, FAS 140 and other similar transactions are called FAS 140 transactions throughout this Complaint.

135.     These benefits became particularly important over time, as it grew obvious to the Insiders that Enron's merchant portfolio was rapidly declining in value.  By November 2000, over a year before Enron filed bankruptcy, Enron documents show the Insiders knew that

- 59% of originally expended capital was not meeting expectations,

- Enron had $3.8 billion of earnings exposure on assets performing below expectation,

- 81 out of 167 equity transactions were underperforming,

- 43% of originally expended debt capital was not performing or "had issues,"

- Enron had $315 million of earnings exposure on debt that was non-performing or "had issues," and

- 31 out of 55 debt transactions were nonperforming or had issues.

136.     Of course, because of MTM accounting, each underperforming asset had been originally recorded on Enron's financial statements at "fair value" based on a then-rosy assessment of the value of that asset, determined in the afterglow of the transaction.  As assessments changed – and the document quoted above shows that they did, radically – MTM accounting likewise required the Insiders to re-determine each underperforming asset's fair value and change Enron's financial statements to recognize the loss.

137.     But it became quickly clear to the Insiders that the size and number of Enron's failures ran the risk of toppling Enron's credit rating.  Therefore, the Insiders created FAS 140 transactions as an alternative:  Instead of re-valuing the asset on Enron's financial statements and recognizing the loss, the Insiders ostensibly transferred the asset into a structure which purportedly qualified for sale reporting pursuant to FAS 140.  The Insiders then moved the asset off the balance sheet, used the cash to operate the company, and – for the time being – resolved the valuation problem.

138.     Between 1998 and the Petition Date, Enron participated in more than thirty FAS 140 transactions. The reporting of a large number of them violated GAAP. Usually, the SPE structure into which the asset was transferred did not meet the requirements for reporting the transfer pursuant to FAS 140. Moreover, reporting the transactions as if they involved FAS 140 structures failed to fairly present in all material respects Enron's financial position, results of operations, and cash flows.

139.     FAS 140 is inapplicable unless the asset being transferred is isolated from the transferor such that it cannot be reached by the transferor's creditors in bankruptcy. An asset is not isolated if transferred to an SPE that should be consolidated on the transferor's financial statements. The question of consolidation is therefore crucial to FAS 140 accounting treatment.

140.     FAS 140 incorporates accounting guidelines that address aspects of the question of consolidation. These guidelines have created a "prevailing practice" with respect to consolidating SPE's. The prevailing practice – in accounting jargon, "the 3% equity rule" – is the equivalent of a requirement. As the Enron Examiner explained, the rule means an SPE must be consolidated unless *independent* third parties make an *equity investment* in the SPE equal to at least *3% of the fair value* of the entity's assets, and the equity investment is *at risk* during the entire term of the SPE.

141.     In substantially all of the FAS 140 transactions involving the 3% equity requirement, the Insiders promised the equity owner verbally that Enron would repay the equity investment. The Bank Defendants to whom these promises were made often documented the promise in their records. The Insiders who made the promises routinely honored them. Thus, where repayment was promised, equity was not at risk, and accounting for the transaction pursuant to FAS 140 violated GAAP.

142.     Some of the Bank Defendants called the Insiders' promises to repay the equity investments "trust me" equity. "Trust me" equity eliminated the Bank Defendants' incentive for

analyzing the FAS 140 deals, before investing, as though they were real investments. When the CFO or Treasurer of one of the largest corporations on earth assures repayment of an investment, determining whether the economics of the underlying asset will support the investment is superfluous. Likewise, when the CFO or Treasurer knows the investor is not scrutinizing the economics of the underlying asset, he is not constrained when he values that asset. It is therefore relatively simple to record the "sale" at an inflated value, and thereby avoid reporting any loss in value on Enron's financial statements. That is what the Insiders did. In this way, the financial institutions knowingly facilitated the Insiders' abuse of MTM accounting by participating in FAS 140 and other transactions in which they received unwritten promises of repayment of their equity investments.

143. Although the Enron Examiner did not report on every FAS 140 transaction, he concluded that for every FAS 140 transaction he did report on, the transaction should be re-characterized as a loan. By failing to report the transaction as a loan in the first instance, the Insiders (with the support and assistance of the Bank Defendants) were able at least to

- record approximately $350 million of income as gain on sales of assets for assets that were not actually sold,

- record $1.1 billion as cash flow from operating activities which should have been reported as cash flow from financing activities,

- remove approximately $894 million of debt (improperly) from Enron's financial statements, and

`  - leave $857 million in contingent obligations off Enron's balance sheet.

144. Had the FAS 140 transactions been properly recorded, they would have had a substantial impact on Enron's credit rating.

> **(4)    The Insiders used minority interest transactions improperly to hide debt.**

145.    The Insiders used another device to keep debt off Enron's balance sheet and engineer its financial statements: the minority interest structure. Citigroup designed the structure and regarded it as a proprietary product. Enron's five primary minority interest structures were Rawhide, Nighthawk, Choctaw, Nahanni and Zephyrus. To execute the structure, the Insiders caused the creation of a subsidiary (Entity A), the majority of which Enron owned. (Therefore, Entity A was consolidated with Enron for financial purposes.) A new and allegedly independent entity (Entity B) purchased the "minority interest" in Entity A. Entities A and B were both SPEs.

146.    Enron purchased its majority interest in Entity A by contributing various assets. In the meantime, Entity B took out a bank loan. Entity B then purchased its minority interest by contributing the proceeds of the loan, plus 3% equity, to Entity A. Finally, Entity A loaned Enron the total amount of Entity's B contribution. At the end of the transaction, it appeared that Enron had received funds directly from an affiliate that was already consolidated with Enron for financial accounting purposes (as opposed to from the bank that loaned Entity B the money). Therefore, Enron did not have to book any debt for the transaction, and Enron's debt ratios were not affected by the loans. Additionally, Enron booked the funds as operating income.

147.    An actual example: On December 27, 1997 the Insiders closed Enron's first minority interest structure. Whitewing Associates LLC ("Whitewing") was formed to be the majority owned entity (Entity A in the example above). Nighthawk Investors LLC ("Nighthawk") was the new and allegedly independent entity (Entity B in the example above) formed to own the minority interest. Enron borrowed $578 million from Citibank and contributed that amount to Whitewing in exchange for a 53.6% managing member interest (the Class A interest). Whitewing was consolidated with Enron for financial accounting purposes. Nighthawk contributed $500 million for its 46.4% Class B

member interest in Whitewing. Nighthawk obtained its funds by borrowing $485 million (97%) from CXC Incorporated ("CXC"), a Citigroup commercial paper affiliate. The other $15 million (3%) was furnished by Golden Eagle L.L.C. ("Golden Eagle"), the managing member and purported 100% equity owner of Nighthawk. Golden Eagle in turn was owned by Kestrel Investor, L.L.C. ("Kestrel"), which was owned by HCM High Yield Opportunity Fund, LP ("HCM"). Golden Eagle obtained its $15 million from Kestrel, which had obtained $7.9 million from HCM and had borrowed $7.1 million from CXC. Citibank provided liquidity support for the loan to Kestrel, and Ambac Assurance Corporation ("Ambac") provided a surety bond for repayment of the $7.1 million loan to Kestrel. That loan was expressly non-recourse to Kestrel or HCM. The Enron convertible preferred stock, and any dividends with regard to it, were the sources of payments to CXC and Golden Eagle/Kestrel.

148.    Whitewing used $1 billion of the $1.078 billion capitalization to buy newly issued shares of Enron convertible preferred stock. Whitewing loaned the remaining $78 million to Enron. The Enron convertible preferred stock and the note from Enron were Whitewing's sole assets. Enron then repaid the Citibank loan it had used to fund its Class A interest in Whitewing. The net effect was that Enron obtained $500 million that, except for HCM's $7.9 million investment, was provided by Citibank's affiliate, CXC. Enron, through a complex series of undertakings, assumed virtually all of the risk of loss and the obligation to repay the Nighthawk note and the Golden Eagle "equity." Nighthawk was not consolidated with Enron for financial accounting purposes, and Enron did not record any of this money as debt.

149.    Enron's accounting treatment for Whitewing, as well as for other minority interest transactions, did not comply with GAAP. The accounting treatment suffered from several of the same infirmities as the FAS 140 transactions. In nearly ever case, "Entity B" should have been consolidated with Enron for financial accounting purposes. If it had been, the loan proceeds would

have been recorded as debt rather than as a minority interest. Second, typically there was in substance a guarantee that took the risk out of Entity B's equity contribution or there was insufficient outside equity in the first place. For example, to avoid consolidating Nighthawk with Enron, Nighthawk needed independent equity of 3% of its total capitalization. However, less than the required 3% was present. Kestrel's entire $15 million was protected by a "costless collar" consisting of put and call options. In addition, $7.1 million of the so-called equity was not at risk because it was borrowed on a non-recourse basis from CXC. The $500 million should have been recorded as Enron debt.

150. The minority interest transactions were material. For example, Nahanni (another year-end deal) contributed 41% of Enron's total reported cash flow from operations in 1999, and had no business purpose other than to increase Enron's operating cash flows.

151. Had the minority interest transactions been properly recorded, they would have had a substantial impact on Enron's credit rating.

> **(5)    The Insiders used tax transactions improperly to generate paper income.**

152. Consistent with their misuse of SPEs, the Insiders found a way to generate financial statement income – without any positive cash flow – through complex tax structures that had no genuine tax-saving purpose. The "tax transactions" – Tomas, Teresa, Steele and Cochise – involved different technical approaches (tax basis step-up, basis shifting, REMIC carryover basis), but had as a common theme the creation of deferred tax assets which could be booked as financial statement income over an artificially short time period. This was accomplished with SPE structures involving many entities and transactions, primarily designed by BT/Deutsche Bank. BT/Deutsche Bank served as Enron's exclusive financial advisor on these transactions and also profited by being a counter-party in some of them. In causing Enron to engage in the transactions and record income

improperly, the Insiders also caused Enron to pay BT/Deutsche Bank huge fees, ranging from $6 million to more than $11 million per transaction.

153.     Four transactions in which this was done were Teresa, Steele, Cochise, and Tomas. During this time period, Enron already had substantial available tax deductions. In the words of Robert Hermann, head of Enron's tax department, "We had debt to choke a horse, plenty of interest deductions and stock option expense deductions. We had losses. We didn't need deductions." Hermann Sworn Statement 46:6-14. In short, Enron did not need expensive tax shelters in order to reduce current income tax liability. On the contrary, the explicit, predominant purpose of the tax transactions was simply to increase financial accounting income. In fact, Teresa actually resulted in a payment in 1997 through 2001 by an Enron subsidiary of approximately $131 million in federal income taxes, which that subsidiary would not have had to pay absent the transaction.

154.     Enron and BT/Deutsche Bank entered into two other tax transactions, known as Valhalla and Renegade, in order for *BT/Deutsche Bank* – not Enron – to reduce its tax liability. These were known as "accommodation" transactions, and BT/Deutsche Bank actually compensated Enron for its role in them.

155.     The effect of the tax transactions was to inflate Enron's income in its public financial statements by significant amounts. Investigators for the Senate Finance Committee have concluded that by 2001, the BT/Deutsche Bank tax transactions accounted for $446 million of the $651 million attributed to Enron's tax schemes. Under GAAP, these sums could not be recognized as income unless Enron would receive real, anticipated tax benefits in future years. That was not the case for many of the transactions. Those transactions were therefore "artificial transactions" with "no bona fide business purpose." And, as the Enron Examiner concluded, Enron's accounting treatment for these transactions was inappropriate.

156.     The Insiders should not have engaged in the tax transactions, nor should they have recorded income on Enron's financial statements from the tax transactions.  The tax transactions had a material effect on Enron's financial statements.  Eliminating the income that they represented would have had a material impact on Enron's credit rating.

   e.     **The scheme gave Insiders and the Bank Defendants time and opportunity to profit at Enron's expense.**

157.     From late 1997 until late 2001 a number of the Insiders facilitated these SPE transactions by establishing and operating three "independent" investment vehicles: Chewco, LJM1, and LJM2.  In doing so, the Insiders received active assistance and eager financial support from many of the Bank Defendants.  The Insiders used these vehicles to help carry out the scheme.  For example, the Insiders (with the Bank Defendants' knowledge) used them to store under-achieving or illiquid Enron assets, thus moving them (and the debt associated with them) off Enron's balance sheet.  The Insiders (with the Bank Defendants' knowledge) used them to "create" funds flow from operations to report on Enron's balance sheet.  The Insiders (with the Bank Defendants' knowledge) also used them to obtain off-balance sheet financing.  These uses helped the Insiders keep Enron's credit profile stable and, thereby, its stock price strong.  *Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp.* at 4-5 (Feb. 1, 2002) [hereinafter "Powers Report"].

158.     But those were not their only – or even primary – uses.  Notoriously, at least three Insiders – Fastow, Kopper, and Glisan – at the same time used the "independent" investment vehicles illegally to syphon money from Enron in the form of huge investment returns and management fees.  Altogether, Fastow (and his family) received over $31 million in distributions, over $12 million in management fees, and approximately $16.35 million in connection with the sale of Fastow's interest in LJM2.  Kopper (and his partner) received at least $24.5 million in

distributions and at least $8.9 million in management fees. Glisan received $1,040,744 on a total investment of $5,800.

159. All three Insiders have been prosecuted in connection with the investment vehicles. (Fastow's wife has been indicted too.) Two of the three – Glisan and Kopper – pled guilty. As part of his plea, Glisan admitted that he and others "engaged in a conspiracy to manipulate artificially Enron's financial statements," and that "LJM enabled Enron to falsify its financial picture to the public; in return, LJM received a prearranged profit." *Glisan 9/10/03 Statement*, Ex. 1 to Plea Agreement. Kopper similarly admitted that the Chewco and LJM transactions were part of an illegal scheme to defraud. Plea Allocution dated August 21, 2002, *United States v. Kopper*, Cr. No. H-02-0560 (S.D. Tex.).

(1) **In late 1997, Fastow and Kopper formed Chewco.**

160. Chewco was the first of the three independent investment vehicles. In the early 1990's, Enron entered into a limited partnership with California Public Employees' Retirement System ("CalPERs"). The partnership was called Joint Energy Development Incorporated ("JEDI"), and CalPERs was the sole limited partner. In late 1997, CalPERs decided to divest its interest in JEDI. Although Enron could have purchased CalPERs' interest directly, doing so would have meant consolidating JEDI on Enron's financial statements. At the time, consolidation would effectively have wiped out 40% of Enron's reported 1997 profits and added approximately $700 million in debt to Enron's balance sheet. To avoid that, Fastow and Kopper conceived of, and created, Chewco – and made it the replacement investor.

161. A problem with Chewco in that role, however, was that Chewco did not satisfy the 3% equity rule. Barclays structured and financed the equity piece of Chewco. However, the equity was not sufficiently at risk. As discussed in the Barclays' section below, Barclays' equity investment was secured by reserve accounts the Insiders established with Enron's money. Virtually

all of Chewco's equity therefore was traceable back to Enron. Nonetheless, Fastow had Enron

report JEDI profits (and *not* report JEDI debt) on Enron's financial statements – which meant Enron,

in turn, announced better-than-expected 1997 performance. Fastow and Kopper paid themselves

handsomely from Chewco for this illusion.

**(2)      In 1999, Fastow and Kopper Expanded Their Scheme by
Creating the LJM Partnerships**

162.    Emboldened by the success of Chewco – as well as by the money he made on

it – Fastow conceived and created the second and third "independent" investment vehicles: LJM1

and LJM2. LJM1 – technically, LJM Cayman, L.P. – was a Cayman Islands limited partnership.

LJM2 – technically, LJM Co-Investment, L.P. – was a Delaware limited partnership. Through

entities, Fastow served as the general partner of the managing partner of each.

163.    Both LJM partnerships were formed in 1999. From June 1999 through June 2001 – a

period of two years – the Insiders had Enron enter into *more than twenty* distinct transactions with

the partnerships. Three were with LJM1 and the rest with LJM2. Through those transactions, the

Insiders were able to increase drastically their manipulation of Enron's financial statements. They

moved many poorly performing assets off-balance sheet. They manufactured earnings for Enron

through sham transactions when Enron was having trouble otherwise meeting its goals for a quarter.

They even improperly inflated the value of Enron's investments by backdating transaction

documents to dates advantageous to Enron. Powers Report at 4-5, 134; Exam. II., App. L at 1, 6,

28.

164.    In late 2001, the Insiders' scheme began to unravel, exposing their fraud. On

October 16, 2001, Enron announced it would take a $544 million after-tax charge against earnings

and a reduction of shareholders' equity of $1.2 billion related to the LJM2 transactions. In

November 2001, Enron re-stated its financials for the period 1997 through 2001 because of

accounting errors relating to LJM1 and Chewco. The restatement reduced Enron's reported net income by $28 million in 1997; $133 million in 1998; $248 million in 1999; and $99 million in 2000. The restatement also reduced shareholders' equity by $258 million in 1997; $391 million in 1998; $710 million in 1999; and $747 million in 2000. It increased debt over these years by more than *2.5 billion.* Powers Report at 2-3.

165. Discovery of the truth about Chewco and the LJM entities led to discovery of the Bank Defendants' role in the Insiders' fraud. It also exposed how the Bank Defendants knowingly helped the Insiders become rich at Enron's expense.

### (3) In 1999, The Bank Defendants Facilitated Fastow and Kopper By Becoming LJM2 Investors.

166. From its inception, LJM2 was intended to be a large private equity fund – much larger, for example, than LJM1. When Fastow conceived the idea of LJM2, he took it to Enron's Finance Committee and Board. Fastow explained that he intended to raise $200 million or more from institutional investors to create a private investment partnership that could readily purchase assets from Enron. Fastow explained that he would be the owner of LJM2 Capital Management, LP – LJM2's general partner. Fastow explained that Enron would benefit from his involvement because LJM2 could purchase assets Enron wanted to sell more quickly and with less transaction costs than outsiders. On October 11, 1999, the Enron Finance Committee and Board of Directors approved the formation of LJM2.

167. With the assistance of one Bank Defendant – Merrill Lynch – Fastow solicited investments in LJM2 from other Bank Defendants. Merrill Lynch authored a private placement memorandum that emphasized Fastow's position as Enron's CFO, and explained that Fastow, Kopper, and Glisan would manage LJM2's day-to-day activity. The Executive Summary in the PPM made LJM2's purpose clear:

> Executive Summary: LJM2 Co-Investment, L.P., a Delaware limited partnership ("LJM2" or the "Partnership"), is being organized by Andrew S. Fastow, Executive Vice President and Chief Financial Officer of Enron Corp., an Oregon corporation ("Enron"), to make… investments in energy- and communications-related business assets. The Partnership expects that Enron will be the Partnership's primary source of investment opportunities and that the Partnership will (i) co-invest with Enron or its subsidiaries… and (ii) make investments in, or acquire an investment interest from Enron or its subsidiaries relating to existing assets or businesses owned by Enron or its subsidiaries. It is expected that in connection with the foregoing investments, Enron will retain significant economic or operating interests in the businesses or assets in which the Partnership invests…. The Partnership's objective is to generate an annualized internal rate of return ("IRR") in excess of 30%….

LJM078358.

168.    The basic investment strategy, as well as important conflicts of interest, were also spelled out in the Executive Summary:

> Investment Strategy: (1) Invest with Enron; (2) invest in assets and businesses where the seller retains an ongoing economic interest; and (3) capitalize on financial expertise of the principals. LJM2 will typically seek to exit transactions either by negotiating co-sale rights or by securitizing and placing investments in the capital markets. The rationale behind Enron providing investment opportunities to LJM2 is to move assets off-balance sheet and reduce its operating and financial risk by selling portions of investments to co-investors. In many cases Enron seeks to maintain an active or controlling role in the underlying investment.

> Conflicts of Interest: The principals are employees of Enron and owe fiduciary duties to Enron, which may from time to time conflict with LJM2 duties. To combat this potential the principals intend to consult regularly with the Advisory Committee regarding transactions with or involving Enron. Also, companies in which the Partnership invests may also engage in transactions with Enron and profits derived by Enron from such transactions will not be shared with the Partnership.

*Id.*

169.    On December 15, 1999, Fastow issued Supplement No. 1 to the Confidential Private Placement Memoranda. It set out five initial investments totaling $93 million that were contemplated to close by year-end 1999 with the initial investment funds.

170.    By the end of December 1999, fourteen limited partners, including five Bank Defendants – Citigroup, JP Morgan Chase, BT/Deutsche Bank, CIBC, and Merrill Lynch

(collectively, "the LJM Investor Defendants") – had subscribed to LJM2. The chart that follows details the amounts and dates of the LJM Investor Defendants' commitments to LJM2, including the vehicle (usually a subsidiary) through which the LJM Investor Defendants made the commitment. Altogether, in a four month period, Citigroup committed $15 million, JP Morgan Chase committed $25 million, BT/Deutsche Bank committed $10 million, CIBC committed $15 million, and Merrill Lynch committed $21.645 million.

| LJM Investor Defendant | Investment Thru | Date | Amount |
|---|---|---|---|
| Citigroup | Citicorp | 12/21/1999 | $10,000,000 |
| | Primerica Life Insurance | 04/05/2000 | $274,500 |
| | The Travelers Indemnity Company | 04/05/2000 | $3,176,500 |
| | Travelers Insurance Company | 04/05/2000 | $1,355,500 |
| | Travelers Live and Annuity Company | 04/05/2000 | $193,500 |
| JP Morgan Chase | J.P. Morgan Partnership Investment Corporation | 12/21/1999 | $12,000,000 |
| | Chemical Investment Inc. | 12/21/1999 | $10,000,000 |
| | Sixty Wall Street Fund, L.P. | 12/21/1999 | $3,000,000 |
| BT/Deutsche Bank | BT Investment Partners, Inc. | 12/21/1999 | $10,000,000 |
| CIBC | CIBC Capital Corporation | 12/21/1999 | $15,000,000 |
| Merrill Lynch | ML IBK Positions, Inc. (investment vehicle for Merrill Lynch & Co.) | 12/21/1999 | $5,000,000 |
| | ML/LJM2 Co-Investment, L.P. (personal investments of nearly 100 Merrill Lynch executives) | 04/05/2000 | $16,645,000 |

171.    As the chart shows, the LJM Investor Defendants' total commitment at the end of 1999 was $65 million, or 60 percent of the total $107 million committed by that time. However, because there was insufficient time to fund LJM2 fully by year-end 1999 with enough capital to

engage in the transactions to which LJM2 had been committed, financial institutions, including the LJM Investor Defendants, funded 100% of the monies needed. Therefore, the Insiders were able to cause Enron to engage in the four transactions as a direct result of the LJM Investor Defendants' participation in LJM2. These transactions generated millions in phony profits for Enron and moved hundreds of millions of dollars of debt off Enron's balance sheet right at year end.

172. Without the LJM Investor Defendants, LJM2 would not have existed, and the Insiders would have been unable to personally profit at Enron's expense or use LJM2 to further their financial statement fraud.

173. Each LJM Investor Defendant invested in LJM2 for one or both of the same two reasons: (i) because Fastow calculated the investment would earn 30 percent, and (ii) because the Bank Defendant believed the investment was necessary to keep Fastow happy and to ensure that he would continue to send transactions its way.

174. By participating in LJM2, the LJM Investor Defendants did keep the transactions flowing. For example, Citigroup engaged in at least 15 transactions (including many lucrative prepay transactions) after committing to LJM2, and earned more than $46 million in fees on those transactions.

175. Every LJM Investor Defendant knew that Fastow and other Insiders were using LJM2 to carry out a scheme to manipulate Enron's financial statements. Every LJM Investor Defendant knew that whenever an Insider decided Enron should enter into a transaction with LJM2, the Insider's personal interest conflicted with Enron's. Every LJM Investor Defendant also knew that LJM2 gave Fastow and other Insiders unlimited opportunities to betray Enron by profiting at Enron's expense. Finally, every LJM Investor Defendant knew that its own participation in LJM2 had been purchased by threats of no future business and/or promises of exorbitant returns. A Citigroup document says best what every LJM Investor Defendant knew: "In committing to LJM2,

we understood that the Fund would be relying on Enron directly for transactions. . . . Additionally, LJM2 principals argue that Enron would make the Fund whole should it suffer losses because the vehicles that the Fund invests in are critically important to Enron's ability to manage its earnings." CITI-B 0017103.

f. **Enron's outside directors were unaware of the scheme.**

176.     Throughout the relevant period, Enron's Board of Directors consisted largely of independent, outside directors who had no involvement in the Insiders' and Bank Defendants' scheme and were unaware of it. From 1997 through 2001, these independent, non-management directors constituted more than two-thirds of the 15-member Board of Directors.

177.     The outside directors did not know that the Insiders and the Bank Defendants were manipulating and misstating Enron's financial condition; nor did they know that the Insiders were secretly reaping enormous personal profits at the expense of the company. The outside directors did not know, for example, that the prepay transactions with Citigroup, Chase, and Barclays were anything other than legitimate commodity transactions. They did not know that these transactions had been structured so that all commodity risk was eliminated and the transactions were in substance loans to Enron. The outside directors also did not know that Delta Energy Corporation and Mahonia Limited were shell SPEs established and controlled by Citigroup and Chase, respectively, for the purpose of executing phony prepay transaction with the Insiders.

178.     Similarly, the outside directors of Enron did not know that the Insiders were improperly accounting for transactions with Citigroup, Chase, Barclays, and CIBC as legitimate FAS 140 and minority interest transactions because in each and every transaction the Insiders had given oral assurances of repayment of the required equity investment. The outside directors were unaware that the Insiders had structured the Nigerian Barge transaction with Merrill Lynch with an unwritten guaranteed takeout within six months and a promised rate of return; nor did they know

that the Insiders had manipulated Enron's 1999 financial results by executing mirror image electricity trades with Merrill Lynch. Similarly, the outside directors did not know that the Insiders created tax transactions with BT/Deutsche Bank that had no legitimate business purpose and were done solely to generate accounting income.

179.     The outside directors of Enron did not know that the Insiders were using related party transactions with Enron to gain enormous personal benefits. While the Enron Board approved Fastow's participation in the LJM partnerships, it did so only after insisting that limitations and controls be placed on his role. With respect to LJM1, the Board conditioned Fastow's participation expressly on the condition that he have no direct pecuniary interest at any time in Enron stock to be held in LJM1. As to LJM2, the Board required that senior officers, including Causey (who, unbeknownst to the Board, was an Insider too), review and approve all transactions between Enron and LJM2. The Board also relied upon Fastow's representation that his economic interests in the LJM partnerships would be reviewed by other executives. The outside directors did not know that Fastow and other Insiders ignored these limitations and controls. As a result, the outside directors did not know that Fastow was reaping tens of millions of dollars from the LJM partnerships or that Glisan, Kopper or any other Enron employee had secretly been given interests in entities transacting business with the company. The outside directors did not know that certain of the Bank Defendants and their executives were participants in the LJM partnerships and were receiving substantial returns on their investments.

180.     Had the outside directors become aware of the Insiders' and the Bank Defendants' scheme they certainly would have stopped it. As a super-majority of the Enron Board, the outside directors had the authority and ability to do at least the following: (1) to suspend or terminate officers and other employees and to initiate appropriate legal proceedings against them; (2) to report wrongdoing to the SEC, the Justice Department, or other regulatory or enforcement authorities and

request an immediate investigation; and (3) to retain counsel and other experts and commence their own investigation. Indeed, the Enron Board promptly took many of these remedial actions in the fall of 2001, when evidence of the Insiders' scheme first surfaced. Fastow was terminated and, as more information became available, other Insiders were, as well; the Board appointed a special committee to investigate the related party transactions and authorized the retention of legal and accounting experts to assist that committee; and when SEC and, later, Justice Department investigations began, the Board offered full and complete cooperation with those authorities.

4. **The Bank Defendants Knowingly Participated In Manipulating And Misstating Enron's Financial Condition**

a. **Citigroup knowingly assisted the Insiders in misstating Enron's financial condition.**

181. Citigroup's involvement in the Insiders' manipulation of Enron's financial condition was essential to the success of the Insiders' scheme. Citigroup knew the Insiders were using SPE transactions to improperly generate income and inflate cash flow from operations and to disguise debt as price risk management liabilities. During the relevant period, Citigroup assisted the Insiders in achieving these goals by designing, financing and/or implementing nine prepay transactions, three minority interest transactions, and two transactions involving Enron's forest products business. Together, these transactions provided Enron with $5.9 billion of financing, from which the Insiders improperly recorded more than $5 billion of cash flows from operating activities, improperly recorded approximately $132 million of income, and understated the debt on Enron's balance sheet by billions of dollars.

182. Citigroup's participation in SPE transactions with Enron has been reviewed and thoroughly criticized by federal and state regulators, a subcommittee of the United States Senate, and the court-appointed Enron Examiner, all of whom concluded that Citigroup knowingly facilitated the Insiders' misstatement of Enron's financial condition.

183.     Following a multi-month investigation, the Securities and Exchange Commission instituted an administrative proceeding against Citigroup based upon its role in the manipulation of Enron's financial condition in nine prepay transactions, the Nahanni minority interest transaction, and the Bacchus transaction involving Enron's forest products business.  With respect to these transactions, the SEC found that Citigroup assisted Enron in "enhancing *artificially* [its] financial presentations through a series of complex structured financings whose purpose and effect, among other things, was to allow [Enron] to report proceeds of financings as cash from operating activities on their statements of cash flows.  In these transactions, Enron . . . received cash upfront and repaid that cash on terms that included a negotiated return in the nature of interest."  SEC Order Instituting a Public Administrative Proceeding in *In the Matter of Citigroup, Inc.* ("SEC Citigroup Order") at 2 (emphasis added).  Citigroup settled the SEC proceeding by paying over $101 million.

184.     Manhattan District Attorney Morgenthau's 18-month investigation of the prepay transactions between Enron and Citigroup concluded that the Citigroup prepays "were never designed to constitute trading in the commodities markets.  Despite the banks' efforts to make these transactions look like commodities trades, they were trades on paper only.  ***In substance, they were loans.***  Structuring these transactions as commodities trades, however, enabled Enron *unfairly* to account for the funds it received as cash flow from operations, rather than as the proceeds of bank or credit financing."  Morgenthau Letter at 2 (emphasis added).  The Morgenthau investigation also concluded that Citigroup knowingly participated in the misstatement of Enron's financial condition: "Citibank *knowingly* structured the prepaid transactions with Enron in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent."  *Id.* at 8 (emphasis added).  Citigroup entered into a Settlement Agreement with the District Attorney's Office in which it agreed to pay $25 million and to adhere to internal reforms designed to prevent future abusive prepay transactions.  In a letter to DA Morgenthau dated July 28, 2003, Citigroup

Chairman and CEO Charles Prince acknowledged Citigroup's wrongdoing: "*I want to assure you, both personally and on behalf of Citigroup, that the Enron transactions do not reflect our current standards and they would not happen now – and will not happen in the future – at Citigroup.*" (emphasis added).

185.    The Permanent Subcommittee on Investigations ("PSI") of the United States Senate also investigated Citigroup's role in Enron's collapse.  As to the prepay transactions, the Chief Investigator for the PSI found that "[i]nternal communications show that it was common knowledge among . . . Citigroup employees that the 'prepays' were designed to achieve accounting, not business, objectives and that Enron was booking the 'prepay' proceeds as trading activity rather than debt.  The evidence indicates that . . . Citigroup not only understood Enron's accounting goal – increasing operating cash flow with reporting debt – but designed and implemented the financial structures to help Enron achieve this objective.  Moreover, they accepted and followed Enron's desire to keep the nature of these transactions confidential."  Roach PSI Report at 3.  He further concluded that Citigroup had knowingly assisted Enron in misrepresenting its financial condition: "The evidence reviewed by the Subcommittee staff indicates that the financial institutions that participated in Enron 'prepays' understood that Enron was seeking to obtain financing from them, but wanted to obtain the financing through orchestrated, multi-party commodity (largely energy) trades rather than straight-out loans, so that the company could characterize the funds as cash flow from operations rather than cash flow from financing.  *Internal communications show that the financial institutions not only understood that Enron intended to engage in this deceptive accounting, they actively aided Enron in return for fees and favorable consideration in other business dealings." Id.* at B-1 (emphasis added).

186.    With respect to the transactions involving Enron's forest products business – Bacchus and Sundance Industrial, the PSI Report found that Citigroup "actively aided Enron in executing [the

transactions], despite *knowing* the transactions utilized deceptive accounting or tax strategies, in return for substantial fees or favorable consideration in other business dealings. The evidence also indicates that Enron would not have been able to complete any of these transactions without the direct support and participation of a major financial institution." U.S. Senate Permanent Subcommittee on Investigations Report on Fishtail, Bacchus, Sundance, and Slapshot, January 2, 2003, at 2 (emphasis added).

187.    The Enron Examiner reviewed in detail the Citigroup prepays, the three Citigroup minority interest transactions (Nighthawk, Rawhide and Nahanni), and the two Citigroup transactions involving Enron's forest products business (Bacchus and Sundance Industrial). With respect to the Citigroup prepay transactions, the Enron Examiner concluded that they were loans disguised to look like commodity transactions; that "each transaction was circular" and that "[a]ll commodity price risk was eliminated by having it circle back to Enron"; that "Citigroup understood Enron's accounting for the Citigroup Prepays and the inadequacy of the disclosures in Enron's financial statements"; and that Citigroup materially assisted the Insiders in misstating Enron's financial condition by, among other things, lending its own funds in five of the prepay transactions, developing the credit linked note structure by which Enron raised funds for other of the prepays, providing its SPE – Delta – to serve as the shell conduit party in six of the prepays, and serving as the conduit entity in two of the prepays in which it was not the lender. Exam. III, App. D at 47, 50. As to the Nighthawk and Nahanni minority interest transactions, the Enron Examiner concluded that Enron's accounting treatment was not in compliance with GAAP; that Citigroup knew that Enron's accounting treatment was not in compliance with GAAP; and that, despite this knowledge, Citigroup facilitated the Insiders' misstatement of Enron's financial condition by structuring the transactions, funding the loans in the structures, and serving as placement agent for the equity investments in the transactions.

188.     Likewise, the Enron Examiner found that the forest products business transactions were improperly accounted for at Enron; that Citigroup knew the accounting was suspect; and that Citigroup nonetheless participated in these transactions by providing both the loans and purchasing the equity necessary for their completion.   Of the forest product transactions, the Bacchus transaction was so out of line that one Citigroup employee wrote: ***"Sounds like we made a lot of exceptions to our standard policies.  I am sure we have gone out of way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts . . . ."*** CITI-B 0281946 (quoted in Exam. III, App. D at 124) (emphasis added).   Similarly, the Sundance Industrial deal was so egregious that the head of Citigroup's Global Risk Management Group refused to approve the transaction and warned that ***"[t]he GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."*** CITI-B 0307593 (quoted in Exam. III, App. D at 131) (emphasis added).  As a result of the foregoing, the Enron Examiner concluded that the evidence is "sufficient for a fact-finder to conclude that Citigroup aided and abetted certain Enron officers in breaching their fiduciary duties."  Exam. III, App. D at 148.

**(1)     Citigroup's relationship with Enron**

189.     Enron considered Citigroup to be one of its most important financial institutions. From 1997 through 2001, Citigroup was classified by Enron as one of its select Tier 1 banks.[3] During this period, Citigroup completed over 60 lending and finance transactions with Enron, an

---

[3] The Insiders defined a Tier 1 bank as one that could:

|       |                                                        |
|-------|--------------------------------------------------------|
| i.    | Underwrite $1 billion in short period of time          |
| ii.   | Ability to lead/structure complex, mission-critical deals |
| iii.  | Deliver balance sheet for nonagented deals when needed |
| iv.   | Relationship driven philosophy vs. transactional       |
| v.    | Account officer capable of delivering institution      |
| vi.   | Strong senior management contacts                      |
| vii.  | Well-developed distribution capabilities               |
| viii. | Limited execution risk                                 |

Exam. III at 46, n.120.

average of more than one per month. An Enron Relationship Review described Citigroup as the "[p]rimary banking relationship for Enron in 1999. They line up perfectly with us – we should reward this structure." EC 000252172.

190.    Likewise, Citigroup considered Enron one of its most valuable and financially rewarding clients. A September 2001 Revenue Memo at Citigroup acknowledged that "[o]ver the last three years, Enron has grown to be one of the highest revenue clients within Citigroup." Exam. III, App. D at 20. During the period 1997 through 2001, Citigroup received approximately $188 million in revenues from its financial transactions with Enron. Enron was so important to Citigroup that at various times Citigroup somewhat reluctantly proceeded with transactions to maintain its existing relationship with Enron and to be rewarded with future business.

191.    For example, the Citigroup Global Loans Approval Memorandum for Project Bacchus stated: "As a part of Citi's broader relationship with Enron, we have been asked to support this transaction. Given the importance of this relationship to [the Global Energy and Mining group], it is difficult if not impossible to deny this request." CITI-B 0290018. In addition to receiving enormous revenue directly from Enron, and hoping to receive more in future transactions, Citigroup had another reason to value and maintain its relationship with Enron: Citigroup developed products in the course of its relationship with Enron that it was marketing to other corporations. For example, Citigroup shopped its prepay product to fourteen companies apart from Enron. Citigroup thus had enormous incentives to continue prepay and other transactions with Enron, so as to not jeopardize the opportunity to reap large revenue from marketing these products to other companies.

192.    Citigroup and its subsidiaries provided Enron with a broad array of financial services during the relevant period, including cash management services, participation in syndicated revolving credit facilities, debt and equity underwriting for both Enron and affiliated entities, merger and acquisition advisory services, project-related finance, and structured finance transactions.

Certain of the structured finance transactions used products designed by Citigroup. For example, the credit linked notes structure used by Enron and Citigroup in the prepays known as Yosemite I through IV was created by Citigroup. The minority interest transactions that Citigroup brought to Enron used a structure that Citigroup designed and considered to be its proprietary product.

193. As a result of the many roles that Citigroup played for Enron, it had access to both internal documents and senior management of Enron and received substantial nonpublic information about the company, including financial information, business plans and strategies, capital structure, and other information about structured finance/SPE transactions in which Enron was involved. Citigroup understood Enron's use of mark-to-market accounting and how that accounting created a persistent need to generate cash flow from operating activities to match reported earnings. Citigroup also knew that Enron was driven by its credit ratings from the rating agencies, and was constantly monitoring the various credit ratios used by the ratings agencies in their assessment of the company. A 1999 Citigroup credit profile of Enron explained that Enron used prepays and deals such as minority interest transactions to "address two issues which have been raised by the rating agencies," one of which was to correct the mismatch between earnings created by mark-to-market accounting and cash flow from operations. CITI-B 00449879-880 (quoted in Exam. III, App. D at 34-35).

194. In its dealings with Enron and the Insiders, Citigroup and its subsidiaries functioned as a single business unit. Employees of the different subsidiaries were able to speak on behalf of one another and to cause one another to participate in transactions with Enron. As demonstrated in this Complaint, Citigroup employees analyzed and approved all the transactions with Enron but often assigned subsidiaries to take part in their financing and/or implementation. For example, Citigroup caused its subsidiary Citibank, N.A. ("Citibank") to participate in nine prepay transactions with Enron and thus make billions of dollars of loans disguised as commodity prepays. Citigroup

also caused its SPE Delta Energy Corporation to serve as the conduit in six of the prepay transactions. Similarly, Citigroup caused its affiliate CXC, Inc. to make loans of $485 million to capitalize each of the minority interest structures called Nighthawk and Nahanni. Citigroup also caused its subsidiary Salomon Brothers Holding Company ("Salomon Holding") to make a purported contribution of $28.5 million to the Sundance Industrial transaction.

195. The Enron Examiner observed, "Citigroup appears to structure its operations around business units rather than legal entities. Units such as Global Capital Structuring and Derivatives design the products, sell them, and use various legal entities within Citigroup to participate in and book the transactions." Exam III, App. D at 9. Indeed, the Enron Examiner noted that "[f]ew of the Citigroup employees who gave testimony . . . were certain of the legal entity that employed them, and some had signing authority for multiple legal entities." *Id.* In addition to those direct and indirect subsidiaries of Citigroup named in this Complaint, there may be other subsidiaries or affiliates which Citigroup caused to participate in one or more of the transactions with Enron that serve as the basis for this Complaint. It is Enron's intention to hold Citigroup and each of these subsidiaries and affiliates responsible for their participation in the challenged transactions, and Enron notifies Citigroup of its intention to include the subsidiaries and affiliates as defendants upon discovery of their identity.

### (2) The Citigroup Prepays

196. During the relevant period, Citigroup caused Citibank to complete nine prepay transactions with Enron, each of which employed a structure designed to disguise a loan to look like a commodity transaction (the "Citigroup prepays"). The nine Citigroup prepays are:

| Name | Closing Date | Amount Financed |
|------|------|------|
| Roosevelt | 12/30/98 | $500 million |
| Truman | 6/29/99 | $500 million |
| Jethro | 9/29/99 | $675 million |

| Yosemite I | 11/18/99 | $800 million |
| Nixon | 12/14/99 | $324 million |
| Yosemite II | 2/23/00 | $331.8 million |
| Yosemite III | 8/25/00 | $475 million |
| Yosemite IV | 5/24/01 | $775.1 million |
| June 2001 | 6/28/01 | $250 million |

**Total  $4.639 billion**

197.    Five of the nine Citigroup prepays were completed as a fiscal quarter or year was coming to a close at Enron.  This was not coincidental.  All of the Citigroup prepays were arranged for the purpose of inflating Enron's operating cash flow so that targeted financial results important to rating agencies and/or industry analysts would be met or exceeded.  In some cases, the Insiders also used the proceeds from the Citigroup prepays to pay off existing indebtedness, thus further manipulating Enron's balance sheet and the rating agency credit ratios based thereon.

198.    In each Citigroup prepay, the prepaid amount was set by the Insiders to enable Enron to falsely maintain or exceed credit ratios or their vital components.  The prepaid amount was in no way determined by a quantity of oil or gas that either Enron wanted to sell or Citigroup/Citibank wanted to buy.  As the SEC found, "the amount of the commodity subject to a prepay was based on the amount Enron wanted to borrow.  That amount was determined by taking the principal amount required by Enron, adding interest for the number of days the transaction was to last, and dividing that sum by the per-unit price of the referenced commodity."  SEC Citigroup Order at 12.

199.    The Chief Investigator for the PSI reached a similar conclusion: ***"Enron's decisions on when to engage in a prepay and the size of the prepay were driven by its need to meet certain ratio targets.  Consequently, funds from prepay transactions would appear on Enron's cash flow statement just days before the end of a quarter, just in time to be factored into Enron's financial statements and pump-up key ratios."***  Roach PSI Report at A-6 (emphasis added).

200.     Each of the Citigroup prepays was structured to give the appearance of a commodity transaction but each was in substance a loan from Citibank to Enron.  Although the basic transaction structure varied somewhat over the course of the Citigroup prepays, in each case the commodity price risk moved through the other parties to the transaction and back to Enron in a circle, so that the risk that the price of the underlying commodity might change was eliminated.  At the closing date of each prepay transaction, the substantively identical commodity swap agreements executed by the parties eliminated the effect of the change in commodity prices and, through the conduit entity, Enron repaid to Citibank the prepaid amount (the principal) plus a specified rate of interest.

201.     Manhattan DA Morgenthau reported that in each of the Citigroup prepays "three separate derivative transactions between three ostensibly independent parties actually constituted a unified, circular structure which, in substance, eliminated price risk and enabled Citibank to make the economic equivalent of loans to Enron that Enron could account for as trades."  Morgenthau Letter at 6.  He concluded that the prepays *were really disguised loans." Id.* (emphasis added). All of the Citigroup prepays, other than Roosevelt, were financially settled, meaning that no commodity ever changed hands.  Four of the Citigroup prepays – Yosemite I through IV – layered on top of the underlying phony commodity transaction the issuance of credit linked promissory notes to institutional investors, the proceeds of which were used to fund the prepaid amounts.

202.     Citigroup initially created the credit-linked note device to off-load certain of its own Enron exposure into the bank market.  This also served the purposes of the Insiders, as they approached limitations to certain banks' capacity to take on Enron debt directly.  The Yosemite structure also contained a "black box" feature that concealed the nature of the assets in the structure. This made Yosemite an ideal vehicle for funding prepays.  Thus the credit linked note device that Citigroup designed for Enron served both the purpose of the Insiders in feeding their bottomless

appetite for borrowing by facilitating more prepays, and simultaneously avoided further commitment of Citigroup's own capital to the scheme.

203. Six of the Citigroup prepays – Roosevelt, Yosemite I through IV, and a June 2001 prepay ("June 2001") – used Delta Energy Corporation as the conduit entity. Delta was an SPE Citigroup formed in the Cayman Islands specifically to serve as the counter party in these transactions. Delta was a Citigroup-controlled shell corporation with no independence from Citigroup or economic substance of its own. Delta engaged only in transactions involving Citigroup (all but one of which also involved Enron) and only when so instructed by Citigroup. Citigroup paid the administrative costs of Delta, its attorney fees, and its transaction fees. The forms at Citibank establishing a bank account for Delta listed Delta's address as "c/o Citicorp North America, Inc." and described the account as an "internal account" to be "controlled" by Citigroup. These forms also identified three Citigroup employees as authorized signatories for the account. Internal Citigroup documents refer to Delta as "shell corporation/SPV" and as a "special purpose entity." CITI-B 0259698. According to the SEC, "Delta was a nominally capitalized SPE established by Citigroup, whose sole purpose in these transactions was to facilitate Enron's accounting treatment." SEC Citigroup Order at 11.

204. The purpose of the Citigroup prepays was to allow the Insiders to improperly record the proceeds from the transactions (the prepaid amount) as cash flow from operating activities instead of cash flow from financing activities, and the obligation to repay this amount as price risk management liabilities instead of debt. And that is exactly what the Insiders did. In each Citigroup prepay, the Insiders accounted for the prepaid amount as cash flow from operations (not cash flow from financing activities, which it was) and the obligation to repay that amount as price risk management liabilities (instead of debt, which it was).

205.    Citigroup knew the prepays were in substance loans to Enron and, as such, should have been recorded on Enron's financial statements as loans – not commodity trades.  Citigroup internal documents (1) describe the Roosevelt prepay as "effectively a commodity denominated corporate obligation" CITI-B 0032092; (2) state candidly that in the Truman prepay, "we were basically making a loan to [Enron]" CITI-B 0260172; and (3) generally summarize Citigroup's prepay transactions with Enron as "oil goes in a circle so they all cancel . . . net economically like a loan," CITI-B 235230; and "Enron's total volume of prepays . . . represents essentially another layer of corporate debt in addition to debt accounted as such," CITI-B 00616908.  After reviewing a prepay transaction, one Citigroup employee pointedly asked: "[G]iven that the flows on the prepaid oil swap, caps and floor all net down to the $475mm payment at maturity and a coupon of 7.474%, was there a reason not to simply structure it as a loan or note?"  CITI-B 00499574.  When another Citigroup employee foolishly asked about the price of the commodity involved in the disguised loans, the comment back was "since this is all a circle, why does it matter?"  CITI-B 0069416.

206.    The SEC found that "[i]f all the contracts [in a given prepay transaction] were performed pursuant to their terms, Citigroup was entitled to receive repayment of its prepayment of the contract price, together with a negotiated return on that amount, on a specified schedule – *i.e.,* the equivalent of an interest payment on the contract price.  The negotiated return was unrelated to any price risk associated with owning a commodity contract."  SEC Citigroup Order at 3.  The Chief Investigator for the PSI concurred: "[W]hen all the bells and whistles are stripped away, the basic transaction fails as a prepay and what remains is a loan to Enron using a bank and an obligation on Enron's part to repay the principal plus interest."  Roach PSI Report at 1.

207.    Not only did Citigroup and Citibank know that the prepays were loans, they also knowingly made misrepresentations to Arthur Andersen that allowed for the improper accounting

for the transactions. Andersen told the Insiders that to obtain the desired accounting treatment the conduit entity had to have a legitimate business purpose for entering into the transaction *and* had to be independent of the financial institution participating in the prepay. After being made aware of Andersen's advice to Enron, Citigroup twice caused Delta to make representations to Andersen that Delta satisfied the business purpose and independence requirements – which Delta clearly did not.

208.    In November 1999 (in connection with the Yosemite I prepay) and in June 2001 (in connection with the June 2001 prepay), Citigroup caused Delta to represent falsely that Delta had undertaken business with a number of entities, that it had assets other than those acquired through transactions with Enron, and that it had unencumbered assets available to the Yosemite lenders in the event of a default. These representations were untrue. Delta had neither a legitimate business purpose for entering into the prepay transactions nor was it independent of Citigroup.

209.    Arthur Andersen also advised the Insiders that in order for the prepay transactions to receive the desired accounting treatment, the commodity contracts that formed the transactions could not be linked, but instead had to operate independently. In practice of course, the transactions were composed of a circular group of three contracts between Citigroup, Enron and, in the majority of cases, Delta. Citigroup knew the prepays could not contain cross-termination provisions, which would sever one party's obligations if another party defaulted, but in order to protect their own financial interests, structured the contracts to contain provisions that were effective cross-defaults, collapsing the entire prepay in the event of a default, even if these structural protections for Citigroup were not denominated as such.

210.    Citigroup also knew that by participating in the prepays it was assisting the Insiders in manipulating and misrepresenting Enron's financial condition. Citigroup knew how Enron was accounting for funds generated by the prepays. The SEC found that "[a]s Citigroup knew, Enron

reported the receipt of cash generated from prepay transactions as cash flow from operating activities, rather than cash flow from financing activities, and it reported its repayment obligation as a price risk management liability, rather than debt." SEC Citigroup Order at 3. When Citigroup's commodities desk asked for a share of the fees that the phony prepays generated, the Derivatives Group at Citigroup resisted. The Derivatives Group had created the prepays, and argued the prepays involved no commodities exposure at all. As the head of the Derivatives Group said, "[If] much of what you do does not involve management of commodities exposures at all, but is simply manipulating cash flows, there may be a much greater overlap in our businesses than I have been lead to believe." *See* Exam. III, App. D at 77-78.

211.    Citigroup also knew that the Insiders were manipulating these aspects of Enron's financial statements, as well as others, to maintain the company's much-needed credit ratings. Internal Citigroup documents candidly state that the prepays provided "favorable accounting treatment" for Enron – meaning that "[a]lthough the deal is effectively a loan, the form of the transaction would allow [Enron] to reflect it as 'liabilities from price risk management activity' on their balance sheet and also provide favorable impact on reported cash flow from operations." *Id.* at 70 (quoting CITI-B 0260171-CITI-B 0260172). Indeed, when Enron began its tumble in the fall of 2001, the head of Citigroup's Derivatives Group wrote a colleague stating, "Want to get your confirmation that (apart from the fact we put deals together for Enron which we knew confused the rating agencies) there is no skellington [sic] in the closet." Exam. III, App. D at 78 (quoting CITI-B 00910235).

212.    Both Citigroup documents and Citigroup employees acknowledge that the purpose of using the prepay structures was to keep Enron's credit ratings from falling. One Citigroup document explained:

Enron has used contract monetizations and prepaids to address two issues which have been raised by the rating agencies. One of the agencies' issues was that earnings which Enron recognized when mark-to-marking its trading book produce a commensurate cash inflow on a timely basis. Another issue was the tenor mismatch between trading assets and trading liabilities. Enron used to deal with these issues through monetizations, that is effectively selling a given cash flow stream arising from a commodity contract. This produced up-front cash equal to the net present value of the profit in the transaction, and removed the asset and liability from the trading book. However due to certain accounting changes, contract monetizations became less attractive and are no longer used by Enron. Today, Enron enters into prepaids . . . .

Exam. III, App. D at 35 (quoting CITI-B 00449879-880). Another Citigroup document states that the Yosemite IV prepay allowed "Enron to maintain the advantageous accounting and rating agency treatment of these financings." *Id.* at 71. Citigroup recognized the ratings agencies had focused on the discontinuity between Enron's net income and funds flow and accordingly collaborated with the Insiders in providing the prepay transactions to close the gap between the two. Citigroup gave substantial assistance to the Insiders to further the Insiders' scheme to manipulate Enron's financial statements with full knowledge:

- that the Citigroup prepays were loans disguised to look like commodity trades,

- that their purpose was to allow the Insiders to improperly account for the prepaid amounts as cash flow from operations and the obligation to repay the prepaid amounts as price risk management liabilities,

- that in fact the Insiders were improperly accounting for the Citigroup prepays, and

- that the Insiders were using the prepays to misstate Enron's financial condition to mislead the rating agencies and others into believing that Enron's financial condition was better than it was.

213. Citibank loaned its own funds to Enron in five of the prepay transactions. Citigroup assisted the Insiders in raising the funds for the four Yosemite prepays by designing the credit linked note structure. With respect to the Yosemite I and II prepays, Citigroup also facilitated the purchase of 50% of the equity in the trust issuing the credit linked notes. Citigroup provided its SPE Delta

in six of the prepays to serve as the conduit party, and Citibank served as the conduit party in two of the other prepays.  In addition, Citigroup/Citibank caused Delta to make false representations to Arthur Andersen, without which the accounting for the prepay transactions would not have been possible.

214.    The Citigroup prepays materially inflated Enron's financial statements.  The prepay transactions were arranged so that the Insiders could cause Enron to meet key financial targets critical to the maintenance of Enron's credit ratings.  In each case, the prepaid amount was determined not by the Insider's desire to sell oil or natural gas but by the amount of cash flow needed to achieve the desired ratings and market reviews. In many cases, the transaction was arranged on the eve of the close of a fiscal period for Enron and closed within days or hours of the end of the quarter or year.  Without the Citigroup prepays, in many quarters during the relevant period Enron would not have met or exceeded the targeted financial results of the analysts or the market and Enron's credit ratings would have been downgraded.  As the Enron Examiner concluded, "Prepays were the quarter-to-quarter cash flow lifeblood of Enron."  Exam. II at 45.

215.    In 1998, $500 million of Enron's reported $1.6 billion of cash flow from operations came from Citigroup prepay transactions.  Of Enron's reported $1.2 billion net cash flow from operations in 1999, 76 % ($935 million) was generated by the Citigroup prepay transactions.  In 2000, the Citigroup prepays created 11% ($546 million) of Enron's reported cash flow from operations.  Enron's reported debt for these years also was materially understated because of the Citigroup prepay transactions.  In 1999 Enron's debt was under-reported by 14% ($1.1 billion), and in 2000 it was under-reported by 16% ($1.6 billion).  The Enron Examiner found that "[t]he Citigroup Prepays alone . . . had a material effect on Enron's cash flows from operating activities," and that had the Citigroup prepays been properly recorded "Enron's reported debt levels would have looked markedly different."  Exam. III, App. D at 48-49.

### (3) The Minority Interest transactions

216.    In December 1997 and December 1999, Citigroup knowingly helped the Insiders manipulate and misstate Enron's financial condition by designing, loaning money to, and arranging the equity investments in two minority interest transactions known as Nighthawk and Nahanni. The sole purpose of these year-end transactions was to enable the Insiders to maintain Enron's credit ratings and to meet the expectations of the market by improperly recording debt as a minority interest in a consolidated subsidiary and/or falsely enhancing its cash flow from operations.

217.    As it does with the SPE in a FAS 140 transaction, GAAP requires that the SPE in a minority interest transaction be capitalized with at least 3% equity of an independent third party, and that the equity remain at risk throughout the pertinent period. Although both Nighthawk and Nahanni were structured with the required 3% equity contribution, in neither case was that equity really at risk and, for this reason, neither Citigroup nor the "equity" investors based their decision to invest on the merits of the underlying investment. The $500 million Nighthawk transaction alone improved Enron's debt-to-equity ratio for 1997 by 8%. The $500 million Nahanni transaction gave Enron 40% of its operating cash flow in 1999 and improved the debt-to-equity ratio by 16%.

### (i) Nighthawk

218.    Nighthawk was Enron's first minority interest transaction implemented by the Insiders and Citigroup. It closed as Enron's 1997 fiscal year was coming to an end – on December 27, 1997. Citigroup was instrumental to the completion of Nighthawk and indeed characterized itself as the "financial advisor" to Enron for the transaction. Nighthawk was the minority shareholder in an Enron majority-owned subsidiary, Whitewing. Nighthawk contributed $500 million to Whitewing for the minority interest in Whitewing, which the Insiders should have classified as debt.

219.     Citigroup developed the structure of the minority interest transaction used in Nighthawk and considered it to be a proprietary product. Citigroup also arranged for Nighthawk's capitalization, which consisted of a loan of $485 million from CXC, Inc., a commercial paper conduit managed by Citigroup, and the required 3% equity investment ($15 million) by Harch Capital Management ("Harch"). Harch was a money management firm that had previously participated in transactions with Citigroup. Harch, in turn, formed a limited liability company to make the equity investment – Golden Eagle L.L.C. ("Golden Eagle"). The sole member of Golden Eagle was another limited liability company, Kestrel Investor L.L.C. ("Kestrel"). The equity investment in Nighthawk was made by Golden Eagle, which in turn obtained the funds from Kestrel.

220.     For several reasons, Nighthawk violated the requirement of GAAP that the 3% equity investment in Nighthawk be at risk. First, $7.1 million of the $15 million equity investment in Nighthawk was borrowed by Kestrel from CXC – the Citigroup affiliate – *on a nonrecourse basis*. Thus, even if Nighthawk failed in its entirety Kestrel was not at risk for almost half of its equity investment. Moreover, Kestrel's investment in Nighthawk was further protected from loss by a surety bond Citigroup obtained from Ambac Assurance Corporation for $7.1 million. In addition, Citigroup issued to Kestrel two hedging agreements covering approximately $15 million of Enron stock in the Nighthawk structure, the effect of which was to protect Kestrel's full $15 million equity investment from loss. For these reasons, the Enron Examiner concluded "that the Nighthawk equity was not at risk." Exam. II, App. I, Annex 1 at 14-15. As a result, the minority investor – Nighthawk – should have been consolidated with the majority-owned Enron subsidiary, Whitewing, and Nighthawk's debt included on Enron's financial statements.

221.     As the creator of the minority interest structure, Citigroup knew that Nighthawk, as the minority investor in the Enron subsidiary, had to have a 3% equity investment at risk throughout

the life of the transaction. Citigroup also knew that the 3% equity in Nighthawk was not at risk. A senior member of Citigroup's Accounting Advisory Office stated:

> Although the equity is substantive, at a 3% capitalization level **the $15MM of equity is not at risk.** A collar put option purchased by Citibank from an A-rated dealer protects the $15MM of equity (sharing in losses of the JV). The equity is back-levered on a nonrecourse basis with a $7.1MM CXC loan with counter party risk assumed by AMBAC.

*See* Exam. III, App. D at 97 (quoting CITI-B00393281) (emphasis added). After reviewing the Nighthawk structure, Citigroup's accountant concluded that "[i]t would therefore seem appropriate . . . for Enron to consolidate the Investor (SPV) as well as the JV." CITI-B 00395282. The Citigroup Managing Director responsible for the Nighthawk transaction reached a similar conclusion, stating that "[t]he Equity Collar effectively protects the Equity Participant from any risk . . . ." Exam. III, App. D at 101 (quoting CITI-B 00573142).

222.    Citigroup also knew that by designing, implementing, and arranging the financing for Nighthawk, it was assisting the Insiders in manipulating Enron's financial condition. Citigroup knew the Insiders intended to report the $500 million Enron received from the Nighthawk structure as investment in minority interests – not as debt. Indeed, one of the bases on which Citigroup marketed the Nighthawk minority interest transaction to the Insiders was that it would not increase balance sheet debt. A pro forma balance sheet prepared by Citigroup as a part of its marketing presentation to Enron showed that the $500 million from the Nighthawk transaction would increase investment in minority interests by $500 million and potentially *decrease* debt by a like amount, if the Insiders used the Nighthawk proceeds to pay down existing company debt. Another basis for the Nighthawk transaction was to satisfy rating agency concerns about Enron's financial statements. A Citigroup memorandum described the "key benefit to Enron from the transaction is that the financing will generate substantial tax deductible, nondilutive *rating agency equity* . . . ." CITI-B 0256319 (emphasis added).

223.    As a result of the Nighthawk transaction, Enron received $500 million at year-end 1997 without increasing its debt.  Had this amount been reflected – as it should – as debt on Enron's balance sheet it would have increased the company's total debt by 8%.

### (ii)    Nahanni

224.    Nahanni was another $500 million minority interest transaction that closed at year end, this time on December 29, 1999.  Citigroup again created the structure and advised Enron on the transaction.  Like the Nighthawk structure, Citigroup designed Nahanni as a vehicle for Enron to borrow $500 million that would not be reflected as debt on the company's balance sheet.  Further, Citigroup and the Insiders added a special feature to Nahanni, which allowed Enron to improperly record the $500 million as cash flow from operations instead of financing activities:

225.    Nahanni, as the minority investor in Marengo, the consolidated subsidiary owned by Enron, contributed $500 million in Treasury bills to the majority-owned subsidiary instead of cash.  The majority-owned subsidiary them immediately sold the Treasury bills, and Enron treated the proceeds of the sale as cash flow from operations.  Citigroup specifically suggested using Treasury bills for this purpose.  Citigroup also arranged for Nahanni's capitalization, again providing a $485 million loan from CXC, Citigroup's affiliate, and arranging an equity investment of $15 million.  The entire Nahanni transaction was nothing more than a way for the Insiders to manipulate Enron's year-end financial statements, a fact which was well known to Citigroup.  One Citigroup document described Nahanni as *"year end window dressing."*  Exam. III, App. D at 113 (quoting CITI-B 0137997-003) (emphasis added).

226.    Nahanni was an invalid minority interest transaction for several reasons.  First, the required 3% equity in Nahanni was not at risk because it was secured by a letter of credit issued by German bank West LB.  Therefore, as the Enron Examiner concluded, "Enron should have consolidated the minority investor and reported the Nahanni debt on its balance sheet."  Exam. III,

App. D at 115.  Second, by its terms the Nahanni transaction was designed to last no more than a

few weeks, just long enough for the Insiders to artificially inflate Enron's financial results for 1999.

The transaction closed on December 29, 1999 and the debt was repaid on January 14, 2000.  This,

as the Enron Examiner found, is nothing more than a scheme to "improve artificially [Enron's] year-

end reporting."  *Id.* at 113.  Third, the sale of Treasury bills should not have been recorded as cash

flow from *operating* activities.  Prior to Nahanni, Enron did not include as part of its merchant

investment operations the sale of treasury bills, and there was no reasonable basis for doing so.  The

Enron Examiner characterized this particular accounting abuse as one of the most aggressive uses

of mark-to-market accounting.

227.    Citigroup knew that Nahanni could not be accounted for as a minority interest.

Citigroup knew the 3% equity investment in Nahanni was improperly supported by the letter of

credit, since Citigroup structured and helped to document the transaction.  The protection given the

equity investment by the letter of credit was in substance similar to that given to the equity

investment in Nighthawk, which Citigroup's internal accountants concluded eliminated all risk of

the investment.  Citigroup also knew the Nahanni transaction was no more than year-end

manipulation of Enron's financial statements.  The letter of credit from West LB, which secured the

3% equity investment, required that the transaction be unwound by no later than January 27, 2000.

The Citigroup officer responsible for the transaction reported that "Enron will agree to repay

[Nahanni] by January 14th."  CITI-B 0289599.  That is why Citigroup internally referred to Nahanni

as "year-end window dressing" and "essentially an insurance policy for YE balancing.'"  CITI-B

0289597.  Finally, Citigroup knew that Enron's operations did not include selling Treasury bills, so

there could be no legitimate basis for claiming $500 million as cash flow from operations based

upon their sale.  Citigroup's own description of Enron's merchant investment activities did not

include buying and selling Treasury bills.

228.    As with Nighthawk, Citigroup understood that the purposes of Nahanni were to improperly allow the Insiders to borrow $500 million without recording it as debt and, by selling Treasury bills, to artificially maintain Enron's credit ratings by generating $500 million in cash flow from operations.  Citigroup's Execution Memo on the transaction stated: "The Nahanni transaction allows Enron to reduce the volatility of operating cash flow (at the expense of greater volatility in its cash flows from financing activities), while avoiding an increase in leverage." Exam. III, App. D at 109 (quoting CITI-B 00592095).  That same Execution Memo explained Enron's focus on the rating agencies: "In recent years, rating agencies have focused on 'managing to cash' the profits earned under [mark-to-market] accounting: that is ensuring earnings were a reflection of cash received." *Id.* at 108.

229.    Nahanni materially affected Enron's financial statements at year-end 1999.  Of Enron's reported net cash flow from operations that year of $1.2 billion, $500 million, or 40%, was generated from Nahanni.  By improperly recording the $500 million borrowed from Nahanni as minority interests instead of debt, the Insiders improved Enron's debt-to-equity ratio by 16%.

### (4)    The Forest Products transactions

230.    In two transactions in December 2000 and June 2001, Citigroup (and in one instance Salomon Holding) knowingly aided the Insiders in improperly monetizing Enron's forest products business.  The first of these transactions, Project Bacchus, was structured as a FAS 140 transaction, the purpose of which was to improperly generate $112 million of income at year-end 2000.  To accomplish this, the Insiders caused Enron to sell 80% of its interest in an SPE (Fishtail) that held certain of Enron's pulp and paper assets to another SPE called Sonoma I L.L.C. ("Sonoma").  Sonoma was capitalized (indirectly through yet another SPE, Caymus Trust) through a $194 million loan from Citigroup, plus an additional  $6 million "equity" contribution by Citigroup.  The sale of 80% of Fishtail's interest to Sonoma for $200 million was forwarded to Enron, creating a gain of

$112 million, because Enron carried the pulp and paper assets on its books at $88 million. The Insiders also reported the entire $200 million as cash flow from operating activities at year-end 2000. According to the Enron Examiner, Bacchus was a "short-term structure[] designed by Enron to enable it to meet certain year-end 2000 earnings targets." Exam. II, App. K at 1.

231. Six months later, on June 1, 2001, the second transaction, Sundance closed. Sundance Industrial Partners L.P. ("Sundance Industrial") was a supposed joint venture that acquired the pulp and paper assets transferred via the Bacchus transaction from Sonoma, as well as other Enron pulp and paper assets. Citigroup caused its subsidiary Salomon Holding to participate in the Sundance transaction as a limited partner and to contribute $28.5 million to Sundance Industrial. Salomon Holding also made an unfunded commitment of $160 million, to be paid only in the event the partnership lost more than $747 million. Based on the investment and unfunded commitment of Salomon Holding, the Insiders characterized Sundance Industrial as a nonconsolidated entity, thus keeping its debt off of Enron's balance sheet. Through Sundance, the Insiders improperly generated an additional $20 million in income for Enron and likewise improperly kept $375 million of debt off its balance sheet.

232. Citigroup was well aware that Bacchus could not properly be reported as a FAS 140 transaction. One key reason was that Citigroup's $6 million equity contribution was not at risk. Because Citigroup's equity investment was not at risk, the Caymus Trust, and accordingly Sonoma, failed the SPE requirement of having 3% third-party equity at risk. Accordingly, no independent third party acquired the Fishtail assets (and in any event the Insiders caused Enron to guarantee the entire purchase price on the "sale" of its own asset).

233. As a condition of proceeding with the Bacchus transaction, Citigroup sought and received oral assurances from Insider Fastow that regardless of the value of the assets in Bacchus Enron would repay Citigroup's "equity" contribution. Citigroup's approval memo for the Bacchus

transaction stated that "Enron's CFO, Andrew S. Fastow, has given his verbal commitment to Bill Fox . . . that Enron Corp. will support the 3% equity piece of this transaction." Exam. III, App. D at 123. Other Citigroup documents described Fastow's promise as "verbal support" and "verbal guarantees." *Id.* Accordingly, Citigroup treated the entire amount committed to the transaction as a loan.

234.    The SEC found that "Citigroup obtained oral representations from Enron that Citigroup would not lose money in connection with its three percent equity investment," and, as a result, concluded: "In economic reality, Bacchus was a $200 million financing structured as a sale for the sole purpose of allowing Enron to characterize the proceeds as cash flow from operating activities and to record a gain of $112 million." SEC Citigroup Order at 3, 9. For this reason, Citigroup's decision to make a $6 million "investment" in Bacchus was made without consideration of the merits of the underlying investment. Moreover, Citigroup was aware that one of the Insiders' reasons for engaging in the transaction was "writing up" the value of the assets sold in the transaction.

235.    Citigroup understood well the significance of keeping Fastow's assurance unwritten. The SEC concluded that "Citigroup understood that reducing this representation to a written contractual term would have negated Enron's accounting treatment." SEC Citigroup Order at 3. When receiving analogous oral commitments in conjunction with the Roosevelt prepay transactions, Citigroup noted that while "Enron has agreed, . . . the papers cannot stipulate that as it would require recategorizing the prepays as simple debt." CITI-B0032147. Had Fastow's oral assurances been included in the transaction documents, Andersen would not have been able to approve the accounting for the Bacchus transaction. For this reason, a Citigroup employee who reviewed the Bacchus transaction stated, "Sounds like we made a lot of exceptions to our standard policies. I am sure we have gone out of our way to let them know that we are bending over backwards for them

. . . let's remember to collect this iou when it really counts . . ." *See* Exam. III, App. D at 124

(quoting CITI-B 0281946). The PSI Report on Bacchus (at 19) stated it this way:

> [T]he Bacchus transaction was steeped in deceptive accounting, if not outright accounting fraud. The evidence shows that Enron guaranteed both the debt and equity "investment" in the Caymus Trust, thereby eliminating all risk associated with the "sale" of the Fishtail assets to the Trust. Without risk, the transaction fails to qualify as a sale under SFAS 140. The fact that Enron's guarantee of the $6 million equity "investment" was never placed in writing, but was kept as an oral side agreement with Citigroup, demonstrates that both parties understood its significance and potential for invalidating the entire transaction. Citigroup nevertheless proceeded with the deal, knowing that a key component, Enron's guarantee of the $6 million, rested on an unwritten and undisclosed oral agreement.

236. Citigroup and Salomon Holding also knew the $28.5 million contribution plus $160 million unfunded commitment to Sundance Industrial was not a real equity investment in the partnership, and it was not viewed or analyzed as such by either of them. The Insiders secured Salomon Holding's cash investment only by requiring the Sundance Industrial partnership to hold a $28.5 million cash reserve at all times and giving Citigroup/Salomon Holding the ability to unilaterally terminate the partnership and thus ensure that its unfunded commitment could never be drawn. Other indicia that Salomon Holding's contribution was not an equity investment are that (1) it received a preferred return of LIBOR plus 6.62% per year, paid prior to distributions to other partners, and (2) an excess income sweep provision capped Citigroup's return at the preferred return, thus depriving Citigroup of participating in the upside of the business.

237. In addition, Citigroup purchased a third-party credit default swap for Salomon Holding's $28.5 million investment. Salomon Holding/Citigroup's unfunded commitment also was protected from being called. By its terms, it could only be called if the partnership lost more than $747 million. If there were any indication that might occur, Salomon Holding/Citigroup could exercise its unilateral right to terminate the partnership and thus avoid funding the obligation. In

the words of Citigroup: "It is 'unimaginable' how our principal is not returned." Exam. III, App. D at 129 (quoting CITI-B 0301369).

238.     Citigroup documents acknowledge that the purported contribution to Sundance Industrial was a loan: "The transaction is structured to safeguard against the possibility that we need to contribute our contingent equity and to ensure that there is sufficient liquidity at all times to repay our $25 million investment." CITI-SPSI 0044827. "No circumstance under which $160 million can be called – our investment is debt." Exam. III, App. D at 129 (quoting PSI 00457254). The memorandum written to the Citigroup Capital Market Approval Committee's states, "The investment has been structured to act like debt in form and substance." CITI-B 0301794 at CITI-B 0301796. One senior Citigroup officer referred to Sundance Industrial as "a funky deal (accounting-wise)" and was "amazed that [Enron] can get it off balance sheet." Exam. III, App. D at 130 (quoting CITI-B 0299613). The Sundance Industrial transaction was so clearly in violation of applicable accounting rules that the head of Citigroup's Global Risk Management group refused to approve it and warned (quite presciently) that "[t]he GAAP accounting is aggressive and a franchise risk to us if there is publicity." *Id.* at 131. This view was shared by the head of Citigroup's Global Relationship Bank: "We share Risk's view ***and if anything, feel more strongly that suitability issues and related risks*** when coupled with the returns, make it unattractive." CITI-B 0307591 (emphasis added).

239.     Citigroup, and with respect to Sundance Industrial Salomon Holding, understood that by participating in the Bacchus and Sundance transactions they were facilitating the Insiders' manipulation and misstatement of Enron's financial condition. With respect to Bacchus, Citigroup documents acknowledge that "Enron's motivation in the deal now appears to be writing up the asset in question from a basis of about $100 MM to as high as $250 MM, *thereby creating earnings.*" CITI-B 0289702 (emphasis added). This caused the Citigroup relationship manager for Enron to

express concern about the "appropriateness" of the Bacchus transaction, "since there is now an earnings dimension to this deal." *Id.* This concern was overcome by the need at Citigroup to keep the Insiders satisfied and sending more deals and financings to Citigroup. As one Citigroup employee pointedly explained, "For Enron, this transaction is 'mission critical' (their label not mine) for YE and a 'must' for us." Exam. III, App. D at 122 (quoting CITI-B 0270033)

240. Before the Bacchus transaction closed, Citigroup had analyzed exactly how it would impact Enron's financial statements:

> The $200 million represents 16.3% and 22.4% of operating cash flow and net income, respectively, for the 12 months ended December 31, 1999. Bacchus represents 22.2% and 11.6% of cash EBITDA for nine months ended 9/30/00 and twelve months ended 12/31/00, respectively.

Exam. III, App. D at 121 (quoting CITI-B 0284053-055).

241. With respect to the Sundance Industrial transaction, Citigroup/Salomon Holding was aware of the Insiders' intention to move the debt associated with the pulp and paper business off Enron's balance sheet. Citigroup documents state that "Enron owns certain pulp and paper assets . . . which have been purchased by Enron in a manner that the assets are off-balance sheet for GAAP accounting purposes." Exam. III, App. D at 130 (quoting CITI-B 0296661).

242. Citigroup's concerns over the accounting abuses which it knew arose from the Bacchus and Sundance Industrial transactions were overcome not just by the Insiders' promise of future revenue from transactions with Enron. Citigroup proceeded with these related transactions because it knew that its exposure to them would quickly be eliminated. Citigroup knew that the $200 million it loaned to Bacchus would be repaid within a matter of months when Sundance closed. In fact that happened. Citigroup also knew that it could exercise provisions in the Sundance Industrial partnership that allowed it to demand that Enron buy out its interest. On November 30,

2001, two days before Enron declared bankruptcy, Citigroup exercised this right and Enron paid off Salomon Holding's $28.5 million contribution.

243.     The Bacchus and Sundance Industrial transactions materially impacted Enron's financial statements for year-end 2000 and the second quarter of 2001. The $112 million in income created by Bacchus represented 11% of Enron's reported net pre-tax income for 2000. The contribution to cash flow from operations of $200 million from Bacchus constituted over 4% of Enron's operating cash flow for that year. Through Sundance Industrial the Insiders improperly kept $375 million of debt off Enron's balance sheet.

### (5)     Citigroup offloaded its Enron exposure.

244.     By 1999, Citigroup's obligor exception on Enron – the amount by which Citigroup's total exposure to Enron exceeded the internal lending limit – had grown to over *one billion dollars.* In January 1999, Citigroup's primary relationship manager for Enron warned colleagues that the bank likely would not approve a new cash management facility for Enron, noting that "our exposure predicament is legend." Exam. III, App. D at 24-25 (CITI-B 00440585). A Vice-Chairman of Citigroup described Citigroup's exposure to Enron as "huge" and subsequently refused to approve any additional exposure until proceeds received by Enron from the Yosemite-funded prepays were received and used to pay down existing exposure. Exam. III, App. D at 25 (quoting CITI-B 0046533). "[U]ntil the moment that we have received the debt repayment resulting from the Yosemite transaction, I am not willing to approve another incremental exposure on Enron." *Id.*

245.     Citigroup thus was clearly motivated to help Enron complete new financings that would bring in cash *to reduce Citigroup's exposure to Enron*. In fact, Citigroup designed the Yosemite credit linked note structure to assist Enron in generating prepay proceeds to be used to pay some of Enron's existing bank exposure – including exposure to Citigroup. Testifying before the United States Senate, Richard Caplan, the designer of Citigroup's Yosemite prepay structures, said

the purpose of the Yosemite deals "was to shift risk from the bank market," and that they ultimately laid off $2.4 billion through the Yosemite transactions. Much of that exposure was Citigroup's, and Citigroup structured Yosemite so it could reduce that exposure in secret: "Ideally, non tier 1 participant banks in the deals will be unaware of the 'sale' of the existing position of the tier 1 banks." CITI-SPSI 0036296. By the close of 1999, Citigroup's one billion dollar obligor exception for Enron had been *eliminated*. The Yosemite prepays continued in 2000 and 2001.

### (6) Citigroup revised its structured finance policies.

246. In August 2002, after Citigroup had been targeted for investigation by the SEC, the Manhattan District Attorney, and the Permanent Subcommittee on Investigations of the U.S. Senate, Citigroup announced that it would no longer do business as it did with Enron. Then CEO of Citigroup Sanford Weill issued a memo to all Citigroup employees in which he renounced the practices and policies through which Citigroup and its subsidiaries had aided and abetted the Insiders' misstatement of Enron's financial condition:

> At Citigroup, we are committed to greater transparency in the disclosure of structured finance transactions and we are answering the call from Washington and from investors by adopting strong initiatives ourselves.
>
> ***Quite simply, if a company does not agree to record a material financing as debt on its balance sheet, Citigroup will only execute the transaction if the company agrees to publicly disclose its impact to investors.***
>
> Starting immediately, we will only do these transactions for clients that agree to make prompt disclosure of the details of the transactions including management's analysis of the net effect the transaction has on the financial condition of the company, the nature and amount of the obligations, and a description of events that may cause an obligation to arise, increase or become accelerated. In addition, we will only do these transactions for clients that agree to provide the complete set of transaction documents to their chief financial officer, chief legal officer and independent auditors.

Exam. III, App. D at 29 n.99 (emphasis added).

247.     More recently, as a result of Citigroup's participation in manipulating Enron's financial condition, Citigroup was forced by the Federal Reserve Bank of New York to formally revise its policies and practices regarding structured finance transactions. The Federal Reserve Bank of New York and the Office of the Comptroller of the Currency (collectively the "Federal Reserve") jointly conducted a review of Citigroup's structured finance and prepay transactions with Enron. That review resulted in a written agreement between the Federal Reserve and Citigroup dated July 28, 2003, in which the Federal Reserve concluded that Citigroup's transactions with Enron "raised concerns that the manner in which Citigroup and its subsidiaries participated in the Structured Transactions exposed them to significant risks." Agreement between Federal Reserve and Citigroup dated July 28, 2003, at 2. To avoid future abuses of structured finance transactions by Citigroup, the Federal Reserve required Citigroup to develop and submit "for review and approval" written revisions to its policies for complex structured finance transactions. Among other things, those revised policies must ensure that Citigroup: (1) "identif[ies] transactions in which the counterparty relationship or the nature of the transaction with the counterparty poses or may pose heightened legal or reputational risks to Citigroup or its subsidiaries"; (2) requires "complete and accurate disclosure of the counterparty's purpose in entering into the particular transaction"; (3) *"assess[es] whether financial, accounting, rating agency disclosure, or other issues associated with a transaction are likely to raise legal or reputational risks for Citigroup and its subsidiaries"*; and (4) conducts "a higher level review of the overall customer relationship . . . where the counterparty's primary purpose, goal or objective in entering into a transaction is to achieve an accounting or tax effect." *Id.* at 3-5 (emphasis added).

### b. Chase knowingly assisted the Insiders in misstating Enron's financial condition.

248. Like Citigroup, Chase's involvement in the Insiders' manipulation of Enron's financial condition was essential to the Insiders' scheme. Chase knew the Insiders were using SPE transactions to improperly inflate cash flow from operations and disguise debt as price risk managements liabilities on Enron's financial statements. From at least 1998, Chase helped the Insiders achieve their improper goals by designing, financing and/or implementing at least seven prepays, two FAS 140s, and one tax transaction. Together, these transactions provided Enron with billions in financing and allowed the Insiders to understate debt on Enron's balance sheet by billions.

249. Like Citigroup, Chase's participation has been investigated and roundly criticized by at least Manhattan District Attorney Morgenthau, the PSI of the Committee on Governmental Affairs for the United States Senate, and the Enron Examiner. All concluded that Chase knowingly facilitated the Insiders' scheme to misstate Enron's financial statements.

250. Morgenthau's 18-month investigation into the Enron prepays actually "focused more closely on the particulars of the Chase transactions" than on Citigroup's. Morgenthau Letter at 2. According to Morgenthau, that was because unlike Citigroup, Chase neither cooperated fully with his investigation nor, in the beginning, acknowledged that the prepays were anything other than legitimate arm's-length commodity trades. As he had with Citigroup, Morgenthau concluded that the prepays between Enron and Chase "were trades on paper only. In substance, they were loans." *Id.* He found that by structuring the loans as commodity trades, Enron "unfairly" accounted for cash flow from financing as cash flow from operations. He concluded that Chase knew the effect of the prepays on Enron's financial statements – and specifically knew that the prepays were being used both to "fill liquidity gaps" and to hide debt capital as price risk management liabilities. He also

acknowledged that Chase knew the ultimate goal of the prepays was "fraudulent accounting" and "to make [Enron's] financial statements less transparent." *Id.* at 8.

251.    When the investigation ended, Morgenthau commented that despite its initial hostility, Chase – like Citigroup – had subsequently "renounced the policies and procedures which led to [its] involvement in the Enron debacle and [had] adopted reforms to see that nothing similar happens again." *Id.* at 8.  Or, as J.P. Morgan Chase & Co. wrote to Morgenthau on July 28, 2003, ***"We have made mistakes.  We cannot undo what has been done, but we can express genuine regret and learn from the past."***  Letter from Marc J. Shapiro, Vice Chairman of J.P. Morgan Chase & Co. to Robert Morgenthau at 1 (July 28, 2003).

252.    The PSI investigation focused in part on the Enron prepays and, therefore, also on Chase.  The Chief Investigator concluded "it was common knowledge" among Enron and Chase employees that "the prepays were designed to achieve accounting, not business, objectives," and that Enron was "booking the 'prepay' proceeds as trading activity rather than debt." PSI Report at B-2. He explained that "lucrative business deals" in the form of fees gave financial institutions like Chase the "[o]bvious incentive" for both going along with, and even expanding upon, Enron's prepay activities. PSI Report at B-10.  He also concluded that Chase, like Citibank, was not only aware that the transactions were driven by the desire to manipulate Enron's financial statements, but also actively aided "in designing and implementing financial structures that created and maintained the fiction that the transactions were trades rather than loans." PSI Report at B-5.

253.    In the Complaint it filed against J.P. Morgan Chase & Co., the Securities and Exchange Commission likewise alleged that Chase aided and abetted the manipulation of Enron's reported financial results through the prepays.  It alleged that the prepays improperly allowed Enron to report loans from Chase as operating activities, and that the prepays "had no business purpose

aside from masking the fact that, in substance, they were loans from Chase to Enron." With respect to Chase's knowledge, the SEC alleged:

> As Chase knew, Enron engaged in prepays to match its reported fair value earnings with reported cash flow from operations to convince analysts and credit rating agencies that Enron's fair value earnings were real, i.e., that the reported fair value earnings represented gains that could and, eventually would, be turned into cash.
>
> As Chase knew, because prepays were disguised loans, Enron not only overstated its cash flow from operating activities, but it understated its cash flow from financing activities and understated debt on its balance sheet. ***Chase knew that, as a result, analysts and credit rating agencies were being misled***.

SEC Chase Complaint ¶ 2 (emphasis added).

### (1) Chase's relationship with Enron

254. Chase had a long history with Enron. During the 1990s, as Enron's core business evolved from regional natural gas provider to commodity and financial product trader, the relationship between the two grew in size and strength. Chase achieved Tier 1 status in 1994 and retained it thereafter. In turn, Chase labeled Enron a "Blue" client – that is, one that could "*prospectively* generate $5 million or more in deal revenues over an 18-month period." JPMBKR-E 0515593 (emphasis in original). In fact, by 1999 Enron was generating fees of more than $15 million annually for Chase's Global Oil and Gas Group. As Chase's own documents show, Chase thought of itself as "Enron's major financing firm." JPMBKR-E 0016225. Enron's value to Chase was substantial. Even in 1995, Chase documents show that Chase recognized Enron as "a bonanza in terms of deal flow." JPMBKR0315455. Chase both contributed $20 million in equity capital to LJM2 and led a $65 million revolver for the entity.

255. The close relationship between Chase and Enron was also such that Chase had a deeper and more detailed understanding of Enron's capital structure and financial position, including some of Enron's structured transactions and off balance sheet obligations, than could have been gleaned from an analysis of Enron's financial statements alone. In May 1999, Chase knew enough

to annotate Enron's financial statements for its internal use, accurately describing where a large number of the off-balance sheet structures, including prepays, were hidden. 0017571; PSI Exhibit 187mm. Over the years, Chase also worked on a long-term project with Enron to restructure Enron's balance sheet. Although the project never completed, Chase gained valuable insight into Enron's financial condition as a result of it. In October 2001, as the financial world began to become concerned with Enron, Fastow wrote to Richard Walker at Chase: "I think you know the credit and the businesses as well as (and better) than anyone in the world, so I'm counting on you to lead the way." JPMBKR-E 0164513.

256.    Between late 1997 and Enron's bankruptcy, Chase and Enron averaged more than one transaction per month. For these transactions, Chase earned fees of over $96 million. Included in the transactions were at least 12 prepay transactions with a combined value of more than $4.8 billion. There were also many FAS 140 transactions and two minority interest transactions (Choctaw and Zephyrus). The prepays, especially, were extremely lucrative. For example, at the end of June 2000 Chase entered into an Enron prepay transaction with the Insiders that, effectively, was a $650 million loan. For arranging the transaction, Chase received an upfront fee of approximately $1.6 million. If the loan had resolved as the parties anticipated and intended (that is, if Enron had not filed bankruptcy), Chase would have received from Enron the return of Chase's $650 million in principle plus $150 million in interest and fees.

### (2)    the Chase prepay transactions

257.    Chase has a unique role in the history of Enron's prepay transactions – it invented the Enron prepay. It therefore considered the Enron prepays to be proprietary transactions, using a proprietary technology. It also never turned down an Insiders' request that Chase participate in a prepay.

258.     Chase's first Enron prepay transaction closed in 1992.  At that time, Enron owned certain oil exploration tax credits that were due soon to expire.  To prevent their expiration, Enron needed a way to accelerate income into the 1992 year.  Chase provided Enron with what it needed – the prepay structure, which it invented specifically for that purpose.  At the time, Chase inserted an SPE into the structure strictly because regulations prohibited Chase from accepting physical delivery of a commodity.

259.     The structure served its purpose; however, the Insiders quickly discovered that it offered more, and better, benefits as a financing tool.  By the mid-1990's, the Insiders were executing prepays in order to meet funding objectives.

260.     Chase engaged in seven prepay transactions between December 1997 and Enron's bankruptcy:

| Name | Closing Date | Amount Financed |
|---|---|---|
| Chase VI Prepay | 12/97 | $300 million |
| Chase VII Prepay | 06/98 | $250 million |
| Chase VIII Prepay | 12/98 | $250 million |
| Chase IX Prepay | 06/99 | $500 million |
| Chase X Prepay | 06/00 | $650 million |
| Chase XI Prepay | 12/00 | $330 million |
| Chase XII Prepay | 09/01 | $350 million |
| | **Total** | **$2.630 billion** |

261.     The seven – labeled "the Mahonia transactions," after the SPEs Chase used to close the circle – totaled $2.63 billion.  Notably and predictably, each prepay closed at the end of a financial reporting period, after the Insiders determined that Enron needed cash flow from operations to report on its financial statements.  Like other Enron prepay transactions, the Mahonia transactions included three steps that were precisely calibrated so that they collectively functioned as an unsecured loan.  While each step ostensibly included commodity risk, the risk flowed in a circle between Chase, its SPE, and Enron such that the deliveries netted out and "all that remained was the

initial advance and the repayment of same, with interest, over time." Exam. III, App. F at 28. At the end of the day, Enron had received cash up-front from the Mahonia entity – cash that Chase funded – and Enron had agreed to pay the cash plus interest back to Chase according to a prearranged schedule.

262.     Chase invented and so (obviously) understood the circularity and the lack of price risk due to the linked contracts – those aspects of the prepay that turned what allegedly was a commodity trade into a loan. A telephone conversation between three Chase employees, taped in the normal course of business on September 20, 2001, shows exactly how well they understood the obligation flow and the purpose of the prepays:

-     " . . . [W]hy do they want to hedge with gas where it is now?"

-     "They're not hedging, they're just, they're just, they do the back-to-back swap."

-     "This is a circular deal that goes right back to them."

-     "[It's]. . . basically a structured finance-"

-     "It's a financing?

-     "Yeah, it's totally a financing, which has a piece of it, they're always had on as a piece of their capital structure, so-"

-     "So it's amortizing. Yeah, it's amortizing debt. I get it."

-     "That's exactly what it is."

PSI Ex. 184a.

263.     Documents created by Chase make the same point. For example:

•     In August 2001, the Insiders were talking with Chase about selling Enron assets. In an internal Chase communication about the subject, one Chase employee wrote another, "Rick, as you will recall, we had some conceptual discussion on this about 6 weeks ago. We had begun to focuss [sic] on it from the point of view of trying to free up capacity in the bank market. Is that the goal here or is this another hide the debt structure?" Exam. III, App. E at 16-17 (quoting JPMBKR-E 0020290).

- In litigation in June 2002, Chase asked a court to require surety bond providers to make payment on bonds that related to certain prepays. In a filing, Chase asserted that the sureties "knew that the [prepays] were part of a structured financing transaction for Enron's general corporate benefit." The same filing claimed that "the surety bonds were part of financing transactions in which the funds advanced by JP Morgan Chase to Mahonia were ultimately used by Enron for general corporate purposes, not to secure future sources of the oil and gas to be delivered." Amended Complaint, *JP Morgan Chase Bank v. Liberty Mutual Insurance Co.*, Case No. 01-Civ. 11523 (S.D.N.Y) at ¶¶ 18, 19.

264. Consistent with their understanding of the true purpose of the prepays, the parties routinely used language of financing when discussing them. For example, Chase documents show that in conversations about the prepays, Chase and Enron typically discussed fees in terms of the London Interbank Offered Rate (LIBOR) plus a basis point spread, terms generally used to refer to pricing on loans. *See, e.g.,* JPMC-H-0111470, JPM-6-04204, Senate-MAH 02296.

265. Chase clearly considered the prepays' central benefit to be the fact that the structure facilitated treating debt as something other than debt on a balance sheet. In 1998, Chase actually developed a "pitch book" to sell other companies on the Enron prepay structure. In it, Chase noted the structure was "balance sheet 'friendly'" and offered an "[a]ttractive accounting impact by converting funded debt to 'deferred revenue,' or long-term trade payable." PSI Ex. 128; Senate MAH-02604-17. In a written statement to Congress, Chase admitted that it succeeded in selling seven companies besides Enron on the Enron-style prepays. PSI Ex. 185q.

266. Chase also appreciated the notice (or lack thereof) that the rating agencies had of the prepay transactions. Chase acknowledged in internal documents that "[m]ost users of the prepay structure believe the transaction to be 'rating agency friendly,'" and that "[f]unded debt ratios will likely improve as deferred revenue is not included in debt/capital ratios." Exam. III, App. E at 20 (quoting JPMC BKR 0015716-746). As late as October 2001, Chase employees bragged that the rating agencies still "haven't figured out prepays." Exam. III at 65 (quoting JPM BKR-E 0241185).

Chase considered this fact in pricing the transactions for Enron: "I think what we're trying to gauge is how, how aggressive they are to pay for this stuff now, which is discretely get, you know, several hundred million dollars and have no market knowledge of what's going on. . . ." PSI Ex. 184c at 684.

267. All together, Chase used three SPEs as conduits for its loans to Enron – Mahonia Limited, Stoneville Aegean Limited, and Mahonia Natural Gas Limited (collectively, "Mahonia"). Chase originally inserted Mahonia into the structure because regulations prohibited Chase from taking title to physical natural gas or crude oil. But after Chase merged with Chemical Bank, the New York State Banking Department gave Chase permission to take title. Therefore, as District Attorney Morgenthau recognized, by 1997 Chase no longer had even a theoretical legitimate business purpose for using Mahonia. Chase nevertheless continued to include Mahonia because excluding it would expose the link between Chase and Enron.

268. Under GAAP, the prepay transactions were not legitimately booked as trades unless the three parties to the trades – Enron, Chase, and Mahonia – were independent of each other. Mahonia was not independent of Chase, and Chase knew that. Indeed, the three Mahonia entities were each shell companies, incorporated at Chase's behest in the Isle of Jersey, one of the British Channel Islands. At the time of their creation in 1986, an attorney acting for Chase acknowledged: "For obvious reasons it is important that the SPVs are controlled by Chase but, for accounting and other requirements, it is not desirable that they are wholly owned by Chase." Letter from Ian James to Commercial Relations Department, Jersey Island, April 24, 1986. PSI Ex. 118.

269. In its complaint against Chase, the SEC emphasized Mahonia's fatal lack of independence: "Mahonia was controlled by Chase and was directed by Chase to participate in the transactions ostensibly as a separate, independent, commodities-trading entity. In fact, however, the SPV had no independent reason to participate in these transactions; as Chase knew, Mahonia was

included in the structure solely to effectuate Enron's accounting and financial reporting goals." SEC

Chase Complaint ¶ 14.

270.    District Attorney Morgenthau also investigated whether Mahonia was independent

and concluded it was not.  Among other things, he reported that

> [t]he only outward sign of Mahonia's existence in Jersey is a sign plate hanging in
> the lobby of the offshore law firm that created it.  It has never had employees, office
> space, a commodities trading desk (much less any gas stations or tankers) or any
> facilities whatsoever for engaging in the business of commodities trading.
> Mahonia's total capitalization, which Chase ultimately paid, was only ten British
> pounds, and Chase paid all the shell company's legal fees, administrative fees,
> government filing fees, and photocopying expenses. Mahonia's sole "profit" in each
> deal was a nominal prearranged fee – never more than $12,500 – again, paid by
> Chase.  (In some deals, the participating SPEs received no compensation whatever
> for taking part in the prepaids.)

Morgenthau Letter at 4.

271.    Other signs that the Chase SPEs were not independent: They were not permitted to

do business with parties other than Chase without Chase's explicit permission.  Chase acted as their

unpaid agent with respect to operational activities.  The SPEs' off-shore directors were not allowed

access to the SPEs' bank accounts at Chase and were not sent bank statements.

272.    The Enron Examiner, who also did his own investigation, agreed with the SEC and

the Manhattan District Attorney.  He found that,

> Mahonia was not independent from JP Morgan Chase in any meaningful sense.  JP
> Morgan Chase had caused Mahonia to be created as a Jersey Channel Islands
> corporation for the express purpose of assisting in transactions arranged by JP
> Morgan Chase.  . . . Mahonia, as a "special purpose vehicle," was not capable of
> performing for itself its obligations under the prepay contracts, thus prompting JP
> Morgan Chase to perform such activities as its agent.

Exam. III, App. E at 56.

273.    Besides knowing that Mahonia was not independent, Chase knowingly made

misrepresentations to Arthur Andersen about whether Mahonia was independent.  In late 2001,

Arthur Andersen required Enron to prove Mahonia's independence from Chase.  The Insiders

therefore asked Chase for a letter that would satisfy Arthur Andersen, one that "doesn't have Chase showing up anywhere on the fax letterhead or anything along those lines, a separate fax number, etcetera." PSI Ex. 184a at 666. A day later, the Insiders confirmed that the letter from Mahonia should state "(in words not yet crafted, so any you want to propose are welcome) that Mahonia and Chase are unrelated entities which are not consolidated on a legal or accounting basis with each other." Exam. III, App. E at 55-56 (quoting AB00512189). Chase provided the letter even though it knew the opposite was true.

274.    Chase also caused Mahonia to make affirmative misrepresentations about Mahonia's role in the Enron prepays. In the contractual documents between Enron and the SPEs, Chase made each of its SPEs affirm that they intended to buy natural gas

> . . . for commercial purposes related to its business as a producer, processor, fabricator, or merchandiser of Natural Gas or natural gas liquids. The Purchaser has the capacity, and intends, to take delivery of the Natural Gas to be delivered hereunder. The Purchaser is acquiring the Natural Gas in the ordinary course of business.

EC00158431, EC00105844. Chase also made Mahonia affirm that it was "entitled to purchase the Natural Gas [involved in the prepay contract with Enron] free of any taxes" because it was "engaged in the business of reselling the Natural Gas delivered" under the contract, and that it was "purchasing the Natural Gas for resale to third parties." *Id.* at EC001058442. As both Chase and Mahonia knew, none of these representations were true.

275.    Moreover, in September 1998, Chase helped the Insiders spread their fraud. As the Chief Investigator for the PSI explained in his testimony to Congress, the basic structure of the Mahonia transactions had

> two key credit support mechanisms to guarantee the parties' obligations, thus removing the performance risk in favor of Chase. First, Enron provide[d] an unconditional guarantee for the obligations of its subsidiary to Chase (through Mahonia). Second, the Enron guarantee [was] supported by either a Performance Letter of Credit ("PLC") with Enron as the account and Mahonia as the beneficiary;

or by surety bonds issued by insurance companies. The PLC amortize[d] according to the amortization schedule of the Enron subsidiary's delivery of gas to Mahonia. That is, if Enron default[ed] on its guarantee, drawings on the PLC [would] match the amount outstanding on the prepay amortization schedule. Enron [paid] the PLC fees, which [were] determined according to Enron's senior debt rating.

PSI at 245.

276.    In September 1998, the Insiders asked Chase to agree that the Insiders could replace existing PLCs in the prepays with surety bonds that guaranteed Enron's delivery performance obligations. The bonds guaranteed that if Enron defaulted on its obligations to Chase (or Mahonia), insurance companies would pay. Because Enron would no longer be the guarantor, the change would have the effect of freeing up capacity at Chase to do additional deals with Enron. Chase agreed to the change. Enron, of course, did eventually fail to meet prepay repayment obligations to Chase – and Chase promptly sued the insurance companies on the bonds. The insurance companies defended against those claims on the ground that the prepay transactions were nothing more than complicated and undisclosed loans from Chase to Enron, using the Mahonia entities as pass-through vehicles.

277.    Enron reported cash flow from operating activities in 1999 of $1.228 billion. Without the Chase prepays, that number would have been $880 million – 28% lower. In 2000, Enron reported cash flow from operating activities of $4.779 billion. Without the Chase prepays, that number would have been $3.798 billion – 21% lower. The prepays had an equally striking impact of Enron's reported debt. In 1999, Enron reported debt of $8.152 billion. Had the then-outstanding Chase prepays been included, the number would have risen to $9.481 billion – an increase of 16%. In 2000, Enron reported debt of $10.229 billion. Had the then-outstanding Chase prepays been included, the number would have risen to $12.539 billion – an increase of 23%. As the Enron Examiner found, these "[r]educed operating cash flow and increased debt levels would

have resulted in credit ratings lower than those enjoyed by Enron during this period." Exam. III, App. E at 22.

278.    To Chase, the Mahonia prepay transactions were – in the words of Chase employees – "smoke and mirrors" and one of Chase's "tricks" for providing Enron with financing. *See* Exam. III, App. E at 20-21 & n.71.  These "tricks" materially inflated Enron's financial statements from at least 1997 until bankruptcy.  Their timing was arranged so that the Insiders could cause Enron to meet key financial targets critical to the maintenance of Enron's credit ratings and the expectations of the market.  In each case, the prepaid amount was determined not by the Insider's desire to sell oil or natural gas but by the amount of cash flow needed to achieve the desired ratings and market reviews. In each case, the transaction was arranged on the eve of the close of a fiscal period for Enron and closed within days or hours of the end of the quarter or year.  Without the Chase prepays, in many quarters during the relevant period Enron would not have met or exceeded the targeted financial results of the analysts or the market, and Enron's credit ratings would have been downgraded.

279.    Recently, Chase – like Citigroup – renounced the practices and policies through which Chase had aided and abetted the Insiders' misstatement of Enron's financial condition.  In its July 28, 2003 letter to Manhattan District Attorney Morgenthau, the Vice Chairman of J.P. Morgan Chase & Co. wrote:

> We have made mistakes.  We cannot undo what has been done, but we can express genuine regret and learn from the past.
>
> The Prepays are a case in point.  Our view historically with respect to such structured finance transactions was that our clients and their accountants were responsible for the clients' proper accounting and disclosure of the transactions.  Since Enron's bankruptcy, we have been widely criticized for this approach and for our involvement in the Prepays through which it has been alleged Enron improperly obtained financing in a manner not transparent to its shareholders and the market generally.  We will in the future hold ourselves to a higher standard.  ***Accordingly, J.P. Morgan Chase has adopted new policies and new procedures designed to***

***ensure that transactions in which it participates are disclosed appropriately by our clients. Under our new policies and procedures, J.P. Morgan Chase would not have approved the Enron prepays.***

(Emphasis added).

**(i)     Payments or transfers during the ninety-day period prior to bankruptcy**

280.    The following facts about the Chase prepays are alleged more specifically for purposes of certain bankruptcy claims. Six (6) of the Mahonia transaction involved payments or transfers within the preference period prior to the Petition Date. These six transactions are commonly referred to as "Chase VI" through "Chase XI." Chase VI closed in December 1997, Chase VII closed in June 1998, Chase VIII closed in December 1998, Chase IX closed in June 1999, Chase X closed in June 2000, and Chase XI closed in December 2000.

281.    As described in the paragraphs above, the Mahonia transactions were a series of commodity transactions typically involving ENA, Enron Natural Gas Marketing ("ENG"), a wholly-owned subsidiary of ENA; JP Morgan Chase; Mahonia; and Enron as Guarantor. Stoneville Aegean Ltd. ("Stoneville") and Fleet National Bank ("Fleet") were involved as secondary parties in one of the Mahonia transactions.

282.    Mahonia and Stoneville are nonsubstantive SPEs established for the benefit of, and controlled by, JP Morgan Chase. As such, Mahonia and Stoneville are alter egos and/or effectively one with JP Morgan Chase. JP Morgan Chase was the ultimate recipient and beneficiary of substantially all sums paid to and benefits received by its SPEs Mahonia and Stoneville during the course of the Mahonia transactions.

283.    While ostensibly prepaid forward oil or gas sales contracts and reciprocal margin payment agreements common in the energy industry, by virtue of intertwined and atypical companion agreements that resulted in circular delivery obligations and related financial swap

agreements designed to eliminate all price risk, the Mahonia transactions were essentially loans made by JP Morgan Chase to ENA or ENG, and guaranteed by Enron, which loans were scheduled to be repaid with interest by ENA and ENG by way of commodity delivery (as a convenience) or cash payment.

284.    For the Mahonia transactions commonly referred to as Chase VI through Chase IX, ENG was the Enron entity contracting to provide commodities to Mahonia in exchange for a prepaid sum of money. Although ENG was ostensibly the contracting entity for these Mahonia transactions, on information and belief, ENA actually made the required commodity deliveries on behalf of ENG. In the event, however, that ENG actually made the required commodities deliveries, then ENG is substituted as the Transferor with respect to the allegations regarding Chase VI through Chase IX in Count 6-8 below.

285.    For the Mahonia transactions that are commonly referred to as Chase VI through Chase IX, ENG was the Enron entity contracting to provide to and/or receive margin payments from Mahonia related to the prepaid forward commodity transactions. Although ENG was ostensibly the contracting party for these margin agreements related to the Mahonia Transactions, on information and belief, ENA actually made the required margin payments on behalf of ENG. In the event, however, that ENG made the required margin payments, then ENG is substituted as the Transferor with respect to the allegations regarding Chase VI through Chase IX in Count 12-14 below.

286.    The Mahonia transactions referred to as Chase VI through Chase X involved the following basic steps:

        a.      JP Morgan Chase provided the funding for the transaction by entering into a prepaid forward contract with its alter ego SPE Mahonia. In exchange for the funding from JP Morgan Chase, Mahonia agreed to deliver to JP Morgan Chase specified quantities of oil or gas at a specific time and place.

b.     Mahonia then entered into a virtually identical prepaid forward contract with ENG for Chase VI through Chase IX and ENA for Chase X through Chase XI, under which Mahonia paid an amount equal to the funds received from JP Morgan Chase (less a nominal fee retained by Mahonia) to ENG or ENA, and ENG or ENA agreed to deliver the same amount of oil or gas to Mahonia at the same time Mahonia was to deliver it to JP Morgan Chase.

c.     ENA and JP Morgan Chase then entered into an agreement which required ENA to make periodic, fixed payments to JP Morgan Chase (calculated as a fixed per unit price for a set quantity of oil or gas).  JP Morgan Chase, in return, would pay ENA the prevailing market price for the same quantity of oil or gas.  These payments were due at the same time ENG or ENA was to deliver the same quantity of oil or gas to Chase's SPE Mahonia (and Mahonia was, in turn, to deliver the commodity to JP Morgan Chase) under the prepaid forward contracts.

287.     The three steps described above in paragraph 286 were designed to function as an integrated whole to produce what was, in substance, a term loan by JP Morgan Chase to ENG or ENA.

288.     Chase XI did not include the agreement between ENA and JP Morgan Chase described in paragraph 286(c).  Rather, JP Morgan Chase sold the commodities obtained from ENA to JP Morgan Chase's SPE Stoneville, which in turn sold the commodities back to ENA at a fixed price.  Similar to the payments by ENA to JP Morgan Chase under the agreement described in paragraph 286(c), the funds paid by ENA to Stoneville, which funds were transferred by JP Morgan Chase's SPE Stoneville to JP Morgan Chase, were intended to be sufficient to repay the Chase XI loan with interest.

### (3)    FAS 140 transactions

#### (i)    Hawaii

289.    Although Chase was not a major participant in the FAS 140 transactions, it did take a $20 million participation interest in Hawaii, on which CIBC was the lead lender. The Hawaii transactions are described in paragraphs 411 through 414 below.

290.    Chase knowingly facilitated the Insiders' manipulation of Enron's financial statements by participating in the Hawaii transaction. Chase knew the Insiders intended to account for Hawaii as a FAS 140 transaction. Chase knew FAS 140 required that Enron not support or guarantee the loan for the applicable SPE. Finally, Chase knew Enron was supporting the loan through a total return swap that provided the lenders with assurance of payment similar to an Enron guaranty. Despite that knowledge, Chase facilitated the transaction by participating in it. Without Chase's participation, the Hawaii transaction would not have closed.

#### (ii)    Fishtail

291.    In December 2000, Chase knowingly facilitated the Insiders' manipulation of Enron's financial statements by participating in the Fishtail transaction. Fishtail, which began life as Grinch, was a project to assist Enron in recording income and cash flow from operations from its pulp and paper business.

292.    The project originally called for Enron to create a joint venture structure (eventually, Fishtail) to which Enron would transfer its existing paper business. However, Enron ended up transferring to Fishtail only the profits from Enron's existing and future trading contracts. Fishtail had a maximum life of five years. Therefore, Enron actually transferred to Fishtail only the five-year profit stream, at most. Enron valued that profit stream at $200 million.

293.    Chase had two roles in connection with the Fishtail structure. Its first role was as equity participant in Annapurna, an SPE established to be the joint venture partner with Enron in

Fishtail. Annapurna was capitalized with $50 million equity. Of that $50 million, LJM2 provided $8 million and Chase provided an unfunded commitment of the remaining $42 million, by way of a letter of credit. Chase knew, however, that none of that $42 million was at risk. It was 100% supported by Enron. The structure was set up to allocate the first $200 million in losses solely to Enron.

294.    Chase knew the Insiders intended to account for the transaction which Fishtail was to be used (Bacchus) as a FAS 140 transaction. Chase also knew that Fishtail therefore had to be structured so as not to be consolidated with Enron. For that to happen, 20% of Fishtail's capitalization had to come from Annapurna. But Chase's portion of Annapurna was not at risk because the Insiders had agreed that Fishtail's first $200 million in losses would be allocated completely to Enron.

295.    Chase's second role in Fishtail was as valuation expert. Enron's $200 million valuation of the five-year profit stream from Enron's trading contracts was dependent on, and supported only by, a valuation analysis Chase performed of Enron's Forest Products business on October 26, 2000, and revised on November 20, 2000. Chase's valuation had three parts: (i) the Garden State Paper Company, (ii) "soft assets," such as Enron credit support, risk management expertise, and management strength, and (iii) the pulp and paper trading business.

296.    Enron had acquired the Garden State Paper Company in August 2000 for $72 million; Chase therefore used $72 million in its valuation. Chase did not assign any specific number to Enron's soft assets. Chase assigned a value of $225 million to $300 million to the pulp and paper trading business. Only two months before, that business had been given a mark-to-market value of only $81.2 million. Less than a year later, in preparing an asset inventory in anticipation of bankruptcy, Enron estimated the total market value of the pulp and paper trading business at $50 million.

297.     Chase's $225 million to $300 million valuation of the pulp and paper trading business was without factual basis or support. Chase's October and November 2000 valuation of Enron's trading contracts was inconsistent with the mark-to-market value attributed to it in September 2000, inconsistent with the value given to it prior to bankruptcy, and inconsistent with its actual value. By all appearances, Chase chose the range $225 million to $300 million solely because the Insiders made known that they valued the trading business at $275 million.

298.     Chase's valuation gave the Insiders an ostensible basis for recognizing improperly a gain in the transfer of the trading contracts from Enron to Annapurna. Chase knew that the Insiders intended to so rely on the valuation Chase provided, knew that the valuation was without support, and yet provided it anyway, which allowed the Fishtail transaction to occur.

299.     Chase knowingly and improperly facilitated the Insiders' manipulation of Enron's financial statements through its valuation, as discussed above, and through its participation in Fishtail.

   c.     **Barclays knowingly assisted the Insiders in misstating Enron's financial condition.**

300.     Barclays' participation in the Insiders' scheme was essential, in part because it started early. By October 1998, Enron already owed Barclays over $1.5 billion. Several high-ranking Barclays employees have admitted Barclays knew from early on that the Insiders were using multiple and varied financing structures to hide the true nature of Enron's financial condition. *See* Exam. III, App. F at 9. Barclays understood the Insiders' motives and the transactions' effect on Enron's financial statements. Barclays Director John Meyers has admitted that no *outsider* could evaluate the effect the Insiders' structures had on Enron's financials. Of course, as a participant in the scheme, Barclays could. For example, by early 1999, Barclays knew that the Insiders' structured financings added $4.6 billion to Enron's reported debt for 1998 of $7.4 billion. Barclays well

understood that the additional debt, properly recorded, increased Enron's debt to total capitalization ratio from 41.9% to 63%.

301.    Barclays chose to remain deeply involved in the Insiders' scheme despite knowing exactly what the Insiders were doing. Seven transactions with Barclays were particularly significant: J.T. Holdings, Nikita, Chewco, SO2, and three prepays. The Enron Examiner found that all seven were reported improperly by the Insiders, that Barclays participated knowing they would be reported improperly, and that as a result of the transactions, a total amount of $410 million was improperly reported as "income" and $1 billion improperly reported as "cash flow from operations." The Enron Examiner also concluded that $1.77 billion of debt was improperly kept off Enron's 1997-2001 financial statements because of them.

### (1)    Barclay's relationship with Enron

302.    Barclays is one of the largest financial services groups in the UK. Its involvement with Enron was extensive and lucrative. It attained Tier 1 status in 1993, and kept it until Enron's bankruptcy. By the late 1990s, Barclays was among Enron's top three banks. Enron, in turn, was Barclays' top oil and gas client worldwide from the late 1990s through 2000. From 1996 through 2001, Barclays led 33 financing transactions and participated in 16 more. Barclays also proposed or considered 27 others during that same time. In connection with the transactions Barclays completed, Barclays was paid over $40 million in fees – a figure that does not include interest Barclays earned on the money it loaned.

303.    Because of its close relationship with the Insiders, Barclays had better access to Enron's true financial information than many other banks, not to mention the rating agencies. Barclays examined Enron's creditworthiness every year based on information to which it was privy by virtue of that relationship. Its access was such that by the end of 1998, Barclays' senior management had already concluded that the increasing reliance on structured financings to handle

Enron's off-balance sheet liabilities "was having a material impact on Enron's financial statements." Meyer Sworn Statement, at 154-57 (Exam. III, App. F at 11).

### (2) J.T. Holdings

304. Since the early 1990s, Barclays has known it is improper *not* to consolidate a synthetic lease structure unless the lessee-SPE that owns the assets is capitalized with 3% independent, at-risk equity. As a result, when the Insiders approached Barclays in the fall 2000 about participating in an unconsolidated structure involving four distinct synthetic lease transactions, Barclays knew the assets to be leased had to be owned by an SPE capitalized with at least 3% independent, at-risk equity. Nevertheless, as a condition to its equity participation in the J.T. Holdings synthetic lease structure, Barclays told Glisan in November 2000 that Barclays would not participate unless Glisan would guarantee Barclays' equity interest would be returned. Barclays' required the promise because it questioned the residual value of the assets underlying the transaction.

305. On November 14, 2000, Barclays Director Richard Williams advised others at Barclays that he had received the necessary assurance:

> We have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer. Specifically, Ben Glisan will commit to us that under all circumstances Enron will execute its purchase option at a price sufficient to repay in full the holders of the B Notes and Certificates.

Exam. III, App. F at 23. Glisan's assurance was exactly what Barclays needed. On December 7, 2000, Barclays made its equity investment by purchasing $1.3 million of C Trust Certificates and contributing them to the SPE.

306. Barclays participated in the J.T. Holdings transaction knowing that Glisan's verbal assurance of repayment meant that less than 3% of the equity would be at risk. (Barclays' certificates were one part of the $3.3 million in trust certificates that made up the 3% equity

component.)  Barclays knew, as a result, that the transaction would not be entitled to off-balance sheet accounting treatment.  Barclays also knew the Insiders would ignore that fact, and would treat the transactions as properly off-balance sheet.  Of course, Barclays was right.  The Insiders recorded the transactions off-balance sheet and, as a result, $106.2 million in debt was not properly reported on Enron's financial statements.

### (3) Nikita

307.    Nikita – a FAS 140 transaction – raised the same issue as J.T. Holdings.  Barclays knew that the trust structure in the transaction had to include at least 3% "at-risk" equity in order for it not to be consolidated on Enron's balance sheet.  Again, however, Barclays demanded and received verbal assurances from the Insiders which took the risk out of the equity investment and thereby invalidated the off-balance sheet accounting treatment.  Nikita represented $71.9 million of debt improperly kept off Enron's financial statements.

308.    Nikita was a FAS 140 transaction the Insiders used to monetize Enron's ownership interests in EOTT Energy Partners, LP (the ownership interests are "EOTT Partnership Units").  The transaction contemplated a syndicate, led by Barclays, that would agree to make up to $235 million available through Besson Trust, an SPE.  Besson Trust purchased Enron's ownership interests in EOTT, in part by borrowing approximately $71.9 million from Barclays.  That loan was effectively guaranteed by Enron through a total return swap.

309.    Until the day before the transaction closed in September 2001, Barclays role also included purchasing an $8.1 million certificate held by CSFB (the other principal financier of the transaction) which would constitute the equity interest.  Again, however, because Barclays was concerned  about the value of the assets underlying the transaction, Barclays required the Insiders to verbally assure Enron's repayment before Barclays would participate.

310.     Ultimately, regulatory reasons stopped Barclays from holding the certificate.  So, instead, CSFB contributed the equity funding.  However, CSFB only agreed to take Barclays' place because Barclays agreed to enter into a total return swap guaranteeing that *CSFB's* investment would be returned.  Barclays thereby became the *de facto* equity holder.  Of course Barclays took on CSFB's risk only because the Insiders had already guaranteed its own risk – Barclays' risk.  The Insiders' verbal assurances survived closing.

311.     Barclays participated in Nikita knowing that the Insiders' verbal assurance of repayment meant that 3% equity would not be at risk.  Barclays knew that as a result, Enron would not be entitled to off-balance sheet accounting treatment.  Barclays also knew that despite that fact, the Insiders would not include the transactions on Enron's financial statements.

312.     The verbal assurances Barclays demanded and received directly caused Enron's accounting treatment to fail.  Without those assurances, however, Barclays would not have entered into the total return swap with CSFB.  Without the total return swap, CSFB would not have held the certificate.  And without true risk for the certificate holder, off-balance sheet treatment was inappropriate.

313.     For purposes of certain bankruptcy claims that arise from Nikita, the following facts are more specifically pled:  Nikita, LLC ("Nikita"), a wholly-owned subsidiary of Enron, contributed the EOTT Partnership Units to another Enron wholly-owned subsidiary, Timber I LLC ("Timber"), in exchange for a Class A Interest in Timber.

314.     Besson Trust, a special purpose entity ("SPE") set up by Enron, purchased the Class B Interest in Timber with financing obtained by issuing a certificate of beneficial interest to CSFB for approximately Eight Million One Hundred Thousand Dollars ($8,100,000) and by borrowing approximately Seventy-One Million Nine Hundred Thousand Dollars ($71,900,000) from Barclays (the "Barclays Loan").

315.    On or about September 28, 2001, Besson Trust entered into a Total Return Swap Agreement with ENA, which Enron guaranteed, and pursuant to which ENA was obligated to pay Besson Trust an amount equal to the amounts payable on the Barclays Loan in exchange for Besson Trust's agreement to pay ENA all amounts received by Besson Trust with respect to the Class B Interest.

316.    On or about November 6, 2001, ENA paid Two Hundred Forty-Eight Thousand Three Hundred Thirty-Three Dollars and Fifty Cents ($248,333.50) to Besson Trust in accordance with the terms of the Total Return Swap Agreement.

317.    Besson Trust paid Barclays Two Hundred Forty-Eight Thousand Three Hundred Thirty-Three Dollars and Fifty Cents ($248,333.50), the same amount that ENA paid to Besson Trust.

318.    Even though the agreement pursuant to which ENA made the payment to Besson Trust was called "Total Return Swap Agreement," in reality the agreement was not a swap agreement but an instrument that allowed ENA to make a payment of interest on the Barclays Loan.

### (4)    SO$_2$

319.    With SO$_2$, the Insiders and Barclays intended to create a financing structure with the economic characteristics of a loan, but which nevertheless could be recorded on Enron's financial statements as cash flow from operations.  The Insiders and Barclays worked on the structure for months – from spring 2001 through October.  The SO$_2$ transaction itself dealt with two purported sales of SO$_2$ emission credits to a Barclays SPE, Colonnade Limited ("Colonnade").

320.    The SO$_2$ transaction worked in much the same way as the prepays. Like the prepays, it also required the participation of an independent third party.  In this case, the third party was Colonnade.  When it structured the transactions, Barclays knew – because the Insiders had told it – about the "smell test" Arthur Andersen would use to evaluate the third party.  In an effort to pass

the test, Barclays "seasoned" Colonnade by pushing two short-dated commodity trades through it. As a factual matter, however, Colonnade still failed. For example, it had not been established for a number of years. Also, it did not have a legitimate history of multiple transactions.

321. Barclays knew the transaction could not properly be accounted for off-balance sheet. Barclays also knew the Insiders intended to book cash flow from the improperly recorded transaction as cash flow from operating activities. Moreover, Barclays' own accountants told it several times that under the accounting rules, Enron was required to consolidate Colonnade. Finally, as Barclays' documents show, Barclays was concerned that the structure of the transaction was inconsistent with the "values of Barclay bank." Exam. III, App. F at 41 (quoting BRC 000127900). Nevertheless, Barclays facilitated the transaction anyway.

322. For purposes of certain bankruptcy claims that arise from $SO_2$, the following facts are more specifically pled.

### (a) The September transaction

323. Specifically, with respect to the first purported sale of $SO_2$ emission credits, on or about September 28, 2001, Barclays and Colonnade entered into a Committed Money Market Facility pursuant to which Barclays loaned Colonnade One Hundred Thirty-Eight Million Four Hundred Seventy-Five Thousand Eight Hundred Twenty-Nine Dollars and Fifty Cents ($138,475,829.50).

324. On or about September 28, 2001, ENA transferred 757,975 emission credits to Colonnade for One Hundred Thirty-Eight Million Four Hundred Seventy-Five Thousand Eight Hundred Twenty-Nine Dollars and Fifty Cents ($138,475,829.50) ("the September Transaction"), the exact amount that Colonnade obtained from Barclays. Colonnade pledged its interest in the emission credits and its rights under the September Option Agreement (as defined below) as security

for the repayment of the funds it borrowed from Barclays under the Committed Money Market Facility.

325.    During the same time period, Herzeleide LLC ("Herzeleide"), a wholly-owned subsidiary of Enron, was created for the sole purpose of being a party to certain option agreements with Colonnade in the context of the $SO_2$ transaction.  Herzeleide is the alter ego of Enron and its affiliates.

326.    On or about September 24, 2001, Herzeleide entered into an Option Agreement (the "September Option Agreement") governing the various put and call arrangements with Colonnade. These arrangements gave Herzeleide a call option to purchase from Colonnade the exact same amount and vintage years of emission credits as those purchased from ENA in the September Transaction.  In addition, these arrangements gave Colonnade a put right to require Herzeleide to purchase the exact same amount and vintage years of the emission credits that ENA sold to Colonnade.

327.    Herzeleide acquired the call rights in exchange for a payment of Four Hundred Twenty-Six Thousand Six Hundred Fifty-Nine Dollars and Thirty-Seven Cents ($426,659.37) to Colonnade ("Herzeleide September Payment") – which was in effect a partial prepayment of interest on the money that Colonnade borrowed from Barclays for the September Transaction, discussed above in paragraph 323.

328.    Upon information and belief, the Herzeleide September Payment was in fact made by ENA to Colonnade.  Enron's records show that ENA made a payment to Colonnade equal to the amount that Herzeleide supposedly paid Colonnade as a premium for the call option arrangement under the September Option Agreement.

329.    Upon information and belief, the Herzeleide September Payment was subsequently transferred to Barclays.

330.     As part of the September Transaction, ENA and Barclays then entered into a swap confirmation under an existing ISDA Master Agreement ("September Swap").  Enron provided a limited guarantee of ENA's obligation under the September Swap.  In the September Swap, ENA agreed to pay Barclays, at the end of the term, the amount by which the price of the emission credits had declined from the price that Colonnade had purchased the emission credits from ENA, and Barclays agreed to pay ENA the amount by which the price of the emission credits had increased from the price that Colonnade had purchased the emission credits from ENA.  The price and vintage year of the emission credits referenced in the September Swap were identical to the price and vintage year of the emission credits sold by ENA to Colonnade in the September Transaction.

331.     On or about September 28, 2001, Barclays and Colonnade entered into a swap agreement where Barclays agreed to pay Colonnade the amount by which the price of the emission credits had declined below the price that Colonnade had purchased the emission credits from ENA.  Conversely, Colonnade agreed to pay Barclays the amount by which the price of the emission credits had increased above the price that Colonnade had purchased the emission credits from ENA.

332.     The agreements referenced in paragraphs 330 and 331 had the net effect of eliminating the price risk of the emission credits from the put and call option arrangements under the September Option Agreement.

333.     The agreements and the derivative transactions described in paragraphs 323-331 above had the economic effect of providing ENA with financing from Barclays equal to the purchase price that Colonnade paid for the emission credits.  Thus, while the September Transaction ostensibly involved the sale of emission credits, in economic substance the September Transaction was a loan secured, in part, by emission credits and Colonnade's rights under the September Option Agreement.

334.     On or about October 30, 2001, ENA and Barclays entered into a Termination Agreement, terminating the September Swap.  The Termination Agreement provided for a termination fee to be paid to Barclays.

335.     In accordance with the provisions of the Termination Agreement, on or about October 30, 2001, ENA paid Barclays a Ten Million One Hundred Three Thousand Two Hundred Ninety-Four Dollars ($10,103,294) termination fee ("Termination Fee").

### (b)     The October transaction

336.     On or about October 30, 2001, ENA transferred to Colonnade 166,607 emission credits for approximately Twenty Nine Million One Hundred Eight Thousand Six Hundred Thirty-Eight Dollars and Eighty-Five Cents  ($29,108,638.85) ("October Transaction").

337.     On or about October 30, 2001, Barclays entered into a Committed Money Facility with Colonnade for One Hundred Seventy Million Dollars ($170,000,000).  Colonnade used part of these funds to pay ENA for the emission credits in the October Transaction.

338.     At the same time, Colonnade entered into a Call Option Agreement with Herzeleide and into a Put Option Agreement with Grampian LLC ("Grampian"), another Enron wholly-owned subsidiary.

339.     Grampian was created for the sole purpose of being a party to certain option agreements with Colonnade in connection with the $SO_2$ transaction.  Grampian is the alter ego of Enron.

340.     The put and call agreements that Herzeleide and Grampian entered into functioned in substantially the same way as did the put and call arrangements in the September Transaction. Similarly, Enron provided a limited guarantee of Herzeleide's and Grampian's obligations under the put and call agreements governing the October Transaction.

341.    On or about October 30, 2001, Herzeleide acquired call rights from Colonnade, for the same amount and vintage year as the emission credits transferred in the September and October Transactions, in exchange for the aggregate amount of Three Million Three Hundred Five Thousand Four Hundred Sixteen Dollars and Two Cents ($3,305,416.02) ("Herzeleide October Payment").

342.    Upon information and belief, the Herzeleide October Payment was in fact made by ENA to Colonnade.  Enron's records show that ENA made a payment to Colonnade equal to the amount that Herzeleide supposedly paid Colonnade as a premium for the call rights in the September and October Transactions.

343.    The Herzeleide October Payment and the Termination Fee were in effect a prepayment of interest on the financing Colonnade obtained from Barclays for the purchase price of the emission credits transferred by ENA.

344.    Barclays and ENA entered in new swap confirmations, under the existing ISDA Master Agreement, similar to those in the September Transaction.

345.    In addition, Barclays and Enron entered into a Charge on Cash Agreement ("Charge on Cash Agreement"), on or about October 30, 2001, which required Enron to deposit Fifty-Nine Million Five Hundred Thousand Dollars ($59,500,000) with Barclays (the "Barclays Deposit") as security for all obligations owing by Enron and its subsidiaries to Barclays and any other entity in which Barclays had an interest.

346.    Pursuant to the terms of the Charge on Cash Agreement, Enron deposited the Barclays Deposit with Barclays on or about October 30, 2001.

347.    Barclays applied the Barclays Deposit as follows:

(a)    Forty Five Million Six Hundred Two Thousand Two Hundred Ninety-Five Dollars ($45,602,295) was applied against the early termination amount allegedly owed by ENA to Barclays as a result of the early termination of the entire Barclays/ENA swap book;

(b)     Ten Million One Hundred Sixty-Three Thousand Ninety Two Dollars and Twenty-Three Cents ($10,163,092.23) was applied to ENA's alleged obligations to the Besson Trust (relating to the Nikita transaction);

(c)     Three Million Four Hundred Fifty-Nine Thousand Eight Hundred Forty-Four Dollars ($3,459,844) was applied to Enron's alleged obligation as guarantor of the Richmond Power Enterprise, L.P.;

(d)     Two Hundred Twenty-Two Thousand Fifteen Dollars ($222,015) was applied to alleged unspecified obligations of Enron Credit Limited; and

(e)     Three Hundred Fifteen Thousand Three Hundred Thirty-Seven Dollars ($315,337) was applied to alleged and unspecified obligations of Enron.

348.     As with the September Transaction, the October Transaction provided ENA with financing from Barclays, which was secured by the emission credits sold to Colonnade and the rights under the call and put agreements.

(c)     **Economic Reality and Allocation of Risk in the SO$_2$ Transaction**

349.     One or more of the various individual transactions that comprised the SO$_2$ Transaction might appear in isolation to be normal trading activity on market terms. When the transactions are viewed in the aggregate, however, the totality of the facts and circumstances make clear that in economic substance, the SO$_2$ Transaction was a $167,600,000 loan from Barclays to Enron and/or ENA.

350.     Each of the various individual transactions was based upon the same amount and vintage years of the Emission Credits purportedly "sold" by ENA to Colonnade.

351.    Each of the various individual transactions related to the September transaction was entered into contemporaneously with the purported "sale" transaction between ENA and Colonnade in September of 2001.

352.    Each of the various individual transactions related to the October transaction was entered into contemporaneously with the purported "sale" transaction between ENA and Colonnade in October of 2001.

353.    There does not appear to be a commercially reasonable explanation for one or more of the various individual transactions unless they are viewed as part of the larger transactions in September and October of 2001.

354.    Despite the appearance of the various individual transactions, Enron and ENA never relinquished the benefits or burdens of ownership of the $SO_2$ emission credits (the "Emission Credits").

355.    In economic substance the Emission Credits were treated as collateral for a loan transaction.  At any point in time, the swaps and options placed the parties in the same position with respect to the Emission Credits as they would have been in a secured loan transaction, that is, Barclays was obligated to pay Enron the surplus value of the collateral and Enron was obligated to satisfy the deficiency balance should the value of the collateral prove to be less than the loan balance.

356.    At all relevant times, the economic risks undertaken by the parties were consistent with those of a loan transaction, not of a sale transaction.

(5)    **Chewco**

357.    Barclays worked closely with Enron to structure the Chewco transaction.  As described earlier, the Insiders formed Chewco in order to acquire CalPERs' interest in JEDI, when CalPERs decided to sell its interest.  Barclays played a role in financing JEDI originally and, in

November 1997, joined with JP Morgan Chase to finance Chewco's indirect acquisition of half of CalPERs' interest. At the time, Barclays clearly understood that JEDI's only purpose was to maintain off-balance sheet treatment for certain assets. In fact, Barclays itself described off-balance sheet treatment as JEDI's "raison d'etre." Exam. III, App. F at 43 (quoting BRC 00001931).

358. Barclays' role was to structure (and finance) Chewco's equity investment. The original concept was that Enron would guarantee Barclays' "quasi-equity" investment in Chewco by providing Barclays with an annual advisory fee that would – not coincidentally – equal the amount of the equity Barclays put "at-risk." Of course, such a fee would very visibly have eliminated Barclays' risk altogether. For "accounting reasons," therefore, the advisory fee concept was deemed unworkable. Barclays and the Insiders replaced it with "reserve accounts." As structured, these "reserve accounts" were accounts that Enron funded at the transaction's closing which effectively provided Barclays with cash collateral covering 60% of its investment in Chewco from day one. Barclays' employees have confirmed that the accounts secured repayment of its equity investment. *See* Exam. III, App. I at 48.

359. Because most of the equity investment in Chewco was guaranteed, 3% equity was not at work and JEDI was not properly treated as an off-balance sheet entity. Eventually, Enron (as opposed to the Insiders) learned that Barclays had insufficient equity at risk in Chewco. As a result, on November 19, 2001, Enron restated its financials back to 1997, when Chewco and JEDI should first have been consolidated with Enron.

### (6) Prepays

360. Barclays understood the economic substance and effect of the Enron prepay transactions. Nevertheless, it participated in at least three: Roosevelt (a $500 million crude oil and natural gas commodity swap), Nixon (a $324 million crude oil advance), and a $150 million crude

oil commodity swap with Enron and CSFB.  The Insiders used these prepays to keep $760 million in debt off of Enron's financial statements.

361.    Barclays had a detailed understanding of these prepays' "essentially circular" nature, which eliminated all price risk in the transactions.  Barclays' credit officer in charge of the Enron relationship understood that notwithstanding their name, the essence of the Enron prepay transactions had nothing to do with deferred revenue.  In June 1999, he explained that although Enron was "notionally" agreeing to deliver commodities in satisfaction of a current obligation, "in actual fact they are only borrowing money." Exam. III at 72 (quoting BRC 000106893-895).  In other words, Barclays understood that the prepay transactions in which it participated were intended to disguise loans as cash flow.

362.    By 2000, Barclays also knew that the Insiders were improperly booking the "loan" money as cash flow from operating activities, not cash flow from financing.  The Enron Examiner found that Barclays also knew that the impact of the prepays could not be determined from Enron's published financial statements–in fact, that their impact could not truly be understood without access to Enron's management.

       **d.**     **BT/Deutsche Bank knowingly assisted the Insiders in misstating Enron's financial condition**

363.    BT/Deutsche Bank's involvement in the Insiders' manipulation of Enron's financial condition was also necessary to the Insiders' scheme.  BT/Deutsche Bank knew the Insiders were using SPE transactions improperly to inflate income on Enron's financial statements and to remove debt.  From at least 1997, BT/Deutsche Bank helped the Insiders achieve their improper goals by designing, financing and/or implementing several important tax transactions.  Together, these transactions allowed the Insiders improperly to engineer significant income on Enron's financial statements.

364.     The Enron Examiner reviewed the BT/Deutsche Bank tax transactions discussed here – Steele, Cochise, Teresa, Tomas, Renegade, and Valhalla.  The Enron Examiner concluded that Teresa, Steele, Tomas, and Cochise were "for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron," that BT/Deutsche Bank knew that these transactions did not have a bona fide business purpose other than enabling the Insiders to incorrectly report income for accounting purposes, and that BT/Deutsche Bank substantially assisted the Insiders' fraud because it "developed [Teresa, Steele, Tomas, and Cochise's] basic tax and accounting structures . . . promoted them to Enron, and participated in the transactions, often as the only party other than Enron affiliates."  Exam. III, App. G at 72-73.  The Enron Examiner concluded that this evidence was "sufficient for a fact-finder to conclude that BT/Deutsche aided and abetted certain [Enron] officers in breaching their fiduciary duties." Exam. III, App. G at 2.

**(1)     BT/Deutsche Bank's relationship with Enron**

365.     When Deutsche Bank acquired Bankers Trust Corporation ("Bankers Trust") in June 1999, Deutsche Bank and Bankers Trust each enjoyed a longstanding relationship with Enron.  By that time, both were Tier 1 banks.  The combined company was a Tier 1 bank as well.  All three (Deutsche Bank, Bankers Trust, and BT/Deutsche Bank) proposed and engaged in a wide variety of transactions with Enron worldwide.  One was BT/Deutsche Bank's $10 million investment in LJM2 in December 1999, which was made at Fastow's invitation.  In a November 29, 2000 internal e-mail, BT/Deutsche Bank described the importance of Enron: "By having this unique access to a very innovative client, we have been able to develop products that we are aggressively marketing to other clients."  Exam. III, App. G at 11 (quoting DBG 079773-774).

### (2)     The tax transactions

366.     In 1997, Enron Insider Maxey formed a Corporate Tax Planning Group within Enron's corporate tax department.  Thereafter, the tax transactions became one of BT/Deutsche Bank's most important areas of involvement with Enron.  Periodically, BT/Deutsche Bank met with Maxey's group to consider structures BT/Deutsche Bank developed that would satisfy Enron's goals.  Among these structures were the highly complex Projects Teresa, Steele, Cochise and Tomas.  In those four transactions, Enron engaged BT/Deutsche Bank as its exclusive financial advisor.  In exchange, BT/Deutsche Bank received over $38 million in fees.  William Boyle, a Bankers Trust vice president, justified BT/Deutsche Bank's huge fees in part by reference to the large amount of accounting income the tax transactions would generate.  AB000187757-AB00018777.  Robert J. Hermann, who headed Enron's corporate tax department, provided an illuminating metaphor:  to Enron, the tax transactions were "kind of like cocaine–they got kind of hooked on it."  Exam. II at 87 n.169.

367.     Enron had huge amounts of net operations losses available to it prior to entering into any of the tax transactions.  Accordingly, the tax transactions were not designed to save current or near-term future taxes.  As a result, the tax transactions had nothing to do with "normal tax savings techniques."  Exam II, App. J at 1.  They also went beyond "typical corporate 'tax shelter' transactions."  *Id.*  Instead, these were a "new genre" of transactions designed to "generate" accounting income from projected future tax savings.  *Id.*  Basically, BT/Deutsche Bank structured transactions that generated current financial accounting income for Enron – including large amounts of pre-tax income – by creating questionable future tax deductions.

368.     Enron would quantify the speculative future tax benefit as a deferred tax credit, which Enron would take into accounting income over the lifetime of the credit.  But as structured by BT/Deutsche Bank, the tax transactions created artificially short lives for the deferred tax credits.

This allowed Enron to include large amounts of accounting income on its statements over just a few years even though the deferred tax asset involved might reflect a projected tax deduction often years or even decades in the future. The Insiders also failed to set up a reserve in case the speculative tax benefit was never realized.

### (a) Steele

369.    Steele was the first of two REMIC Carryover Basis Transactions ("the REMIC transactions") that BT/Deutsche Bank brought Enron. The two – Steele and Cochise, both of which BT/Deutsche Bank designed – allowed the Insiders' egregious manipulation of Enron's financial statements. The REMIC transactions' principal effect was to inappropriately inflate reported financial accounting, pre-tax income of expenses by associating those expenses with investments in certain "Facilitating Assets" – investments that were both low-yielding and included substantial transaction costs. Between 1997 and 2001, Enron's consolidated financial statement improperly reported $144 million of pre-tax income in connection with Facilitating Assets.

370.    BT/Deutsche Bank developed Steele and promoted it to Maxey in June 1997. The transaction was designed to create $121.8 million of pre-tax financial statement income for Enron. As Enron's exclusive financial advisor in the transaction, BT/Deutsche Bank's contract called for a fee of $10 million.

371.    The stated (as opposed to designed) purpose of Steele was to acquire and manage a portfolio of financial assets with an enhanced earnings profile. But the low-yielding nature of the Facilitating Assets, as well as Enron's representation that it would not have closed Steele but for its accounting benefits, make clear that this purpose was a sham.

372.    Maxey and BT/Deutsche Bank understood exactly how and why Steele was constructed. They knew – because they developed and promoted it – that the transaction was meant to improperly generate financial accounting benefits by amortizing a large portion of the deferred

tax credit associated with the acquisition of the REMIC Residual Interests into pre-tax accounting income over the life of the Facilitating Assets – in Steele's case, five-year corporate bonds. The amortization of the associated tax benefit into pre-tax income, combined with the artificially short period of time over which that amortization was conducted, made the transaction particularly aggressive and misleading. As Maxey testified, the low-yield corporate bonds were acquired simply to provide an artificially short, useful life of five years over which to amortize the credit. Exam. III, App. G at 30. Amortizing this tax benefit generated $121.8 million of "operating income."

373.    BT/Deutsche Bank understood this accounting treatment was aggressive. In fact, on September 10, 1997, Peggy Capomaggi, a Bankers Trust employee, expressed doubts in an internal e-mail that Enron's acquisition of assets from the bank properly constituted a "business combination" – a necessary requirement. Exam. III, App. G at 34.

374.    Both the Insiders and BT/Deutsche Bank recognized that the accounting literature required a rational, systematic method with respect to the amortization period. They also knew that the deferred tax assets could only be attributed to REMIC Residual Interests with an estimated life of 27 years. Still, Enron amortized the deferred credit over *five* years. As all involved knew, the five-year period related to the life of the corporate bonds, not the REMIC Residual Interests.

### (b)    Cochise

375.    A common theme in the tax transactions – and one clearly present in Cochise – was to make a series of transactions look like, and claim that they functioned like, transactions discussed in accounting literature, when actually they did not. For example, BT/Deutsche Bank would find, in the accounting literature, a conclusion that a particular historical transaction had to be reported in a particular manner in order to fairly present the entity's financial position. BT/Deutsche Bank would then concoct a series of transactions mirroring those in the literature, carefully weave them together, and then claim the accounting rules "required" its customer to report the transaction as the

literature dictated. The problem with BT/Deutsche Bank's approach, however, was that the transactions BT/Deutsche Bank concocted would not otherwise have occurred. And that difference turned the accounting rules on their head. Instead of following rules to report a historical transaction in a manner that fairly presented the transaction, BT/Deutsche Bank was avoiding a fair presentation by following "rules" for a structured transaction that had no substance.

376.    On June 15, 1998 and July 27, 1998, BT/Deutsche Bank promoted Cochise (a variation on Steele) to the Insiders as another scheme to generate accelerated pre-tax accounting income. Its purpose was to generate for Enron's financial statement $75 million in pre-tax accounting income and $79 million in accounting earnings from the future benefit of future tax deductions. At best, however, the benefits were questionable and the tax deductions speculative. As Enron's exclusive financial advisor in Cochise, BT/Deutsche Bank's fee was $15 million. Once again, Cochise was constructed so as to allow BT/Deutsche Bank to sell or monetize its REMIC Residual Interests while generating pre-tax financial accounting income that the Insiders wanted.

377.    While Steele's Facilitating Assets were corporate bonds, Cochise's were interests in two airplanes purchased from a BT/Deutsche Bank affiliate (the "Cochise Airplanes"). The Cochise Airplanes were not purchased for their investment potential – in fact, after its bankruptcy, Enron sold them for $40 million less than their 1999 purchase price. Instead, Maxey testified that they were purchased in order for the transactions to be treated as a business combination, and to obtain an asset whose financial accounting basis could be reduced to zero. As Maxey explained, the basis reduction was needed to offset the deferred tax asset that acquisition of the REMIC Residual Interests generated.

378.    BT/Deutsche Bank knew Cochise was intended to generate financial accounting benefits. BT/Deutsche Bank also understood that Maxey's tax group planned to recognize a gain on the sale equal to the full fair value of the Cochise Airplanes and amortize the remaining deferred

credit into pre-tax income over a five-year period. Amortizing the credit over five years was not rational, since the deferred tax assets were attributable solely to REMIC Residual Interests with a much longer life.

379. Cochise's accounting treatment did not comply with GAAP because the IRS would not sustain the tax deductions it created for Enron. The speculative future deductions upon which the Cochise transaction relied simply fail when scrutinized.

### (c)     Teresa

380. Teresa was the first tax transaction BT/Deutsche Bank sold to Enron. BT/Deutsche Bank developed the Teresa transaction and, in May 1996, marketed it to Enron as a means to generate financial accounting income. Just like the REMIC transactions, Teresa was *not* designed to give Enron present value tax savings – and Bankers Trust Managing Director Thomas Finley has so testified. In fact, to create accounting statement income, Teresa actually generated tax *liability* of $131 million for Enron (in 1997 through 2000) that it would not otherwise have had. Finley acknowledged in internal memoranda and presentations to Enron that Teresa was designed solely to generate financial accounting benefits.

381. Along with the REMIC transactions, the Enron Examiner characterized tax basis step-up transactions as among the "most egregious" in their manipulation of financial accounting rules. Teresa engineered a $1.3 billion tax basis step-up for the Enron corporate headquarters building, quantified that increase as a future tax benefit, and recorded that quantified benefit as current accounting income over an artificially short period of time. The Insiders intended to accomplish the basis step-up by passing Enron's interest in the corporate headquarters building to a partnership, and later distributing the property to an Enron affiliate that had achieved an increased basis in its partnership interest. Maxey expected the increased tax basis in the partnership interest eventually to be reflected as an increase in the basis of the corporate headquarters building, and

expected that it would result in increased depreciation deductions over a period of 39.5 years. Enron recorded, at the outset, deferred tax assets to reflect these potential future tax benefits, assuming that the building was actually distributed back to Enron in the future. Maxey also testified that recording the deferred tax assets reduced current tax expense and thereby increased current reported after-tax earnings.

382.     In its internal discussions, BT/Deutsche Bank estimated that Teresa would provide $240 million of after-tax income. As Enron's exclusive financial advisor with respect to Teresa, BT/Deutsche Bank was initially promised a fee of up to $8 million. However, the fee was later reduced to $6.625 million after the Insiders agreed to participate in another tax transaction – Project Renegade – for BT/Deutsche Bank's benefit. Project Renegade is discussed below.

383.     The accounting treatment for which Teresa was created did not accord with GAAP. For one thing, Enron's ability to realize the future tax benefits it recorded was far from assured. Also, recording Teresa's tax benefits when they were recorded was premature, since those benefits would not actually arise until the basis step-up was reflected in the basis of Enron's corporate headquarters. Even had it not been premature to record them, Enron should have established a valuation allowance or tax cushion.

384.     Through its familiarity with the Teresa transaction, BT/Deutsche Bank knew the tax benefit it reflected would not be available until some undetermined date, years in the future, when Enron's corporate headquarters was distributed to Enron and Enron was able to take increased depreciation deductions. BT/Deutsche Bank also knew that on a present value basis, Teresa would not provide Enron with tax savings. Instead, as BT/Deutsche Bank knew, the Insiders' goal was to generate financial accounting income by improperly recording deferred tax assets in advance of future tax deductions – even before the resulting increased basis could attach to a depreciable asset.

In the end, because of Teresa, the Insiders and BT/Deutsche Bank improperly created $229 million of after-tax, financial statement income for Enron.

### (d)    Tomas

385.    Responding to an Insiders' request, BT/Deutsche Bank proposed the concept of the Tomas transaction to Enron in 1998. Tomas' principal goal was to side-step Enron's need to report a financial statement expense from the disposal of a portfolio of low-tax-basis assets. In the end, Tomas enabled the Insiders to record permanent tax benefits as pre-tax gains on Enron's financial statements – gains of $25.6 million in 1998 and $18 million in 2000.

386.    The Tomas structure worked as follows: Enron contributed assets with a low basis for both accounting and tax purposes, assets it wanted to sell, to a structure. That structure had been designed to allow Enron to receive back, or swap, low tax basis stock of an affiliate that held cash equal to the sales value of the low basis assets. The low basis stock could then be liquidated without Enron having to recognize tax gain.

387.    As part of the transaction, BT/Deutsche Bank and the Insiders represented that Oneida, the Enron SPE involved in Tomas, would engage in a leasing business. However, by June 2000, Oneida had not done any leasing. In order to create the appearance that it had, BT/Deutsche Bank and Enron transferred the Cochise Airplanes – the Facilitating Assets from the Cochise transaction – to Oneida in the summer of 2000.

388.    Another key aspect of the structure was that those involved in the transaction – including BT/Deutsche Bank – knew it would unwind in two years and a day. Under applicable tax rules, certain favorable presumptions arise when a contributing partner receives a liquidating distribution more than two years after its contribution. However, these presumptions are overcome by clear evidence of an understanding that liquidation was agreed to at the outset. Both a lawyer and an accountant, Maxey knew that because the Insiders intended to unwind the

transaction in two years and one day, the tax treatment the Insiders gave it was risky and subject to uncertainty. BT/Deutsche Bank knew the risk as well. Nevertheless, Maxey recorded the full tax benefit from the avoidance of the built-in gain anyway, as BT/Deutsche Bank fully expected he would.

389.     BT/Deutsche Bank also knew that the price paid for the Airplanes was inflated. It was supported by Enron's valuation, but was flatly contradicted by a third-party appraisal that BT/Deutsche Bank commissioned and received from BK Associates, Inc. on June 12, 2000. The Insiders and BT/Deutsche Bank arranged the sale of the Cochise Airplanes in such a way that Enron booked the entire sale proceeds of $36.5 million as net income from the sale. This gain recognition was facilitated by inappropriate purchase accounting adjustments that had reduced Enron's book basis in the Cochise Airplanes to zero.

390.     Tomas's accounting did not comply with GAAP. More specifically, the recognition of gain on the sale of the airplanes was improper for at least two reasons:

(a)     First, Maxey has admitted under oath that Enron held the Cochise Airplanes for a period of time simply to create the impression that they had not been purchased for resale, even though the Insiders intended from the outset to dispose of the planes. Exam. III, App. G at 52. BT/Deutsche Bank knew the Insiders' plans.

(b)     Second, applying purchase accounting adjustments to reduce the book basis of the Cochise Airplanes violated GAAP because the purchase of the Cochise Airplanes was unrelated to the acquisition of the REMIC Residual Interests in Cochise.

### (e)     Renegade and Valhalla

391.     The Renegade and Valhalla tax accommodation transactions did not themselves produce tax *or* accounting benefits for Enron. Instead, they were lucrative rewards for BT/Deutsche Bank's work on other questionable transactions with the Insiders. As such, they facilitated the

Insiders' scheme *and* created substantial tax benefits for BT/Deutsche Bank. Enron participated only indirectly in BT/Deutsche Bank's tax benefits through, for example, favorable financing terms and fees.

392. In Renegade – a December 1998 financing – Enron borrowed $8 million from BT/Deutsche Bank at a discounted rate. BT/Deutsche Bank then essentially paid Enron a $1.73 million fee for accommodating it. In Valhalla, a May 2000 financing transaction, the Insiders helped BT/Deutsche Bank create deductible interest *and* nontaxable income by exploiting differences between U.S. and German tax law. Valhalla ultimately allowed BT/Deutsche Bank to finance a stream of tax-exempt income through deductible payments. Essentially, for an "accommodation fee" equal to the spread between the interest it paid and the interest it received, Enron facilitated a tax-avoidance arrangement for BT/Deutsche Bank.

### (3) BT/Deutsche Bank attempts to reduce its Enron exposure.

393. BT/Deutsche Bank's frequent contact with the Insiders gave it the opportunity to learn the "facts behind the numbers" in Enron's financial statements. Exam. III, App. G at 20 (quoting Cambridge sworn statement). By as early as 2000, BT/Deutsche Bank knew enough about Enron's financial situation to begin to attempt to reduce its exposure to Enron – a number that exceeded $600 million by June 1999. By October 2001, BT/Deutsche Bank became so worried about the extent of Enron's off-balance sheet debt that it refused to authorize any further credit exposure to the corporation. This despite the fact that Enron's *external* ratings were still favorable.

394. BT/Deutsche Bank held periodic meetings with the Insiders to discuss the reality behind Enron's financial statements. The Insiders laid no "ground rules" in these meetings as to what could not be discussed. So BT/Deutsche Bank asked to be briefed on Enron's trading activity revenues, its philosophy regarding asset sales, and the level of its off-balance sheet obligations. At one such meeting, BT/Deutsche Bank learned that in the fourth quarter of 2000, Enron had used SPE

sales to inflate reported cash flow from operating activities from $100 million to almost $5 billion. As a result of those one-on-one discussions, BT/Deutsche Bank was able to make its own estimate of Enron's off-balance sheet obligations, and confirm that number with the Insiders.

395.     BT/Deutsche Bank's private knowledge was clearly at odds with its public statements. From at least January 13, 1999 until at least September 15, 2000, BT/Deutsche Bank analysts consistently rated Enron a "Buy." In its January 28, 2000 report, BT/Deutsche Bank not only rated Enron a "Buy," but raised the stock's target price to $90, predicting a 15% three-year EPS growth rate. BT/Deutsche Bank succinctly summed up its feelings regarding Enron: "All we can say is WOW!" Two months later, on April 14, 2000, BT/Deutsche Bank reiterated its "Buy" rating and raised the stock's target price to $96 and its three-year EPS growth rate to 16%. Five months later, on September 15, 2000, BT/Deutsche Bank not only reiterated its "Buy" rating, but raised the stock's target price to $100.

>          e.     **CIBC knowingly assisted the Insiders in misstating Enron's financial condition.**

396.     CIBC played an active and important role in the Insiders scheme to manipulate Enron's financial statements. Between 1998 and bankruptcy, CIBC and the Insiders completed a substantial number of transactions the Insiders improperly reported pursuant to FAS 140. In each instance, CIBC created and/or participated in the transaction knowing the Insiders intended to improperly account for it in Enron's financial statements. CIBC's role in those transactions was to provide the 3% equity investment needed to qualify the transaction under FAS 140. However, CIBC's equity was never really at risk. CIBC would not, and did not, participate without first receiving the Insiders' agreement that CIBC's equity investment would be repaid. That agreement led CIBC to characterize its investments internally as "trust me" equity. Exam. III, App. H at 6 (CIBC 1139804).

397.     CIBC knew that because its equity was not at risk, the transactions in which it participated did not qualify for FAS 140 treatment.  But CIBC also knew the Insiders would report the transactions as if they did.  Without CIBC's equity piece, these FAS 140 transactions would not have occurred.  Consequently, simply by participating, CIBC aided the Insiders' scheme to improperly generate cash flow from operations and disguise Enron's true debt.  In fact, the CIBC's improper FAS 140 transactions generated over $1.7 billion of operating cash flow for Enron and hid over $1.0 billion of debt.

398.     The Enron Examiner, who independently reviewed the CIBC FAS 140 transactions, reached the same conclusion.  He found that "CIBC knew the accounting results Enron sought to achieve in the FAS 140 transactions"; that CIBC "obtained verbal assurances" of repayment from the Insiders  "knowing that the assurances likely would not be disclosed" and, had they been disclosed, "Enron could not have accounting for the transaction as it did"; and that CIBC "participated in FAS 140 transactions that CIBC knew were designed to manipulate [Enron's] financial statements."  Exam. III, App. H at 2-3.

### (1)     CIBC's relationship with Enron

399.     Defendant CIBC is a full-service financial institution that operates primarily in Canada, Europe, and the United States.  In the early 1990s, CIBC's involvement with Enron was relatively limited.  In 1998, the nature of the relationship changed as the number of transactions between CIBC and Enron increased dramatically.  From 1998 to Enron's bankruptcy, CIBC completed an average of two Enron FAS 140 transactions per quarter – more than three dozen in all, including the various asset transfers in the Hawaii "warehouse" vehicle.  As a result, CIBC was elevated to the status of Tier 1 bank.   From 1997 to bankruptcy, CIBC earned approximately $30 million in fees.  More than $14 million of those fees were attributable solely to the FAS 140 transactions.

## (2) The FAS 140 transactions

400.  Beginning in 1998, CIBC and the Insiders executed twelve FAS 140 transactions. In 1998, the transactions were named Riverside 3, Riverside 4, Pilgrim/Sarlux, and Pilgrim/Trakya. In 1999, they were Riverside 5, Leftover, Nimitz, Ghost, Alchemy, and Discovery.  In 2000, they were Specter and Hawaii.  The Hawaii transaction was special, in that it alone allowed Enron to monetize ten different assets.

401.  CIBC knew that in every FAS 140 transaction, the Insiders sought to borrow money for Enron's use without adding debt to Enron's balance sheet.  As a result, CIBC also knew that the goal of every FAS 140 transaction was to avoid consolidating the borrower-SPE on Enron's financial statements.  CIBC thwarted that goal every time it required – and received – the Insiders' assurance that CIBC's equity investment would be repaid.  CIBC fully understood the ramifications of what it was doing, and so allowed the Insiders to keep their promises oral, not written.  However, CIBC recorded the fact of them internally.  For example, on June 21, 2001, one CIBC employee wrote to others:

> Unfortunately there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected.  We have a general understanding with Enron that any equity loss is a very bad thing.  They have been told that if we sustain any equity losses, we will no longer do these types of transactions with them.  We have done many "trust me" equity transactions with Enron over the last 3 years and have sustained no losses to date.  If there has been a case where the value of the asset has been in question, Enron has repurchased the asset at par plus our accrued yield.

Exam. III, App. H at 55-56 (quoting AB0000470387) (emphasis in original).  CIBC employees involved in the transaction got the point.  CIBC's Risk Management Vice President, Collete Delaney, the individual who presented most of Enron's's transactions to the CIBC Credit Committee from 1997 until 2000, testified that she understood that if such "verbal assurances" had been put in

writing, the transactions "would not have met the requirements for the accounting treatment Enron was seeking." *Id.* at 39.

402.    Neither CIBC nor the Insiders ever disclosed the nature or existence of these verbal assurances.

### (a)    The 1998 FAS 140 transactions

403.    In its dealing with Enron before mid-1998, CIBC learned several general objectives that guided the Insiders' choice of transactions – to "get the cash out of contracts that have been marked to market" and, more importantly, to achieve "off-balance sheet treatment of the proceeds associated with the contracts." From those early dealings, CIBC also knew the Insiders wanted to avoid any real disclosure of the substance of these transactions – in other words, "off balance sheet treatment without even a note in the financial statements." *Id.* at 22 (citing CIBC 1429742-43).

404.    In June and September 1998, CIBC closed its first two FAS 140 transactions with Enron –   Riverside 3 and Riverside 4.   These transactions gave CIBC an even more intimate understanding of the Insiders' goals, and "provided a springboard to the rest of CIBC's FAS 140 Transactions." Exam. III, App. H at 15.   Through them, CIBC learned that the Insiders used "monetizations" to "manage" reported earnings.  It also learned that the timing of these transactions was not coincidence.   Not surprisingly given their purpose, the Insiders had a tendency "to concentrate deal activity around quarter ends." *Id.* at 16, n.49 (citing CIBC 1139002)

405.    CIBC's credit applications reveal that CIBC knew the FAS 140 transactions were financial statement driven transactions and structured to give the Insiders maximum flexibility in manipulating earnings.  For example, CIBC and the Insiders specifically structured the Riverside 3 loan so it could be "drawn in full or in two tranches (to allow Enron to book gains) in either the second or third accounting quarters."   The Riverside 4 loan was also designed to be drawn in two tranches for the same reason. *Id.* at 27 (citing CIBC 1044116).

406.    In December 1998, CIBC and Enron closed Pilgrim/Sarlux and Pilgrim/Trakya, in which the Insiders monetized Enron's interests in two foreign power plants.  The Pilgrim transactions were CIBC's first FAS 140 transactions in the United States, and its first FAS 140 transactions to include an Enron total return swap ("TRS").  Through the TRS, Enron guaranteed repayment of the debt the SPE incurred in the FAS 140 transaction.  However, as CIBC knew, that repayment obligation never made it to Enron's financial statements.  Although the Enron Examiner asked a number of CIBC employees to identify where in Enron's financial statements those transactions might appear, not a single one could.  As a result, the Enron Examiner determined that by structuring the transaction to include a TRS while recording the transaction pursuant to FAS 140, the Insiders and CIBC caused Enron to inadequately disclose almost $1 billion of debt.

### (b)    The 1999 FAS 140 transactions

407.    CIBC and the Insiders started 1999 with Riverside 5, Leftover (which monetized the interests in the Trakya power plant that were not monetized in Pilgrim/Trakya) and Nimitz (which monetized the interests in the Sarlux power plant that were not monetized in Pilgrim/Sarlux).  In Leftover and Nimitz, CIBC provided the 3% equity piece necessary for FAS 140 treatment.  As usual, however, CIBC's equity was not at risk because before committing any funds, CIBC received the Insiders' assurances – assurances of high ranking executives – that CIBC's 3% equity piece would be fully repaid.  Once again, CIBC failed to disclose the fact of these verbal assurances.

408.    Of course, CIBC also realized that the 1999 FAS 140 transactions were financial statement driven, since the Insiders' practice of engaging in the transactions just prior to reporting periods continued.  Nimitz closed just two days before the end of the second quarter of 1999.  Ghost closed on December 21, Alchemy on December 27, and Discovery on December 29, 1999 – three transactions in a single eight-day period at the end of the year.

409. In connection with the 1999 FAS 140 transactions, CIBC again recorded the fact of the Insiders' promise in CIBC's own documents. For example, the CIBC credit application for Discovery reads: "As highlighted, this equity reflects 3% of the total transaction size. This equity component is necessary to get the desired accounting treatment. This facility represents true equity risk. ***Note, however, as has been the case in previous transaction [sic] of this nature, Enron executive management will represent that this money will absolutely be repaid.***" *Id.* at 38 (citing CIBC 1048541) (emphasis added).

### (c)     The 2000 FAS 140 transactions

410. By 2000, CIBC and the Insiders had done a number of FAS 140 Transactions all without a hitch.

411. Hawaii was the most significant FAS 140 transaction between CIBC and Enron. The first iteration of Hawaii closed in March 2000. Hawaii was a unique structure – a warehouse vehicle "designed to allow the monetization of multiple assets, and a total of 22 transactions were completed under this structure between March 2000 and the fourth quarter of 2001." *Id.* at 15.

412. Again, however, before CIBC agreed to purchase the 3% equity in Hawaii, it required verbal assurances from Fastow or another senior Insider that the equity would be repaid. CIBC likewise insisted that the Insiders reaffirm their repayment commitment every time the facility was restructured or amended. *Id.* at 46-47. By the end of 2000, even CIBC's most senior executives were conditioning the approval of FAS 140 Transactions on the express agreement – always unwritten – of repayment.

413. Once again, CIBC's own documents demonstrate the fact of the agreement. For example, to obtain approval of a Hawaii credit application, one CIBC employee noted that the Insiders had fully repaid CIBC's equity participation in Discovery. In a later credit memo CIBC noted that in the past, the Insiders had seen to it that an early equity investment in Hawaii

(McGarret N) had been was fully repaid, even though the value of the underlying assets had declined. *Id.* at 47 (citing CIBC 1044570, CIBC 1 4699552). In that particular case, Causey approved Enron's repurchase of CIBC's equity at inflated prices. *Id.* In truth, Enron repaid CIBC's equity in full on several transactions (including Hanover Compressor and Eli Lilly assets) where the value of the assets in the SPE had declined substantially and, therefore, the purported equity value should have been correspondingly reduced.

414.    The FAS 140 transactions conducted through Hawaii continued well into 2001. In every one of them, CIBC conducted virtually no due diligence on the values of any of the underlying assets. This total absence of due diligence, or even any real negotiation over the price to be "paid" for the assets being purchased from Enron, demonstrates more than anything else that CIBC knew its equity was not at risk. Almost equally telling is how CIBC rated the debt and equity portion of these FAS 140 transactions internally. Despite their supposedly distinct nature, both debt and equity were treated as *debt obligations* of Enron. *Id.* at 59.

> **f.      Merrill Lynch knowingly assisted the Insiders in misstating Enron's financial condition**

415.    Merrill Lynch's participation was crucial to the Insiders' manipulation and misstatement of Enron's financial statements at least in the year 1999. Over the course of that year, Merrill Lynch participated in three transactions with Enron which form the basis of this Complaint. Merrill Lynch knew that two of those transactions – Nigerian Barge and the electricity trade transactions – were intended to inflate Enron's earnings in the fourth quarter of 1999 by approximately $60 million or 30%. Merrill Lynch also knew that its participation in LJM2 would assist Insiders Fastow and Kopper in profiting at Enron's expense. For its participation in the 1999 transactions with Enron, Merrill Lynch received revenue of approximately $40 million.

416.     By virtue of an unprecedented agreement with the United States Department of

Justice, Merrill Lynch narrowly escaped indictment for its role in manipulating and misstating

Enron's financial statements.  It did so only by acknowledging the evidence developed by the

Department that its employees may have ***"violated federal criminal law"*** in the Nigerian Barge and

1999 electricity trade transactions with Enron and by "accept[ing] responsibility for the conduct of

its employees giving rise to any violation" of those laws.  Based upon these admissions and Merrill

Lynch's agreement to adopt policies and procedures to prevent future manipulations of clients'

financial statements through structured finance transactions, the Justice Department agreed not to

"prosecute Merrill Lynch for any crimes committed by its employees relating to the [Enron]

transactions."  Three of Merrill Lynch's employees were not so lucky; they were indicted by a

federal grand jury for "knowingly and intentionally devis[ing] a scheme and artifice to defraud

Enron" and others.  The primary alleged co-conspirator in that scheme is former Enron CFO Fastow.

417.     On September 17, 2003, Merrill Lynch & Co., Inc. and the Justice Department

entered into an agreement concluding the Department's criminal investigation of Merrill Lynch's

role in the collapse of Enron.  In that agreement, the Justice Department states that it notified Merrill

Lynch that "Merrill Lynch personnel have violated federal criminal law" in connection with the

Nigerian Barge and 1999 electricity trade transactions with Enron.  Agreement, ¶ 1.  Moreover, the

Justice Department concluded that Merrill Lynch employees ***"aided and abetted Enron's violation***

***of federal criminal law in connection with the same transactions."***  *Id.*  (emphasis added).  For its

part, Merrill Lynch

> acknowledges that the Department has developed evidence during its
> investigation that one or more Merrill Lynch employees may have violated
> federal criminal law.  ***Merrill Lynch accepts responsibility for the conduct***
> ***of its employees giving rise to any violation in connection with the***
> ***[Nigerian Barge and 1999 electricity trade transactions].***

*Id.* at ¶ 2 (emphasis added). To escape indictment, Merrill Lynch not only agreed to accept responsibility for the criminal conduct of its employees, but it "further agree[d] that it will not, through its attorneys, board of directors, agents, officers or employees make any public statement, in litigation or otherwise, contradicting Merrill Lynch's acceptance of responsibility." *Id.* at ¶ 7.

418.    In addition, Merrill Lynch agreed to adopt policies and procedures to prevent future manipulation of client financial statements through structured finance transactions. These policies include, among others, the following: (1) Merrill Lynch will not participate in any transaction where it believes an objective is to achieve a misleading financial statement; (2) Merrill Lynch will not participate in any transaction in which there is an agreement to unwind the transaction at an agreed-upon price unless that agreement is reflected on its books and is provided to the client's auditor; and (3) Merrill Lynch will not engage in any year-end transaction in which it believes that the client's motivation is to achieve accounting objectives, including specifically off-balance sheet treatment, without the specific approval of a new Merrill Lynch committee established to review structured finance transactions. *Id.* at Exhibit A.

419.    The same day that Merrill Lynch dodged indictment three of its employees were indicted by a federal grand jury for conspiracy to commit wire fraud in connection with the Nigerian Barge transaction. Indictment in *U.S. v. Bayly, Brown and Furst,* Sept. 17, 2003, at Count One. One of the three, James Brown, also was indicted for perjury and obstruction of justice for lying to the grand jury about the oral promise from Fastow to Merrill Lynch to repurchase the Nigerian Barges at an agreed-upon rate of return. *Id.* at Counts Two and Three. According to the indictment, the other two employees, Bayly and Furst, gave false testimony to the SEC and/or the PSI about the unwritten promise from Enron in the Nigerian Barge transaction. *Id.* at ¶¶ 18, 21, 23. The indictment alleges that (1) Merrill Lynch agreed "to serve as a temporary buyer" of the Nigerian barges from Enron (¶ 10); (2) the purpose of the agreement was to enable Enron to "record earnings

and cash flow in 1999 and thus appear more profitable" (*id.*); (3) that the phony purchase of the barges by Merrill Lynch "allowed Enron to record improperly $12 million in earnings and $28 million in funds flow for the fourth quarter of 1999"(*id.*); (4) Merrill Lynch "knew the purchase was not real" because it had made "an oral handshake side-deal" with Fastow that Enron would repurchase the barges "within six months" and that "Merrill Lynch would receive a rate of return of approximately 22%." *Id.* at ¶ 11.

420.    The indictment makes clear why Fastow and Merrill Lynch were engaging in the Nigerian Barge transaction: Fastow was breaching his fiduciary duties to Enron to improperly earn year-end bonuses.  The phony earnings generated by the transaction "enabled the business unit from which the deal emanated [Fastow's group] to meet its targeted financial goals for the year, which in turn led to increased unwarranted bonuses to executives in that business unit." *Id.* at ¶ 10.  For its part, Merrill Lynch was knowingly participating in Fastow's breach of fiduciary duties to earn a guaranteed return of 22%, but, more importantly, by facilitating this year-end transaction "Merrill Lynch solidified its status as a 'friend of Enron' and thereby positioned itself to receive an increased slice of the lucrative deals that Enron dispensed to financial institutions." *Id.* at ¶ 9.  The indictment also alleges that Fastow caused LJM2 – not Enron – to repurchase the barges from Merrill Lynch "without any negotiation between Merrill Lynch and LJM2 as to the purchase price." *Id.* at ¶ 13.

421.    Merrill Lynch's role in Enron's downfall also has been examined and criticized by the SEC, the PSI, and the Enron Examiner.  The Enron Examiner found that "Merrill Lynch's conduct and participation in the Nigerian Barge and the 1999 electricity trade transactions allowed Enron to book improper gains of approximately $60 million for the fourth quarter of 1999." Exam. III, App. I at 2.  As to the Nigerian Barge transaction, the Enron Examiner concluded that Merrill Lynch "entered into an oral agreement with Enron whereby Enron promised to take Merrill Lynch out of the Nigerian Barge transaction within six months at a specified rate of return, knowing

that if such an agreement were disclosed to Enron's auditors, Enron could not have accounted for the transaction as a sale." *Id.* As to the 1999 electricity trades, the Enron Examiner concluded that Merrill Lynch "entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper." *Id.*

422.    On March 17, 2003, the SEC charged Merrill Lynch with aiding and abetting Enron's accounting fraud. The SEC alleged that Merrill Lynch, along with its senior executives Furst, Schuyler M. Tilney, Bayly, and Thomas W. Davis, helped Enron commit securities fraud. Complaint in *SEC v. Merrill Lynch*, March 17, 2003, at ¶ 1. The SEC described the Nigerian Barge transaction as an "asset parking arrangement" in which Enron purported to "sell" an interest in the barges to Merrill Lynch; in fact, the "risk of ownership never passed to Merrill Lynch," and the transaction was nothing but a "short term loan" with a "specified rate of return." *Id.* at ¶ 2. The SEC alleged that Merrill Lynch knew Enron would report $12 million in income from this "sham 'sale.'" *Id.* As to the 1999 electricity trades–for which Enron agreed to pay Merrill Lynch $17 million in fees–the SEC alleged that Merrill Lynch knew Enron would improperly report $50 million in income from the "sham energy trade." *Id.* On the same day that the SEC suit was filed, Merrill Lynch settled the charges by agreeing to the entry of a permanent anti-fraud injunction *and* by paying $80 million in disgorgement ($37.5 million), penalties ($37.5 million), and interest ($5 million).

423.    PSI also investigated Merrill Lynch's involvement in Enron's collapse. Senator Carl Levin, Chairman of the PSI, concluded that Merrill Lynch "helped Enron artificially and deceptively create revenue." Statement of Senator Carl Levin, July 30, 2002, at 2. Senator Levin found that Enron could never have engaged in the deceptions it did without Merrill Lynch's help. *Id.* In his

words, "Merrill Lynch assisted Enron in cooking its books by pretending to purchase an existing Enron asset when it was really engaged in a loan." *Id.*

424.     The Enron Examiner concluded that Merrill Lynch's business units operated across a variety of Merrill Lynch legal entities. After a Merrill Lynch business unit decided to proceed with a transaction, it would use whichever legal entity was appropriate for that transaction. The Enron Examiner also found that the Merrill Lynch committees that dealt with the various transactions operated generally on Merrill Lynch's behalf. Few Merrill Lynch employees who testified before the Enron Examiner were able to specify which of the Merrill Lynch legal entities employed them. For that reason, this Complaint generally uses the term "Merrill Lynch" to refer to the institution as a whole.

### (1)     Merrill Lynch's relationship with Enron

425.     Merrill Lynch considered Enron to be "one of its biggest clients" and "the key to its Houston office." Levin Statement at 4. 1999 was an important year in the relationship between Merrill Lynch and Enron. In that year, Merrill Lynch earned more fees from Enron than any other bank–even though it never rose above Tier 3 status. Between 1997 and 2001, Merrill Lynch received approximately $63 million in revenue from its transactions with Enron. In 1999 alone, Merrill Lynch received $40 million.

426.     From 1997 through 2001, Merrill Lynch was involved in approximately 35 transactions with Enron, including "underwritings, private placements of debt and equity, structured finance transactions, derivative transactions, and participation as a syndicate member in several credit facilities." Exam. III, App. I at 12. The volume of transactions increased dramatically after November 1998, when Merrill Lynch raised its rating on Enron stock from neutral to accumulate.

427.     Merrill Lynch equity analysts covered Enron throughout the time period relevant to this lawsuit. After Merrill Lynch analyst John Olson lowered his rating on Enron stock in July 1997,

Enron, including Fastow, pressured Merrill Lynch to change its equity coverage. Merrill Lynch executives Tilney and Rick Gordon understood that Olson's equity coverage of Enron had been a cause of strain between Enron and the bank for years. In April 1998, Enron CFO Fastow informed Merrill Lynch that because of its equity coverage, it would not be included as a manager of Enron's upcoming $750 million common stock offering. Fastow was explicit about the fact that this action was to send Merrill Lynch a strong message about how "viscerally" Enron felt about the equity coverage. Gordon and Tilney wrote a memorandum to Herb Allison, Merrill Lynch's CEO, explaining that Enron thought Olson's coverage was flawed. Then, in August 1998, Merrill Lynch fired John Olson. After Olson's replacement upgraded Enron's stock rating in November 1998, Merrill Lynch's Enron business increased more than tenfold – from $3 million in 1998 to $40 million in 1999.

428.    Merrill Lynch knew that Enron intended to use the 1999 electricity trades and the Nigerian Barge transaction to improperly record gains of approximately $60 million in the fourth quarter of 1999. The former head of Merrill Lynch's Global Derivatives group, Jeffrey Kronthal, testified that Merrill Lynch knew that Enron would book earnings of $50-60 million from the electricity trades. Merrill Lynch also knew that Enron would book $12 million in earnings from the Nigerian Barge transaction. Merrill Lynch was well aware that Enron's intended accounting for these three transactions was incorrect and that Enron frequently moved its assets off balance sheet. It also knew, as reflected in a December 9, 1998 presentation to Enron about structured financings, that Enron's transactions were often driven by balance sheet issues.

429.    Because it worked on approximately 23 debt and equity offerings for Enron between 1997 and 2001, Merrill Lynch developed a substantial familiarity with Enron's financial condition. As the private placement agent for LJM2, Merrill Lynch made note of the *$17 billion* difference

between Enron's assets ($34 billion) and its "assets under management" ($51 billion).  Merrill Lynch clearly understood Enron's improper use of off-balance sheet vehicles.

(2)    <strong>Nigerian Barge</strong>

430.    The Insiders brought the Nigerian Barge transaction to Merrill Lynch in mid-December 1999.  Because Enron was facing a shortfall in earnings, they needed to close the transaction by the end of that year.  Enron's Treasurer Jeffrey McMahon explained to Merrill Lynch that Enron had attempted to negotiate a sale of the barges to third party Marubeni, but that sale had fallen through.  Enron was in a bind, and it needed Merrill Lynch to purchase an interest in the barges before the end of that month.  McMahon informed Merrill Lynch's Furst by memorandum that "(i) the transaction would allow Enron to book $12 million in earnings; (ii) Merrill Lynch's 'hold' would be for six months or less; and (iii) the investment would yield a 22.5% rate of return to Merrill Lynch." Exam. III, App. I at 25 (quoting Memorandum from Robert Furst, Merrill Lynch, to Dan Bayly and Schuyler Tilney, *et al.*, Merrill Lynch, regarding Enron Corp., Dec. 21, 1999 [MLBE 0305288]).  Furst reminded Merrill Lynch that Enron was one of its top clients, and that participating in the Nigerian Barge transaction would help Merrill Lynch to stand out "from the pack" of Enron's financial institutions.  *Id.*

431.    Merrill Lynch's Project and Lease Finance Group initially objected to the Nigerian Barge transaction.  Merrill Lynch's executives, including James Brown, were aware from the start that Enron's accounting for the transaction might be improper.  Brown was well aware that Merrill Lynch would never gain control over the barges and that Enron would quickly take Merrill Lynch out of the transaction.  He also wondered where Enron's $12 million "gain" was coming from if Merrill Lynch was only investing $7 million in the transaction.  Ultimately, Brown warned Merrill Lynch's Debt Markets Commitment Committee that participation in Nigerian Barge posed

"***reputational risk, i.e. aid/abet Enron income statement manipulation***."  Exam. III, App. I at 26 (quoting Brown Sworn Statement, at 62, 76-77) (emphasis added).

432.    Merrill Lynch's Brown also expressed concern about the fact that the proposed deal did not include a *written* agreement that Enron would buy the barges back from Merrill Lynch.  As a condition of going forward with Nigerian Barge, Merrill Lynch's Debt Market Commitment Committee instructed Bayly to get an oral confirmation that Enron would commit to taking Merrill Lynch out of the transaction within six months.  Fastow provided that oral commitment in a telephone conversation on December 22, 1999.  However, neither the agreement to buy back Merrill Lynch's interest in the barges nor to provide an agreed-upon rate of return on its investment was included in the final *written* agreement–the letter agreement between Merrill Lynch and Enron dated December 29, 1999.  To include either, of course, would have precluded the intended accounting for the transaction.  Further evidence of the existence of the undisclosed agreement to take Merrill Lynch out of the "sale" within six months at a predetermined rate of return includes Merrill Lynch's total failure to conduct any due diligence before "buying" its interest in the barges or to actually negotiate the purchase price with Enron, in addition to the extremely short time frame–less than two weeks–during which the transaction was proposed and completed.

433.    Despite knowing that the Insiders' intended accounting for the Nigerian Barge transaction was improper, Merrill Lynch proceeded with Nigerian Barge.  In return, Merrill Lynch executive Daniel Bayly made sure that Fastow understood that Merrill Lynch expected to be rewarded with substantial future business.

434.    In Nigerian Barge, Merrill Lynch purported to purchase 90.1% of Enron's interest in future cash flows from three power-producing barges off the Nigerian coast for $28 million.  However, the transaction was really nothing more than a short-term loan; the ownership risks never

passed from Enron to Merrill Lynch. Instead, the Insiders guaranteed to Merrill Lynch in an undisclosed side deal that Enron would take the bank out of the deal in six months.

435.     Nigerian Barge closed less than two weeks after McMahon first proposed it. Once the deal closed, the Insiders caused Enron to report $12 million in fourth quarter earnings from the transaction. Six months later, Fastow caused an SPE established by LJM2 to buy Merrill Lynch's $7 million equity back for $7.525 million. The $525,000 premium, coupled with the $250,000 fee Merrill Lynch received for participating in the transaction, amounted to a return of 22.14% on the initial investment. Merrill Lynch received the $250,000 "advisory" fee for structuring the transaction despite the fact that the Insiders, not Merrill Lynch, designed it.

### (3)     1999 electricity trade

436.     Merrill Lynch participated in a second transaction at year-end 1999 designed to manipulate and misstate Enron's financial condition: The 1999 electricity trade. This transaction involved back-to-back electricity call options whose essential terms – price, quantity, market location, and term – were mirror images of each other. As a result, the sales and purchases of electricity offset each other. Moreover, the call options were structured so that the first call option could not be exercised until nine months after the transaction closed. The transaction closed on December 31, 1999. Merrill Lynch knew that the purpose of this transaction was to artificially generate between $50 million and $60 million of earnings for Enron and thus enable the company to appear to meet its year-end earnings target. Merrill Lynch also knew that the Insiders' intended accounting for the 1999 electricity trade transaction was improper. Nonetheless, Merrill Lynch proceeded with the transaction, initially for the astronomical fee of $17 million.

437.     Merrill Lynch knew that the 1999 electricity trade was a sham electricity transaction. The call options were virtually offsetting and "delta neutral" to both Enron and Merrill Lynch. Exam. III, App. I at 39 (quoting e-mail from Dan Gordon, Merrill Lynch, to Christine Gonzales and

Jeff Kronthal, *et al.*, Merrill Lynch, Dec. 29, 1999, at MLBE 0370936). Merrill Lynch knew that the trades were structured so that the options "in the money" and "out of the money" were equivalent for the two transactions. Exam. III, App. I at 38 (quoting Kronthal Sworn Statement, at 109-110). Merrill Lynch also knew that the Insiders intended to use the 1999 electricity trade to artificially inflate Enron's year-end earnings by approximately $50 million. E-mails between Merrill Lynch employees acknowledge that "we were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation)." Exam. III, App. I at 42 (quoting e-mail from Schuyler Tilney, Merrill Lynch, to Dan Gordon and Robert Furst, Merrill Lynch, May 30, 2000 [MLBE 0370956]). In fact, the Insiders caused Enron to improperly record earnings of $50 million from the 1999 electricity trade.

438. Not only was the 1999 electricity trade a sham transaction but Merrill Lynch knew that the Insiders would unwind the deal before the first option was exercised. When the Insiders did just that in May of 2000 Merrill Lynch's Tilney conceded that "[t]his is not that great a surprise." *Id.* at 44.

### (4) LJM2

439. In addition to knowingly participating in the manipulation of Enron's financial condition, Merrill Lynch knowingly facilitated the Insiders' scheme through its critical role in LJM2. At Fastow's urging, Merrill Lynch served as the exclusive financial advisor to and placement agent for LJM2, the private investment partnership formed by Insiders Fastow, Glisan and Kopper. Merrill Lynch prepared and distributed the private placement memorandum for LJM2, raised approximately $390 million in commitments from investors for LJM2, committed itself to invest $5 million, and established an investment vehicle through which 97 Merrill Lynch executives committed to invest $16 million in LJM2. By virtue of its roles, Merrill Lynch understood well that the purpose of LJM2 was to permit Fastow and Kopper to profit at Enron's expense. Merrill Lynch

knew these Insiders were managing LJM2 and that it was formed to transact business with their employer, Enron. The LJM2 private placement memo touted as a central benefit of LJM2 the "dual roles" of Fastow and the other Enron employees who would manage the partnership. LJM078364. So central was Fastow's role in LJM2 that investors were assured that they did not have to make additional capital contributions if he no longer served both Enron and LJM2. The private placement memo also offered "superior returns" based upon the Insiders' "access to Enron's information pertaining to potential investments."

440. Merrill Lynch also knew from experience that LJM2 was used by the Insiders' to implement their breaches of fiduciary duties to Enron. LJM2 was the vehicle the Insiders used in 2000 to fulfill their deliberately unwritten promise to Merrill Lynch that it would be taken out of the Nigerian Barge transaction within six months. The purchase price for that buy-out was not negotiated; instead, LJM2 paid the rate of return agreed by the Insiders at the outset of the transaction six months earlier.

### 5. The Bank Defendants' Participation in the Insiders' Scheme Caused Substantial Loss to Enron.

441. By knowingly assisting the Insiders in manipulating and misstating Enron's financial condition, the Bank Defendants caused Enron to suffer enormous injury. Individually, and certainly collectively, the participation of the Bank Defendants was essential to the Insiders' far-reaching scheme to manipulate Enron's financial condition and artificially maintain Enron's credit ratings, all of which enabled the Insiders to improperly obtain personal benefits from transactions with the company and to conceal their acts of past mismanagement. Without the prepay, FAS 140, minority interest, tax and other transactions designed, implemented, and in many cases financed by the Bank Defendants, the Insiders would not have been able to conceal from the rating agencies and others Enron's true financial condition, and their scheme would have collapsed. As the Enron Examiner

concluded, **"At least by 1999, and perhaps earlier, Enron's continued success was dependent upon its ability to deploy [structured finance] accounting techniques to manage these key credit ratios."** Exam. II at 36 (emphasis added). Similarly, the Bank Defendants' participation with the Insiders' private investment partnerships was critical to their formation and success. Without the knowing involvement of the Bank Defendants in these vehicles for self-dealing, the Insiders would not have be able to obtain tens of millions of dollars at company expense.

442. The transactions in which each Bank Defendant participated materially altered Enron's financial condition. The Citigroup prepay transactions, alone, materially affected Enron's 1999 statement of cash flow from operations, causing it to artificially increase from $293 million to over $1.2 billion, an increase of over 300%. The group of Citigroup transactions challenged herein allowed the Insiders to improperly record more than $5 billion of cash flows from operating activities, improperly record approximately $132 million in income, and understate Enron's debt by billions of dollars during the relevant period. Similarly, the Chase prepay transactions, alone, assisted the Insiders in overstating Enron's cash flow from operations by $2.6 billion from December 1997 through September 2001. Without these transactions, Enron's operating cash flow would have been 28% lower in 1999 and 21% lower in 2000, and Enron's debt would have been 16% higher in 1999 and 23% higher in 2000. Focusing specifically on the prepay transactions, the Enron Examiner found that for 1999 and 2000 Enron "almost certainly" would have had lower credit ratings had these transactions not occurred.

443. More than half of Enron's net income reported for 1998 was provided by three FAS 140 transactions with CIBC. Those same transactions provided 45% of Enron's reported cash flow from operations that year. During 1999, 13% of Enron's reported net income and 67% of its cash flow from operations were based upon FAS 140 transactions with CIBC. The improper tax transactions that Deutsche Bank facilitated contributed over $518 million to Enron's net income,

most of which occurred during the relevant period. The Nigerian Barge and 1999 Electricity transactions in which Merrill Lynch played a key role allowed the Insiders to improperly record $60 million of income at year-end 1999, without which Enron would have missed its quarterly earnings target, and the Insiders' scheme would have been threatened. Finally,, the transactions in which Barclays participated led to $410 million being improperly recorded as income, $1 billion being improperly recorded as cash flow from operations, and $1.7 billion not being included as debt on Enron's financial statements.

444. As a direct and proximate result of the Bank Defendants' participation in the Insiders' scheme, the Insiders were able to obtain tens of millions of dollars in improper personal benefits which came at the company's expense. More significantly, as a direct and proximate result of the Bank Defendants' participation in the Insiders' scheme, Enron's debt was wrongfully expanded out of all proportion to its ability to repay. As a result, at least as early as 1999, Enron was insolvent. Thereafter, while its true financial condition was concealed by the acts and omissions of the Insiders and the Bank Defendants, the company's debt load increased substantially and its insolvency was aggravated and deepened. When the scheme of the Insiders and the Bank Defendants was exposed, Enron was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs and the costs of numerous governmental investigations, its relationships with its customers, suppliers, and employees were undermined, and its assets were dissipated. By the time of its bankruptcy in December 2001, Enron was insolvent by tens of billions of dollars.

**V.**

**CAUSES OF ACTION**

*A.*     *COUNTS 1 - 5*
         *(Against Citigroup Defendants)*

**COUNT 1**

**(Avoidance of Preferential Transfers Related to the Citi Preferential Transfers)**

445.     The allegations in paragraphs 1 through 444 of this Complaint are incorporated herein by reference.

446.     Within ninety (90) days prior to the Petition Date, or within one (1) year for Insiders, Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified in the first column of the following chart as the initial transferee or beneficiary of a given transfer (collectively, the "Citi Preferential Transferees"), whether directly, or through a conduit, the transfers on the respective dates and in the respective amounts set forth in the following chart (collectively, the "Citi Preferential Transfers"):

| Transferor | Initial Transferee/ Beneficiary | Immediate and Mediate Transferees | Date of Transfer | Reference Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| ENA | Ponderosa | Sundance; Rawhide; CXC; Citibank | 8/2001 | Rawhide | $49,312,500.00 |
| Enron | Ponderosa | Sundance | 10/05/2001 | Rawhide | $810,009,146.31 |
| ENA | Delta/Citibank | Citibank* | 10/15/2001 | Yosemite I | $27,254,190.00 |
| ENA | Citibank | | 10/16/2001 | Yosemite I | $1,745,810.00 |
| ENA | Citibank | Citibank | 10/19/2001 | Yosemite IV | $10,045,203.00 |
| ENA | Delta/Citibank | Citibank* | 10/19/2001 | Yosemite IV | $3,943,546.00 |
| Enron | Sundance Industrial/ Salomon Holding | Salomon Holding* | 11/14/2001 | Sundance Industrial | $28,500,000.00 |
| Enron | Citibank | | 11/15/2001 | Yosemite I | $511,111.00 |
| | | | | **TOTAL** | **$931,321,506.31** |

447.     To the extent Delta and Sundance Industrial, in the asterisked items above, are found not to be mere conduits of the transfers in question, Plaintiff asserts that Delta and Sundance Industrial were the initial transferees of the identified transfers and that Citibank and Salomon Holding were the immediate transferees of said transfers.

448.    Although certain of the Citi Preferential Transfers were made under so-called swap agreements, these payments in truth and in fact were interest and amortizing principal payments on loans made by Citibank to Enron and/or ENA pursuant to the circular transactions.

449.    The Citi Preferential Transfers that the respective transferors made to the respective transferees constitute transfers of interests of the transferors in property.

450.    At the time the Citi Preferential Transfers were made, the transferee of each respective transfer was a creditor of the transferor.

451.    Each of the Citi Preferential Transfers was made for or on account of an antecedent debt owed by the respective transferor to the respective transferee before such transfer was made.

452.    At the time of each of the Citi Preferential Transfers, the respective transferor was insolvent.

453.    Each of the Citi Preferential Transfers was made to or for the benefit of the respective transferee.

454.    The Citi Preferential Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code. They enabled the respective transferee to receive more than it would have received in a case under chapter 7 of the Bankruptcy Code if the Citi Preferential Transfers had not been made, and the respective transferee had received payment of the respective transferor's indebtedness to it to the extent permitted by the Bankruptcy Code.

### COUNT 2
**(Avoidance of Fraudulent Transfers Related to the Citi 548 Transfers)**

455.    The allegations in paragraphs 1 through 454 of this Complaint are incorporated herein by reference.

456.    On or within one (1) year of the Petition Date, Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified below, whether directly, or through a conduit, the following transfers (collectively, the "Citi 548 Transfers"):

| Transferor | Initial Transferee/ Beneficiary | Immediate and Mediate Transferees | Date of Transfer | Reference Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| ENA | Citibank | | 12/2000 | Garden State Paper | $245,000.00 |
| Enron | Citibank | | 12/2000 | Bacchus | $500,000.00 |
| Enron | Citigroup | | 5/2001 | ECLN II 144 offering | $2,200,000.00 |
| Enron | Sundance Industrial, Caymus Trust | Citibank | 6/01/2001 | Sundance Industrial | $208,500,000.00 |
| Enron | SSB | | 6/2001 | Sundance Industrial | $725,000.00 |
| Enron | Citibank | | 6/2001 | June 2001 prepay | $880,000.00 |
| ENA | Ponderosa | Sundance; Rawhide; CXC; Citibank | 8/2001 | Rawhide | $49,312,500.00 |
| Enron | Ponderosa | Sundance | 10/05/2001 | Rawhide | $810,009,146.31 |
| ENA | Delta/Citibank | Citibank* | 10/15/2001 | Yosemite I | $27,254,190.00 |
| ENA | Citibank | | 10/16/2001 | Yosemite I | $1,745,810.00 |
| ENA | Citibank | Citibank | 10/19/2001 | Yosemite IV | $10,045,203.00 |
| ENA | Delta/Citibank | Citibank* | 10/19/2001 | Yosemite IV | $3,943,546.00 |
| Enron | Sundance Industrial/ Salomon Holding | Salomon Holding* | 11/14/2001 | Sundance Industrial | $28,500,000.00 |
| Enron | Citibank | | 11/15/2001 | Yosemite I | $511,111.00 |
| | | | | **TOTAL** | **$1,144,371,506.31** |

457.    To the extent Delta and Sundance Industrial, in the asterisked items above, are found not to be mere conduits of the transfers in question, Plaintiff asserts that Delta and Sundance Industrial were the initial transferees of the identified transfers and that Citibank and Salomon Holding were the immediate transferees of said transfers.

458.    To the extent that a transfer identified in this Count is also included in Count 1 as an avoidable preference payment, the transfer is pled alternatively as a fraudulent transfer.

459.    The Citi 548 Transfers constituted transfers of interests of the respective transferor in property.

460.     Enron and/or ENA received from the transferees of the Citi 548 Transfers less than reasonably equivalent value in exchange for the Citi 548 Transfers.

461.     Enron and/or ENA were insolvent on the respective dates that the Citi 548 Transfers were made, or were rendered insolvent as a result of making the Citi 548 Transfers.

462.     At the time the Citi 548 Transfers were made, Enron and/or ENA intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

463.     At the time the Citi 548 Transfers were made, Enron and/or ENA were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Enron and/or ENA was unreasonably small capital.

464.     The Citi 548 Transfers are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 3
**(Avoidance of Fraudulent Transfers Related to the Citi 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

465.     The allegations in paragraphs 1 through 464 of this Complaint are incorporated herein by reference.

466.     Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of existing unsecured creditors of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

467.     Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified below, whether directly, or through a conduit, the transfers identified in the following chart (collectively, the "Citi 544 Transfers"):

| Transferor | Initial Transferee/ Beneficiary | Immediate and Mediate Transferees | Date of Transfer | Reference Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Citibank | | 6/1999 | Truman | $1,200,000.00 |
| Enron | Citigroup | | 11/1999 | Yosemite I 144 Offering | $4,900,000.00 |
| Enron | Citibank | | 12/1999 | Nahanni | $6,200,000.00 |
| Enron | Citibank | | 12/1999 | Nixon | $100,000.00 |
| Enron | Citigroup | | 2/2000 | Yosemite II 144 offering | $2,100,000.00 |
| Enron | Citigroup | | 8/2000 | ECLN I 144 offering | $1,800,000.00 |
| Enron | SSB | | 11/2000 | Daishowa Acquisition | $3,000,000.00 |
| ENA | Citibank | | 12/2000 | Garden State Paper | $245,000.00 |
| Enron | Citibank | | 12/2000 | Bacchus | $500,000.00 |
| Enron | Citigroup | | 5/2001 | ECLN II 144 offering | $2,200,000.00 |
| Enron | Sundance Industrial/ Caymus Trust | Citibank | 6/01/2001 | Sundance Industrial | $208,500,000.00 |
| Enron | SSB | | 6/2001 | Sundance Industrial | $725,000.00 |
| Enron | Citibank | | 6/2001 | June 2001 prepay | $880,000.00 |
| ENA | Ponderosa | Sundance; Rawhide; CXC; Citibank | 8/2001 | Rawhide | $49,312,500.00 |
| Enron | Ponderosa | Sundance | 10/05/2001 | Rawhide | $810,009,146.31 |
| ENA | Citibank | | 10/16/2001 | Yosemite I | $1,745,810.00 |
| ENA | Delta/Citibank | Citibank* | 10/15/2001 | Yosemite I | $27,254,190.00 |
| ENA | Citibank | Citibank | 10/19/2001 | Yosemite IV | $10,045,203.00 |
| ENA | Delta/Citibank | Citibank* | 10/19/2001 | Yosemite IV | $3,943,546.00 |
| Enron | Sundance Industrial/ Salomon Holding | Salomon Holding* | 11/14/2001 | Sundance Industrial | $28,500,000.00 |
| Enron | Citibank | | 11/15/2001 | Yosemite I | $511,111.00 |
| | | | | **TOTAL** | **$1,163,671,506.31** |

468.     To the extent Delta and Sundance Industrial, in the asterisked items above, are found not to be mere conduits of the transfers in question, Plaintiff asserts that Delta and Sundance Industrial were the initial transferees of the identified transfers and that Citibank and Salomon Holding were the immediate transferees of said transfers.

469.     To the extent that a transfer identified in this Count is also identified as an avoidable preference payment or an avoidable fraudulent transfer under Section 548 of the Bankruptcy Code,

the transfer is pled alternatively as a fraudulent transfer under applicable state law and Section 544 of the Bankruptcy Code.

470.     The Citi 544 Transfers constituted transfers of interests of the respective transferor in property.

471.     Enron and/or ENA received from the transferees of the Citi 544 Transfers less than reasonably equivalent value in exchange for the Citi 544 Transfers.

472.     Enron and/or ENA were insolvent on the respective dates that the Citi 544 Transfers were made, or were rendered insolvent as a result of making the Citi 544 Transfers.

473.     At the time the Citi 544 Transfers were made, Enron and/or ENA intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

474.     At the time the Citi 544 Transfers were made, Enron and/or ENA were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Enron and/or ENA was unreasonably small capital.

## COUNT 4
### (Recovery of Avoided Transfers Related to the Citi Preferential Transfers, the Citi 548 Transfers, and the Citi 544 Transfers)

475.     The allegations in paragraphs 1 through 474 of this Complaint are incorporated herein by reference.

476.     To the extent that each of the respective Citi Preferential Transfers, the Citi 548 Transfers, or the Citi 544 Transfers is avoided under Bankruptcy Code Section 544, 547 or 548, then pursuant to Bankruptcy Code Section 550, Plaintiff may recover, for the benefit of Enron's and ENA's bankruptcy estates, the property transferred, or the value of such property from the transferees listed below:

(i)     Citibank as the initial, or subsequent, transferee for the Yosemite I, Yosemite IV, Sundance Industrial, Garden State Paper, Bacchus, June 2001 prepay, Truman, Nahanni and Nixon transaction transfers;

(ii)    Delta, in the event it is determined not to be a mere conduit, as the initial transferee for certain of the Yosemite I and Yosemite IV transaction transfers;

(iii)   Sundance Industrial as the initial transferee for certain of the Sundance Industrial transaction transfers;

(iv)    Salomon Holding as the initial, or subsequent, transferee for certain of the Sundance Industrial transaction transfers;

(v)     Ponderosa as the initial transferee for the Rawhide transaction transfers;

(vi)    Sundance, Rawhide, CXC, and Citibank as subsequent transferees for the Rawhide transaction transfers;

(vii)   Caymus Trust as initial, or subsequent, transferee for a certain Sundance Industrial transaction transfer;

(viii)  Citigroup as the initial transferee for the ECLN I 144 offering, ECLN II 144 offering, Yosemite I 144 offering and Yosemite II 144 offering transaction transfers; and

(ix)    Salomon Smith Barney as the initial transferee of the Daishowa and a certain Sundance Industrial transaction transfer.

## COUNT 5
**(Disallowance of Claims Under Section 502(d) of the Bankruptcy Code; Against Citigroup, Citibank, SSB, Delta, Yosemite I Trust, Sundance Industrial, Salomon Holding, Ponderosa, Sundance, Rawhide, CXC, and Caymus Trust)**

477.    The allegations in paragraphs 1 through 476 of this Complaint are incorporated herein by reference.

478.    By reason of the foregoing facts and pursuant to Bankruptcy Code Section 502(d), the respective claims of Citigroup, Citibank, SSB, Delta, Yosemite I Trust, Sundance Industrial, Salomon Holding, Ponderosa, Sundance, Rawhide, CXC, and Caymus Trust, having received transfers subject to (i) recovery under Bankruptcy Code Section 550 and (ii) avoidance under

Bankruptcy Code Sections 547 or 548, should be disallowed unless and until such party has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code Sections 544, 547, 548, 550 or 553.

**B.     *COUNTS 6 - 19***
**       *(Against JP Morgan Chase Defendants)***

## COUNT 6
**(Avoidance of Preferential Transfers Related to the Mahonia Commodity Transfers)**

479.     The allegations in paragraphs 1 through 478 of this Complaint are incorporated herein by reference.

480.     The delivery of certain oil and natural gas commodities by ENA to JP Morgan Chase's SPE Mahonia during the period September 2, 2001 to the Petition Date are voidable preferences pursuant to Section 547(b) of the Bankruptcy Code.

481.     Within ninety (90) days before the Petition Date, ENA transferred or caused to be transferred to or for the benefit of Mahonia an aggregate of approximately 47,380,000 MMBtu of natural gas and an aggregate of approximately 1.159 million barrels of crude oil pursuant to confirmation letters and their associated forward contracts.  This includes 10,350,000 MMBtu of natural gas in connection with Chase VI; 8,100,000 MMBtu of natural gas in connection with Chase VII; 1,159,546 barrels of crude oil in connection with Chase VIII; 12,640,000 MMBtu of natural gas in connection with Chase IX; 12,384,000 MMBtu of natural gas in connection with Chase X; and 3,906,000 MMBtu of natural gas in connection with Chase XI (collectively, the "Mahonia Commodity Transfers").

482.     The estimated value of the 47,380,000 MMBtu of natural gas and 1.159 million barrels of crude oil involved in the Mahonia Commodity Transfers is approximately One Hundred Forty-Seven Million Five Hundred Thousand Dollars ($147,500,000).

483.    On information and belief, Mahonia transferred all of the oil and natural gas commodities received from ENA to JP Morgan Chase.

484.    The Mahonia Commodity Transfers that ENA made to Mahonia constitute transfers of interests of ENA in property.

485.    At the time the Mahonia Commodity Transfers were made, Mahonia was a creditor of ENA.

486.    Each of the Mahonia Commodity Transfers was made to or for the benefit of Mahonia.

487.    Each of the Mahonia Commodity Transfers was made for or on account of an antecedent debt owed by ENA to Mahonia before such Mahonia Commodity Transfers were made.

488.    At the time of each of the Mahonia Commodity Transfers, ENA was insolvent.

489.    The Mahonia Commodity Transfers at issue under the Mahonia Transactions are voidable as preferences under section 547(b) of the Bankruptcy Code.  They enabled Mahonia to receive more than it would have received in a case under chapter 7 of the Bankruptcy Code, if the Mahonia Commodity Transfers had not been made, and Mahonia had received payment of ENA's indebtedness to it to the extent permitted by the Bankruptcy Code.

490.    Alternatively to paragraphs 485 through 489 above, and as described in paragraph 282 of this Complaint, Mahonia was a mere conduit through which the commodities flowed to the initial transferee, JP Morgan Chase.  In that case, the allegations in this Count concerning Mahonia are applicable to JP Morgan Chase.

## COUNT 7
### (Avoidance of Fraudulent Transfers Related to the Mahonia Commodity Transfers)

491.    The allegations in paragraphs 1 through 490 of this Complaint are incorporated herein by reference.

492.    In the alternative to Count 6, the Mahonia Commodity Transfers are voidable fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

493.    The Mahonia Commodity Transfers constitute transfers of interests of ENA in property.

494.    The Mahonia Commodity Transfers were made on or within one (1) year before the Petition Date.

495.    ENA received from Mahonia and/or JP Morgan Chase less than reasonably equivalent value in exchange for the Mahonia Commodity Transfers.

496.    ENA was insolvent on the date that the Mahonia Commodity Transfers were made or became insolvent as a result of the Mahonia Commodity Transfers.

497.    At the time of the Mahonia Commodity Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

498.    At the time of the Mahonia Commodity Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

499.    Alternatively to paragraph 495 above, and as described in paragraph 282, Mahonia was a mere conduit through which the commodities flowed to the initial transferee, JP Morgan Chase.

### COUNT 8
### (Avoidance of Fraudulent Transfers Related to
### the Mahonia Commodity Transfers Under Section 544 of the Bankruptcy Code and
### Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

500.    The allegations in paragraphs 1 through 499 of this Complaint are incorporated herein by reference.

501.     In the alternative to Counts 6 and 7, the Mahonia Commodity Transfers are voidable fraudulent transfers under applicable state law.

502.     Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

503.     The Mahonia Commodity Transfers constitute transfers of interests of ENA in property.

504.     ENA received from Mahonia and/or JP Morgan Chase less than reasonably equivalent value in exchange for the Mahonia Commodity Transfers.

505.     ENA was insolvent on the date that the Mahonia Commodity Transfers were made or became insolvent as a result of the Mahonia Commodity Transfers.

506.     At the time of the Mahonia Commodity Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

507.     At the time of the Mahonia Commodity Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

508.     Alternatively to paragraph 504 above, and as described in paragraph 282, Mahonia was a mere conduit through which the commodities flowed to the initial transferee, JP Morgan Chase.

### COUNT 9
### (Avoidance of Preferential Transfers Related to Chase Principal and Interest Transfers)

509.     The allegations in paragraphs 1 through 508 of this Complaint are incorporated herein by reference.

510. In the alternative to Counts 6 through 8 above, certain so-called "swap" payments by ENA to JP Morgan Chase during the period September 2, 2001 to the Petition Date are voidable preferences pursuant to Section 547(b) of the Bankruptcy Code.

511. Within ninety (90) days before the Petition Date, ENA paid or caused to be paid an aggregate sum of approximately One Hundred Thirty-Six Million Four Hundred Thousand Dollars ($136,400,000.00) to JP Morgan Chase on account of the agreements relating to the Chase VI-Chase X Mahonia transactions and to JP Morgan Chase's alter ego, Stoneville Aegean, on account of the agreement relating to the Chase XI Mahonia transaction.

512. In the Chase XI Mahonia transaction, the JP Morgan Chase SPE Stoneville Aegean received payments from ENA and, pursuant to an agreement between Stoneville Aegean and JP Morgan Chase, immediately transferred said payments to JP Morgan Chase to repay the loan with interest. As the payments from ENA to Stoneville Aegean matched the payments from Stoneville Aegean to JP Morgan Chase, and the transfer of the payments from Stoneville Aegean to JP Morgan Chase took place immediately upon receipt of the payments from ENA, the payments to Stoneville Aegean should be considered payments to JP Morgan Chase for purposes of the Chase XI Mahonia transaction.

513. Although the transfers from ENA to JP Morgan Chase were made under so-called "swap" agreements, in reality, these payments were not swap payments and, in truth and in fact, were interest and amortizing principal payments on loans made by JP Morgan Chase to ENA or ENG pursuant to the circular Mahonia transactions.

514. Within ninety (90) days before the Petition Date, ENA paid or caused to be paid to or for the benefit of JP Morgan Chase relating to the Chase VI through Chase X Mahonia transactions and to or for the benefit of Stoneville Aegean relating to the Chase XI Mahonia transaction the aggregate sum of approximately One Hundred Thirty-Six Million Four Hundred

Thousand Dollars ($136,400,000.00) (collectively, the "Chase Principal and Interest Transfers"), which transfers include, but are not limited to, the following transfers on the dates and in the respective amounts set forth below:

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 9/25/2001 | ENA | JP Morgan Chase | $4,944,500.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $3,918,400.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $4,898,000.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $3,405,000.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $2,760,000.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $3,495,000.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $2,883,000.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $2,821,000.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $2,244,400.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $3,232,680.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $2,418,037.20 |
| 9/25/2001 | ENA | JP Morgan Chase | $3,232,680.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $2,670,030.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $2,277,000.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $1,739,400.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $2,247,300.00 |
| 10/25/2001 | ENA | JP Morgan Chase | $1,887,300.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $2,244,400.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $1,775,680.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $2,313,220.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $1,902,780.00 |
| 9/25/2001 | ENA | JP Morgan Chase | $3,226,216.50 |
| 10/25/2001 | ENA | JP Morgan Chase | $3,122,145.00 |
| 11/26/2001 | ENA | JP Morgan Chase | $3,226,216.50 |
| 9/20/2001 | ENA | JP Morgan Chase | $9,804,325.00 |
| 10/19/2001 | ENA | JP Morgan Chase | $10,663,234.70 |
| 11/20/2001 | ENA | JP Morgan Chase | $10,564,155.30 |
| 9/25/2001 | ENA | Stoneville Aegean/JP Morgan Chase | $7,173,134.64 |
| 10/25/2001 | ENA | Stoneville Aegean/JP Morgan Chase | $6,941,743.20 |
| 11/26/2001 | ENA | Stoneville Aegean/JP Morgan Chase | $7,173,134.64 |
| 9/2001 | ENA | JP Morgan Chase | $715,860.00 |
| 9/2001 | ENA | JP Morgan Chase | $5,675,340.00 |
| 10/2001 | ENA | JP Morgan Chase | $6,051,401.00 |
| 10/2001 | ENA | JP Morgan Chase | $2,773,322.00 |

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| | | TOTAL | $136,420,035.68 |

515.    The Chase Principal and Interest Transfers that ENA made to JP Morgan Chase and/or Stoneville Aegean constitute transfers of interests of ENA in property.

516.    At the time the Chase Principal and Interest Transfers were made, JP Morgan Chase and Stoneville Aegean were creditors of ENA.

517.    Each of the Chase Principal and Interest Transfers was made to or for the benefit of JP Morgan Chase and/or Stoneville Aegean.

518.    Each of the Chase Principal and Interest Transfers was made for or on account of an antecedent debt owed by ENA to JP Morgan Chase and/or Stoneville Aegean before each respective Chase Principal and Interest Transfer was made.

519.    At the time of each of the Chase Principal and Interest Transfers, ENA was insolvent.

520.    The Chase Principal and Interest Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code.  They enabled JP Morgan Chase and Stoneville Aegean, respectively, to receive more than each of JP Morgan Chase and Stoneville Aegean would have received in a case under chapter 7 of the Bankruptcy Code, if the Chase Principal and Interest Transfers had not been made, and JP Morgan Chase and Stoneville Aegean had received payment of ENA's indebtedness to them to the extent permitted by the Bankruptcy Code.

521.    Alternatively to paragraphs 514 through 520, and as described in paragraphs 282 and 512 of this Complaint, with respect to the Chase XI Mahonia Transaction, Stoneville Aegean was a mere conduit through which the Chase Principal and Interest Transfers flowed to the initial transferee, JP Morgan Chase.

## COUNT 10
### (Avoidance of Fraudulent Transfers Related to the Chase Principal and Interest Transfers)

522.    The allegations in paragraphs 1 through 521 of this Complaint are incorporated herein by reference.

523.    In the alternative to Count 9, the Chase Principal and Interest Transfers are voidable fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code..

524.    The Chase Principal and Interest Transfers constitute transfers of interests of ENA in property.

525.    The Chase Principal and Interest Transfers were made on or within one (1) year before the Petition Date.

526.    ENA received from JP Morgan Chase and/or Stoneville Aegean less than reasonably equivalent value in exchange for the Chase Principal and Interest Transfers.

527.    ENA was insolvent on the date that the Chase Principal and Interest Transfers were made or became insolvent as a result of the Chase Principal and Interest Transfers.

528.    At the time of the Chase Principal and Interest Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

529.    At the time of the Chase Principal and Interest Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

530.    Alternatively to paragraph 526 above, and as described in paragraphs 282 and 512, with respect to the Chase XI Mahonia transaction, Stoneville Aegean was a mere conduit through which the transfers flowed to the initial transferee, JP Morgan Chase.

## COUNT 11

**(Avoidance of Fraudulent Transfers Related to the Chase Principal and Interest Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

531.     The allegations in paragraphs 1 through 530 of this Complaint are incorporated herein by reference.

532.     In the alternative to Counts 9 and 10, the Chase Principal and Interest Transfers are voidable fraudulent transfers under applicable state law.

533.     Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

534.     The Chase Principal and Interest Transfers that ENA made to JP Morgan Chase and Stoneville Aegean constitute transfers of interests of ENA in property.

535.     ENA received from JP Morgan Chase and/or Stoneville Aegean less than reasonably equivalent value in exchange for the Chase Principal and Interest Transfers.

536.     ENA was insolvent on the date that the Chase Principal and Interest Transfers were made or became insolvent as a result of the Chase Principal and Interest Transfers.

537.     At the time of the Chase Principal and Interest Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

538.     At the time of the Chase Principal and Interest Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

539.     Alternatively to paragraphs 534 and 535 above, and as described in paragraphs 282 and 512, with respect to the Chase XI Mahonia transaction, Stoneville Aegean was a mere conduit through which the transfers flowed to the initial transferee, JP Morgan Chase.

## COUNT 12
### (Avoidance of Preferential Transfers Related to the Purported Margin Transfers)

540.     The allegations in paragraphs 1 through 539 of this Complaint are incorporated herein by reference.

541.     The payment of certain so-called "margin" payments by ENA to JP Morgan Chase's SPE and alter ego, Mahonia, during the period September 2, 2001 to the Petition Date are voidable preferences pursuant to Section 547(b) of the Bankruptcy Code.

542.     Commencing on or about June 28, 2000, ENA entered into certain margin agreements with JP Morgan Chase's SPE Mahonia (collectively, the "Margin Agreements") relating to the Chase X through Chase XI Mahonia transactions as follows: (i) Margin Agreement between Mahonia and ENA, June 28, 2000; and (ii) Margin Agreement between Mahonia and ENA, December 28, 2000.

543.     Commencing on or about December 18, 1997, ENG entered into Margin Agreements relating to the Chase VI through Chase IX Mahonia transactions as follows: (i) Margin Agreement between Mahonia and ENG, December 18, 1997, as amended by the Amendment between ENG and Mahonia, December 19, 2000; (ii) Margin Agreement between Mahonia and ENG, June 26, 1998; (iii) Margin Agreement between Mahonia and ENG, December 1, 1998; and (iv) Margin Agreement between Mahonia and ENG, June 28, 1999.

544.     Although ENG was a party to some of the Margin Agreements, on information and belief ENA funded all purported margin payments that were required to be posted under the terms of each Margin Agreement, irrespective of whether ENG or ENA was party to the particular margin agreement.

545.     Under the Margin Agreements, ENA agreed to deliver security to Mahonia security for the obligations to deliver oil or natural gas commodities under the forward commodity contracts

entered into by ENA and/or ENG and Mahonia upon the occurrence of certain "Trigger Events" relating to Enron's minimum allowable debt to capitalization ratios and other minimum creditworthiness thresholds as defined in the Margin Agreements. To the extent that ENA's or ENG's margin requirements decreased or were eliminated under the applicable Margin Agreement, Mahonia would be obligated to return the corresponding funds in accordance with the terms of the Margin Agreements, with interest.

546.    Under the Margin Agreements, JP Morgan Chase had a security interest in all of Mahonia's rights under the Margin Agreements with ENA and ENG, and upon information and belief, Mahonia transferred the margin payments to JP Morgan Chase.

547.    In each of the Mahonia transactions, the circular structure of each transaction eliminated any price risk to Mahonia or JP Morgan Chase.

548.    Margin agreements normally are intended to protect contracting parties from commodity price fluctuations. Due to the circular nature of the commodity transfers in the Mahonia transactions, however, there was no price risk to the parties in those transactions.

549.    Although characterized as margin payments under the Margin Agreements, the margin payments made by ENA under the Margin Agreements in the Mahonia transactions were not, in reality, margin payments because, due to the structure of the Mahonia transactions, they were inconsistent with the commercial purpose of margin payments.

550.    Within ninety (90) days before the Petition Date, ENA paid or caused to be paid to or for the benefit of Mahonia the aggregate sum of approximately Six Hundred Seventy-One Million Three Hundred Thirty-One Thousand Seven Hundred Fourteen Dollars ($671,331,714.00) (collectively, the "Initial Purported Margin Transfers"), which include, but are not limited to, the following transfers, on the respective dates and in the respective amounts set forth below.

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 9/4/2001 | ENA | Mahonia | $12,500,000.00 |
| 9/5/2001 | ENA | Mahonia | $900,000.00 |
| 9/7/2001 | ENA | Mahonia | $5,600,000.00 |
| 9/21/2001 | ENA | Mahonia | $10,700,000.00 |
| 9/24/2001 | ENA | Mahonia | $8,700,000.00 |
| 9/26/2001 | ENA | Mahonia | $1,200,000.00 |
| 9/27/2001 | ENA | Mahonia | $14,900,000.00 |
| 10/1/2001 | ENA | Mahonia | $6,100,000.00 |
| 10/3/2001 | ENA | Mahonia | $19,300,000.00 |
| 10/11/2001 | ENA | Mahonia | $24,300,000.00 |
| 10/15/2001 | ENA | Mahonia | $9,800,000.00 |
| 10/18/2001 | ENA | Mahonia | $26,300,000.00 |
| 10/19/2001 | ENA | Mahonia | $10,663,234.00 |
| 10/22/2001 | ENA | Mahonia | $19,900,000.00 |
| 10/22/2001 | ENA | Mahonia | $46,800,000.00 |
| 10/26/2001 | ENA | Mahonia | $29,800,000.00 |
| 10/26/2001 | ENA | Mahonia | $46,800,000.00 |
| 10/29/2001 | ENA | Mahonia | $9,700,000.00 |
| 10/30/2001 | ENA | Mahonia | $1,300,000.00 |
| 10/31/2001 | ENA | Mahonia | $25,300,000.00 |
| 11/8/2001 | ENA | Mahonia | $6,800,000.00 |
| 11/13/2001 | ENA | Mahonia | $400,000.00 |
| 11/20/2001 | ENA | Mahonia | $23,000,000.00 |
| 11/26/2001 | ENA | Mahonia | $30,000,000.00 |
| 9/4/2001 | ENA | Mahonia | $7,800,000.00 |
| 9/5/2001 | ENA | Mahonia | $600,000.00 |
| 9/7/2001 | ENA | Mahonia | $6,100,000.00 |
| 9/20/2001 | ENA | Mahonia | $9,804,325.00 |
| 9/24/2001 | ENA | Mahonia | $4,200,000.00 |
| 9/27/2001 | ENA | Mahonia | $7,800,000.00 |
| 10/1/2001 | ENA | Mahonia | $2,000,000.00 |
| 10/3/2001 | ENA | Mahonia | $24,500,000.00 |
| 10/11/2001 | ENA | Mahonia | $29,800,000.00 |
| 10/15/2001 | ENA | Mahonia | $24,200,000.00 |
| 10/18/2001 | ENA | Mahonia | $17,700,000.00 |
| 10/22/2001 | ENA | Mahonia | $10,000,000.00 |
| 10/26/2001 | ENA | Mahonia | $26,600,000.00 |
| 10/30/2001 | ENA | Mahonia | $17,900,000.00 |
| 10/31/2001 | ENA | Mahonia | $1,500,000.00 |
| 10/31/2001 | ENA | Mahonia | $35,900,000.00 |
| 11/8/2001 | ENA | Mahonia | $1,300,000.00 |
| 11/13/2001 | ENA | Mahonia | $24,800,000.00 |
| 11/20/2001 | ENA | Mahonia | $10,564,155.00 |

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| 11/26/2001 | ENA | Mahonia | $17,500,000.00 |
| | | **TOTAL** | **$671,331,714.00** |

551.    Upon information and belief, during the ninety (90) days prior to the Petition Date, JP Morgan Chase or its alter ego, Mahonia, caused to be returned to ENA the aggregate sum of approximately Four Hundred Sixty-Six Million Two Hundred Thousand Dollars ($466,200,000.00) of the aforementioned Initial Purported Margin Transfers originally paid by ENA to Mahonia during the ninety (90) days before the Petition Date.

552.    Upon information and belief, Mahonia erroneously paid Forty-Six Million Eight Hundred Thousand Dollars ($46,800,000.00) in margin payments to ENA when Mahonia was supposed to have received that amount.

553.    Upon information and belief, during the ninety-day preference period, commodity payments of Thirty One Million Thirty One Thousand Seven Hundred Fourteen Dollars ($31,031,714.00) were made to ENA such that the net margin transfers by ENA to Mahonia totaled approximately One Hundred Twenty-Seven Million Three Hundred Thousand Dollars ($127,300,000.00) during the ninety (90) days before the Petition Date (the net transfers being hereafter referred to as the "Purported Margin Transfers").

554.    Upon information and belief, Mahonia used the margin transfers to reduce its outstanding obligations to JP Morgan Chase.

555.    The Purported Margin Transfers that ENA made to Mahonia constitute transfers of interests of ENA in property.

556.    At the time the Purported Margin Transfers were made, Mahonia was a creditor of ENA.

557.    Each of the Purported Margin Transfers was made to or for the benefit of Mahonia.

558.     Each of the Purported Margin Transfers was made for or on account of an antecedent debt owed by ENA to Mahonia before such Purported Margin Transfer was made.

559.     At the time of each of the Purported Margin Transfers, ENA was insolvent.

560.     The Purported Margin Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code.  They enabled JP Morgan Chase's SPE Mahonia to receive more than it would have received in a case under chapter 7 of the Bankruptcy Code, if the Purported Margin Transfers had not been made, and Mahonia had received payment of ENA's indebtedness to it to the extent permitted by the Bankruptcy Code.

561.     Alternatively to paragraphs 555 through 560, and as described in paragraph 282, Mahonia was a mere conduit through which the Purported Margin Transfers flowed to the initial transferee, JP Morgan Chase.  In that case, the allegations in this Count concerning Mahonia are applicable to JP Morgan Chase.

**COUNT 13**
**(Avoidance of Fraudulent Transfers Related to the Purported Margin Transfers)**

562.     The allegations in paragraphs 1 through 561 of this Complaint are incorporated herein by reference.

563.     In the alternative to Count 12, the Purported Margin Transfers are voidable fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

564.     The Purported Margin Transfers constitute transfers of interests of ENA in property.

565.     The Purported Margin Transfers were made on or within one (1) year before the Petition Date.

566.     ENA received from Mahonia and/or JP Morgan Chase less than reasonably equivalent value in exchange for the Purported Margin Transfers.

567.     ENA was insolvent on the date that the Purported Margin Transfers were made by ENA to Mahonia or became insolvent as a result of the Purported Margin Transfers.

568.     At the time of the Purported Margin Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

569.     At the time of the Purported Margin Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

570.     Alternatively to paragraph 566, and as described in paragraph 282, Mahonia was a mere conduit through which the Purported Margin Transfers flowed to the initial transferee, JP Morgan Chase.

## COUNT 14
### (Avoidance of Fraudulent Transfers Related to the  Purported Margin Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

571.     The allegations in paragraphs 1 through 570 of this Complaint are incorporated herein by reference.

572.     In the alternative to Counts 12 and 13, the Purported Margin Transfers are voidable fraudulent transfers under applicable state law.

573.     Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

574.     The Purported Margin Transfers constitute transfers of interests of ENA in property.

575.     ENA received from Mahonia and/or JP Morgan Chase less than reasonably equivalent value in exchange for the Purported Margin Transfers.

576.     ENA was insolvent on the date that the Purported Margin Transfers were made by ENA to Mahonia or became insolvent as a result of the Purported Margin Transfers.

577.     At the time of the Purported Margin Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

578.     At the time of the Purported Margin Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

579.     Alternatively to paragraph 575, and as described in paragraph 282, Mahonia was a mere conduit through which the Purported Margin Transfers flowed to the initial transferee, JP Morgan Chase.

**COUNT 15**
**(Avoidance of Preferential Transfers Related to the Chase Preferential Fee Transfer)**

580.     The allegations in paragraphs 1 through 579 of this Complaint are incorporated herein by reference.

581.     Within ninety (90) days before the Petition Date, ENA paid or caused to be paid to or for the benefit of JP Morgan Chase the aggregate sum of approximately One Million Dollars ($1,000,000.00) in connection with Chase XII (the "Chase Preferential Fee Transfer").

582.     The Chase Preferential Fee Transfer constitutes a transfer by ENA to JP Morgan Chase of an interest of ENA in property.

583.     At the time the Chase Preferential Fee Transfer was made, JP Morgan Chase was a creditor of ENA.

584.     The Chase Preferential Fee Transfer was made to or for the benefit of JP Morgan Chase.

585.    The Chase Preferential Fee Transfer was made for or on account of an antecedent debt owed by ENA to JP Morgan Chase before such transfer was made.

586.    At the time of the Chase Preferential Fee Transfer, ENA was insolvent.

587.    The Chase Preferential Fee Transfer is voidable as a preference under section 547(b) of the Bankruptcy Code.  It enabled JP Morgan Chase to receive more than it would have received in a case under chapter 7 of the Bankruptcy Code, if the Chase Preferential Fee Transfer had not been made, and JP Morgan Chase had received payment of ENA's indebtedness to it to the extent permitted by the Bankruptcy Code.

## COUNT 16
### (Avoidance of Fraudulent Transfers Related to the Chase Structuring Fee Transfers)

588.    The allegations in paragraphs 1 through 587 of this Complaint are incorporated herein by reference.

589.    On or within one (1) year before the Petition Date, ENA paid or caused to be paid to or for the benefit of JP Morgan Chase structuring fees relating to, among other transactions, the Mahonia transactions and the Fishtail transaction, in the aggregate amount of approximately Two Million Five Hundred Thousand Dollars ($2,500,000.00), which transfers include, but are not limited to, the transfers on the respective dates and in the respective amounts set forth below (collectively, the "Chase Structuring Fee Transfers"):

| Transferor | Transferee | Transfer Date | Transaction | Transfer Amount |
|------------|------------|---------------|-------------|-----------------|
| ENA | JP Morgan Chase | 12/00 | Chase XI | $1,000,000.00 |
| ENA | JP Morgan Chase | 1/3/01 | Fishtail | $500,000.00 |
| ENA | JP Morgan Chase | 09/01 | Chase XII | $1,000,000.00 |
|  |  |  | **TOTAL** | **$2,500,000.00** |

590.    To the extent that a transfer identified in this Count is also included in Count 15 as an avoidable preference payment, the transfer is pled alternatively as a fraudulent transfer.

591.   The Chase Structuring Fee Transfers constitute transfers of interests of ENA in property.

592.   The Chase Structuring Fee Transfers that ENA made to JP Morgan Chase were made on or within one (1) year before the Petition Date.

593.   ENA received from JP Morgan Chase less than reasonably equivalent value in exchange for the Chase Structuring Fee Transfers.

594.   ENA was insolvent on the dates that the Chase Structuring Fee Transfers were made by ENA to JP Morgan Chase or became insolvent as a result of the Chase Structuring Fee Transfers.

595.   At the time of the Chase Structuring Fee Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

596.   At the time of the Chase Structuring Fee Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

597.   The Chase Structuring Fee Transfers are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

### COUNT 17
**(Avoidance of Fraudulent Transfers Related to the Chase 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

598.   The allegations in paragraphs 1 through 597 of this Complaint are incorporated herein by reference.

599.   Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

600. ENA paid or caused to be paid to or for the benefit of JP Morgan Chase the aggregate sum of approximately Four Million One Hundred Twenty-Five Thousand Dollars ($4,125,000.00), which includes, but is not limited to, transfers on the respective dates and in the respective amounts set forth below (collectively, the "Chase 544 Transfers"):

| Transferor | Transferee | Transfer Date | Transaction | Transfer Amount |
|---|---|---|---|---|
| ENA | JP Morgan Chase | 6/28/00 | Chase X | $1,625,000.00 |
| ENA | JP Morgan Chase | 12/00 | Chase XI | $1,000,000.00 |
| ENA | JP Morgan Chase | 1/3/01 | Fishtail | $500,000.00 |
| ENA | JP Morgan Chase | 9/01 | Chase XII | $1,000,000.00 |
| | | | **TOTAL** | **$4,125,000.00** |

601. To the extent that a transfer identified in this Count is also identified as an avoidable preference payment or an avoidable fraudulent transfer under Section 548 of the Bankruptcy Code, the transfer is pled alternatively as a fraudulent transfer under applicable state law and Section 544 of the Bankruptcy Code.

602. ENA received from JP Morgan Chase less than reasonably equivalent value in exchange for the Chase 544 Transfers.

603. The Chase 544 Transfers constitute transfers of interests of ENA in property.

604. The Chase 544 Transfers were made between June 2000 and September 2001.

605. ENA was insolvent on the dates that the Chase 544 Transfers were made or became insolvent as a result of the Chase 544 Transfers.

606. At the time of the Chase 544 Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

607. At the time of the Chase 544 Transfers, ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

## COUNT 18
### (Recovery of Avoided Transfers Related to the Mahonia Commodity Transfers, the Chase Principal and Interest Transfers, the Purported Margin Transfers, the Chase Preferential Fee Transfer, the Chase Structuring Fee Transfers, and the Chase 544 Transfers)

608.    The allegations in paragraphs 1 through 607 of this Complaint are incorporated herein by reference.

609.    To the extent that each of the Mahonia Commodity Transfers, the Chase Principal and Interest Transfers, the Purported Margin Transfers, the Chase Preferential Fee Transfer, the Chase Structuring Fee Transfers, and the Chase 544 Transfers is avoided under Bankruptcy Code Sections 547, 548, or 544, then pursuant to Section 550, Plaintiff may recover from each of (a) Mahonia as initial transferee for the Mahonia Commodity Transfers and the Purported Margin Transfers; (b) JP Morgan Chase as initial or subsequent transferee for the Mahonia Commodity Transfers, the Chase Principal and Interest Transfers, the Purported Margin Transfers, the Chase Preferential Fee Transfers, the Chase Structuring Fee Transfers, and the Chase 544 Transfers; or (c) Stoneville Aegean as initial transferee for the Chase Principal and Interest Transfers, for the benefit of ENA's bankruptcy estate, the property transferred, or the value of such property.

## COUNT 19
### (Disallowance of Claim Under Bankruptcy Code Section 502(d); Against JP Morgan Chase, Mahonia, and Stoneville Aegean)

610.    The allegations in paragraphs 1 through 609 of this Complaint are incorporated herein by reference.

611.    By reason of the foregoing facts and pursuant to Bankruptcy Code Section 502(d), the respective claims of Mahonia, JP Morgan Chase, and Stoneville Aegean must be disallowed unless and until the respective defendant has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code Section 550.

## C.    COUNTS 20 - 24
##        *(Against CIBC Defendants)*

### COUNT 20
**(Avoidance of Preferential Transfers Related to CIBC Hawaii Preferential Transfers)**

612.    The allegations in paragraphs 1 through 611 of this Complaint are incorporated herein by reference.

613.    Within ninety (90) days before the Petition Date, Enron paid or caused to be paid to or for the benefit of CIBC, the aggregate sum of approximately Eleven Million Three Hundred Forty-One Thousand Five Hundred Eleven Dollars and Ninety-One Cents ($11,341,511.91), including, but not limited to, transfers on the respective dates and in the respective amounts set forth below (collectively, the "CIBC Hawaii Preferential Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron | CIBC | 9/07/01 | (McGarrett F) | $588,247.89 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $467,157.49 |
| Enron | CIBC | 9/07/01 | (McGarrett F) | $3,607,653.56 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $227,475.54 |
| Enron | CIBC | 9/14/01 | (McGarrett J) | $442,491.73 |
| Enron | CIBC | 9/20/01 | (McGarrett C) | $341,245.72 |
| Enron | CIBC | 9/20/01 | (McGarrett D) | $1,019,482.29 |
| Enron | CIBC | 9/24/91 | (McGarrett M) | $217,818.89 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 9/28/01 | (McGarrett I) | $1,273,702.72 |
| Enron | CIBC | 9/28/01 | (McGarrett K) | $325,959.81 |
| Enron | CIBC | 9/28/01 | (Hawaii Facility Fee and Commit Fee) | $84,616.21 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 10/17/01 | (McGarrett K) | $50,184.45 |
| Enron | CIBC | 10/17/01 | (McGarrett D) | $245,585.78 |
| Enron | CIBC | 10/17/01 | (McGarrett C) | $82,203.58 |
| Enron | CIBC | 10/17/01 | (McGarrett M) | $39,073.48 |
| Enron | CIBC | 10/17/01 | (McGarrett P) | $213,476.52 |
| Enron | CIBC | 10/17/01 | (McGarrett O) | $224,140.07 |
| Enron | CIBC | 10/17/01 | (Hawaii Fees) | $1,077,500.00 |
| Enron | CIBC | 10/17/01 | (Hawaii Breakage Fees) | $150,000.00 |
|  |  |  | **TOTAL** | **$11,341,511.91** |

614.    Although certain of the CIBC Hawaii Preferential Transfers were made under so-called "swap agreements," in reality, these payments were not swap payments and, in truth and in fact, were interest and amortizing principal payments on loans made by CIBC to ENA or Enron pursuant to the circular Hawaii Transactions.

615.    The CIBC Hawaii Preferential Transfers that Enron made to CIBC constitute transfers of interests of Enron in property.

616.    At the time the CIBC Hawaii Preferential Transfers were made, the transferee of each respective transfer was a creditor of the transferor of each respective transfer.

617.    Each of the CIBC Hawaii Preferential Transfers was made to or for the benefit of CIBC.

618.    Each of the CIBC Hawaii Preferential Transfers was made for or on account of an antecedent debt owed by Enron to CIBC before such CIBC Hawaii Preferential Transfer was made.

619.    At the time of each of the CIBC Hawaii Preferential Transfers, Enron was insolvent.

620.    The CIBC Hawaii Preferential Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code. They enabled CIBC to receive more than CIBC would have received in a case under chapter 7 of the Bankruptcy Code, if the CIBC Hawaii Preferential Transfers had not been made, and CIBC had received payment of Enron's indebtedness to it to the extent permitted by the Bankruptcy Code.

## COUNT 21
### (Avoidance of Fraudulent Transfers Related to the CIBC 548 Transfers)

621.    The allegations in paragraphs 1 through 620 of this Complaint are incorporated herein by reference.

622.    On or within one year before the Petition Date, Enron paid or caused to be paid to or for the benefit of CIBC the aggregate sum of approximately Eleven Million Three Hundred Forty-

Five Thousand Ninety-Four Dollars and Thirty-Seven Cents ($11,345,094.37) which includes, but is not limited to, the transfers on the dates and in the amounts set forth below (collectively, the "CIBC 548 Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron | CIBC | 3/23/01 | (Breakage Fees) | $3,582.46 |
| Enron | CIBC | 9/07/01 | (McGarrett F) | $588,247.89 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $467,157.49 |
| Enron | CIBC | 9/07/01 | (McGarrett F) | $3,607,653.56 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $227,475.54 |
| Enron | CIBC | 9/14/01 | (McGarrett J) | $442,491.73 |
| Enron | CIBC | 9/20/01 | (McGarrett C) | $341,245.72 |
| Enron | CIBC | 9/20/01 | (McGarrett D) | $1,019,482.29 |
| Enron | CIBC | 9/24/01 | (McGarrett M) | $217,818.89 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 9/28/01 | (McGarrett I) | $1,273,702.72 |
| Enron | CIBC | 9/28/01 | (McGarrett K) | $325,959.81 |
| Enron | CIBC | 9/28/01 | (Hawaii Facility Fee and Commit Fee) | $84,616.21 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 10/17/01 | (McGarrett K) | $50,184.45 |
| Enron | CIBC | 10/17/01 | (McGarrett D) | $245,585.78 |
| Enron | CIBC | 10/17/01 | (McGarrett C) | $82,203.58 |
| Enron | CIBC | 10/17/01 | (McGarrett M) | $39,073.48 |
| Enron | CIBC | 10/17/01 | (McGarrett P) | $213,476.52 |
| Enron | CIBC | 10/17/01 | (McGarrett O) | $224,140.07 |
| Enron | CIBC | 10/17/01 | (Hawaii Fees) | $1,077,500.00 |
| Enron | CIBC | 10/17/01 | (Hawaii Breakage Fees) | $150,000.00 |
| | | | **TOTAL** | **$11,345,094.37** |

623. To the extent that a transfer identified in this Count is also included in Count 20 as an avoidable preference payment, the transfer is pled alternatively as a fraudulent transfer.

624. Enron received from CIBC less than reasonably equivalent value in exchange for the CIBC 548 Transfers.

625. The CIBC 548 Transfers constitute transfers of interests of Enron in property.

626. The CIBC 548 Transfers were made on or within one (1) year before the Petition Date.

627. Enron was insolvent on the date that the CIBC 548 Transfers were made or became insolvent as a result of the CIBC 548 Transfers.

628. At the time of the CIBC 548 Transfers, Enron was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Enron was unreasonably small capital.

629. At the time of the CIBC 548 Transfers, Enron intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

630. The CIBC 548 Transfers are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 22
### (Avoidance of Fraudulent Transfers Related to the CIBC 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

631. The allegations in paragraphs 1 through 630 of this Complaint are incorporated herein by reference.

632. Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA. Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

633. Enron paid or caused to be paid to or for the benefit of CIBC the aggregate sum of approximately Thirteen Million Two Hundred Seventeen Thousand Four Hundred Eighty-One Dollars and Eighteen Cents ($13,217,481.18), which includes, but is not limited to, transfers on the respective dates and in the respective amounts set forth below (collectively, the "CIBC 544 Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron Broadband | CIBC | 3/22/00 | (Project Ghost Breakage Fees and Equity) | $11,136.81 |
| Enron | CIBC | 3/23/01 | (Breakage Fees) | $3,582.46 |
| Enron | CIBC | 3/31/00 | (Fees) | $1,861,250.00 |
| Enron | CIBC | 9/07/01 | (McGarrett F) | $588,247.89 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $467,157.49 |
| Enron | CIBC | 9/07/01 | (McGarrett F) | $3,607,653.56 |
| Enron | CIBC | 9/07/01 | (McGarrett G) | $227,475.54 |
| Enron | CIBC | 9/14/01 | (McGarrett J) | $442,491.73 |
| Enron | CIBC | 9/20/01 | (McGarrett C) | $341,245.72 |
| Enron | CIBC | 9/20/01 | (McGarrett D) | $1,019,482.29 |
| Enron | CIBC | 9/24/01 | (McGarrett M) | $217,818.89 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 9/28/01 | (McGarrett I) | $1,273,702.72 |
| Enron | CIBC | 9/28/01 | (McGarrett K) | $325,959.81 |
| Enron | CIBC | 9/28/01 | (Hawaii Facility Fee and Commit Fee) | $84,616.21 |
| Enron | CIBC | 9/28/01 | (McGarrett L) | $331,748.09 |
| Enron | CIBC | 10/17/01 | (McGarrett K) | $50,184.45 |
| Enron | CIBC | 10/17/01 | (McGarrett D) | $245,585.78 |
| Enron | CIBC | 10/17/01 | (McGarrett C) | $82,203.58 |
| Enron | CIBC | 10/17/01 | (McGarrett M) | $39,073.48 |
| Enron | CIBC | 10/17/01 | (McGarrett P) | $213,476.52 |
| Enron | CIBC | 10/17/01 | (McGarrett O) | $224,140.07 |
| Enron | CIBC | 10/17/01 | (Hawaii Fees) | $1,077,500.00 |
| Enron | CIBC | 10/17/01 | (Hawaii Breakage Fees) | $150,000.00 |
| | | | **TOTAL** | **$13,217,481.18** |

634. To the extent that a transfer identified in this Count is also identified as an avoidable preference payment or an avoidable fraudulent transfer under Section 548 of the Bankruptcy Code, the transfer is pled alternatively as a fraudulent transfer under applicable state law and Section 544 of the Bankruptcy Code.

635. Enron received from CIBC less than reasonably equivalent value in exchange for the CIBC 544 Transfers.

636. The CIBC 544 Transfers constitute transfers of interests of Enron in property.

637. Enron was insolvent on the date that the CIBC 544 Transfers were made or became insolvent as a result of the CIBC 544 Transfers.

638. At the time of the CIBC 548 Transfers, ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with ENA was unreasonably small capital.

639. At the time of the CIBC 544 Transfers, Enron intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

## COUNT 23
### (Recovery of Avoided Transfers Related to the CIBC Hawaii Preferential Transfers, the CIBC 548 Transfers, and the CIBC 544 Transfers)

640. The allegations in paragraphs 1 through 639 of this Complaint are incorporated herein by reference.

641. To the extent that each of the CIBC Hawaii Preferential Transfers is avoided under Bankruptcy Code Section 547, and/or each of the CIBC 548 Transfers is avoided under Bankruptcy Code Section 548, and/or each of the CIBC 544 Transfers is avoided under Bankruptcy Code Section 544, then pursuant to Bankruptcy Code Section 550, Plaintiff may recover from CIBC, for the benefit of the Enron bankruptcy estate, the property transferred, or the value of such property.

## COUNT 24
### (Disallowance of Claim Under Bankruptcy Code Section 502(d); Against CIBC)

642. The allegations in paragraphs 1 through 641 of this Complaint are incorporated herein by reference.

643. By reason of the foregoing facts and pursuant to Bankruptcy Code Section 502(d), the claims of CIBC must be disallowed unless it has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code Section 550.

## COUNT 25
### (Avoidance of Preferential Transfers Related to the Barclays Preferential Transfers)

644.     The allegations in paragraphs 1 through 643 of this Complaint are incorporated herein by reference.

645.     Within ninety (90) days prior to the Petition Date, Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified in the first column of the following chart as the initial transferee or beneficiary of a given transfer (collectively, the "Barclays Preferential Transferees"), whether directly, or through a conduit, the transfers on the dates and in the amounts set forth in the following chart:

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Barclays | | 10/30/01 | $SO_2$ | $59,500,000.00 |
| ENA | Barclays | | 10/30/01 | $SO_2$ | $10,103,294.00 |
| ENA | Colonnade | Barclays | 10/24/01 | $SO_2$ | $426,659.37 |
| ENA | Barclays* (Colonnade) | | 9/28/01 | $SO_2$ | $426,659.37 |
| ENA | Colonnade | Barclays | 11/01/01 | $SO_2$ | $3,305,416.02 |
| ENA | Barclays* (Colonnade) | | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Barclays | | 9/28/01; 10/31/01 | $SO_2$ | $1,635,000.00 |
| ENA | Barclays | | 11/05/01- 11/26/01 | $SO_2$ | $17,038,519.00 |
| ENA | Besson Trust | Barclays | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays* (Besson Trust) | | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays | | 9/29/01 | Nikita | $765,000.00 |
| Enron | JGB Trust | Barclays | 9/17/01 | Avici | $133,657.39 |
| Enron | Barclays* (JGB Trust) | | 9/17/01 | Avici | $133,657.39 |

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | JGB Trust | Barclays | 10/04/01 | Avici | $32,383,831.16 |
| Enron | Barclays* (JGB Trust) | | 10/04/01 | Avici | $32,383,831.16 |
| Enron | Barclays | | 9/27/01 | Prepaid Oil Swap | $390,000.00 |
| | | | | **TOTAL** | **$125,929,710.40** |

646.    To the extent Colonnade, Besson Trust, and JGB Trust, in the asterisked items above, are found to be mere conduits of the transfers in question, Plaintiff asserts that Barclays was the initial transferee of the identified transfers.

647.    Although certain of the Barclays Preferential Transfers were made under so-called swap agreements, in reality, these payments were not swap payments and, in truth and in fact, were interest and amortizing principal payments on loans made by Barclays to Enron and/or ENA.

648.    The Barclays Preferential Transfers constitute transfers of interests of the transferors in property.    649.    At the time the Barclays Preferential Transfers were made, the transferee of each respective transfer was a creditor of the transferor of each respective transfer.

650.    Each of the Barclays Preferential Transfers was made to or for the benefit of the respective transferee.

651.    Each of the Barclays Preferential Transfers was made for or on account of an antecedent debt owed by the respective transferor to the respective transferee before such transfer was made.

652.    At the time of each of the Barclays Preferential Transfers, the respective transferor was insolvent.

653.    The Barclays Preferential Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code.  They enabled the respective transferee to receive more than it would have received in a case under Chapter 7 of the Bankruptcy Code if the Barclays Preferential Transfers had

not been made, and the respective transferee had received payment of the respective transferor's indebtedness to it to the extent permitted by the Code.

## COUNT 26
### (Avoidance of Fraudulent Transfers Related to Barclays 548 Transfers)

654.    The allegations in paragraphs 1 through 653 of this Complaint are incorporated herein by reference.

655.    On or within one (1) year before the Petition Date, Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified in the first column of the following chart as the initial transferee or beneficiary of a given transfer (collectively, the "Barclays 548 Transferees"), whether directly, or through a conduit, the transfers on the respective dates and in the respective amounts set forth in the following chart (collectively, the "Barclays 548 Transfers"):

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Barclays | | 12/11/00 | Avici | $185,534.00 |
| Enron | Barclays | | 10/30/01 | $SO_2$ | $59,500,000.00 |
| ENA | Barclays | | 10/30/01 | $SO_2$ | $10,103,294.00 |
| ENA | Colonnade | Barclays | 9/28/01 | $SO_2$ | $426,659.37 |
| ENA | Barclays* (Colonnade) | | 10/24/01 | $SO_2$ | $426,659.37 |
| ENA | Colonnade | Barclays | 11/01/01 | $SO_2$ | $3,305,416.02 |
| ENA | Barclays* (Colonnade) | | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Barclays | | 9/28/01; 10/31/01 | $SO_2$ | $1,635,000.00 |
| ENA | Barclays | | 11/05/01 – 11/26/01 | $SO_2$ | $17,038,519.00 |
| ENA | Besson Trust | Barclays | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays* (Besson Trust) | | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays | | 9/28/01 | Nikita | $765,000.00 |
| Enron | JGB Trust | Barclays | 9/17/01 | Avici | $133,657.39 |
| Enron | Barclays* (JGB Trust) | | 9/17/01 | Avici | $133,657.39 |
| Enron | JGB Trust | Barclays | 10/04/01 | Avici | $32,383,831.16 |
| Enron | Barclays* (JGB Trust) | | 10/04/01 | Avici | $32,383,831.16 |

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Barclays | | 9/27/01 | Prepaid Oil Swap | $390,000.00 |
| | | | | **TOTAL** | **$126,115,244.44** |

656. To the extent Colonnade, Besson Trust, and JGB Trust, in the asterisked items above, are found to be mere conduits of the transfers in question, the Plaintiff asserts that Barclays was the initial transferee of the identified transfers.

657. To the extent that a transfer identified in this Count is also included in Count 25 as an avoidable preference payment, the transfer is pled alternatively as a fraudulent transfer.

658. The respective transferors of the Barclays 548 Transfers received from the Barclays 548 Transferees less than reasonably equivalent value in exchange for the Barclays 548 Transfers.

659. The Barclays 548 Transfers constitute transfers of interests of the respective transferor in property.

660. The Barclays 548 Transfers were made on or within one year before the Petition Date.

661. Enron and/or ENA was insolvent on the date that the Barclays 548 Transfers were made or became insolvent as a result of the Barclays 548 Transfers.

662. At the time of the Barclays 548 Transfers, Enron and/or ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Enron and/or ENA was unreasonably small capital.

663. At the time of the Barclays 548 Transfers, Enron and/or ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

664. The Barclays 548 Transfers are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

# COUNT 27

## (Avoidance of Fraudulent Transfers Related to the Barclays 548 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

665.     The allegations of paragraphs 1 through 664 of this Complaint are incorporated herein by reference.

666.     Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

667.     Enron and/or ENA paid or caused to be paid to or for the benefit of the parties identified in the first column of the following chart as the initial transferee or beneficiary of a given transfer (collectively, the "Barclays 544 Transferees"), whether directly, or through a conduit, the transfers on the respective dates and in the respective amounts set forth in the following chart (collectively, the "Barclays 544 Transfers"):

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Barclays | | 12/11/00 | Avici | $185,534.00 |
| Enron | Barclays | | 10/30/01 | $SO_2$ | $59,500,000.00 |
| ENA | Barclays | | 10/30/01 | $SO_2$ | $10,103,294.00 |
| ENA | Colonnade | Barclays | 10/24/01 | $SO_2$ | $426,659.37 |
| ENA | Barclays* (Colonnade) | | 9/28/01 | $SO_2$ | $426,659.37 |
| ENA | Colonnade | Barclays | 11/01/01 | $SO_2$ | $3,305,416.02 |
| ENA | Barclays* (Colonnade) | | 11/01/01 | $SO_2$ | $3,305,416.02 |
| Enron | Barclays | | 9/28/01; 10/31/01 | $SO_2$ | $1,635,000.00 |
| ENA | Barclays | | 11/05/01 – 11/26/01 | $SO_2$ | $17,038,519.00 |
| ENA | Besson Trust | Barclays | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays* (Besson Trust) | | 11/06/01 | Nikita | $248,333.50 |
| ENA | Barclays | | 9/28/01 | Nikita | $765,000.00 |
| Enron | JGB Trust | Barclays | 9/17/01 | Avici | $133,657.39 |

| Transferor | Initial Transferee (Conduit) | Subsequent Transferee | Date of Transfer | Transaction | Amount of Transfer |
|---|---|---|---|---|---|
| Enron | Barclays* (JGB Trust) | | 9/17/01 | Avici | $133,657.39 |
| Enron | JGB Trust | Barclays | 10/04/01 | Avici | $32,383,831.16 |
| Enron | Barclays* (JGB Trust) | | 10/04/01 | Avici | $32,383,831.16 |
| Enron | Barclays | | 9/27/01 | Prepaid Oil Swap | $390,000.00 |
| Enron | Barclays | | 12/99 | Nixon Prepay | $466,000.00 |
| | | | | **TOTAL** | **$126,581,247.44** |

668. To the extent Colonnade, Besson Trust, and JGB Trust, in the asterisked items above, are found to be mere conduits of the transfers in question, the Plaintiff asserts that Barclays was the initial transferee of the identified transfers.

669. To the extent that a transfer identified in this Count is also identified as an avoidable preference payment or an avoidable fraudulent transfer under Section 548 of the Bankruptcy Code, the transfer is pled alternatively as a fraudulent transfer under applicable state law and Section 544 of the Bankruptcy Code.

670. The respective transferors of the Barclays 544 Transfers received from the Barclays 544 Transferees less than a reasonably equivalent value in exchange for the Barclays 544 Transfers.

671. The Barclays 544 Transfers constitute transfers of interests of the respective transferor in property.

672. Enron and/or ENA was insolvent on the date that the Barclays 544 Transfers were made or became insolvent as a result of the Barclays 544 Transfers.

673. At the time of the Barclays 544 Transfers, Enron and/or ENA was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Enron and/or ENA was unreasonably small capital.

674.     At the time of the Barclays 544 Transfers, Enron and/or ENA intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

## COUNT 28
### (Recovery of Avoided Transfers Related to the Barclays Preferential Transfers, the Barclays 548 Transfers, and the Barclays 544 Transfers)

675.     The allegations of paragraphs 1 through 674 of this Complaint are incorporated herein by reference.

676.     To the extent that each of the Barclays Preferential Transfers is avoided under Bankruptcy Code Section 547, and/or each of the Barclays 548 Transfers is avoided under Bankruptcy Code Section 548, and/or each of the Barclays 544 Transfers is avoided under Bankruptcy Code Section 544, then pursuant to Bankruptcy Code Section 550, Plaintiff may recover for the benefit of the Enron and/or ENA bankruptcy estate, from the Barclays Preferential Transferees, the Barclays 548 Transferees, and the Barclays 544 Transferees, the property transferred, or the value of such property.

## COUNT 29
### (Turnover of Property of the Estate)

677.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 676 of this Complaint as if fully set forth herein.

678.     Subsequent to the filing of the chapter 11 petitions of Enron and/or ENA, neither Barclays nor Colonnade has accounted to Plaintiff for the whereabouts, disposition or application of the Barclays Deposit and Emissions Credits ("Collateral").

679.     The Collateral is property of the estates of Enron and/or ENA.

680.     Section 542 of the Bankruptcy Code provides that an "entity, other than a custodian, in possession, custody, or control . . . of property that the trustee may use, sell, or lease . . . shall

deliver to the trustee, and account for, such property or the value of such property . . . unless such property is of inconsequential value or benefit to the estate."

681.    Barclays and/or Colonnade are in possession, custody, and/or control of the Collateral, which is not of substantial value or benefit to the estate and which is property belonging to Enron and/or ENA that may be used, sold or leased by said debtors in possession. Barclays and Colonnade should be ordered to turn over the Collateral or the value thereof immediately.

682.    Accordingly, this Court should enter an order requiring Barclays and Colonnade to turn over the Collateral or its value to Enron and/or ENA pursuant to Section 542 of the Bankruptcy Code.

### COUNT 30
**(Violation of Automatic Stay)**

683.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 682 of this Complaint as if fully set forth herein.

684.    Subsequent to the filing of the Chapter 11 petitions of Enron and/or ENA, Barclays and/or Colonnade exercised control over the Collateral and/or took action to dispose of the Collateral and apply the proceeds thereof to alleged obligations to Barclays, Colonnade and/or their affiliates that included, without limitation, the purported exercise of postpetition setoffs against the Collateral and proceeds of the Collateral.

685.    Accordingly, Barclays and Colonnade are in violation of the automatic stay provisions of Section 362 of the Bankruptcy Code, and the Court should enter an order declaring that (a) Barclays and Colonnade have violated the automatic stay, (b) any and all actions taken by Barclays and Colonnade in violation of the provisions of Section 362 of the Bankruptcy Code are null and void *ab initio*, and (c) Barclays and Colonnade shall immediately take all actions necessary to restore the parties to their relative positions as they existed on December 2, 2001.

## COUNT 31
### (Invalid and Avoidable Non-Mutual Setoffs)

686.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 685 of this Complaint as if fully set forth herein.

687.    The terms of the Charge on Cash Agreement, among other documents related to the $SO_2$ Transaction, purporting to authorize non-mutual setoff rights among Barclays affiliates are invalid, unenforceable and avoidable under applicable law, including Section 553 of the Bankruptcy Code.

688.    Accordingly, to the extent that provisions of the Charge on Cash Agreement or other documents related to the $SO_2$ Transaction purport to authorize non-mutual setoffs, this Court should declare that such provisions and any and all non-mutual setoffs purportedly made by Barclays or any Barclays affiliate are invalid, unenforceable and avoided pursuant to Section 553 of the Bankruptcy Code and other applicable law.

## COUNT 32
### (Recovery of Invalid and Avoidable Non-Mutual Setoffs for the Benefit of the Estates)

689.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 688 of this Complaint as if fully set forth herein.

690.    The non-mutual setoffs purportedly made by Barclays are invalid, unenforceable and avoidable pursuant to Section 553 of the Bankruptcy Code, and accordingly pursuant to Section 550(a) of the Bankruptcy Code, the Plaintiff may recover from Barclays or any immediate or mediate transferee of Barclays or any Barclays affiliate, the property set off or the value of the property set off plus interest from the transfer dates for the benefit of Plaintiff's estates.

## COUNT 33
### (Avoidable Setoffs Resulting in Improvement in Position)

691.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 690 of this Complaint as if fully set forth herein.

692.    Setoffs, if any, made by Barclays or any Barclays affiliate within 90 days prior to the filing of Enron's or ENA's chapter 11 petitions are avoidable to the extent the insufficiency at the time of setoff was less than the insufficiency that existed at certain prior points in time specified in Section 553(b) of the Bankruptcy Code (the "Improvement in Position Setoffs").

693.    Accordingly, the Improvement in Position Setoffs should be avoided pursuant to Section 553 of the Bankruptcy Code, and the Plaintiff may recover from Barclays or any such Barclays affiliate the amount of such Improvement in Position Setoff plus interest from the transfer dates.

## COUNT 34
### (Recovery of Avoidable Setoffs Resulting in Improvement in Position for the Benefit of the Estates)

694.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 693 of this Complaint as if fully set forth herein.

695.    The Improvement in Position Setoffs purportedly made by Barclays or any Barclays affiliate are avoidable pursuant to Section 553 of the Bankruptcy Code, and accordingly pursuant to Section 550(a) of the Bankruptcy Code, the Plaintiff may recover from Barclays or any such Barclays affiliate, or any immediate or mediate transferee of Barclays or any such Barclays affiliate, the property set off or the value of the Improvement in Position Setoffs plus interest from the transfer dates for the benefit of the Plaintiff's estate.

## COUNT 35
### (Avoidance of Unauthorized Postpetition Transfers)

696.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 695 of this Complaint as if fully set forth herein.

697.    Subsequent to the filing of the chapter 11 petitions of Enron and/or ENA, Barclays and/or Colonnade exercised control over the Collateral and/or took action to dispose of the Collateral and apply the proceeds thereof to the asserted Barclays Claims in satisfaction of non-mutual setoffs (the "Postpetition Transfers").

698.    The Collateral was property of the estates of Enron and/or ENA.

699.    The Postpetition Transfers were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

700.    Accordingly, the Postpetition Transfers by Barclays and/or Colonnade should be avoided pursuant to Section 549 of the Bankruptcy Code, and the Plaintiff may recover from Barclays and/or Colonnade the amount of the Postpetition Transfers plus interest from the transfer dates.

## COUNT 36
### (Recovery of Avoided Unauthorized Postpetition Transfers)

701.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 700 of this Complaint as if fully set forth herein.

702.    The Postpetition Transfers purportedly made by Barclays and/or Colonnade are avoidable pursuant to Section 549 of the Bankruptcy Code. Accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Plaintiff may recover from Barclays and/or Colonnade, or any immediate or mediate transferee of Barclays and/or Colonnade, the property transferred or the value of the Postpetition Transfers plus interest from the transfer dates for the benefit of the Plaintiff's estate.

## COUNT 37
### (Avoidance of Unperfected Security Interest in Certain Emission Credits)

703.     The allegations in paragraphs 1 through 702 of this Complaint are incorporated herein by reference.

704.     Colonnade filed a UCC financing statement on September 28, 2001 with the Secretary of State for the State of Delaware that identifies its collateral as either (a) 862,504 Emission Credits without specifying any "Vintage Years," or (b) 757,975 Emission Credits for particular "Vintage Years."

705.     In fact, the $SO_2$ Transaction involved 924,582 Emission Credits owned by ENA for various particular "Vintage Years."

706.     Colonnade's alleged security interest in the Emission Credits was not perfected under applicable state law on the date of the filing of ENA's Chapter 11 petition.

707.     Accordingly, Colonnade's security interest in the unperfected Emission Credits is avoidable pursuant to Section 544(a) of the Bankruptcy Code.

## COUNT 38
### (Disallowance of Claim Under Section 502(d) of the Bankruptcy Code; Against Barclays and Besson Trust)

708.     The allegations of paragraphs 1 through 707 of this Complaint are incorporated herein by reference.

709.     By reason of the foregoing facts and pursuant to Bankruptcy Code Section 502(d), all of the claims of Barclays and Besson Trust must be disallowed unless they have turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code Section 550 as alleged in Counts 1 through 37 hereof.

*E.*    ***COUNTS 39 – 45***
        ***(Against BT/Deutsche Bank Defendants)***

### COUNT 39
### (Avoidance of Valhalla Setoff as a Postpetition Transaction)

710.    The allegations in paragraphs 1 through 709 of this Complaint are incorporated herein by reference.

711.    In or about May 2000, Enron and Deutsche Bank entered into Project Valhalla, a financing involving a "net loan" from Deutsche Bank to Enron of $50 million. Deutsche Bank intended Valhalla to provide approximately $40 million in tax benefits annually to Deutsche Bank because of differences in U.S. and German tax laws.

712.    In connection with the financing, Deutsche Bank transferred, or "loaned," Two Billion Dollars ($2,000,000,000.00) to Rheingold GmbH ("Rheingold"), an indirect German subsidiary of Enron, in return for participation rights entitling Deutsche Bank to distribution payments at a 7.7% rate of return.

713.    Rheingold used the $2 billion loan from Deutsche Bank to purchase preferred stock in Risk Management & Trading Corporation ("RMTC"), an Enron affiliate. RMTC then loaned the $2 billion to Enron, which loaned $1.95 billion of that amount to Deutsche Bank, New York under a structured note bearing interest at a stated rate of 8.74% (the "Deutsche Bank Note"). Among other things, the Deutsche Bank Note provides that Enron may use the interest accrued thereon to purchase derivative options from Deutsche Bank (the "Valhalla Derivatives").

714.    In or about December 2000, Deutsche Bank, London was substituted as the borrower under the Deutsche Bank Note.

715.    Deutsche Bank realized tax benefits from the two offsetting loans described in paragraph 713 above. Under German law, the distributions Deutsche Bank received from Rheingold pursuant to the participation rights were treated as tax-free dividends. Payments of interest by

Deutsche Bank, London to Enron Corp. on the Deutsche Bank Note were deductible. As a result, Deutsche Bank was able to use deductible payments to finance tax-exempt income.

716.     Although Enron did not receive substantial tax benefits from Project Valhalla, it did receive an "accommodation fee," which was the difference between the 7.7% interest Enron was obligated to pay on the participation rights and the 8.74% interest Enron received on the Deutsche Bank Note. This accommodation fee amounted to an annual fee to Enron in an amount approximately between $17 million and $20 million annually.

717.     At the same time as the two offsetting loans were entered into, Deutsche Bank and Valhalla GmbH ("Valhalla"), another Enron German subsidiary and the direct parent of Rheingold, entered into a put option agreement that gave Deutsche Bank the right to sell its participation rights in Rheingold to Valhalla upon the occurrence of certain specified events, such as a downgrade in Enron's long-term debt or credit rating (the "Put Option Agreement"). To exercise the "put," Deutsche Bank was required to specify a business day on which exercise of the put right "shall become effective." By the terms of the Put Option Agreement, the day so specified was required to be more than five business days after receipt of the put notice by Enron and Valhalla.

718.     In the Put Option Agreement, Enron agreed to guarantee Valhalla's repurchase obligations to Deutsche Bank (the "Enron/Valhalla Guaranty").

719.     The Put Option Agreement and the Enron/Valhalla Guaranty created two offsetting positions: Deutsche Bank, London's $1.95 billion obligation to Enron under the Deutsche Bank Note and Enron's $2 billion obligation to Deutsche Bank under the Enron/Valhalla Guaranty. The Deutsche Bank Note and the Enron/Valhalla Guaranty expressly allowed the parties to satisfy amounts owed under one agreement by "setting off" amounts owed under the other agreement.

720.    On or about November 28, 2001, Moody's Investors Services, Inc. and Standard & Poor's Corporation downgraded Enron's credit rating to below investment grade. This downgrade triggered a "put occurrence" under the Put Option Agreement.

721.    By letter dated November 28, 2001, Deutsche Bank advised Enron and Valhalla that it was exercising its put right under the Put Option Agreement.  Deutsche Bank set the "put date" (*i.e.*, the date on which exercise of the put right "shall become effective") as December 6, 2001.

722.    On or about November 29, 2001, Deutsche Bank sent a second letter to Enron and Valhalla in which Deutsche Bank purported to provide notice of its intention to set off Deutsche Bank, London's obligations under the Deutsche Bank Note by any and all amounts Enron owed or would owe to Deutsche Bank, including by virtue of the Enron/Valhalla Guaranty, "whether or not then due and payable and whether or not liquidated" (the "Valhalla Setoff").  Deutsche Bank did not specify the amount of the purported setoff in the letter, but again identified December 6, 2001 as the "settlement date" for completion of the transaction.

723.    On information and belief, as of December 2, 2001, Deutsche Bank was aware that Enron had commenced its Chapter 11 bankruptcy case.

724.    By letter dated December 5, 2001, Deutsche Bank advised Enron of its election to terminate an interest rate swap built into the Deutsche Bank Note that had been confirmed on May 2, 2000 (the "May 2, 2000 Swap").

725.    On information and belief, as of December 2, 2001, Deutsche Bank had not determined what amounts were due and owing by Deutsche Bank, London to Enron and by Enron to Deutsche Bank and, therefore, the amount of the Valhalla Setoff was not known.  Until the May 2, 2000 Swap and Valhalla Derivatives were terminated on December 6, 2001, Deutsche Bank was not able to determine the exact amount of the Valhalla Setoff.

726.     On or about December 6, 2001, Deutsche Bank sent two letters, one to Enron and the other to Valhalla.  The letter to Enron included a spreadsheet purporting to show that Deutsche Bank, London owed Enron a "settlement amount" of $3,717.357.11 based on the May 2, 2000 Swap. The letter to Valhalla stated that Valhalla owed Deutsche Bank $39,764,394.84 under the Put Option "after giving effect to the setoff" under the Deutsche Bank Note and the Enron/Valhalla Guaranty.

727.     By letter dated December 11, 2001, Deutsche Bank advised Enron that Enron owed Deutsche Bank $39,764,394.84 by virtue of the Enron/Valhalla Guaranty.

728.     On or about October 15, 2002, Deutsche Bank filed a Proof of Claim with this Court, asserting a claim of $36,047,037.73.  Such claim was intended to be the amount Valhalla owed to Deutsche Bank under the Put Option Agreement, minus the amount Deutsche Bank, London owed to Enron on the May 2, 2000 Swap.

729.     By the terms of the Deutsche Bank Note and the Put Option Agreement, Deutsche Bank's purported setoff of Deutsche Bank, London's obligations under the Deutsche Bank Note did not occur prior to the Petition Date.

730.     Deutsche Bank sought to complete the Valhalla Setoff with knowledge that Enron had already commenced its Chapter 11 bankruptcy case, and without seeking relief from the automatic stay under Bankruptcy Code Section 362.

731.     On information and belief, Deutsche Bank did not record the setoff on its books until the Swaps and currency exchanges could be calculated, on or after December 6, 2001.

732.     By completing the Valhalla Setoff after Enron commenced its chapter 11 bankruptcy case, and with knowledge of the pendency of that case, Deutsche Bank acted in willful violation of the automatic stay under Bankruptcy Code Section 362.

733.     By reason of the foregoing facts, the Valhalla Setoff constitutes an improper transfer of property of Enron's bankruptcy estate.

734.     The Valhalla Setoff was made in violation of the automatic stay and, accordingly is null, void and subject to avoidance under Bankruptcy Code Section 549(a).

735.     To allow Deutsche Bank to effect the Valhalla Setoff would prejudice other creditors and otherwise be inequitable.

**COUNT 40**
**(Recovery of Avoided Postpetition Transaction)**

736.     The allegations in paragraphs 1 through 735 of this Complaint are incorporated herein by reference.

737.     To the extent that the Valhalla Setoff is avoided under Bankruptcy Code Section 549, then, pursuant to Bankruptcy Code Section 550, Plaintiff may recover from Deutsche Bank, for the benefit of Enron's bankruptcy estate, the property transferred, or the value of such property.

**COUNT 41**
**(Avoidance of Preferential Transfers Related to the**
**BT/Deutsche Bank Preferential Transfers)**

738.     The allegations in paragraphs 1 through 737 of this Complaint are incorporated herein by reference.

739.     Within ninety (90) days before the Petition Date, Enron paid or caused to be paid to or for the benefit of Bankers Trust the aggregate sum of approximately Five Hundred Fifteen Thousand and Eighty-Eight Dollars ($515,088.00), which includes, but is not limited to, the transfers on or about the respective dates and in the respective amounts set forth below (collectively, the "BT/Deutsche Bank Preferential Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron | Deutsche Bank | 37161 | Teresa | $65,088.00 |
| Enron through ECT Investing Partners, L.P. | Bankers Trust | 37200 | Steele | $450,000.00 |
| | | | **TOTAL** | **$515,088.00** |

740.    The BT/Deutsche Bank Preferential Transfers constitute transfers of interests of Enron in property.

741.    At the time the BT/Deutsche Bank Preferential Transfers were made, the transferee was a creditor of Enron.

742.    Each of the BT/Deutsche Bank Preferential Transfers was made to or for the benefit of Deutsche Bank and/or Bankers Trust.

743.    Each of the BT/Deutsche Bank Preferential Transfers was made for or on account of an antecedent debt owed by Enron to the respective transferee before such transfer was made.

744.    At the time of each of the BT/Deutsche Bank Preferential Transfers, Enron was insolvent.

745.    The BT/Deutsche Bank Preferential Transfers are voidable as preferences under section 547(b) of the Bankruptcy Code. They enabled the respective transferee to receive more than it would have received in a case under chapter 7 of the Bankruptcy Code, if the BT/Deutsche Bank Preferential Transfers had not been made, and the respective transferee had received payment of Enron's indebtedness to it to the extent permitted by the Bankruptcy Code.

## COUNT 42
### (Avoidance of Fraudulent Transfers Related to the BT/ Deutsche Bank Fraudulent Transfers)

746.    The allegations in paragraphs 1 through 745 of this Complaint are incorporated herein by reference.

747.    On or within one (1) year before the Petition Date, Enron paid or caused to be paid to or for the benefit of Deutsche Bank and/or Bankers Trust the aggregate sum of approximately One Million Nine Hundred Ninety-Five Thousand Two Hundred Sixty-Two Dollars ($1,995,262.00), which includes, but is not limited to, the transfers on the respective dates and in the respective amounts set forth below (collectively, the "BT/Deutsche Bank Fraudulent Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron through ECT Investing Partners, L.P. | Bankers Trust | 1/31/01 | Steele | $450,000.00 |
| Enron through ECT Investing Partners, L.P. | Bankers Trust Co. | 4/30/01 | Steele | $450,000.00 |
| Enron | Deutsche Bank | 5/1/01 | Teresa | $65,087.00 |
| Enron | Deutsche Bank | 6/29/01 | Teresa | $65,087.00 |
| Enron through ECT Investing Partners, L.P. | Bankers Trust Co. | 7/30/01 | Steele | $450,000.00 |
| Enron | Deutsche Bank | 9/28/01 | Teresa | $65,088.00 |
| Enron through ECT Investing Partners, L.P. | Bankers Trust Co. | 11/6/01 | Steele | $450,000.00 |
| | | | **TOTAL** | **$1,995,262.00** |

748.     To the extent that a transfer identified in this Count also included in Count 41 is an avoidable preference payment, the transfer is pled alternatively as a fraudulent transfer.

749.     Each of the BT/Deutsche Bank Fraudulent Transfers constitutes transfers of interests of Enron in property.

750.     Enron received from Bankers Trust less than reasonably equivalent value in exchange for the BT/Deutsche Bank Fraudulent Transfers.

751.     Enron was insolvent on the date that the BT/Deutsche Bank Fraudulent Transfers were made or became insolvent as a result of the BT/Deutsche Bank Fraudulent Transfers.

752.     At the time the BT/Deutsche Bank Fraudulent Transfers were made, Enron intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

753.     At the time the BT/Deutsche Bank Fraudulent Transfers were made, Enron was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Enron was unreasonably small capital.

754. The BT/Deutsche Fraudulent Transfers are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT 43
**(Avoidance of Fraudulent Transfers Related to the BT/Deutsche Bank 544 Transfers Under Section 544 of the Bankruptcy Code and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

755. The allegations in paragraphs 1 through 754 of this Complaint are incorporated herein by reference.

756. Pursuant to Bankruptcy Code Section 544(b), Plaintiff has the rights of an existing unsecured creditor of Enron and/or ENA. Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

757. Enron paid or caused to be paid to or for the benefit of Deutsche Bank and Bankers Trust the aggregate sum of approximately Thirty-Eight Million Nine Hundred Sixty-Seven Thousand Three Hundred Thirty-Two Dollars and Ninety-Four Cents ($38,967,332.94) which includes, but is not limited to, the transfers on the respective dates and in the respective amounts set forth below (collectively, the "BT/Deutsche Bank 544 Transfers"):

| Transferor | Transferee | Transfer Date | Reference | Transfer Amount |
|---|---|---|---|---|
| Enron | Deutsche Bank | 10/5/00 | Osprey | $1,347,070.94 |
| Enron | Bankers Trust | 5/1/01 | Teresa | $65,087.00 |
| Enron | Bankers Trust | 6/29/01 | Teresa | $65,087.00 |
| Enron | Bankers Trust | 9/28/01 | Teresa | $65,088.00 |
| Enron | Bankers Trust/DB | Various dates | Cochise | $11,250,000.00 |
| Enron | Bankers Trust/DB | Various dates | Steele | $8,200,000.00 |
| Enron | Bankers Trust/DB | Various dates | Teresa | $6,625,000.00 |
| Enron | Bankers Trust/DB | Various dates | Tomas | $10,000,000.00 |
| | | | **TOTAL** | **$37,617,332.94** |

758. To the extent that a transfer identified in this Count is also identified as an avoidable preference payment or an avoidable fraudulent transfer under Section 548 of the Bankruptcy Code,

the transfer is pled alternatively as a fraudulent transfer under applicable state law and Section 544 of the Bankruptcy Code.

759.    Enron received from the respective transferees of the BT/Deutsche Bank 544 Transfers less than reasonably equivalent value in exchange for the BT/Deutsche Bank 544 Transfers.

760.    The BT/Deutsche Bank Transfers constitute transfers of interests of Enron in property.

761.    Enron was insolvent on the date that the BT/Deutsche Bank 544 Transfers were made or became insolvent as a result of the BT/Deutsche Bank 544 Transfers.

762.    At the time the BT/Deutsche Bank 544 Transfers were made, Enron intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

763.    At the time the BT/Deutsche Bank 544 Transfers were made, Enron was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Enron was unreasonably small capital.

## COUNT 44
### (Recovery of Avoided Transfers
### Related to the BT/Deutsche Bank Preferential Transfers, the BT/Deutsche Bank
### Fraudulent Transfers, and the BT/Deutsche Bank 544 Transfers)

764.    The allegations in paragraphs 1 through 763 of this Complaint are incorporated herein by reference.

765.    To the extent that the BT/Deutsche Bank Preferential Transfers are avoided under Bankruptcy Code Section 547 and/or the BT/Deutsche Bank Fraudulent Transfers are avoided under Bankruptcy Code Section 548 and/or the BT/Deutsche Bank 544 Transfers are avoided under Section 544, then, pursuant to Bankruptcy Code Section 550, Plaintiff may recover from the

respective transferees of these transfers, for the benefit of the Enron's bankruptcy estate, the property transferred, or the value of such property.

## COUNT 45
### (Disallowance of Claim Under Section 502(d) of the Bankruptcy Code; Against Bankers Trust and Deutsche Bank)

766.     The allegations in paragraphs 1 through 765 of this Complaint are incorporated herein by reference.

767.     By reason of the facts alleged in Counts 39 through 44 above and pursuant to Bankruptcy Code Section 502(d), the claims of Bankers Trust and Deutsche Bank must be disallowed unless the respective defendant has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code Section 550.

**F.     *COUNTS 46 - 50***
    ***(Against Multiple Defendant Group)***

## COUNT 46
### (Avoidance of Intentional Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code; Against All Defendants)

768.     The allegations in paragraphs 1 through 767 of this Complaint are incorporated herein by reference.

769.     In furtherance of their scheme to manipulate and misstate Enron's financial statements, the Insiders, in breach of their fiduciary duties, caused the Plaintiff to make transfers of interests of the Plaintiff in property, and/or to incur obligations to the Defendant(s) and/or their affiliates, on or within one (1) year before the Petition Date (the "Intentional Fraudulent Transfers").

770.     The Intentional Fraudulent Transfers were caused by the Insiders in connection with the following transactions described in this Complaint:

| Transaction Name | Defendant | Date |
|---|---|---|
| Roosevelt | Citigroup | 12/30/1998 |
| Truman | Citigroup | 06/29/1999 |
| Jethro | Citigroup | 09/29/1999 |

| Transaction Name | Defendant | Date |
|---|---|---|
| Yosemite I | Citigroup | 11/18/1999 |
| Nixon | Citigroup | 12/14/1999 |
| Yosemite II | Citigroup | 02/23/2000 |
| Yosemite III | Citigroup | 08/25/2000 |
| Yosemite IV | Citigroup | 05/24/2001 |
| June 2001 | Citigroup | 06/28/2001 |
| Nighthawk | Citigroup | 12/1997 |
| Nahanni | Citigroup | 12/1999 |
| Bacchus | Citigroup | 12/2000 |
| Sundance | Citigroup | 06/01/2001 |
| | | |
| Chase IV Prepay | Chase | 12/1997 |
| Chase VII Prepay | Chase | 06/1998 |
| Chase VIII Prepay | Chase | 12/1998 |
| Chase IX Prepay | Chase | 06/1999 |
| Chase X Prepay | Chase | 06/2000 |
| Fishtail | Chase | 12/2000 |
| Chase XI Prepay | Chase | 12/2000 |
| Chase XII Prepay | Chase | 09/2001 |
| | | |
| Riverside III | CIBC | 1998 |
| Riverside IV | CIBC | 1998 |
| Pilgrim | CIBC | 12/1998 |
| Riverside V | CIBC | 1999 |
| Leftover | CIBC | 1999 |
| Nimitz | CIBC | 1999 |
| Ghost | CIBC | 1999 |
| Alchemy | CIBC | 1999 |
| Discovery | CIBC | 1999 |
| Hawaii | CIBC | 1999 |
| Specter | CIBC | 03/2000 |
| | | |
| Chewco | Barclays | 12/30/1997 |
| Roosevelt | Barclays | 12/1998 |
| Nixon | Barclays | 12/1999 |
| JT Holdings, Inc. | Barclays | 12/7/2000 |
| Prepaid Oil Swap | Barclays | 12/15/2000 |
| Nikita | Barclays | 09/2001 |
| S02 | Barclays | 10/30/2001 |
| | | |
| Nigerian Barge | Merrill Lynch | 12/29/1999 |
| 1999 Electricity Trades | Merrill Lynch | 12/31/1999 |
| | | |
| Teresa | BT/Deutsche Bank | 03/21/1997 |
| Steele | BT/Deutsche Bank | 10/31/1997 |
| Renegade | BT/Deutsche Bank | 12/23/1998 |

| Transaction Name | Defendant | Date |
|---|---|---|
| Cochise | BT/Deutsche Bank | 01/28/1999 |

771.     Each transfer of an interest of the Plaintiff in property in connection with or related to the transactions identified in this Court, including each fee, principal, interest and other payment or transfer of funds, was an Intentional Fraudulent Transfer as defined herein.

772.     Each Intentional Fraudulent Transfer was caused by the Insiders in breach of their fiduciary duties with actual intent to hinder, delay or defraud one or more entities to which Plaintiff was or became, on or after the date that such transfers were made or such obligations were incurred, indebted.  These transfers were made to assist the Insiders in presenting misleading or incomplete financial information about Enron and diminished the bankruptcy estates.

## COUNT 47
### (Avoidance of Intentional Fraudulent Transfers and Conveyances Under Section 544 of the Bankruptcy Code and Applicable State Law; Against All Defendants)

773.     The allegations in paragraphs 1 through 772 of this Complaint are incorporated herein by reference.

774.     In furtherance of their scheme to manipulate and misstate Enron's financial statements, the Insiders, in breach of their fiduciary duties, caused the Plaintiff to make transfers of interests of the Plaintiff in property, and/or to incur obligations to the Defendant(s) and/or their affiliates before the Petition Date (the "Intentional Fraudulent Conveyances").

775.     The Intentional Fraudulent Conveyances were caused by the Insiders in connection with the transactions identified in Count 46 of the Complaint.

776.     Each transfer of an interest of the Plaintiff in property in connection with or related to the transactions identified in Count 46, including each fee, principal, interest and other payment or transfer of funds, was an Intentional Fraudulent Conveyance as defined herein.

777.     Each Intentional Fraudulent Conveyance was caused by the Insiders in breach of their fiduciary duties with actual intent to hinder, delay or defraud one or more entities to which Plaintiff was or became, on or after the date that such transfers were made or such obligations were incurred, indebted.  These transfers were made to assist the Insiders in presenting misleading or incomplete financial information about Enron and diminished the bankruptcy estates.

778.     Each Intentional Fraudulent Conveyance is avoidable under Bankruptcy Code § 544 and applicable state law.

## COUNT 48
### (Recovery of Avoided Intentional Fraudulent Transfers and Conveyances Under Section 550 of the Bankruptcy Code; Against All Defendants)

779.     The allegations in paragraphs 1 through 778 of this Complaint are incorporated herein by reference.

780.     To the extent that any Intentional Fraudulent Transfer or Conveyance is avoided under Bankruptcy Code §§ 544 or 548(a)(1)(A), then pursuant to Bankruptcy Code § 550, Plaintiff may recover the property transferred, or the value of such property, for the benefit of the bankruptcy estates.

## COUNT 49
### (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code; Against All Defendants)

781.     The allegations in paragraphs 1 through 780 of this Complaint are incorporated herein by reference.

782.     By reason of the foregoing facts and pursuant to Bankruptcy Code § 502(d) the claims of each Defendant should be disallowed unless and until the Defendant has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which the Defendant is liable under Bankruptcy Code § 550.

537519v1/007457

## COUNT 50
### (Equitable Subordination Under Sections 510(c)(1) and 105(a) of the
### Bankruptcy Code; Against Defendants and Affiliates Submitting Proofs of Claim)

783.  The allegations in paragraphs 1 through 783 of this Complaint are incorporated herein by reference.

784.  This Count is brought on behalf of Enron, ENA, and all of their affiliated debtor entities in the chapter 11 cases jointly administered under case number 01-16034 [AJG] (collectively, the "Debtors").

785.  Plaintiff alleges this claim against all Defendants, affiliates of Defendants and others that have asserted claims against any of the Debtors that may, directly or indirectly, benefit any Defendant.

786.  The Defendants engaged in inequitable conduct, including conduct described in this Complaint, that has resulted in injury to creditors or the conferring of an unfair advantage on the Defendants.  This inequitable conduct has resulted in harm to the Plaintiff and to its entire creditor body, in that general unsecured creditors have been misled as to the true financial condition of Plaintiff, general unsecured creditors have been induced to extend credit without knowledge of the actual facts regarding Plaintiff's financial condition, and general unsecured creditors are less likely to recover the full amounts due them because of the conduct of the Defendants.

787.  Under principles of equitable subordination, all claims asserted against the Debtors by, on behalf of, or for the benefit of the Defendants or their affiliated entities, should be subordinated for purposes of distribution, pursuant to Sections 510(c)(1) and 105(a) of the Bankruptcy Code.

788.  Plaintiff cannot at this time identify each and every one of the voluminous claims that have been filed which may, indirectly, be for the benefit of, or on behalf of, any of the Defendants or their affiliates, because information necessary to make this determination is exclusively in the

possession of others. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Defendants or their affiliates, directly or indirectly, against the Debtors are subordinated pursuant to Sections 510(c)(1) and 105(a) of the Bankruptcy Code. No funds which would otherwise be paid to general unsecured creditors should be paid to any of the Defendants or their affiliates.

a.    Direct claims by any of the Defendants or their affiliates against the Debtors should be subordinated.

b.    Claims asserted by other entities (such as agents, lead lenders, SPEs, or trustees) against the Debtors, which claims are, in whole or in part, directly or indirectly, on behalf of or for the benefit of the Defendants or their affiliates, should be subordinated to that extent.

789.    Because of the close relationships, common ownership and control, common decision-making, joint roles in the transactions and conduct at issue, overlapping director, officer, and employee relationships and functions, and shared benefits among affiliated entities within the same financial institution family, the claims of all entities so affiliated with any Defendant which engaged in inequitable conduct should be subordinated for purposes of distribution pursuant to Sections 510(c)(1) and 105(a) of the Bankruptcy Code.

790.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

### COUNT 51
### Aiding and Abetting Breach of Fiduciary Duty
### (Enron Against all Bank Defendants)

791.    Enron realleges and incorporates by reference the allegations in paragraphs 1 through 790 in their entirety.

792.    As officers, senior officers, and/or employees with management responsibility at Enron and/or its subsidiaries, the Insiders owed Enron fiduciary duties. These duties required the

Insiders at all times to act on behalf of Enron in good faith, to exercise the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and to conduct themselves in a manner they reasonably believed to be in the best interest of the company. As part of their fiduciary duties, the Insiders at all times were required to be honest and candid and to make complete disclosure in their dealings with the company and its Board of Directors. Further, in their communications with investors the Insiders were obligated to do so honestly, candidly and completely in all material respects.

793. By virtue of the acts and omissions described in this Complaint, the Insiders repeatedly violated their fiduciary duties to Enron. The Insiders violated their duties of good faith, due care, and loyalty by causing Enron to enter into each of the numerous structured finance transactions described in this Complaint, including the prepay, FAS 140, minority interest, tax and other transactions, for the purpose and with the effect of manipulating and misstating Enron's financial condition. The Insiders also breached their fiduciary duties of good faith, due care, and loyalty to Enron by reporting or causing to be reported in Enron's financial statements the financial effects of these transactions as though they were valid and in compliance with applicable accounting and other requirements, when, as described in this Complaint, they were not. With respect to those same structured finance transactions, the Insiders violated their duties to conduct themselves honestly, candidly and with full disclosure in their dealings with the company and its Board of Directors. Further, the Insiders breached their fiduciary duty of honesty, candor and complete disclosure by causing Enron's communications with its investors pertaining to these transactions and their effects on Enron's financial statements to be materially misleading and incomplete.

794. By virtue of the acts and omissions described in this Complaint, Insiders Fastow, Kopper, and Glisan also breached their duties of good faith, due care, and loyalty by entering into transactions with Enron, directly and through entities in which they or members of their families

owned an interest, in which they or their family members derived an improper personal benefit at the expense of the company. These Insiders also breached their duties of good faith, due care, and loyalty by arranging for and facilitating transactions between Enron and other officers and employees of the company, acting directly and through entities in which they or members of their families owned an interest, in which Enron officers and employees derived an improper personal benefit at the expense of the company. In each of these transactions, these Insiders and Causey breached their fiduciary duties by failing to disclose to the company all material facts of each such transaction and/or by deliberately failing to supervise these transactions.

795.   By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to the Insiders in breaching their fiduciary duties to Enron. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants participated with actual knowledge that the purpose of the transaction was to manipulate and misstate Enron's financial statements and that the transaction would be reported by Enron in a materially misleading manner. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants gave substantial assistance to the Insiders by designing, implementing, financing, purporting to invest in, obtaining others to invest in, and/or closing the transaction and/or by causing their subsidiaries or affiliates to do the same.

796.   By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to those Insiders who breached their duties of good faith, due care, and loyalty by entering into transactions with Enron, directly and through entities in which they or members of their families owned an interest, in which they or members of their families derived an improper personal benefit. In each of the transactions described in this Complaint in which an Insider and/or a member of his family improperly derived a personal benefit from a transaction with Enron, one or more of the Bank Defendants participated with actual knowledge that the transaction

was designed to or would benefit the Insider at Enron's expense. In each of these transactions, one or more of the Bank Defendants and/or their officers gave substantial assistance to the Insiders by investing, or by obtaining others to invest, in the transaction or the entity formed by the Insiders to participate in the transaction.

797. As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

## COUNT 52
### Aiding and Abetting Fraud
### (Enron Against all Bank Defendants)

798. Enron realleges and incorporates by reference the allegations in paragraphs 1 through 797 in their entirety.

799. The Insiders, as officers, senior officers, and/or employees with management responsibility at Enron and/or its subsidiaries, owed Enron fiduciary duties. Specifically, among others, the Insiders owed Enron a fiduciary duty to be honest and candid and to make complete disclosure in their dealings with the company and its Board of Directors.

800. From 1997 through 2001, the Insiders knowingly misrepresented and/or omitted to disclose to the company and its Board of Directors (1) the true nature and/or purpose of the structured finance transactions listed below, including that they would be reported in Enron's financial statements in a manner that violated GAAP and/or was otherwise misleading; and (2) the wrongful manipulation and misstatement of Enron's financial statements directly caused by the structured finance transactions listed below. The structured finance transactions are Roosevelt,

Truman, Jethro, Yosemite I, Nixon, Yosemite II, Yosemite III, Yosemite IV, June 2001 prepay, Nighthawk, Nahanni, Bacchus, Sundance Industrial, Chase VI prepay, Chase VII prepay, Chase VIII prepay, Chase IX prepay, Chase X prepay, Chase XI prepay, Chase XII prepay, Fishtail, Prepaid Oil Swap, Nikita, JT Holdings Inc., $SO_2$, Chewco, Steele, Cochise, Teresa, Tomas, Renegade, Valhalla, Riverside III, Riverside IV, Pilgrim, Riverside V, Leftover, Nimitz, Ghost, Alchemy, Discovery, Specter, Hawaii, Nigerian Barge, and 1999 Electricity Trade.

801. With respect to these structured finance transactions, the Insiders knowingly caused to be included in Enron's internal and publicly disseminated financial statements misleading information about the company's cash flow from operating and financing activities, income and net income, debt and price risk management liabilities, interest expense, and other information, as well as the financial measures, ratios and other calculations which are derived from or are based upon these figures.

802. In addition, with respect to these structured finance transactions, the Insiders knowingly made misrepresentations and/or omitted to disclose material information to the company and/or its Board of Directors at the Board meetings and Board committee meetings listed below, all of which took place prior, or in some cases immediately prior, to the closing of one or more of the structured finance transactions. Once each of the structured finance transactions listed below closed, and its financial effects were captured initially in Enron's internal and publicly disseminated financial statements, at no time thereafter did any of the Insiders reveal to the company or its Board of Directors (1) the true nature and/or purpose of the structured finance transactions, including that they had been reported in Enron's financial statements in a manner that violated GAAP and/or was otherwise misleading, and/or (2) the wrongful manipulation and misstatement of Enron's financial statements directly caused by these structured finance transactions.

### *Roosevelt*

803.   The Insiders did not disclose to Enron that the accounting for the Roosevelt transaction, which closed approximately December 30, 1998, was inconsistent with GAAP or was otherwise misleading.

804.   The Insiders did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13, 1998, and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 18, 1998)

805.   Insiders Causey and Fastow did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, the Finance Committee meeting on December 7, 1998, and the Executive Committee meeting on December 18, 1998.

806.   Insider McMahon did not disclose to Enron that the accounting for the Roosevelt transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, and the Finance Committee meeting on December 7, 1998.

### *Truman*

807.   The Insiders did not disclose to Enron that the accounting for the Truman transaction, which closed approximately June 29, 1999, and was scheduled to continue until September, 1999, was inconsistent with GAAP or otherwise misleading.

808.   The Insiders did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including a meeting on June 28, 1999, one day before the transaction closed), at

Finance Committee meetings in and around the time of the transaction (including a meeting on May 3,1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 7, June 11, and June 22, 1999).

809.     Insider Fastow did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 28, 1999, one day before the transaction closed, and at the Finance Committee meeting on May 3, 1999.

810.     Insider Causey did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

811.     Insider McMahon did not disclose to Enron that the accounting for the Truman transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee Meeting on May 3, 1999, and at the Executive Committee meeting on June 22, 1999.

*Jethro*

812.     The Insiders did not disclose to Enron that the accounting for the Jethro transaction, which closed approximately September 29, 1999, and was scheduled to continue until November, 1999, was inconsistent with GAAP or otherwise misleading.

813.     The Insiders did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10 and September 17, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 9, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on September 3, September 14, and September 24, 1999).

814.     Insider Fastow did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 9, 1999.

815.     Insider McMahon did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on September 17, 1999.

816.     Insider Causey did not disclose to Enron that the accounting for the Jethro transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 9, 1999.

*Yosemite I*

817.     The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction, which closed approximately November 18, 1999, and was scheduled to continue until December, 2004, was inconsistent with GAAP or otherwise misleading.

818.     The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10, September 17, October 11-12, November 5, and November 18, 1999, the same day the project closed).

819.     The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading in a Finance Committee meeting on May 3, 1999, including in a mention of the Yosemite I transaction in the materials that were provided to the Finance Committee by Insider McMahon as part of the Treasurer's report.

820.     The Insiders did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading in a Finance Committee meeting

on August 9, 1999, including in a mention of the Yosemite I transaction in the materials that were provided to the Finance Committee.

821.    Insider Causey did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 10 and October 11-12, 1999 and at the Finance Committee meetings on May 3 and August 9, 1999.

822.    Insider Fastow did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 11-12, 1999 and at the Finance Committee meetings on May 3 and August 9, 1999.

823.    Insider McMahon did not disclose to Enron that the accounting for the Yosemite I transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 11-12, 1999.

*Nixon*

824.    The Insiders did not disclose to Enron that the accounting for the Nixon transaction, which closed approximately December 14, 1999, was inconsistent with GAAP or otherwise misleading.

825.    The Insiders did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999, one day prior to closing), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

826. Insider Causey did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

827. Insider McMahon and Andrew Fastow did not disclose to Enron that the accounting for the Nixon transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

*Yosemite II*

828. The Insiders did not disclose to Enron that the accounting for the Yosemite II transaction, which closed approximately February 23, 2000, and was scheduled to continue until approximately January 2007, was inconsistent with GAAP or otherwise misleading.

829. The Insiders did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18 and December 14, 1999, and February 7-8, 2000).

830. Insider McMahon did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on December 13, 1999, including in a mention of the Yosemite II transaction in a chart in his Treasurer's report.

831. Insider Causey did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Board meeting on December 14, 1999.

832. Insiders Causey and Fastow did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on October 6, 2000, including in a mention of Yosemite II in a list of

transactions, during a Finance Committee meeting on December 13, 1999, including in a mention of the Yosemite II transaction in a chart in the Treasurer's report, and during Audit and Compliance and Finance Committee meetings on February 12, 2001, including in a mention of Yosemite II in a list of investment activity for 2000.

833.     Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Yosemite II transaction was inconsistent with GAAP or otherwise misleading during a Finance Committee meeting on February 7-8, 2000.

### *Yosemite III*

834.     The Insiders did not disclose to Enron that the accounting for the Yosemite III transaction, which closed approximately August 25, 2000, and was scheduled to continue until July, 2005, was inconsistent with GAAP or otherwise misleading

835.     The Insiders did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 1, 7-8, and 24, 2000), in Finance Committee meetings in and around the time of the transaction (including a meeting on August 7, 2000), and in Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

836.     Insider Causey did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the August 1 and August 24, 2000, Board meetings, and at the August 7, 2000 Finance Committee meeting.

837.     Insider Fastow did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive Committee meeting, at the August 1, 2000 Board meeting, and at the August 7, 2000 Finance Committee meeting.

838.     Insider Glisan did not disclose to Enron that the accounting for the Yosemite III transaction was inconsistent with GAAP or otherwise misleading at the June 22, 2000 Executive Committee meeting, at the August 1, 2000 Board meeting, and at the August 7, 2000 Finance Committee Meeting.

*Yosemite IV*

839.     The Insiders did not disclose to Enron that the accounting for the Yosemite IV transaction, which closed approximately May 24, 2001, was inconsistent with GAAP or otherwise misleading.

840.     The Insiders did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on March 16 and May 1, 2001), Finance Committee meetings in and around the time of the transaction (including a meeting on April 30, 2001), and Executive Committee meetings in and around the time of the transaction (including a meeting on March 12, 2001).

841.     Insider Causey did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001, and the Finance Committee meeting on April 30, 2001.

842.     Insider McMahon did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001.

843.     Insider Fastow did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on April 2001 (including in a mention of "certain prepay transactions that were underway") and April 30, 2001, and at the Executive Committee meeting on March 12, 2001.

844.    Insider Glisan did not disclose to Enron that the accounting for the Yosemite IV transaction was inconsistent with GAAP or otherwise misleading in a Finance Committee meeting on March 12, 2001.

*June 2001*

845.    The Insiders did not disclose to Enron that the accounting for the June 2001 transaction, which closed approximately June 28, 2001, was inconsistent with GAAP or otherwise misleading.

846.    The Insiders did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 1 and June 13, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on April 30, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

847.    Insiders Fastow and Glisan did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001, and at the Board meeting on June 13, 2001.

848.    Insider Causey did not disclose to Enron that the accounting for the June 2001 transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 13, 2001.

*Nighthawk*

849.    The Insiders did not disclose to Enron that the accounting for the Nighthawk transaction, which closed approximately December 26, 1997, was inconsistent with GAAP or otherwise misleading.

850.     The Insiders did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Board and Finance Committee meetings at which the Nighthawk project was presented, including in a Finance Committee meeting on December 8, 1997, a Board meeting on December 9, 1997, a Board meeting on February 1, 1999, and a Board meeting on September 17, 1999.

851.     Insider Causey did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 8, 1997, when Nighthawk was presented, and at the Board meeting on February 1, 1999, when the restructuring of Nighthawk was presented.

852.     Insider Fastow did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 8, 1997, when Nighthawk was presented.

853.     Insider McMahon did not disclose to Enron that the accounting for the Nighthawk transaction was inconsistent with GAAP or otherwise misleading at Board meetings on February 1 and September 17, 1999, when the restructuring of Nighthawk was presented.

*Nahanni*

854.     The Insiders did not disclose to Enron that the accounting for the Nahanni transaction, which closed approximately December 17, 1999, was inconsistent with GAAP or otherwise misleading.

855.     The Insiders did not disclose to Enron that the accounting for the Nahanni transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13,

1999, at which the transaction was referenced), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

856.     Insiders McMahon, Causey, and Fastow did not disclose to Enron that the accounting for the Nahanni transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999, at which Nahanni was mentioned in a Treasurer's report.

*Bacchus*

857.     The Insiders did not disclose to Enron that the accounting for the Bacchus transaction, which closed approximately December 20, 2000, was inconsistent with GAAP or otherwise misleading.

858.     The Insiders did not disclose to Enron that the accounting for the Bacchus transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and December 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000).

859.     Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the Bacchus transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Sundance Industrial*

860.     The Insiders did not disclose to Enron that the accounting for the Sundance transaction, which closed approximately June 1, 2001, was inconsistent with GAAP or otherwise misleading.

861.     The Insiders did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on March 16 and May 1, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on April 30, 2001), and Executive Committee meetings in and around the time of the transaction (including a meeting on March 12, 2001).

862.     Insider Causey did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001, and the Finance Committee meeting on April 30, 2001.

863.     Insider McMahon did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on May 1, 2001.

864.     Insider Fastow did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001, and the Executive Committee meeting on March 12, 2001.

865.     Insider Glisan did not disclose to Enron that the accounting for the Sundance transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on April 30, 2001.

### Chase VI Prepay

866.     The Insiders did not disclose to Enron that the accounting for the Chase VI prepay transaction, which was executed approximately December 18, 1997 was inconsistent with GAAP or otherwise misleading.

867.     The Insiders did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around

the time of the transaction (including meetings on October 5, October 14, and December 9, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on October 13 and December 8, 1997), and Executive Committee meetings in and around the time of the transaction (including meetings on October 21, November 5, and November 14, 1997).

868.    Insider Causey did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 14, 1997, and the Finance Committee meetings on October 13 and December 8, 1997.

869.    Insider Fastow did not disclose to Enron that the accounting for the Chase VI prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 14, 1997, and the Finance Committee meetings on October 13 and December 8, 1997, and at the Executive Committee meeting on November 5, 1997.

### *Chase VII Prepay*

870.    The Insiders did not disclose to Enron that the accounting for the Chase VII prepay transaction, which closed approximately June 26, 1998 was inconsistent with GAAP or otherwise misleading.

871.    The Insiders did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4-5 and June 22, 1998, four days before the deal closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 4, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 3 and June 12, 1998).

872.    Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Board

meeting on June 22, 1998, four days before the deal closed, and at the Finance Committee meeting on May 4, 1998.

873.     Insider Causey did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 4, 1998.

### *Chase VIII Prepay*

874.     The Insiders did not disclose to Enron that the accounting for the Chase VIII prepay transaction, which closed approximately December 1, 1998 was inconsistent with GAAP or otherwise misleading.

875.     The Insiders did not disclose to Enron that the accounting for the Chase VIII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 10-11 and October 12-13, 1998), at Finance Committee meetings in and around the time of the transaction (including meetings on October 12 and December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on September 11, November 2, November 17, and November 23, 1998).

876.     Insider Causey did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 12-13, 1998, at the Finance Committee meetings on October 12 and December 7, 1998, and at the Executive Committee meeting on November 2, 1998.

877.     Insider Fastow did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on October 12 and December 7, 1998, and the Executive Committee meetings on September 11, November 2, and November 23, 1998.

878.     Insider McMahon did not disclose to Enron that the accounting for the Chase VII prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on October 12 and December 7, 1998, and at the Executive Committee meeting on November 2, 1998.

### Chase IX Prepay

879.     The Insiders did not disclose to Enron that the accounting for the Chase IX prepay transaction, which closed approximately June 28, 1999, and scheduled to continue until June 30, 2004, was inconsistent with GAAP or otherwise misleading.

880.     The Insiders did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 19 and June 28, 1999, the same day the deal closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including meetings on June 7, June 11, and June 22, 1999).

881.     Insider Fastow did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on June 28, 1999, and the Finance Committee meeting on May 3, 1999.

882.     Insider McMahon did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999, and the Executive Committee meeting on June 22, 1999.

883.     Insider Causey did not disclose to Enron that the accounting for the Chase IX prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

*Chase X Prepay*

884.    The Insiders did not disclose to Enron that the accounting for the Chase X prepay transaction, which was executed approximately June 28, 2000, and scheduled to continue until June 30, 2005, was inconsistent with GAAP or otherwise misleading.

885.    The Insiders did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18 and December 14, 1999, February 7-8, April 3, and May 2, 2000), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, February 7 and May 1, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20, March 2, May 17, June 1, and June 22, 2000).

886.    Insider Causey did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on December 14, 1999 and May 2, 2000, and at the Finance Committee meetings on December 13, 1999, and May 1, 2000.

887.    Insider Fastow did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on April 3, 2000, at the Finance Committee meetings on December 13, 1999, February 7, 2000, and May 1, 2000, and the Executive Committee meeting on May 17, June 1, and June 22, 2000.

888.    Insider McMahon did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999 and February 7, 2000.

889.     Insider Glisan did not disclose to Enron that the accounting for the Chase X prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 1, 2000, and the Executive Committee meeting on June 22, 2000.

*Chase XI Prepay*

890.     The Insiders did not disclose to Enron that the accounting for the Chase XI prepay transaction, which closed approximately December 28, 2000, and scheduled to continue until November, 2005, was inconsistent with GAAP or otherwise misleading.

891.     The Insiders did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on December 7 and December 21, 2000).

892.     Insider Fastow did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000, and the Executive Committee meeting on December 21, 2000.

893.     Insiders Glisan and McMahon did not disclose to Enron that the accounting for the Chase XI prepay transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Chase XII Prepay*

894.     The Insiders did not disclose to Enron that the accounting for the Chase XII prepay transaction, which closed approximately September 28, 2001, and was scheduled to continue until March 25, 2002, was inconsistent with GAAP or otherwise misleading.

895.     The Insiders did not disclose to Enron that the accounting for the Chase XII prepay transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 13-14 and 27, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 13, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

896.     Insiders Causey and Fastow did not disclose to Enron that the accounting for the Chase XII prepay transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on August 13-14, 2001, and a Finance Committee meeting on August 13, 2001.

*Fishtail*

897.     The Insiders did not disclose to Enron that the accounting for the Fishtail transaction, which was executed approximately December 19, 2000, was inconsistent with GAAP or otherwise misleading.

898.     The Insiders did not disclose to Enron that the accounting for the Fishtail transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and December 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000),

899.     Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the Fishtail transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Prepaid Oil Swap*

900.     The Insiders did not disclose to Enron that the accounting for the Prepaid Oil Swap transaction, which closed approximately December 15, 2000, was inconsistent with GAAP or otherwise misleading.

901.     The Insiders did not disclose to Enron that the accounting for the Prepaid Oil Swap transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 7 and 12, 2000), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 11, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on December 7, 2000).

902.     Insiders Causey, Fastow, Glisan, and McMahon did not disclose to Enron that the accounting for the Prepaid Oil Swap transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 11, 2000.

*Nikita*

903.     The Insiders did not disclose to Enron that the accounting for the Nikita transaction, which closed approximately September 28, 2001, was inconsistent with GAAP or otherwise misleading.

904.     The Insiders did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on August 13-14 and 27, 2001), at Finance Committee meetings in and around the time of the transaction (including a meeting on August 13, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

905.     Insiders Causey and Fastow did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on August 13-14, 2001, and the Finance Committee meeting on August 13, 2001.

906.     Insider Glisan did not disclose to Enron that the accounting for the Nikita transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 13, 2001.

### *JT Holdings Inc.*

907.     The Insiders did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction, which closed approximately December 7, 2000, was inconsistent with GAAP or otherwise misleading.

908.     The Insiders did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 7, October 27, and December 7, 2000, the same day the project closed), at Finance Committee meetings in and around the time of the transaction (including a meeting on October 6, 2000), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

909.     Insider Causey did not disclose to Enron that the accounting for the JT Holdings, Inc., transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 27, 2000, and at the Finance Committee meeting on October 6, 2000.

910.     Insider Fastow did not disclose to Enron that the accounting for the JT Holdings, Inc., transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on October 27, 2000, at the Executive Committee meeting on June 22, 2000, and at the Finance Committee meeting on October 6, 2000.

911.    Insider Glisan did not disclose to Enron that the accounting for the JT Holdings, Inc. transaction was inconsistent with GAAP or otherwise misleading at the Executive Committee meeting on June 22, 2000, and at the Finance Committee meeting on October 6, 2000.

*SO$_2$*

912.    The Insiders did not disclose to Enron that the accounting for the SO$_2$ transaction, which closed approximately December 1, 2001, was inconsistent with GAAP or otherwise misleading.

913.    The Insiders did not disclose to Enron that the accounting for the SO$_2$ transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 1, 2001 (the date the deal closed) and eleven dates in November, 2001), at Finance Committee meetings in and around the time of the transaction (including meetings on August 13 and October 8, 2001), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 21, 2001).

914.    Insider McMahon did not disclose to Enron that the accounting for the SO$_2$ transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on December 1, 2001, or in November.

915.    Insiders Causey, Fastow, and Glisan did not disclose to Enron that the accounting for the SO$_2$ transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on August 13 and October 8, 2001.

*Chewco*

916.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction, which closed on December 30, 1997, was inconsistent with GAAP or otherwise misleading.

917.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at a November 5, 1997 Executive Committee meeting in which the project was presented for approval.

918.    In presenting the Chewco transaction to the Executive Committee, Insider Fastow described Chewco Investments, L.L.C. as "a special purpose vehicle not affiliated with the Company."

919.    The Insiders did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 5, 1997, October 14, 1997, and December 9, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on October 13, 1997 and December 8, 1997), and at other Executive Committee meetings in and around the time of the transaction (including meetings on October 21, 1997, November 14, 1997 and December 29, 1997).

920.    Insider Causey did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the October 14, 1997 Board meeting and the October 13, 1997 and December 8, 1997 Finance Committee meetings.

921.    Insider Fastow did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the October 14, 1997 Board meeting, the October 13, 1997 and December 8, 1997 Finance Committee meetings, and the November 5, 1997 Executive Committee meeting.

922.    Insider Kopper did not disclose to Enron that the accounting for the Chewco transaction was inconsistent with GAAP or otherwise misleading at the November 5, 1997 Executive Committee meeting.

*Steele*

923.     The Insiders did not disclose to Enron that the accounting for the Steele transaction, which closed approximately October 31, 1997, was inconsistent with GAAP or otherwise misleading.

924.     The Insiders did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 6, May 28, August 11, October 5, and October 14, 1997), at Finance Committee meetings in and around the time of the transaction (including meetings on May 5, August 10, and October 13, 1997), and at Executive Committee meetings in and around the time of the transaction (including meetings on May 23, June 5, July 10, August 21, and October 21, 1997).

925.     Insider Causey did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 11 and October 14, 1997, at the Finance Committee meetings on May 5, August 10, and October 13, 1997, and at the Finance Committee meeting on February 9, 1998, in which Project Steele appeared on a document provided to the Finance Committee.

926.     Insider Fastow did not disclose to Enron that the accounting for the Steele transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on August 11, October 5, and October 14, 1997, at the Finance Committee meetings on May 5, August 10, and October 13, 1997 and February 9, 1998 (in which Project Steele appeared on a document provided to the Finance Committee), and at the Executive Committee meetings on June 5, July 10, and August 21, 1997.

*Cochise*

927.     The Insiders did not disclose to Enron that the accounting for the Cochise transaction, which was executed approximately January 28, 1999, was inconsistent with GAAP or otherwise misleading.

928.     The Insiders did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading during a Board meeting on February 28, 1999, at which the project was discussed, an Executive Committee meeting on December 18, 1998, at which the project was discussed, or during a Finance Committee meeting on December 13, 1999, in which the project appeared on a list of year end transactions.

929.     The Insiders did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on July 21, August 10-11, October 12-13, 1998, and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including meetings on August 10, October 12, and December 7, 1998), and at other Executive Committee meetings in and around the time of the transaction (including meetings on September 11, November 2, November 17, November 23, 1998).

930.     Insider Causey did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21, August 10-11, October 12-13, December 8, 1998, and February 8, 1999, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, and at the Executive Committee meetings on November 2 and December 18, 1998 (during which Causey discussed the Cochise transaction with the Committee).

931.     Insider Fastow did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21,

August 10-11, December 8, 1998, and February 8, 1999, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, and at the Executive Committee meetings on September 11, November 2, November 23, and December 18, 1998.

932.    Insider McMahon did not disclose to Enron that the accounting for the Cochise transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on July 21, August 10-11, and December 8, 1998, at the Finance Committee meetings on August 10, October 12, and December 7, 1998, and at the Executive Committee meeting on November 2, 1998.

**Teresa**

933.    The Insiders did not disclose to Enron that the accounting for the Teresa transaction, which was executed approximately March 1, 1997, was inconsistent with GAAP or otherwise misleading.

934.    The Insiders did not disclose to Enron that the accounting for the Teresa transaction was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which the project was discussed, or during a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

935.    Insider Causey did not disclose to Enron that the accounting for the Teresa transaction was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which he made a presentation on Teresa, or during a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

936.    Insider Fastow did not disclose to Enron that the accounting for the Teresa transaction, was inconsistent with GAAP or otherwise misleading during an Executive Committee meeting on March 25, 1997, at which Teresa was discussed, and at a Finance Committee meeting on February 9, 1998, in which the project appeared on a list of 1997 transactions.

***Tomas***

937.    The Insiders did not disclose to Enron that the accounting for the Tomas transaction, which was executed approximately September 15, 1998, was inconsistent with GAAP or otherwise misleading.

938.    The Insiders did not disclose to Enron that the accounting for the Tomas transaction was inconsistent with GAAP or otherwise misleading during a meeting of the Executive Committee on March 2, 1998, during which the project was discussed.

939.    Insiders Causey and Maxey did not disclose to Enron that the accounting for the Tomas transaction was inconsistent with GAAP or otherwise misleading during a meeting of the Executive Committee on March 2, 1998, during which the project was discussed.

940.    In the March 2, 1998, Executive Committee meeting, Insider Causey misrepresented to Enron that (1) Tomas was a project designed to enhance the financial return of a portfolio of leased assets, despite the fact that the SPE did not engage in any leasing activities until the Insiders arranged a lease of aircraft in the summer of 2000, and (2) Tomas would generate after-tax earnings, despite the fact that the transaction was designed to generate current "pre-tax" financial accounting income by creating questionable future tax deductions.

***Renegade***

941.    The Insiders did not disclose to Enron that the Renegade transaction, which was executed approximately December 23, 1998, was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders.

942.    The Insiders did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at Board meetings in and around the time of the transaction (including meetings on October 12 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a

meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

943.    Insider Causey did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the Board meetings on October 12 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meeting on December 18, 1998.

944.    Insider Fastow did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meetings on November 23 and December 18, 1998.

945.    Insider McMahon did not disclose to Enron that the Renegade transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998.

*Valhalla*

946.    The insiders did not disclose to Enron that the Valhalla transaction, which closed approximately September 1, 2000, was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders.

947.    The Insiders did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at a Board meeting on December 14, 1999, at which the meeting agenda stated that Causey gave a report on a Finance Committee recommendation that Project Valhalla be approved, or during a December 13, 1999 Finance Committee meeting, at which the transaction was listed in the December 14, 1999 Board agenda as having been discussed.

537519v1/007457

948.     The Insiders did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at Board meetings in and around the time of the transaction (including meetings on February 7, 2000, April 3, 2000, May 2, 2000 and August 1, 7, and 24, 2000), in Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, February 7, 2000, May 1, 2000 and August 7, 2000), and in Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 2000).

949.     Insider Causey did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the December 14, 1999 Board meeting in which he was scheduled to report on the Project, at subsequent Board meetings on May 2, 2000, August 1 and August 7, 2000 and at the December 13, 1999, May 1, 2000 and August 7, 2000 Finance Committee meetings.

950.     Insider Fastow did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the June 22, 2000, Executive Committee meeting, at the April 3, 2000, August 1, 7 and 24, 2000 Board meetings, and at the December 13, 1999, February 7, 2000, May 1, 2000 and August 7, 2000 Finance Committee meetings.

951.     Insider Glisan did not disclose to Enron that the Valhalla transaction was a reward to BT/Deutsche for its work on other questionable tax transactions with the Insiders at the May 1, 2000 and August 7, 2000 Finance Committee meetings, the June 22, 2000 Executive Committee meeting, and at the August 1, 2000 Board meeting.

### *Riverside III*

952.    The Insiders did not disclose to Enron that the accounting for the Riverside III transaction, which was executed approximately June 30, 1998, was inconsistent with GAAP or otherwise misleading.

953.    During a Board meeting on June 22, 1998, at which Riverside III was discussed, Insiders McMahon and Fastow did not disclose to Enron that the accounting for the transaction was inconsistent with GAAP or otherwise misleading.

### *Riverside IV*

954.    The Insiders did not disclose to Enron that the accounting for the Riverside IV transaction, which was executed approximately September 29, 1998, was inconsistent with GAAP or otherwise misleading.

955.    The Insiders did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on October 12-13, 1998, during which the transaction was discussed.

956.    Insider Fastow did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced.

957.    Insider McMahon did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced.

958.    Insider Causey did not disclose to Enron that the accounting for the Riverside IV transaction was inconsistent with GAAP or otherwise misleading at meetings of the Finance

Committee on August 10, 1998, at which the transaction may have referenced, and October 12, 1998, at which the project was referenced, or at the Board meeting on October 13, 1998, at which the transaction was approved.

### *Pilgrim*

959.    The Insiders did not disclose to Enron that the accounting for the Pilgrim transaction, which was executed approximately December 23, 1998, was inconsistent with GAAP or otherwise misleading.

960.    The Insiders did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

961.    Insider Causey did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on October 12-13 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meeting on December 18, 1998.

962.    Insider Fastow did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meetings on November 23 and December 18, 1998.

963.    Insider McMahon did not disclose to Enron that the accounting for the Pilgrim transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, and at the Finance Committee meeting on December 7, 1998.

*Riverside V*

964.     The Insiders did not disclose to Enron that the accounting for the Riverside V transaction, which closed approximately January 29, 1999, was inconsistent with GAAP or otherwise misleading.

965.     The Insiders did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 12-13 and December 8, 1998), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 7, 1998), and at Executive Committee meetings in and around the time of the transaction (including meetings on November 17, November 23, and December 18, 1998).

966.     Insider Causey did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meetings on October 12-13 and December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meeting on December 18, 1998.

967.     Insider Fastow did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998, and at the Executive Committee meetings on November 23 and December 18, 1998.

968.     Insider McMahon did not disclose to Enron that the accounting for the Riverside V transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 8, 1998, at the Finance Committee meeting on December 7, 1998.

*Leftover*

969.    The Insiders did not disclose to Enron that the accounting for the Leftover transaction, which was executed approximately May 28, 1999, was inconsistent with GAAP or otherwise misleading.

970.    The Insiders did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4 and May 19, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on April 13, 1999).

971.    Insider Causey did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

972.    Insider Fastow did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on April 13, 1999.

973.    Insider McMahon did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on April 13, 1999.

*Nimitz*

974.    The Insiders did not disclose to Enron that the accounting for the Nimitz transaction, which was executed approximately June 25, 1999, was inconsistent with GAAP or otherwise misleading.

975.    The Insiders did not disclose to Enron that the accounting for the Nimitz transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on May 4 and May 19, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on May 3, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on June 22, 1999, three days before the deal closed).

976.    Insider Causey did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

977.    Insider Fastow did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999.

978.    Insider McMahon did not disclose to Enron that the accounting for the Leftover transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on May 3, 1999 and at the Executive Committee meeting on June 22, 1999.

*Ghost*

979.    The Insiders did not disclose to Enron that the accounting for the Ghost transaction, which closed approximately December 21, 1999 was inconsistent with GAAP or otherwise misleading.

980.    The Insiders did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18, and December 14, 1999, one week before the transaction closed) and at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999).

981.    Insider Causey did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999.

982.    At the Finance Committee meeting on December 13, 1999, during which Ghost was included in Insider McMahon's Treasurer's report, Insiders McMahon, Causey, and Fastow did not disclose to Enron that the accounting for the Ghost transaction was inconsistent with GAAP or otherwise misleading.

*Alchemy*

983.    The Insiders did not disclose to Enron that the accounting for the Alchemy transaction, which closed approximately December 27, 1999 was inconsistent with GAAP or otherwise misleading.

984.    The Insiders did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18, and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

985.    Insider Causey did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

986.    Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Alchemy transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

537519v1/007457

*Discovery*

987.     The Insiders did not disclose to Enron that the accounting for the Discovery transaction, which closed approximately December 29, 1999 was inconsistent with GAAP or otherwise misleading.

988.     The Insiders did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 18, and December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including a meeting on December 13, 1999), and at Executive Committee meetings in and around the time of the transaction (including a meeting on October 20, 1999).

989.     Insider Causey did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999, and at the Finance Committee meeting on December 13, 1999.

990.     Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Discovery transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

*Specter*

991.     The Insiders did not disclose to Enron that the accounting for the Specter transaction, which close approximately March 29, 2000, was inconsistent with GAAP or otherwise misleading.

992.     The Insiders did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at a Board meeting on February 7, 2000 in which McMahon discussed a related "syndication vehicle" with the Board.

993.     The Insiders did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at other Board meetings in and around the

time of the transaction (including a meeting on December 14, 1999), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, and February 7, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20, and March 2, 2000).

994.    Insider Causey did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

995.    Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Specter transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999, and February 7, 2000.

*Hawaii*

996.    The Insiders did not disclose to Enron that the accounting for the Hawaii transaction, which closed approximately March 31, 2000, was inconsistent with GAAP or otherwise misleading.

997.    The Insiders did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on December 14, 1999, and February 7-8, 2000), at Finance Committee meetings in and around the time of the transaction (including meetings on December 13, 1999, and February 7, 2000), and at Executive Committee meetings in and around the time of the transaction (including meetings on January 20 and March 2, 2000).

998.    Insider Causey did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on December 13, 1999.

999. Insiders Fastow and McMahon did not disclose to Enron that the accounting for the Hawaii transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meetings on December 13, 1999, and February 7, 2000.

**Nigerian Barge**

1000. The Insiders did not disclose to Enron that the accounting for the Nigerian Barge transaction, which closed approximately December 29, 1999, was inconsistent with GAAP or otherwise misleading.

1001. The Insiders did not disclose to Enron that the accounting for the Nigerian Barge transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on November 5, November 18, and December 14, 1999).

1002. Insider Causey did not disclose to Enron that the accounting for the Nigerian Barge transaction was inconsistent with GAAP or otherwise misleading at the Board meeting on December 14, 1999.

**1999 Electricity Trades**

1003. The Insiders did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction, which closed approximately December 1, 1999, was inconsistent with GAAP or otherwise misleading.

1004. The Insiders did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at Board meetings in and around the time of the transaction (including meetings on October 11-12, November 5, and November 18, 1999), at Finance Committee meetings in and around the time of the transaction (including meetings on August 9 and October 11, 1999), and at Executive Committee meetings in

and around the time of the transaction (including meetings on September 3, September 14, September 24, and October 20, 1999).

1005.  Insiders Causey, Fastow and McMahon did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on October 11, 1999 and at the board meeting on October 11-12, 1999.

1006.  Insiders Causey and Fastow did not disclose to Enron that the accounting for the 1999 Electricity Trades transaction was inconsistent with GAAP or otherwise misleading at the Finance Committee meeting on August 9, 1999.

1007.  In addition to the foregoing misrepresentations and/or omissions made by the Insiders to Enron and its Board of Directors, the Insiders made misrepresentations and/or omitted to disclose material to Arthur Andersen.  The Insiders made each of these misrepresentations and omissions knowing that if Andersen relied upon them they would be incorporated into financial statements and other documents prepared or reviewed by Andersen and delivered to Enron and/or its Board of Directors.  The Insiders made the following misrepresentations and omissions to Andersen:

a.      The Insiders did not disclose to Arthur Andersen the "verbal assurances" they gave to the Bank Defendants of repayment of their 3% equity investment in connection with FAS 140 transactions such as Bacchus, Nikita, Leftover, Nimitz, Discovery, Alchemy, and Hawaii, which closed from approximately 1998 to 2001, and other SPE transactions such as J.T. Holdings, which closed approximately December 7, 2000, even though these "verbal assurances" caused the accounting for the transactions to violate GAAP or be otherwise misleading.

b.      The Insiders did not disclose to Arthur Andersen the verbal assurances they gave to Merrill Lynch that Enron would reacquire or assure the repurchase of the assets that had been purportedly "sold" in the Nigerian Barge transaction, which closed approximately

December 29, 1999, or the verbal insurances they gave to BT/Deutsche Bank in the Cochise transaction, which closed approximately January 28, 1999, even though these assurances caused the accounting for these transactions to violate GAAP or be otherwise misleading.

          c.    The Insiders did not disclose to Arthur Andersen that Delta Energy Corporation was a special purpose entity established by Citigroup solely to engage in prepay transactions, which was effectively controlled and funded by Citigroup, even though this fact caused accounting for the transactions in which Delta was involved to violate GAAP or be otherwise misleading.

          d.    The Insiders did not disclose to Arthur Andersen that Mahonia, an entity used in prepay transactions with JP Morgan Chase, was not independent from JP Morgan Chase in any meaningful sense, even though this fact caused the accounting for the transactions in which Mahonia was involved to violate GAAP or be otherwise misleading.

       1008.  From 1997 through 2001, Insiders Fastow, Glisan, and Kopper, and in certain instances Causey, knowingly misrepresented and/or omitted to disclose to Enron and/or its Board of Directors (1) the true nature, ownership and/or purpose of Chewco, LJM1 and LJM2, (2) the wrongful self-dealing facilitated by these entities, and (3) the wrongful manipulation and misstatement of Enron's financial statements caused by or through transactions with these entities.

       1009.  With respect to transactions between Enron and Chewco, LJM1 or LJM2, the Insiders knowingly caused to be included in Enron's internal and publicly disseminated financial statements misleading information about the company's cash flow from operating and financing activities, income and net income, debt and price risk management liabilities, interest expense, and other information, as well as the financial measures, ratios and other calculations which are derived from or are based upon these figures.

1010.  At the time the aforementioned misrepresentations and/or omissions were made, the Insiders either knew that they were false, or they made them recklessly without knowledge of their truth.  The Insiders either knew that the accounting for each structured finance transaction was inconsistent with GAAP or that the description of each of those transactions was otherwise misleading, or recklessly did not determine whether the accounting for those transactions was consistent with GAAP or that the descriptions of those transactions were not otherwise misleading.

1011.  The Insiders made these misrepresentations and omissions with the intent and the expectation that Enron and its Board of Directors would rely and act upon them.  Enron and/or its Board of Directors actually and justifiably relied upon these misrepresentations and omissions. Enron and/or its Board of Directors were entitled to and did believe that the Insiders were acting in the best interest of the company and were not employing structured finance transactions (1) whose accounting did not comply with GAAP or otherwise were described in a misleading manner, or (2) for the purpose of manipulating and misstating Enron's financial statements.  Enron and its Board of Directors were entitled to and did believe that the Insiders were acting in the best interest of the company and were not (1) secretly profiting from transactions with the company, (2) sharing profits from transactions with the company with the company's lenders or their executives, or (3) employing transactions with the company for the purpose or with the effect of manipulating and misstating Enron's financial statements.  The Insiders made each misrepresentation or omitted to disclose each material fact, even those made in the first instance to Arthur Andersen, for the purpose and with the intention that Enron and/or its Board of Directors would rely upon it.

1012.  By virtue of the acts and omissions described in this Complaint, the Bank Defendants knowingly gave substantial assistance to the Insiders in committing fraud against Enron.  In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants participated with actual knowledge that the purpose of the transaction was to manipulate

and misstate Enron's financial statements and that the transaction would be reported by Enron in a materially misleading manner. In each of the structured finance transactions described in this Complaint, one or more of the Bank Defendants gave substantial assistance to the Insiders by designing, implementing, financing, purporting to invest in, and/or closing the transaction and/or by causing their subsidiaries or affiliates to do the same. In each of the transactions described in this Complaint in which an Insider and/or a member of his family improperly derived a personal benefit from a transaction with Enron, one or more of the Bank Defendants participated with actual knowledge that the transaction was designed to or would benefit the Insider at Enron's expense. In each of these transactions, one or more of the Bank Defendants and/or their officers gave substantial assistance to the Insiders by investing, or by obtaining others to invest, in the transaction or the entity formed by the Insiders to participate in the transaction.

1013. Specifically, by way of examples and not an exhaustive list, the Bank Defendants gave substantial assistance to the Insiders as follows:

*Citigroup*

1014. In connection with the Roosevelt transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a) On or about April 22, 1999, James F. Reilly sent an e-mail to Thomas Stott, Steve Baillie, Chris Lyons, Joseph Mackiewicz, Jean Diaz, and William Fox regarding an unwritten agreement to an early repayment of a portion of the prepay transaction.

(b) On or about April 27, 1999, James F. Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, Steve Baillie, Chris Lyons, and Sumit Mathai regarding an unwritten agreement to an early repayment of the portion of the prepay transaction.

1015.   In connection with the Truman transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)      On or about June 22, 1999, James Reilly sent an e-mail to William Fox, Sumit Mathai, Steve Baillie, and Thomas Stott regarding the request for a new $500 million prepay.

(b)      On or about September 17, 1999, James Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, and Steve Baillie regarding funding of prepay transactions into capital markets.

1016.   In connection with the Nighthawk transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)      On or about October 1, 1997, Elliot Conway sent a letter to an Enron employee regarding the costs and fees for the Nighthawk transaction.

1017.   In connection with the Yosemite I transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)      On or about August 31, 1999, James Reilly sent an e-mail to William Fox and Steve Baillie regarding Yosemite and a scheduled committee meeting.

(b)      On or about September 17, 1999, James Reilly sent an e-mail to Onno Ruding, John Kennedy, Tom Boland, William Fox, Thomas Stott, and Steve Baillie regarding funding of prepay transactions into capital markets.

(c)      On or about October 1, 1999, Adam Kulick sent an e-mail to Onno Ruding, Petros Sabatacakis, Thomas Boland, Fernando Ynigo, David Bushnell, William Fox, James Reilly, Lynn Feintech, and Paul Deards regarding Project Yosemite approval and structuring.

(d)      On or about October 14, 1999, Adam Kulick sent an e-mail to Lynn Feintech, Tom Francois, and James Reilly forwarding an outline of the prepay transaction.

1018. In connection with the Nixon transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)     On or about February 15, 2000, James Reilly sent an e-mail to Onno Ruding, Thomas Stott, William Fox, Steve Baillie, and Sumit Mathai regarding use of the prepays to retire the Nixon transaction.

1019. In connection with the Yosemite II transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)     On or about November 12, 1999, James Reilly sent an e-mail to William Fox, Steve Baillie, and Niels Kirk regarding Enron's desire to complete a second Yosemite transaction.

(b)     On or about November 18, 1999, Sumit Mathai sent an e-mail to Rick Caplan, Tom Francois, Adam Kulick, Steve Baillie, and James Reilly providing an early draft of a transaction description.

(c)     On or about November 22, 1999, Tom Francois sent an e-mail to Adam Kulick, Rick Caplan, Eleanor Wagner, Ramesh Gupta, David Bushnell, James Reilly, William Fox, Thomas Stott, Lynn Feintech, Doug Warren, and Marcy Engel discussing the Yosemite II structure.

(d)     On or about November 23, 1999, Tom Francois sent an e-mail to Adam Kulick, Rick Caplan, Eleanor Wagner, Ramesh Gupta, David Bushnell, James Reilly, William Fox, Thomas Stott, Lynn Feintech, Doug Warren, and Marcy Engel discussing the Yosemite II structure.

(e)     On or about February 15, 2000, James Reilly sent an e-mail to Onno Ruding, Thomas Stott, William Fox, Steve Baillie, and Sumit Mathai regarding use of the Yosemite II proceeds to retire the Nixon transaction.

(f)     On or about December 12, 2000, James Reilly sent an e-mail to Rick Caplan, Steve Baillie, Amanda Angelini, Tom Francois, and Donald Bendernagel regarding Yosemite II accounting.

1020.    In connection with the June 2001 transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about June 18, 2001, Michael Nepveux sent an e-mail to Amanda Angelini, James Reilly, Sean Mulhearn, William Fox, and Lydia Junek regarding a new request for non-debt funding.

(b)    On or about June 25, 2001, Timothy Swanson sent an e-mail to James Forese, Steve Wagman, and Paul Deards, forwarded by Steve Wagman to Michael Nepveux on June 27, 2001, summarizing the prepay transaction.

1021.    In connection with the Nahanni transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about July 24, 2001, James Reilly sent an e-mail to Michael Nepveux and Joseph Mackiewicz, regarding use of the Nahanni facility for year-end balancing.

1022.    In connection with the Bacchus transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)    On or about November 24, 2000, Steve Baillie sent an e-mail to William Fox, Lydia Junek, Niels Kirk, John Lyons, and James Reilly summarizing the status of various transactions, including the asset treatment in Bacchus.

(b)    On or about November 28, 2000, James Reilly sent an e-mail to Maureen Hendricks, Dean Keller, Steve Becton, Richard Caplan, Amanda Angelini, William Fox, Lydia Junek, Steve Baillie, and Chris Lyons summarizing Bacchus and advising of the critical nature of the transaction.

(c)    On or about December 13, 2000, Shirley Elliot sent an e-mail to William Fox, Steve Baillie, Lydia Junek, Tom Stott, and Tero Tiilikainen regarding the materiality of the Bacchus transaction.

(d)　On or about December 14, 2000, William Fox sent an e-mail to Shirley Elliot, Steve Baillie, Lydia Junek, Tom Stott, and Tero Tiilikainen regarding the Enron balance sheet.

(e)　On or about December 21, 2000, Lydia Junek sent an e-mail to William Fox, Amanda Angelini, Andrew Lee, Dean Keller, Don Bendernagel, Doug Warren, James Reilly, Chris Lyons, Saul Bernstein, Richard Caplan, Steve Baillie, Suzanne Holmes, and Tom Francois regarding verbal support for the transaction received from Andrew Fastow of Enron.

(f)　On or about December 27, 2000, Amanda Angelini sent an e-mail to Steve Baillie, William Fox, Lydia Junek, James Reilly, Steve Becton, Dean Keller, Chris Lyons, Steve Wagman, Lynn Feintech, Paul Deards, and Richard Caplan regarding structural analysis and the "trust me" feature in the Bacchus transaction.

(g)　On or about April 18, 2001, William Fox sent an e-mail to Thomas Stott who, upon information and belief, was resident in Citigroup's offices in New York, New York, referring to verbal support of the Bacchus transaction.

1023.　In connection with the Sundance Industrial transaction, Citigroup knowingly gave substantial assistance to the Insiders.

(a)　On or about May 14, 2001, Richard Caplan sent an e-mail to James Forese, Richard Stuckey, Eleanor Wagner, Donald Bendernagel, Saul Bernstein, Tom Francois, Mark Purwein, Lynn Feintech, Doug Warren, Timothy Leroux, Amanda Angelini, James Reilly, Dean Keller, and John Chrysikopoulos containing a Sundance transaction summary.

(b)　On or about October 29, 2001, Richard Caplan sent an e-mail to William Fox and James Reilly providing a description of the Sundance transaction.

1024.　Citigroup knowingly gave substantial assistance to the Insiders in connection with Citigroup's investment in LJM2, the purported "independent" investment vehicle created by Insider Andrew Fastow.

(a)     On or about December 14, 1999, William Fox sent an e-mail to MaryLynn Putney and James Reilly recommending investment in LJM2.

1025.   Citigroup knowingly gave substantial assistance to the Insiders in connection with a SPE called "Delta," which was used in six Citigroup-Enron prepay transactions, including Roosevelt and Yosemite I through IV.

(a)     On or about November, 1999, Citigroup caused Delta to represent to Arthur Andersen that Delta had undertaken business with a number of entities, that Delta had assets other than those acquired through transactions with Enron, and that Delta had unencumbered assets available to the Yosemite lenders upon a default.

(b)     On or about June, 2001, Citigroup caused Delta to represent to Arthur Andersen that Delta had undertaken business with a number of entities, that Delta had assets other than those acquired through transactions with Enron, and that Delta had unencumbered assets available to the Yosemite lenders upon a default.

### JP Morgan Chase

1026.   In connection with the Chase VI Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about September 9, 1997, Richard Walker forwarded a Call Report relating to a call between Richard Walker and an Enron employee regarding initiating the prepay transaction to Peter Lind, Dinsa Mehta, Jeffrey Dellapina, Sandra Aultman, George Serice, Tod Benton, and Juli Bieser.

(b)     On or about October 5, 1997, Richard Walker e-mailed a Call Report relating to an October 3, 1997 call between Richard S. Walker and an Enron employee regarding executing the Chase VI prepay to Dinsa Mehta, Jeffrey Dellapina, Peter Lind, George Serice, Tod Benton, and Sandra Aultman.

(c)     On or about October 29, 1997,  George Serice sent an e-mail to Susan Stevens, Richard Walker, Karen Simon, Howard Schramm, Sandra Aultman, Dinsa Mehta, and Jeffrey Dellapina regarding an overview of and the benefits to Enron of the prepay transaction.

(d)     On or about November 14, 1997, George Serice sent an e-mail to Greg Nelson, Peter Gleysteen, Susan Stevens, Tod Benton, Karen Simon, and Christian Gates regarding, among other things, pricing, underwriting, credit approval, and the bank market for the prepay transaction.

(e)     On or about December 1, 1997, George Serice sent a memorandum to Jeffrey Dellapina regarding the distribution among Chase entities of the fee collected from the Chase VI prepay.

1027.   In connection with the Chase VII Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about May 29, 1998, Jeffrey Dellapina sent an e-mail to Heather Lindstrom, Mark Malloy, Dexter Charles, Dinsa Mehta, Richard Walker, and George Serice regarding credit exposure related to Chase VII.

(b)     On or about June 2, 1998, George Serice sent an e-mail to Enron employees, Bob Mertensotto, Carrie Cerda, Richard Walker, and Jeffrey Dellapina regarding pricing of the Chase VII prepay.

(c)     On or about June 8, 1998, Mark Malloy sent an e-mail to Richard Walker, Jeffrey Dellapina, Heather Lindstrom, Dinsa Mehta, Dexter Charles, George Serice, and Phillip Levy regarding surety bond issues.

(d)     On or about June 18, 1998, Phillip Levy sent a facsimile to Jeffrey Dellapina regarding Enron bond issues.

(e)     On or about June 29, 1998, Richard Walker sent an e-mail to Richard Garbarino, Don Fraser, Jeffrey Dellapina, Dexter Charles, George Serice, and Bob Mertensotto regarding anticipated prepay revenues.

1028.   In connection with the Chase VIII Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about November 9, 1998, Bob Mertensotto sent an e-mail to Mike Addy and Sandra Aultman regarding Enron's request for the Chase VIII prepay transaction.

(b)     On or about November 24, 1998, Bruce Ellard sent an e-mail to Peter Coad, Steve Allen, Alexander Mintcheff, Vivian Shelton, Dinsa Mehta, and Dexter Charles regarding approval for physical delivery.

(c)     On or about December 2, 1998, Peter Coad sent an e-mail to Don Layton and Don Wilson regarding the background, pricing, return, booking, credit, and documentation of prepay transactions.

1029.   In connection with the Chase IX Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)     On or about March 12, 1999, Bob Mertensotto sent an e-mail to Jeffrey Dellapina regarding establishing the Chase IX prepay.

(b)     On or about June 4, 1999, Patrick O'Brien sent an e-mail to Dermot Drysdale, Joseph Scalfani, David Morris, Dinsa Mehta, Janet Caruso, Maggie Serravalli, Erik Gerken, Bruce Ellard, Ronald Antonelli, George Brash, Vivian Shelton, Nick Quintana, Anthony Carpentieri, Sharon Foilek, Lorry Ripley, and Aditya Mohan regarding the classification of the prepay as a loan or a derivative.

(c)     On or about June 7, 1999, Janet Caruso sent an e-mail to Bruce Ellard, Dinsa Mehta, and Robert Benjamin regarding accounting issues related to the proposed prepay transaction.

(d)      On or about June 11, 1999, an Enron employee and Richard Walker had a telephone conference regarding the timing and amount of the Chase IX prepay, a report of which was sent from Richard Walker to Jeffrey Dellapina, Bob Mertensotto, Robert Traband, Christopher Wardell, Gary Wright, Todd Maclin, and Dod Fraser.

(e)      On or about June 24, 1999, Richard Walker sent an e-mail to Dinsa Mehta, Jeffrey Dellapina, Bob Mertensotto, and Robert Traband regarding the business purpose of the prepay.

(f)      On or about June 29, 1999, Chase Commodity Swap Operations sent a facsimile to an Enron employee regarding commodity swap transactions.

1030.   In connection with the Chase X Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)      On or about June 28, 2000, Mahonia Limited sent a letter to Chase Manhattan Bank regarding Enron's request to enter into Chase X.

(b)      On or about June 29, 2000, Mahonia Limited sent a Confirmation Letter to Enron North America Corp. regarding commodity price and delivery logistics.

(c)      On or about June 30, 2000, Rajesh Chawla sent an e-mail to Don Wilson, Lesley Daniels Webster, Fraser Partridge, Steven Allen, Vivian Shelton, Dexter Charles, Jeffrey Dellapina, Mark Babunovic, Robert Benjamin, and Janet Caruso regarding Chase X logistics.

(d)      On or about July 7, 2000, Gareth Essex Cater sent an e-mail to Zandra Sherrington regarding transfer instructions for Mahonia Limited.

1031.   In connection with the Chase XI Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)      On or about November 11, 2000, an Enron employee, Jeffrey Dellapina, and Richard Walker had a telephone conference regarding Enron's interest in Chase XI, a Call Report

of which was sent by Richard Walker to Robert Traband, George Serice, Christopher Lowe, and Christopher Teague.

(b)    On or about November 17, 2000, Colin Carscadden sent an e-mail to Karen Simon, Richard Walker, Robert McGuire, Todd Maclin, Kamal Murari, Robert Traband, and Jeffrey Dellapina regarding Enron's request for Chase XI.

(c)    On or about December 8, 2000, Phillip Levy sent an e-mail to Julie Carter, Gareth Essex Cater, Ian James, and Jeffrey Dellapina regarding the use of SPEs in Chase XI.

(d)    On or about December 12, 2000, Phillip Levy sent an e-mail to Melissa Vogel regarding the term and structure of Chase XI.

(e)    On or about December 29, 2000, Jeffrey Dellapina sent a Fee Letter to Enron regarding fees for Chase XI.

1032.    In connection with the Chase XII Prepay transaction, JP Morgan Chase knowingly gave substantial assistance to the Insiders.

(a)    On or about September 13, 2001, a telephone conference was held between Jeffrey Dellapina, Robert Traband, George Serice, and Enron employees regarding Mahonia's independence.

(b)    On or about September 20, 2001, an Enron employee sent an e-mail to Jeffrey Dellapina, Robert Traband, and other Enron employees regarding requested representations about Mahonia's independence.

(c)    On or about September 20, 2001, Jeffrey Dellapina, Robert Traband, and Jim Ballentine conducted a telephone conference regarding prepay exposure and use of sureties for the Chase XII prepay.

(d)    On or about September 24, 2001, Julie Carter sent an e-mail to Phillip Levy regarding the structure and the closing documentation related to the transaction.

(e)     On or about September 26, 2001, Jeffrey Dellapina sent an e-mail to Michael Sabloff regarding a revised transaction structure based on tax considerations.

(f)     On or about September 24, 2001, Robert Traband sent an e-mail to James Ballentine, Richard Walker, and Jeffrey Dellapina regarding the Chase XII structuring summary.

1033.     JPMorgan Chase knowingly gave substantial assistance to the Insiders in connection with the Fishtail transaction:

(a)     On December 20, 2000, Robert Traband sent a letter to an Enron employee regarding Enron's agreement to pay Chase a $500,000 advisory fee as consideration for structuring the financing for Annapurna LLC.

(b)     On or about April 9, 2001, Marilyn Fossey sent an e-mail to Robert Traband with a copy to Peter M. Licalzi addressing an issue concerning Annapurna LLC's ownership interest in Fishtail, LLC.

1034.     JPMorgan Chase knowingly gave substantial assistance to the Insiders in connection with the Hawaii transaction:

(a)     On or about November 2, 2000, George Serice sent two e-mails to Robert Traband, Josh Rogers, Roxanne Blanco, Richard Walker with a copy to Tod Benton regarding JPMorgan Chase's participation in Hawaii.

(b)     On or about November 1, 2000, George Serice sent an e-mail to Roxanne Blanco and Robert Traband regarding Fleet's desire to verify pricing and upfronts on Hawaii.

(c)     On or about November 22-27, 2000, Peter M. Licalzi, Robert Traband, and Bob Mertensotto sent e-mails concerning the pay off and cancellation of the Hawaii 125-0 trust.

1035.     JP Morgan Chase knowingly gave substantial assistance to the Insiders in connection with the Mahonia transactions.

(a)     In a September 13, 2001, telephone call, Jeffrey Dellapina of JP Morgan Chase and Enron employees discussed misrepresenting to Arthur Andersen that Mahonia was independent of JP Morgan Chase.

(b)     On September 28, 2001, the discussed letter was sent to Arthur Andersen.

*Barclays*

1036.   In connection with the JT Holdings Inc. transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)     On or about February 23, 2000, Nicholas Bell sent an e-mail to David Barton regarding a permanent reduction in the exposure related to the MTBE-related assets.

(b)     On or about December 1, 2000, Nicholas Bell sent a facsimile to Enron Global Finance regarding Barclays commitment of funding.

1037.   In connection with the Nikita transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)     On or about September 20, 2001, Nicholas Bell sent an e-mail to an Enron employee, Richard Williams, and John Sullivan regarding administrative details of the transaction.

(b)     On or about September 24, 2001, John Sullivan sent an e-mail to Sarah Abbott, Richard Williams, Tim Ritchie, Eric Chilton, Nicholas Bell, and Dhuane Stephens regarding Barclays Exposure Committee approval of the transaction.

(c)     On or about September 26, 2001, John Sullivan sent an e-mail to an Enron employee, Richard Williams, and Nicholas Bell regarding draft transaction documentation.

1038.   In connection with the Chewco transaction, Barclays knowingly gave substantial assistance to the Insiders:

(a)     On December 18, 1997, John Meyer of Barclays sent an e-mail to Bob Clemmens and Henry Pullman of Barclays recommending approval of the Chewco transaction and forwarding an e-mail from George McKean of Barclays regarding the terms of the financing.

(b)     On December 5, 1997, George McKean of Barclays sent an e-mail to John Meyer, Tom Connor, Sal Esposito, and Richard Williams of Barclays, summarizing the terms of the proposed Chewco refinancing.

1039.   In connection with the $SO_2$ transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)     On or about April 10, 2001, Martin Woodhams sent an e-mail to Brian Smith regarding potential areas of risk relating to a transaction and containing an earlier e-mail from an Enron employee regarding a transaction summary.

(b)     On or about October 9, 2001, an Enron employee sent an e-mail to Martin Woodhams, with copies to Robert Bruce, Joel Ephross, Michael Robison, and Ying Liu regarding the timing of payment settlement and structuring of the $SO_2$-related options.

(c)     On or about November 29, 2001, Martin Woodhams sent an e-mail to John Fiorello confirming the number of 2009 allowances owned by Colonnade.

(d)     On or about December 1, 2001, Caroline Hopwood sent an e-mail to Matthew Hooper, Jerry del Misser, Benoit de Vitry, Michael Hempstead, Richard Firth, Bob Clemmens, Andy Fately, Tim Gant, Julie Finch, Pat McCormack, Jake Scrivens, and Guy Dempsey regarding selling of $SO_2$ positions and wording of related documentation.

1040.   In connection with the Roosevelt transaction, Barclays knowingly gave substantial assistance to the Insiders.

(a)     On or about December 28, 1998, a telephonic conference call was held between Richard Williams, Enron employees, and others regarding the details of the natural gas and prepay and commodity swap terms.

(b)     On or about April 26, 1999, Richard Williams sent an e-mail to Jonathon Taylor and Brian Smith regarding Enron performance issues.

(c)     On or about November 17, 1999, Richard Williams sent an e-mail to Brian Smith regarding the Roosevelt unwind.

1041.   In connection with an SPV known as "Colonnade," Barclays knowingly gave substantial assistance to the Insiders.

(a)     On April 25, 2001, Martin Woodham of Barclays sent an e-mail to himself summarizing Arthur Andersen's "smell test" for special purpose vehicles to meet if they are to be treated as off balance sheet.

(b)     In its June 6, 2001, engagement letter for the $SO_2$ transaction, Benoit de Vitry of Barclays wrote to an employee of Enron, regarding Enron's payment of out of pocket expenses incurred by Barclays.

(c)     On June 22, 2001, Martin Woodham of Barclays e-mailed an employee of Enron, assuring Enron regarding Colonnade's intended transactional history, business limitations, business partners, and unencumbered assets, months before Colonnade was created or even named.

(d)     On June 25, 2001, Richard Williams of Barclays e-mailed Martin Woodhams of Barclays, regarding the Andersen "smell test" for Colonnade.

(e)     In order to fraudulently meet Arthur Andersen's "smell test," Barclays planned and ultimately executed two short-dated trades with Colonnade on or about August and September, 2001.

(f)     On September 6, 2001, Martin Woodham of Barclays sent a memorandum to the New Products Committee, in which he detailed the fraudulent transactional history that would be created for the SPV.

**_BT/Deutsche Bank_**

1042.     In connection with the Steele transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about June 24, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron regarding potential rates of return on a proposed "REMIC/Subco structure" later developed to be Project Steel, and a list of certain representations needed from Enron.

(b)     On or about August 11, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron regarding the possible costs of entering into Project Steele.

(c)     On or about September 3, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron confirming the engagement of Bankers Trust Company as Enron's exclusive financial advisor in connection with structuring a transaction involving the utilization of an existing partnership owned by Enron's affiliates to make a joint investment in personal property and financial assets.

(d)     On or about October 28, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron.

(e)     On or about January 28, 1999, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron.

(f)     On or about September 17, 1997, Thomas Finley, Bill Boyle, and Brian McGuire sent a facsimile to R. Davis Maxey of Enron containing a draft presentation booklet for Project Steele.

(g)     On or about September 25, 1997, Thomas Finley sent a letter to R. Davis Maxey of Enron containing summary schedules of income and cash flow projections for Project Steele.

(h)     On or about May 15, 2001, Brian McGuire sent an e-mail to James Hollman and Stephen Jankovitz requesting financial information regarding Project Steele from Enron.

1043.   In connection with the Cochise transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about January 19, 1999, Brian McGuire sent a letter to R. Davis Maxey of Enron regarding schedules of accounting benefits, taxable income and losses, and other calculations.

(b)     On or about January 28, 1999, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron regarding engagement of Bankers Trust Company in connection with the direct investment in various lease property and a real estate investment trust.

(c)     On or about March 2, 1999, an Enron employee sent a facsimile to Brian McGuire regarding Bankers Trust's presentation materials regarding Project Cochise.

(e)     On or about May 3, 2000, an Enron employee sent an e-mail to Brian McGuire regarding calculations of Maliseet's Class A preferred stock rate reset and taxable income.

1044.   In connection with the Teresa transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about January 21, 1996, Thomas Finley sent a letter regarding an economic model and cash flow projections to R. Davis Maxey of Enron.

(b)     On or about March 27, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron confirming Bankers Trust Company as Enron's exclusive financial advisor in connection with structuring and establishing a limited partnership for Project Teresa.

(c)     On or about December 17, 1997, Thomas Finley sent an Engagement Letter to Richard A. Causey of Enron.

(d)     On or about December 28, 1998, Brian McGuire sent an amended Engagement Letter to Richard A. Causey of Enron.

(e)     On or about March 27, 1997, Enron's Richard A. Causey sent a letter to EN-BT Delaware, Inc., a Deutsche Bank affiliate, providing a written representation regarding Enron's principal purposes for participating in the recapitalization and operation of OPI and Enron Liquids Holding Corp. and the capitalization, formation, and operation of Enron Leasing and Enron Property Management Corp.

(f)     On or about May 15, 1997, a letter was sent from Thomas Finley at Bankers Trust Company to Enron Leasing Partners, L.P. regarding advisory fees for structuring Enron Leasing Partners, L.P.

(g)     On or about May 26, 1999, James Hollman sent an e-mail to Brian McGuire regarding calculations and adjustments of Enron Liquid Holding Company earnings and profits.

(h)     On or about October 20, 2000, R. Davis Maxey of Enron sent an e-mail to Brian McGuire and another Enron employee regarding quarterly distributions of Enron Leasing Partners, LP.

1045.   In connection with the Tomas transaction, BT/Deutsche Bank knowingly gave substantial assistance to the Insiders.

(a)     On or about February 23, 1998, Brian McGuire sent an e-mail to R. Davis Maxey of Enron summarizing the cash flows and accounting earnings for Project Tomas.

(b)     On or about September 15, 1998, Brian McGuire sent an Engagement Letter to Richard A. Causey of Enron confirming the use of Bankers Trust Company as Enron's exclusive

financial advisor in connection with structuring and establishing a limited partnership to acquire and manage a leasing portfolio owned by Portland General Holdings, Inc.

(c)     On or about December 17, 1999, an Enron employee sent an e-mail to Stephen Jankovitz, Brian McGuire, and Danny Wilson regarding payment of fees for Tomas and Teresa.

(d)     On or about July 10, 2000, Brian McGuire sent an e-mail to an Enron employee regarding a description of Seneca and Huron for a bid package.

(e)     On or about July 11, 2000, an Enron employee sent an e-mail to Brian McGuire regarding the status of Deutsche Bank's efforts to contact bidders for assets and appraisal information regarding Project Tomas.

(f)     On or about November 1, 2000, Stephen Jankovitz sent an e-mail to Enron employees regarding the opening balance on an Oneida note receivable from Bankers Trust.

1046.   In connection with the Renegade transaction, BT/Deutsche knowingly gave substantial assistance to the Insiders:

(a)     On or about December 23, 1998, Bankers Trust sent a letter to ECT Equity Corp. confirming a money market trade made in connection with Project Renegade.

(b)     On or about December 28, 1998, Bankers Trust Company sent an Engagement Letter to Enron Finance Holdings Group, in care of Enron Corp., and BT Alex. Brown Incorporated regarding the engagement of BT Alex. Brown Incorporated as the exclusive placement agent for the sale of up to $72,000,000 aggregate principal amount of Wiltshire Financial Asset Company, LLC Certificates, Class A, in connection with Project Renegade.

(c)     On or about December 29, 1998, R. Davis Maxey of Enron sent a facsimile to Brian McGuire regarding execution of the Enron guarantee in the Project Renegade transaction.

1047.    In connection with the Valhalla transaction, BT/Deutsche knowingly gave substantial assistance to the Insiders:

(a)    On or about December 21, 1999, Brian McGuire sent a facsimile to R. Davis Maxey and an Enron employee enclosing a revised accounting memorandum for Project Valhalla.

(b)    On or about May 2, 2000, Deutsche Bank sent a reimbursement of expenses letter agreement to Enron pursuant to which Deutsche Bank agreed to reimburse Enron for various expenses incurred in connection with Project Valhalla.

(c)    On or about May 2, 2000, Deutsche Bank's in-house counsel sent a letter to Enron expressing counsel's opinion with respect to legality and validity of Deutsche Bank's participation in Project Valhalla under the laws of the Federal Republic of Germany.

*CIB C*

1048.    In connection with the Riverside III transaction, CIBC and CIBC World Markets plc knowingly gave substantial assistance to the Insiders.

(a)    On or about June 1, 1998, Shannon Ernst, David Weekes, and Mark Wolf sent an Application for Corporate Credit to VP, Risk Management and CIBC Credit Committee, with copies to Robert Long, Colette Delaney, Michael Corkum, and Katheryn McGovern.

1049.    In connection with the Riverside IV transaction, CIBC and CIBC World Markets plc, knowingly gave substantial assistance to the Insiders.

(a)    On or about September 14, 1998, Shannon Ernst, Steve McTiernan, and Mark Wolf sent an Application for Corporate Credit to VP Risk Management and CIBC Credit Committee with copies to Colette Delaney and Katheryn McGovern.

1050.    In connection with the Pilgrim transaction, there were two separate but related transactions, Pilgrim/Trakya and Pilgrim/Sarlux.  While the transactions commenced on the same day and closed at approximately the same time, a unique asset supported each transaction.  In

connection with these transactions, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)     On or about October 27, 1998, Ian Schottlaender, Mark Wolf, and Billy Bauch sent a Memorandum to Richard Hassard, William Phoenix, and Ray Smith regarding structuring and underwriting a transaction to provide Enron with an accounting gain on two power plants in which Enron has an equity interest.

(b)     On or about December 4, 1998, Colette DeLaney sent an e-mail to Bob Abra and Lorne Robbins authorizing Pilgrim and asking questions regarding Pilgrim and Riverside.

(c)     On or about December 4, 1998, Bob Abra sent a Credit Communication to Executive Director, Credit Management Houston with a copy to CEO, Large Corporate Market and Executive Director, ACSC authorizing Pilgrim with the understanding that Enron will be asked questions about earnings on Riverside and Pilgrim.

(d)     On or about October 21, 1998, Billy Bauch sent a Memorandum to John Hunkin, Gerald Beasley, Ron Ormand, Ian Schottlaender, and Mark Wolf regarding a meeting with Enron to discuss Enron's financing needs and the transactions Enron intends to complete by year end.

(e)     On or about December 1, 1998, Mark Wolf and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management, the CIBC Credit Committee, Colette Delaney, and Katheryn McGovern.

1051.   In connection with the Riverside V transaction, CIBC and CIBC World Markets plc. knowingly gave substantial assistance to the Insiders.

(a)     On or about December 15, 1998, Shannon Ernst sent an Application for Corporate Credit to Head of Credit Risk Management, Europe, CIBC Credit Committee, Colette Delaney, and Mark Wolf.

1052.   In connection with the Leftover transaction, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)      On or about June 14, 1999, Mark Wolf sent an Application for Corporate Credit to VP Risk Management; CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro.

1053.   In connection with the Nimitz transaction, CIBC and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)      On or about June 15, 1999, Mark Wolf sent an Application for Corporate Credit to VP Risk Management; CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro.

1054.   In connection with the Ghost transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc., knowingly gave substantial assistance to the Insiders.

(a)      On or about December 7, 1999, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; the Executive Director, ACSC; CEO, EVP, Large Corporate Market; Michael Ablialoro; and Gerry Beauclair.

1055.   In connection with the Alchemy transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)      On or about December 7, 1999, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Market; Michael Ablialoro; and Gerry Beauclair.

1056.   In connection with the Discovery transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)        On or about December 15, 1999, Mark Wolf and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; and Michael Ablialoro.

1057.   In connection with the Hawaii transaction, CIBC, CIBC World Markets Corp. and CIBC, Inc. knowingly gave substantial assistance to the Insiders.

(a)        On or about May 21, 2001, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; Michael Ablialoro; and Gerry Beauclair.

(b)        On or about June 21, 2001, Mercy Arango sent an e-mail to Gerry Beauclair, Lorne Robbins, Ian Schottlaender, and Mark Wolf regarding Andrew Fastow's assurance that risk would not be realized and stating that CIBC had sustained no loss during the last three years it did the "trust me" equity transactions.

(c)        On or about August 25, 2000, Mark Wolf and Mercy Arango sent an Application for Corporate Credit to VP Risk Management; the CIBC Credit Committee; Executive Director, ACSC; CEO, EVP, Large Corporate Markets; and Michael Ablialoro.

(d)        On or about October 5, 2000, CVP Risk Management, USA Investment and Corporate Bank sent a Credit Communication to Executive Director, ACSC; CEO, EVP, Large Corporate Market; and Michael Ablialoro authorizing modification to the Hawaii structure.

1058.   In connection with the Specter transaction, CIBC, CIBC World Markets Corp., and CIBC, Inc. together knowingly gave assistance to the Insiders, including:

(a)        On March 20, 2000, Mercy Arango, Mark Wolf, and Lucia Martinez sent an Application for Corporate Credit related to the Specter transaction to the Vice President of Risk Management and the CIBC Credit Committee.

*Merrill Lynch*

1059.   In connection with the Nigerian Barge transaction, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)      On or about December 21, 1999, Robert Furst sent a memorandum to Dan Bayly, Mark McAndrews, Jim Brown, Kevin Cox, Schuyler Tilney, and Mark Devito, regarding Jeffrey McMahon's request that Merrill Lynch participate in the Nigerian Barge transaction, noting that there would be a return of 22.5% and a hold for less than six months, and recommending participation in the transaction.

(b)      On or about December 21, 1999, Robert Furst sent a memorandum to Jim Brown regarding the Nigerian Barge transaction.

(c)      On or about December 22, 1999, Brad Bynum sent an e-mail to Mark Devito, James Brown, and William Fuhs regarding an interoffice memorandum related to the Debts Market Commitment Committee meeting.

(d)      On or about December 23, 1999, an unknown Merrill Lynch representative sent a draft letter agreement to Jeff McMahon containing Merrill Lynch's $250,000 advisory fee for acting as Enron's exclusive advisor in the Nigerian Barge transaction, along with a 15% return.

(e)      On or about December 28, 1999, Dan Boyle sent an e-mail to Pamela Perry, cc'd to William Fuhs and Geoffery Wilson, requesting that the $250,000 fee not be paid until the first business day of 2000.

(f)      On or about December 29, 1999, Jim Brown sent a final letter agreement with Merrill Lynch's $250,000 fee for its role as exclusive advisor in the Nigerian Barge transaction to Andrew Fastow.

(g)      On or about January 25, 2000, Mark Devito e-mailed Schuyler Tilney, regarding Enron's appreciation for Merrill Lynch's assistance in the Nigerian Barge deal and their indication that it would lead to future business.

(h)      On or about May 4, 2000, Kira Toone e-mailed Gary Carlin, cc'd to Joseph Valenti, computing a 15% return on the Nigerian Barge investment.

(i)      On or about June 13, 2000, Kira Toone e-mailed Alan Hoffman, cc'd to Joseph Valenti and Gerald Haugh, indicating Merrill Lynch's understanding that it would be taken out of the transaction by June 30, 2000.

(j)      On or about June 14, 2000, Robert Furst sent a letter to Dan Boyle with copies to James Brown, J. Tomaselli, William Fuhs, and Geoffery Wilson, providing details of wiring instructions to buy Merrill Lynch out of the Nigerian Barge deal.

(k)      On or about June 15, 2000, William Fuhs e-mailed Rob Furst and Geoffery Wilson regarding a phone call about Nigerian Barge.

(l)      On or about June 15, 2000, Kira Toone e-mailed Joseph Valenti with queries about LJM2 and buyout timing.

(m)      On or about June 15, 2000, Joseph Valenti e-mailed Gary Carlin, cc'd to Kira Toone, Michael DeBettis, and Gerald Haugh, noting that LJM2 was purchasing Merrill Lynch's barge interest, but that Merrill Lynch was still involved in the barges based on its limited partner interest in LJM2.

(n)      On or about June 29, 2000, William Fuhs e-mailed James Brown, informing him that $7.25 million had been received by Merrill Lynch.

(o)      On or about March 2, 2001, Robert Lyons e-mailed James Brown, regarding promises of repayment from Andrew Fastow.

(p)    On or about January 17, 2002, Kira Toone e-mailed Joseph Valenti, regarding the 15% return.

(q)    On or about January 18, 2002, Curt Cariddi e-mailed John Devine and John Fosina, cc'd to Gary Carlin and Joseph Valenti, regarding the role of Merrill Lynch's funding and the 15% interest.

1060.    In connection with the 1999 electricity trades transaction, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)    On or about December 28, 1999, Merrill Lynch Credit Services sent a letter agreement to Enron Power Marketing, Inc., signed by Cliff Baxter and Roger Baum.

(b)    On or about December 29, 1999, Christine Gonzalez, Ron Rosenberg, Jeff Kronthal, Keith Jacobson, Robert McCann, Luke Farber, Robert Seitz, Paul Morton, David Lund, Katie Curran, Kate Maloney, Kathleen Lynch, Donna Schloss, George Glaraga, and John McDermott, sent an e-mail to Dan Gordon discussing terms of the 1999 electricity trades transaction.

(c)    On or about December 30, 1999, Rob Furst had a phone conversation with Richard Causey regarding Enron's accounting for the transaction.

(d)    On or about May 30, 2000, Schuyler Tilney e-mailed Dan Gordon and Rob Furst, stating that Merrill Lynch knew that Enron used the power trades to meet 1999 earnings and discusses termination of the power trade contracts.

(e)    On or about May 30, 2000, Dan Gordon e-mailed Schuyler Tilney and Rob Furst, regarding Tilney's May 30, 2000, e-mail about the power trades.

(f)    On or about May 31, 2000, Dan Gordon e-mailed Rodney Malcolm regarding the termination of the Midwest Peaking Trade.

1061.  In connection with the LJM2 related party entity, Merrill Lynch knowingly gave substantial assistance to the Insiders.

(a)      On September 16, 1999, David Sullivan sent a letter agreement to Andrew Fastow under which Merrill Lynch would act as the exclusive financial advisor to LJM2.

(b)      On December 20, 1999, Joseph S. Valenti sent a subscription agreement package to an unknown party regarding investment in LJM2.

(c)      On December 20, 1999, Michael Kopper sent a letter agreement to Joseph Valenti regarding investment in LJM2.

(d)      On April 5, 2000, Joseph S. Valenti sent a subscription agreement package to an unknown party regarding Merrill Lynch/LJM2 Co-Investment, L.P. investment of $16,645,000 in LJM2.

1062.  As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

### COUNT 53
### Unlawful Civil Conspiracy
### (Enron Against All Bank Defendants)

1063.  Enron realleges and incorporates by reference the allegations in paragraphs 1 through 1062 in their entirety.

1064.  By virtue of the acts and omissions described in this Complaint, from 1997 through 2001 the Bank Defendants conspired with the Insiders to manipulate and misstate Enron's financial condition and to facilitate transactions between the Insiders and Enron in which the Insiders derived

improper personal benefits. The Bank Defendants and the Insiders agreed on the both the objects of the conspiracy and the courses of action to be taken in furtherance of it. The Bank Defendants knowingly participated in the unlawful objects – to manipulate and misstate Enron's financial statements and to facilitate self-dealing transactions between the Insiders and Enron – and knowingly participated in the courses of action taken in furtherance of it – the Insiders' numerous breaches of fiduciary duties to Enron, and the Insiders' fraud against Enron.

1065. By virtue of the acts and omissions described in this Complaint, numerous overt acts were taken by the Bank Defendants and the Insiders in furtherance of the conspiracy.

1066. As a direct and proximate result of the Bank Defendants' actions and omissions, Enron was injured and damaged in at least the following ways: (1) its debt was wrongfully expanded out of all proportion to its ability to repay and it became insolvent and thereafter deeply insolvent; (2) it was forced to file bankruptcy and incurred and continues to incur substantial legal and administrative costs, as well as the costs of governmental investigations; (3) its relationships with its customers, suppliers and employees were undermined; and (4) its assets were dissipated.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A. For an order avoiding and setting aside the transfers identified in Counts 1 through 49.

B. For an order directing each respective transferee of the transfers and set offs identified in Counts 1 through 49 to return to the bankruptcy estates the property transferred or pay the value of such property.

C. For an order directing Barclays and Colonnade to turn over to the bankruptcy estates the Collateral, or its value, as identified in Count 29.

D.      For an order avoiding and setting aside the security interest asserted by Colonnade in the Emission Credits, as identified in Count 37.

E.      For an order declaring that Barclays and Colonnade are in violation of the automatic stay, declaring that all actions taken by Barclays and Colonnade in violation of the automatic stay are null and void *ab initio*, and ordering that Barclays and Colonnade shall immediately take all action necessary to restore the parties to their respective positions as they existed on December 2, 2001, as identified in Count 30.

F.      For an order avoiding and declaring invalid all provisions in the Charge on Cash Agreement or other related documents related to the $SO_2$ Transaction and any and all non-mutual setoffs purportedly made by Barclays or any Barclays affiliate, as identified in Count 31.

G.      For an order directing Barclays and any Barclays affiliate to turn over to the bankruptcy estates of property set off, or its value, as identified in Counts 32 through 34.

H.      For an order setting aside the Valhalla Setoff and the Postpetition Transfers identified in Counts 39 and 40 as improper postpetition transfers.

I.      For an order disallowing any claim of each respective transferee of the transfers identified in Counts 1 through 49 unless and until such transferee has turned over to Plaintiff the property transferred, or paid Plaintiff the value of such property, for which it is liable under Bankruptcy Code § 550.

J.      For subordination of all claims or proofs of claim which have been filed or brought or which may hereafter be filed or brought by, on behalf of, or for the benefit of any of the Subordination Defendants or their affiliated entities, against the Plaintiff or other Debtors, in the related bankruptcy proceedings, as identified in Count 50.

K.      For an order avoiding and setting aside each Intentional Fraudulent Transfer and Intentional Fraudulent Conveyance as identified in Counts 46 and 47.

L.    For an order directing that each Defendant provide an accounting of all transfers of interests of the Plaintiff in property made in connection with or related to the transactions identified in Counts 46 and 47.

M.    For damages in an amount to be proved at trial.

N.    For prejudgment interest.

O.    For attorneys' fees and costs, and costs of suit.

P.    For such other and further relief as this Court deems just and proper.

September 24, 2003

ENRON CORP., *et al.*
Debtors-in-Possession,
By its Special Litigation Counsel,
SUSMAN GODFREY L.L.P.,
By:


_____/s/ H. Lee Godfrey_____
H. LEE GODFREY (*Pro Hac Vice* Pending)
KENNETH S. MARKS (KSM-7050)
MARY KATHRYN SAMMONS (*Pro Hac Vice* Pending)
ERIC J. MAYER (EJM-1744)
Members of the Firm
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366

- and -

ENRON CORP., *et al.*,
Debtors-in-Possession,
By its Bankruptcy Co-Counsel,
TOGUT, SEGAL & SEGAL LLP,
By:


                    /s/ Scott E. Ratner
_____
ALBERT TOGUT (AT-9759)
SCOTT E. RATNER (SER-0015)
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000